# EXHIBIT W

9

1    I'd say, "Hello. Good morning. How was the
2    night? What's up? Do you think the rain will hurt
3    the rhubarb," that sort of thing.
4    Q.    Would that sergeant stay late, have to stay?
5    The sergeant that was working the shift before you,
6    would that sergeant have to stay late to communicate
7    information to you?
8    A.    That would be conjecture on my part, I
9    believe. I al- -- I did -- he would have to collect
10   up various patrol reports or review and any
11   citations that might have been made.
12        I was -- again, eight o'clock, I had to be
13   upstairs with a clipboard doing the roll call. I'm
14   assuming. I know typically I would stay to
15   review -- report review was a first line
16   supervisor's responsibility. So I was frequently
17   there a bit after the hour just to collect up the
18   paperwork.
19   Q.    Do you know how much after the shift ended
20   you -- how long you would stay?
21   A.    Well, it wasn't an established, finite time.
22   Sometimes, if it happened right -- you could scurry
23   right along, and other -- you get a late traffic
24   accident or arrest late in the shift that might

10

1    involve -- but again, it becomes part of the routine
2    of the job. So it's another ten, ten, 15 minutes,
3    something like that just to close out, and we
4    occasionally check out radar, and, you know, you
5    would have to enter a log entry that you'd assigned
6    a particular officer a piece of equipment. Or at
7    the end of the day, you had to put a counter entry
8    that you had, in fact, collected all this equipment
9    back.
10   Q.    How many patrol officers reported to you
11   during a shift?
12   A.    Typically, a half dozen.
13   Q.    What were your job duties in terms of
14   supervising the patrol officers?
15        MR. CANZONERI: Objection.
16        THE WITNESS: Well, I spent in the -- I was
17   the desk sergeant at the station three quarters of
18   the time. Oh, I'd supervise the -- sort of the
19   beginning, the mustering in, and sending out and
20   issuing some equipment, and from time to time,
21   there'd be some -- there's some -- I'm tripping over
22   myself here.
23        There's an infinite number of variables in
24   the police. That's what makes it interesting, but

11

1    some dilemma would present itself. And I'd be the
2    decisionmaker, or somebody had to do something. And
3    they were delayed at an accident. Well, somebody
4    has to get to that traffic crossing. If it's a
5    school day or something, you'd to make a decision
6    that "A" is tied up, so "B" is going to have to
7    cover this, big strategy decisions, no policy
8    decisions or anything, no -- further up the food
9    chain than poor old Sergeant Douglas at the front
10   desk.
11   BY MS. MURPHY:
12   Q.    Were you involved at all in making
13   recommendations or suggestions for who would be
14   promoted to a sergeant?
15   A.    No.
16   Q.    Did you ever provide any input?
17   A.    No.
18   Q.    Was that because it was not invited or
19   because it wasn't part of your job?
20   A.    On both.
21   Q.    Okay.
22   A.    No, it's a civil service. There's a
23   promotion exam and these decisions.
24   Q.    So if you are dealing with an internal

12

1    promotion list, would you provide any input?
2    A.    Nothing. I suppose if someone had asked me
3    for a recommendation, I might have been willing to
4    provide one, but it just never -- that's all
5    speculative. It never happened.
6    Q.    In the hiring of patrol officers, do you
7    know if that is governed by civil service?
8    A.    Yes, ma'am, it is, to the best of my
9    knowledge.
10   Q.    Did you ever have an instance where you
11   wrote up a patrol officer for either a conduct or
12   performance issue?
13        MR. CANZONERI: Objection.
14        THE WITNESS: Yes, and that's both positive
15   and negative and more positives than negatives.
16   There were some issues of some complaints, and I
17   would -- and it's a bureaucracy, provide the forms,
18   hear them out. But the decisions were all made
19   above me on the food chain.
20   BY MS. MURPHY:
21   Q.    When you say "the decisions," is it accurate
22   to say that the facts were communicated by you, and
23   the decisions about what would be done --
24   A.    I'd say the "allegations" would be my word,

13

1    more than the facts.
2    Q.    So you would provide the allegations?
3    A.    We had a -- you know, we got kind of
4    specific here -- like, a citizen's complaint or
5    something on that order, there was a form. The
6    supervisor's first -- another senior moment. I
7    apologize. It was that you could provide to someone
8    who chose to issue a complaint, and I'd make note
9    that they were there and were provided with the
10   form. I passed that, a memo to that effect, to the
11   patrol division commander.
12   Q.    Did you have the authority to write up an
13   employee if there was a performance or conduct
14   problem?
15   A.    I had an ob- --
16        MR. CANZONERI: Objection.
17        THE WITNESS: I had an obligation to do
18   that.
19   BY MS. MURPHY:
20   Q.    What do you mean by "an obligation to do
21   that"?
22   A.    I was the sergeant.
23   Q.    So what does that mean?
24   A.    Well, I was the supervisor. I think if

14

1    something came to my attention that was something
2    really derelict or egregiously bad, I was duty bound
3    to advise the chief's office of such a matter.
4    Q.    Did you find that the chief paid attention
5    to what you told him?
6        MR. CANZONERI: I'm sorry. Can you repeat?
7    I didn't hear it.
8        MS. MURPHY: Sure.
9    BY MS. MURPHY:
10   Q.    Did you find that the chief paid attention
11   to what you told him?
12        MR. CANZONERI: Objection.
13        THE WITNESS: It's a real -- again, we'd be
14   assumptions and conjecture and speculation. They
15   answered the mail. That's about the best I can say
16   on that one.
17   BY MS. MURPHY:
18   Q.    So you don't know how much weight the chief
19   did or didn't give your --
20   A.    No, I wouldn't -- again, I wouldn't care to
21   speculate on that at all.
22   Q.    Were you part of the group that did
23   background investigations on patrol officers?
24   A.    No, ma'am.

15

1    Q.    Do you know who the group was during your
2    tenure who did background investigations on patrol
3    officer applicants?
4        MR. CANZONERI: Objection as to time frame.
5    BY MS. MURPHY:
6    Q.    I am referring to 2000 to 2003.
7    A.    Again, it would only be conjecture. I
8    believe it was handled by the detective bureau
9    but --
10   Q.    Okay.
11   A.    -- again, speculative at best.
12   Q.    Were any patrol officers in your division
13   ever promoted?
14   A.    Promotion is glacially slow at the police.
15   I had -- just way outside anything I had anything to
16   do with.
17   Q.    Were you a sergeant on one specific shift?
18   A.    Yes, ma'am.
19   Q.    Were you a sergeant for one specific
20   department, and when I say "department," I am
21   referring to patrol officers?
22        MR. CANZONERI: Objection.
23        THE WITNESS: I was assigned -- during this
24   time frame we're discussing, I was a day sergeant in

16

1    group 2. Again, it's a seven-day-a-week operation.
2    BY MS. MURPHY:
3    Q.    Okay.
4    A.    There were four days on, two days off.
5    There were three sergeants for the three different
6    groups. I was the group two sergeant. That just
7    allows -- two people are always on duty. One guy,
8    one sergeant -- I get gender neutral. One sergeant
9    was always on his days off. Then there'd be
10   occasions there'd be sick calls and training days
11   and vacations, and that's one of the real tedium
12   parts of this, is keeping the schedule. And that's
13   times the 65 employees.
14   Q.    Were you in the patrol division?
15   A.    Yes, ma'am.
16   Q.    How many patrol officers were regularly
17   scheduled for your shift?
18   A.    Again, it comes back to an earlier question.
19   There used to be six. Perhaps, eight people would
20   muster in on a day, and there would probably be
21   another three or four on a regularly-assigned day
22   off. So there probably was -- I don't know -- I
23   would guess ten or 12 of us. Forgive me. I'm some
24   years removed from all this now.

17

1    Q.    Now, and feel free -- if I have already
2    asked a question, you can tell me you have already
3    answered it, and I will move on.  Did you have any
4    decision-making authority during your shift?
5          MR. CANZONERI:  Objection.
6          THE WITNESS:  Outside the coffee order,
7    none.
8    BY MS. MURPHY:
9    Q.    So if you received a call, you didn't
10   decide --
11   A.    Oh.
12   Q.    -- who would respond or how --
13   A.    Oh, no.
14   Q.    -- someone would respond?
15   A.    No, these are all established.  It was
16   established by geography.
17   Q.    Okay.
18   A.    Specific to your question, though, if it
19   happened on Maple Street, Maple Street was a
20   specific address, and it was assigned to an officer
21   in a beat scheme, pretty standard throughout the
22   police community.
23   Q.    If you had a complaint, for instance, on
24   Maple Street, would you tell a patrol officer to go

18

1    to Maple Street?
2    A.    Yeah, but whomever was on a particular area.
3    I mean, if a case was -- got a little more involved,
4    you could -- I would make a decision to move people.
5    If it became some sort of lost child case or
6    something, you might have to move -- you might want
7    to move people in, and I might make decisions to
8    hold people over or call people in early or make it
9    after hours, weekend calls.
10         There was a scheme of detectives.  They had
11   a cycle of on call.  If we had a serious crime or
12   you needed photographic, fingerprint at the crime
13   scene type of stuff, I would decide.  Again, there
14   was guidance provided, of course, but we'd call a
15   detective in, the duty detective.
16   Q.    Did you have the authority to move people or
17   call them in during a shift?
18   A.    Oh, yes, ma'am.
19         MR. CANZONERI:  Objection.
20   BY MS. MURPHY:
21   Q.    Did you ever fill out time sheets?
22   A.    We didn't use that term.
23   Q.    Okay.
24   A.    We had a clipboard with everybody's name

19

1    typed in, and you checked off that they were present
2    at the roll call there.  So it served the function
3    as a time sheet.  In a way bygone time, there was a
4    very large book, but it would be decades outside the
5    time frame we're talking here --
6    Q.    Okay.
7    A.    -- where you checked everybody.  Your name
8    was preprinted in a huge ledger book.  Something
9    left over from the 18th century, I think.  (Witness
10   indicating.)
11   Q.    When would you put in for overtime?
12   A.    When overtime was performed.
13   Q.    What did you consider to be overtime?
14   A.    Well, in the obvious case, if you accepted
15   an overtime tour of duty, that's the obvious one.
16   Period-- something that held me substantially
17   beyond the tour of duty, or I'm thinking one episode
18   I was on a paid detail and it morphed into an arrest
19   situation that kept me there for some significant --
20   like, till four o'clock in the morning.  And I
21   applied for overtime for outside the appointed
22   detail hours.  I applied for overtime, and it was
23   recognized.
24   Q.    Were you ever denied overtime when you

20

1    applied for it, if you recall?
2    A.    I really don't recall.  I'm sure I'd
3    remember that.  So I'm comfortable with no as an
4    answer.
5    Q.    Were you a member of a union?
6    A.    Yes, ma'am.
7    Q.    What was that union?
8    A.    Oh, International Brotherhood of Police
9    Officers, Local 622.
10   Q.    So was it the superior officers?
11   A.    Yes.
12   Q.    Do you know if there was a collective
13   bargaining agreement between your union and the Town
14   of Natick?
15   A.    Yes, ma'am, there was.
16   Q.    Did it set forth the terms of your
17   employment?
18   A.    Excuse me?
19   Q.    Did it set forth the terms of your
20   employment?
21   A.    I'm not trying to be evasive, but --
22   Q.    That is okay.
23   A.    -- yes, yes, and no, it didn't.  It
24   addressed some things like the pay scale and some

# EXHIBIT X

5

1  is Kathy Murphy. I am with Murphy, Hesse, Toomey &
2  Lehane, and we represent the defendants in this
3  case, the Town of Natick, the Natick Police
4  Department, and Dennis R. Mannix in his capacity as
5  Chief of Police.
6  **A.    Okay.**
7  **Q.    Could I ask you to state your name and spell**
8  it for the record?
9  **A.    Yes, my first name is Nicholas,**
10  **N-i-c-h-o-l-a-s. My middle initial is "S." My last**
11  **name is Mabardy, spelled M-a-b-a-r-d-y.**
12  **Q.    I am going to hand you a document that has**
13  been previously marked as Exhibit 1 in this these
14  depositions and ask you if you are the same Nicholas
15  Mabardy who is listed in the second paragraph of the
16  plaintiffs's section of this complaint?
17  **A.    Yes, I am.**
18  **Q.    Thank you.**
19  Just one thing, Lieutenant Mabardy, I meant
20  to tell you at the beginning. If at any time during
21  this deposition you don't understand my questions,
22  if I haven't been clear, if you want to go back and
23  correct a question, or if you need a break, feel
24  free to stop me, and we can go back. We can clarify

6

1  your answers, we can take a break, whatever it is
2  you would like.
3  **A.    Thank you.**
4  **Q.    Thank you.**
5  Are you employed, Lieutenant Mabardy?
6  **A.    Yes, I am.**
7  **Q.    Where are you employed?**
8  **A.    The Town of Natick.**
9  **Q.    Do you work in any specific department?**
10  **A.    The police department.**
11  **Q.    How long have you been in the police**
12  department in Natick?
13  **A.    Over 38 years.**
14  **Q.    What is your position with the police**
15  department in Natick?
16  **A.    I am a lieutenant, police lieutenant.**
17  **Q.    Is that a rank, or is that a job position?**
18  **A.    That is a rank.**
19  **Q.    Do you have a position within that rank?**
20  **A.    Yes, I do.**
21  **Q.    What is the position?**
22  **A.    I am the investigative services commander.**
23  **Q.    How long have you been the investigative**
24  services commander?

7

1  **A.    Approximately four years.**
2  **Q.    What was your position prior to that?**
3  **A.    I was the community services officer.**
4  **Q.    What was your rank at that time?**
5  **A.    I was a lieutenant.**
6  **Q.    How long were you the community services**
7  officer?
8  **A.    Approximately six years.**
9  **Q.    And was your rank lieutenant the entire**
10  time?
11  **A.    Yes.**
12  **Q.    What about prior to being the community**
13  services officer?
14  **A.    I was a sergeant.**
15  **Q.    Did you have a -- what were your job duties**
16  as a sergeant?
17  **A.    I was a shift supervisor.**
18  **Q.    Do you recall which shift?**
19  **A.    The 4:00 p.m. to 12:00 a.m. shift.**
20  **Q.    Am I correct that they are broken down into**
21  shifts 1, 2, and 3?
22  **A.    That is correct.**
23  **Q.    Okay.**
24  **A.    This would be considered shift 3.**

8

1  **Q.    So how long were you a sergeant, a shift**
2  supervisor?
3  **A.    21 years.**
4  **Q.    So am I accurate in my math that since about**
5  1996 you have been a lieutenant, since about '75 to
6  '96, you were a sergeant?
7  **A.    That is correct.**
8  **Q.    Can you describe for me your job duties**
9  currently in investigative services?
10  **A.    I currently am in charge of investigation --**
11  **investigative services, where there are seven**
12  **detectives that work in that detective division or**
13  **investigative services division.**
14  **Q.    What are the rank of the detectives that**
15  work in your division?
16  **A.    They refer to them as "detectives," but**
17  **they're patrol officers by civil service standings.**
18  **Q.    I am going to hand you a document that has**
19  been marked as Exhibit 2, Agreement Between The Town
20  Of Natick And International Brotherhood Of Police
21  Officers, 311. Do you know if the detectives who
22  report to you would be part of this -- would be
23  covered by this agreement?
24  **A.    I don't believe they are.**

13

1  compensated.

2  BY MS. MURPHY:

3  **Q.**     Has anyone ever told you that you would get

4  extra compensation for working beyond four o'clock?

5     MR. CANZONERI:  Objection.

6     THE WITNESS:  No one has told me that I

7  would get compensation for working beyond that.

8  BY MS. MURPHY:

9  **Q.**     Do you have an expectation that you should

10  be or would be getting compensation for that work

11  beyond four o'clock?

12  **A.     Factually, I do work beyond that.  I don't**

13  **abuse the opportunity to be compensated when the**

14  **decision is mine.  If the staying and working**

15  **overtime is necessitated or required, then I get**

16  **compensated.**

17  **Q.**     Do you report directly to the chief?

18  **A.     Yes, I do.**

19  **Q.**     Is the chief the individual who would

20  inform you if he felt overtime was required or

21  needed?

22  **A.     The chief would approve.  He would be the**

23  **one to approve overtime.**

24  **Q.**     Do you have any instances where you feel the

14

1  chief has misled you regarding when you would or

2  wouldn't be compensated for time?

3  **A.     Absolutely not.**

4  **Q.**     In those instances where you have stayed

5  beyond your shift and that the extra time was not

6  required, did the chief ever give you the impression

7  that there would be extra compensation for that work

8  time?

9     MR. CANZONERI:  Objection.

10     THE WITNESS:  Has he ever asked me?

11  BY MS. MURPHY:

12  **Q.**     Has he ever given you the impression that

13  there would be extra compensation for the work

14  beyond four o'clock?

15     MR. CANZONERI:  Objection.

16     THE WITNESS:  I'm not sure I understand what

17  you mean.  Has he ever asked me if I --

18  BY MS. MURPHY:

19  **Q.**     I will rephrase it.  I'm sorry.

20  **A.     Okay.**

21  **Q.**     When you work beyond four o'clock, --

22  **A.     Yes.**

23  **Q.**     -- which it sounds like you do as a somewhat

24  regular practice, has the chief ever represented to

15

1  you in those instances that you would be paid

2  overtime or paid extra compensation for that work

3  beyond four o'clock?

4  **A.     He's never denied me overtime.**

5  **Q.**     What are your job duties as the lieutenant

6  in charge of investigative services?

7  **A.     I review the criminal cases that have been**

8  **filed by the patrol officers and determine if**

9  **further investigation is necessary.**

10  **Q.**     Do you manage the work of the seven

11  detectives that report to you?

12     MR. CANZONERI:  Objection.

13     THE WITNESS:  I'm not sure what you mean by

14  "manage."

15  BY MS. MURPHY:

16  **Q.**     Do you supervise the work of the seven

17  detectives that report to you?

18     MR. CANZONERI:  Objection.

19     THE WITNESS:  I assign them cases to

20  investigate.

21  BY MS. MURPHY:

22  **Q.**     Do you have any other authority over their

23  work?

24  **A.     I review their reports, their**

16

1  **investigations.**

2  **Q.**     Do you give them feedback?

3  **A.     I have.**

4  **Q.**     But it is not part of your job duties, or it

5  is?

6  **A.     The detectives are quite experienced in**

7  **their -- in their job.**

8  **Q.**     So then what do you do in your job?

9     MR. CANZONERI:  I'm sorry?  I didn't hear.

10  BY MS. MURPHY:

11  **Q.**     What do you do in your job?

12     MR. CANZONERI:  Thank you.

13     THE WITNESS:  Beside review cases and assign

14  cases to be investigated?

15  BY MS. MURPHY:

16  **Q.**     Yes.

17  **A.     Okay.  I also am the assistant to the**

18  **firearms licensing authority that the police**

19  **department has.  I assist with the processing taken**

20  **and storage of evidence.**

21  **Q.**     Who do you assist with that?

22  **A.     Detective Blanchard.  I am also the public**

23  **information officer in the absence of the department**

24  **assigned, public information officer.  I take drug**

17

1  evidence to the state lab for analysis.  I still do
2  a por- -- I should say a percentage of the community
3  services.  That's -- for right now, that's all I can
4  recall.  I'm sure I can remember more things, but
5  right now, that's all I can recall.
6  Q.      Is it accurate that your primary
7  responsibilities are overseeing the detective unit?
8          MR. CANZONERI:  Objection.
9  BY MS. MURPHY:
10 Q.      Did you understand the question?
11 A.      Yes, I did.  I also do investigations
12 myself, another part.  So I don't feel my primary
13 function or my time is not primarily spent
14 supervising the detectives.  They work independent,
15 their experience, their expertise.  They've been
16 detectives a lot longer than I've been in the
17 detective division or assigned to the detective
18 division.
19 Q.      So do they make independent judgments on
20 their own?
21         MR. CANZONERI:  Objection.
22         THE WITNESS:  They're knowledgeable of the
23 duties and responsibilities, what is required to
24 conduct investigations.

18

1  BY MS. MURPHY:
2  Q.      Do they make independent judgments about
3  investigations as they go through them?
4          MR. CANZONERI:  Objection.
5          THE WITNESS:  When you say "independent
6  judgments," in what area would you refer as
7  "independent"?
8  BY MS. MURPHY:
9  Q.      Sure.  I think what I am trying to do is get
10 into the substance of the work a little bit.
11 A.      Okay.
12 Q.      So I guess my question is this.  You
13 testified that you review the cases and assign the
14 cases; is that correct?
15 A.      That is correct.
16 Q.      Once you have assigned the cases and before
17 they come back to you for review again, which I am
18 assuming happens; is --
19 A.      Yes.
20 Q.      -- that correct?
21 A.      That's correct.
22 Q.      Once you assign the cases, who conducts that
23 investigation?
24 A.      The detective does.

19

1  Q.      Who makes the decisions along the way about
2  how they are going to conduct the investigation?
3  A.      The detective does.
4  Q.      Who makes the judgment calls along the way
5  about who will be spoken with, what kind of evidence
6  will be gathered, or whatever the investigation will
7  require?
8  A.      The detective does that.
9  Q.      Who has the discretion to make those
10 judgment calls about what is going to happen?
11 A.      Each individual --
12         MR. CANZONERI:  Objection.
13         THE WITNESS:  -- detective.
14         MR. CANZONERI:  Go on.  You can respond.
15         THE WITNESS:  Each individual detective.
16 BY MS. MURPHY:
17 Q.      Do the detectives come to you and report to
18 you step by step and you assign them tasks in the
19 course of each investigation, or do they operate
20 independently?
21 A.      I would say that they operate independently.
22 Q.      Are they experienced in their areas?
23 A.      Very experienced.
24 Q.      Are they astute in their areas?

20

1  A.      Well-trained, to the point where detectives
2  all have an expertise in certain areas.
3  Q.      Do all seven detectives take their
4  instructions from you?
5  A.      Cases are assigned by me, but they do take
6  on cases on -- independently as well.
7  Q.      Tell me how that happens.
8  A.      Detectives are, as myself, fairly well-known
9  in the community, and sometimes people go directly
10 to them, as they do with me.
11 Q.      Are they allowed to take on a case without
12 reporting it to you?
13 A.      They are allowed to do that.  They do notify
14 me out of courtesy.
15 Q.      Who makes the decision if something will be
16 investigated?
17 A.      The person that does report review and
18 myself.
19 Q.      Who does report review?
20 A.      There's another ranking officer that's a
21 lieutenant.
22 Q.      Who is that?
23 A.      That is Lieutenant Grassey.
24 Q.      When these lieutenants aren't reporting to

21

1  you, who do they report to? Let me just strike that
2  and ask that differently.
3       Who do they report to in the organizational
4  structure, the seven lieutenants that are in your
5  division?
6  A.   **Correction, seven detectives?**
7  Q.   Yes.
8  A.   **Okay. I think you said, "seven**
9  **lieutenants."**
10 Q.   Oh, I'm sorry. Let me fix the whole thing.
11 A.   **Okay.**
12 Q.   Who do the seven detectives that work in
13 your division report to?
14 A.   **They report to me.**
15 Q.   Who else do they report to?
16 A.   **The chief of police.**
17 Q.   Does the chief manage them day to day?
18 A.   **No.**
19      MR. CANZONERI: Objection.
20 BY MS. MURPHY:
21 Q.   Does the chief rely on you to manage them
22 day to day?
23      MR. CANZONERI: Objection.
24      THE WITNESS: Because of our paramilitary

22

1  organization, certain table of organization is set
2  up, and we break it down into ranking officers and
3  divisions and stuff. So I'm in charge of a
4  division.
5  BY MS. MURPHY:
6  Q.   And if I am correct, that division is the
7  detective division, right?
8  A.   **That is correct.**
9  Q.   And I think actually what you were
10 describing in terms of your organizational chart or
11 organization might be exactly what I am trying to
12 get at. Do these detectives report directly to the
13 chief, or does the chief rely upon you to manage and
14 oversee their work?
15      MR. CANZONERI: Objection.
16      THE WITNESS: In the table of organization,
17 the chief expects that I will conduct the operation,
18 oversee the operation.
19 BY MS. MURPHY:
20 Q.   And the "operation" being detective
21 services?
22 A.   **Investigative services.**
23 Q.   Investigative services, I'm sorry.
24 A.   **Yes.**

23

1  Q.   And hence, the title "investigative services
2  commander"?
3  A.   **That is correct. Yes.**
4  Q.   Could you describe for me, if you can, a
5  typical investigation?
6  A.   **There are so many different. You're**
7  **talking about numerous crimes. Depending on the**
8  **type of crime, are you -- I don't know. Are you**
9  **asking homicides? Are you asking bank robberies?**
10 **Are you asking Internet crime? Are you asking**
11 **burglaries? I don't -- I'm not sure. What -- how**
12 **can you just describe how an investigation is**
13 **conducted unless you specify what type of crime**
14 **you're investigating?**
15 Q.   So I guess there are just so many different
16 types of investigations it would be impossible to
17 describe what a typical investigation would look
18 like; is that correct?
19 A.   **That's probably why the detectives have the**
20 **expertise or the training in what they do, so that**
21 **they can investigate these various crimes. Some are**
22 **better at some or more experienced at some, and**
23 **that's why certain detectives get assigned a certain**
24 **type of crime to investigate.**

24

1  Q.   So do they have a big guide book that tells
2  them in each type of investigation exactly the steps
3  to follow, like, a recipe, or is it a lot of
4  thinking work, figuring out how to do it, and what
5  they are looking at?
6       MR. CANZONERI: Objection.
7       THE WITNESS: There are already many
8  established techniques through the Municipal Police
9  Institute. State Police mandate certain things in
10 homicides, mandate that you call the State Police.
11 A lot of traditional, long-standing, established
12 ways of investigating cases have been -- obviously,
13 there is new -- there's always new techniques. Just
14 an example, DNA, which I should also mention to you
15 that I am one of the few people in the department
16 that is qualified, certified to take people swabs,
17 which can be submitted for DNA testing.
18 BY MS. MURPHY:
19 Q.   You have a lot of job duties, by the way.
20 No wonder why you work late. But in all
21 seriousness, I guess what I am trying to figure out
22 is, whether or not there is a specific set of steps
23 that a lieutenant or that you -- I'm sorry. I keep
24 saying that wrong. That a detective follows or

25

1  whether each investigation can command, depending
2  upon the facts, can command different steps,
3  process, discretion, or judgments about what will be
4  done?
5       MR. CANZONERI:  Objection.
6  BY MS. MURPHY:
7  Q.      Do you need me to repeat the question?
8  A.      **No.  Because you mentioned "discretion,"**
9  **detectives use a fair amount of discretion, but it's**
10 **based on their training, experience, and their**
11 **knowledge of a subject matter of the type of crime.**
12 **Some -- there is a detective that is well-trained**
13 **and a great deal of experience in forensics, crime**
14 **scene; another one in Internet crimes; identity**
15 **theft; another one is juveniles; youth crimes.**
16 **Another one is in domestic violence.  I mean, you**
17 **just -- another one is with fraud, homicides,**
18 **burglaries.  All these people -- drugs, drug**
19 **investigators.**
20       I find myself when I do investigations on
21 the cases I investigate, I have to go to them and
22 ask them, different detectives, if they can assist
23 me because they have contacts.  They have prior
24 experience, and are trained in areas that I look for

26

1  assistance in.  I rely on the District Attorney's
2  Office for assistance, as do the detectives.
3  Q.      Are you the point person in the town for
4  investigations?
5       MR. CANZONERI:  Objection.
6       THE WITNESS:  Could you just --
7  BY MS. MURPHY:
8  Q.      Do you want me to ask that differently?
9  A.      **Well, could you explain what "point person"**
10 **means?**
11 Q.      Sure.
12 A.      **Put in your -- what your --**
13 Q.      Sure.  What I am thinking is this.  If it is
14 a District Attorney's Office, if it is another
15 police department, if it is State Police, if it is
16 law enforcement, are you the person that people
17 would go to in the Town of Natick regarding
18 investigative services?  In other words, is this
19 your area?  Is investigative --
20 A.      **No.**
21 Q.      -- services your area of command or your
22 area of charge?
23       MR. CANZONERI:  Objection.
24       THE WITNESS:  If I was egotistical, which

27

1  I'm not, but I know that the District Attorney's
2  Office, for example, they know what detectives are
3  working on what cases because they work directly
4  with the DA's Office.  So it's not necessary to go
5  through me.
6  Q.      Who else should -- I'm sorry.  Go ahead.
7  A.      **No, you go ahead.  Go ahead.  I'm sorry.**
8  **You were going to ask me --**
9  Q.      No.  Did I interrupt you?
10 A.      **No, you said something about homicide.**
11 Q.      Oh, no.  When you said that they work
12 directly with the DA's Office, it just made me
13 remember a question I wanted to ask you.  Do the
14 detectives do that, do they work directly with the
15 DA's Office or with outside parties on
16 investigations, or does everything go through you
17 first?
18 A.      **No.  No, it does not.  No.**
19 Q.      Does not go through you first?
20 A.      **Does not go through me first, no.**
21 Q.      So they do work directly with, like, the
22 DA's Office, for instance?
23 A.      **DA's Office, State Police, detective**
24 **division units from other cities and towns.**

28

1  Q.      And is it fair to say then that their
2  investigative report reaches you when it is
3  completed only?
4  A.      **That's correct.**
5  Q.      Do you remain aware of what cases each
6  individual is working on each day?
7       MR. CANZONERI:  Objection.
8       THE WITNESS:  I try to stay familiar, but
9  it's not possible with the number of cases to know
10 exactly every case that every detective is working
11 on and do my own, my own -- my own job, and respond
12 to the public.
13 BY MS. MURPHY:
14 Q.      Do you consider the investigative services
15 unit, however, to be your responsibility?
16       MR. CANZONERI:  Objection.
17 BY MS. MURPHY:
18 Q.      Do you want me to ask the question
19 differently?
20 A.      **No.  No.  No.**
21 Q.      Okay.
22 A.      **Thank you.**
23       **I am willing to take the responsibility for**
24 **it as part of my job or to be responsible for what**

29

1  goes on in there as part of the paramilitary
2  structure.
3  Q.        Do you consider the chief, Chief Mannix,
4  ultimately responsible for the Natick Police
5  Department?
6  A.        I beg your pardon?
7  Q.        Do you consider Chief Mannix to be
8  ultimately responsible for the Natick Police
9  Department?
10  A.        Oh, undoubtedly.
11  Q.        Okay.
12  A.        He is -- Chief Mannix is the -- without
13  question is the chief of the police.
14  Q.        Do you think Chief Mannix relies upon you
15  to oversee and supervisor or manage -- you can tell
16  me the right words -- the investigative services
17  unit?
18        MR. CANZONERI:  Objection.
19        THE WITNESS:  Does he expect me to do that?
20  BY MS. MURPHY:
21  Q.        Do you think he relies upon you to do that?
22        MR. CANZONERI:  Objection.
23        THE WITNESS:  He assigned me to the position
24  of investigative services commander.  So that was an

30

1  assignment.  So I'm assigned to command that
2  division.
3  BY MS. MURPHY:
4  Q.        What does the word "command" mean to you?
5  A.        Leadership, coordinate, coordination,
6  coordinate, collaborate.
7  Q.        How are persons assigned to your division?
8  A.        The chief of police has the right of
9  assignment.
10        MR. CANZONERI:  Off the record for one
11  second.
12        (Brief recess.)
13        MS. MURPHY:  Could you read my last
14  question, John?
15        THE REPORTER:  Sure.
16        MS. MURPHY:  I'm sorry.  I don't remember.
17        (Requested portion was read by the court
18  reporter.)
19  BY MS. MURPHY:
20  Q.        So if there is an opening, for instance, in
21  the division, does somebody just get assigned there,
22  you don't have a say in the process, or you don't
23  participate in the process?
24  A.        I'd like to make recommendations, but my

31

1  recommendations are not always -- I should say my
2  recommendations aren't the deciding factor.
3  Q.        Walk me through the job -- please strike
4  that, John.
5        Walk me through the steps if there is an
6  opening in your department how it becomes filled.
7  A.        Can I ask you are you referring to the
8  police department or the investigative services
9  division?
10  Q.        Thank you.
11        I am referring to the investigative services
12  division?
13  A.        The chief of police again makes the decision
14  on if there is an opening or not to fill.  If there
15  is an opening, to fill it or not fill it.  There was
16  a sergeant assigned to the detective division.  He
17  was promoted.  His position was not filled.
18  Q.        Do you know if there is an opening in the
19  investigative services division?
20  A.        I do not believe there is an opening.
21  Q.        Do you in general recognize when there is an
22  opening in the division?
23  A.        What I have to say is, when you refer to
24  openings, I don't believe we have a minimum staffing

32

1  level in the investigative services division.  So
2  when you say "opening," I don't know exactly what
3  you mean by "opening."
4  Q.        I am not explaining this right then.  I am
5  trying to find out, figure out the hiring process
6  and the steps that are taken.  So if there is a
7  determination that someone is going to be hired or
8  that there is an opening, I am trying to understand
9  what steps are there followed to fill that position
10  starting with the very, very, very beginning of job
11  posting or whatever it might be.
12  A.        I would think that the executive or chief's
13  executive officer on behalf of the chief would post
14  a job opening or the chief of police posts it
15  through his executive officer.
16  Q.        Are you referring to Lieutenant Fitzpatrick?
17  A.        I beg your pardon?
18  Q.        Are we referring to Lieutenant Fitzpatrick?
19  A.        Sergeant Fitzpatrick.
20  Q.        Sergeant Fitzpatrick.
21        Thank you.
22  A.        No, he is not the chief's executive officer.
23  Q.        Who is?
24  A.        Lieutenant Mason?

33

1   Q.     I'm sorry.  I interrupted you.  So
2  Lieutenant Mason or the chief post the position; is
3  that correct?
4   A.     **Lieutenant Mason does as part of his**
5  **function of the chief's executive officer.**
6   Q.     Are applications or résumés submitted?
7   A.     **To the chief of police.**
8   Q.     So applications and résumés are submitted to
9  Chief Mannix?
10   A.     **Chief Mannix.  That's correct.**
11   Q.     Do you know what Chief Mannix does with
12  those applications or résumés?
13          MR. CANZONERI:  Objection.
14          THE WITNESS:  I don't want to speculate.
15  BY MS. MURPHY:
16   Q.     Okay.
17   A.     **I can presume.**
18   Q.     Okay.
19   A.     **Because he is -- Chief Mannix is very fair,**
20  **takes into consideration a lot of things when he**
21  **makes -- through the decision making from my own**
22  **experience.  I see that.  So I don't want to**
23  **speculate what he does.**
24   Q.     Is it your testimony, though, that he

34

1  excludes you from the hiring process of detectives
2  in your division?
3   A.     **No.**
4   Q.     Okay.
5   A.     **No, that is not true.**
6   Q.     What is true?
7   A.     **He has a command staff, and he takes**
8  **recommendations.**
9   Q.     Are you part of that command staff?
10   A.     **Yes, I am.**
11   Q.     So speaking specifically about you, does
12  Chief Mannix include you or exclude you from the
13  hiring process for detectives in your division?
14   A.     **I'd like to feel he includes, includes me.**
15   Q.     How does he include you?
16   A.     **Because I'm part of the command staff.**
17   Q.     But tell me how that translates into
18  practical everyday activities or decision making.
19          MR. CANZONERI:  Objection.
20  BY MS. MURPHY:
21   Q.     Do you understand the question?
22   A.     **I believe he takes -- he hears the**
23  **recommendations that are made, but he makes the**
24  **ultimate decision.**

35

1   Q.     How do you become involved in this process
2  at all if the applications and résumés go directly
3  to the chief?
4   A.     **The chief informs the command staff that he**
5  **has -- I would think he -- it hasn't happened that**
6  **often.  So I honestly -- I honestly can't say that**
7  **how does he inform us that he has résumés or**
8  **requests or job applications?  I don't know.  He**
9  **doesn't -- he doesn't come to the command staff**
10  **meetings and present us with an application or a**
11  **résumé.**
12   Q.     So is it your testimony that the patrol
13  services division commander and the information
14  services communications division commander provide
15  input into detectives that are selected?
16          MR. CANZONERI:  Objection.
17          THE WITNESS:  They are part of the command
18  staff.  They are seated in the same room with the
19  chief of police, as I am, as other members of the
20  command staff.  So there's discussion, there's
21  dialogue.
22  BY MS. MURPHY:
23   Q.     What role do you play in the selection of a
24  detective in your division?  And I am sorry to be

36

1  redundant.  I am trying to understand --
2   A.     **No.  No, that's perfectly all right.**
3   Q.     I am just trying to understand --
4   A.     **And I am just --**
5   Q.     -- what your role is in this whole process.
6  Do you have any input at all?  If you do the degree
7  to which you have input, anything you can tell me
8  about it?
9   A.     **The problem with that question to me is, how**
10  **do I view myself in the process?  Do I view myself**
11  **as having a large impact, a little impact?  How much**
12  **does the chief value my recommendation?**
13   Q.     Do you make a recommendation?
14   A.     **Yes, I do.**
15   Q.     Do you review the applications?
16   A.     **Yes, I do.**
17   Q.     Do you --
18   A.     **Not on detectives.**
19   Q.     Okay.
20   A.     **But you say, review applications?**
21   Q.     Yes.
22   A.     **For hirees we are allowed to view the**
23  **applications and interview hirees, new applicants**
24  **for the police job.  Detective division is not a --**

37

1      MR. CANZONERI: Is what?

2      THE WITNESS: The detective division,

3  there's not a big turnover of people in detective.

4  Five out of the seven detectives were there prior to

5  me being assigned to the detective division.

6  BY MS. MURPHY:

7  Q.      If there is an opening in the detective

8  division, is it your understanding that you have

9  input into who is selected for that position?

10      MR. CANZONERI: Objection.

11      THE WITNESS: I'd like to think -- I'd like

12  to think so, yes.

13  BY MS. MURPHY:

14  Q.      Do you interview candidates?

15      MR. CANZONERI: Objection.

16      THE WITNESS: I'm present.

17  BY MS. MURPHY:

18  Q.      You are present for the interviews?

19  A.      **For the interviews.**

20  Q.      Who else is present for the interviews?

21  A.      **Members of the command staff.**

22  Q.      Do you make a recommendation to the chief

23  regarding who should be selected?

24  A.      **Yes, I do.**

38

1  Q.      Do you have the authority to participate in

2  disciplining a person in your division?

3  A.      **No, I do not.**

4  Q.      Do you make recommendations about

5  disciplinary action involving persons in your

6  division?

7      MR. CANZONERI: Objection.

8      THE WITNESS: If you could just rephrase

9  that, --

10  BY MS. MURPHY:

11  Q.      Sure.

12  A.      **-- please?**

13  Q.      Do you have anything disciplinary -- let me

14  strike that.

15      Can you recommend disciplinary action

16  against individuals in your division?

17      MR. CANZONERI: Objection.

18      THE WITNESS: I can submit -- if I find a

19  violation of a policy, procedures, rules, or

20  regulations or however you want, I could submit

21  something in writing to the chief of police.

22  BY MS. MURPHY:

23  Q.      Have you ever done that?

24  A.      **No, I have not, not -- I should clarify**

39

1  that.  **I have not done an internal investigation on**

2  **anybody in the detective division or taken any**

3  **citizen complaints on anyone in the detective**

4  **division.**

5  Q.      If there is a conduct or performance problem

6  with someone within the detective division, do you

7  have the authority to make a recommendation

8  regarding action being taken against that

9  individual?

10      MR. CANZONERI: Objection.

11      THE WITNESS: I would say I can submit the

12  facts to the chief of police.

13  BY MS. MURPHY:

14  Q.      Do you review the work of the individuals in

15  your department -- your division? I'm sorry.

16  A.      **Do I review their reports?**

17  Q.      Yes.

18  A.      **Yes.**

19  Q.      Do you receive a fixed amount of

20  compensation every week no matter how many hours you

21  work?

22  A.      **I get a salary.**

23  Q.      What is your base salary?

24  A.      **I should have brought my pay stub.**

40

1  Q.      That is okay.  Just an estimate, or if you

2  don't know, you don't know.

3  A.      **I should have --**

4      MR. CANZONERI: I will object.

5      THE WITNESS: -- brought my pay stub.  I

6  should have brought my pay stub, and I apologize.  I

7  don't know.

8  BY MS. MURPHY:

9  Q.      Do you work details?

10  A.      **Yes, I do.**

11  Q.      Does the chief require you to work details?

12  A.      **No, he does not.**

13  Q.      Have you ever had an instance where the

14  chief has forced you to work a detail?

15  A.      **Absolutely not.**

16  Q.      Has the chief ever forced you to work

17  overtime?

18  A.      **Absolutely not.**

19  Q.      Has the chief ever taken job action against

20  you for not working a detail?

21  A.      **Never.**

22  Q.      Have you ever felt threatened in your job if

23  you didn't work a detail?

24  A.      **Not at all.**