# EXHIBIT Y

### Page 5

| Time | # | Speaker | Text |
|---|---|---|---|
| 00:00:10 | 1 | | Department, and Dennis Mannix in his capacity as |
| 00:00:13 | 2 | | Chief of Police -- |
| 00:00:14 | 3 | A. | Uh-huh. (Indicates affirmatively). |
| 00:00:14 | 4 | Q. | -- in this litigation in which you are a |
| 00:00:17 | 5 | | plaintiff. |
| 00:00:17 | 6 | A. | Yes. |
| 00:00:18 | 7 | Q. | Could you state your name for the record, |
| 00:00:19 | 8 | | please? |
| 00:00:19 | 9 | A. | Brian C. Grassey. |
| 00:00:21 | 10 | Q. | Could you spell Grassey? |
| 00:00:23 | 11 | A. | G-r-a-s-s-e-y. |
| 00:00:26 | 12 | Q. | Where do you live, Mr. Grassey? |
| 00:00:28 | 13 | A. | I live at 28 Miller Street in Franklin, |
| 00:00:32 | 14 | | Massachusetts. |
| 00:00:32 | 15 | Q. | Are you currently employed? |
| 00:00:34 | 16 | A. | I am currently employed. |
| 00:00:37 | 17 | Q. | Who is your employer? |
| 00:00:38 | 18 | A. | The Town of Natick. I am employed with the |
| 00:00:41 | 19 | | police department in the Town of Natick. |
| 00:00:43 | 20 | Q. | What is your position or rank? |
| 00:00:45 | 21 | A. | I am presently a lieutenant. |
| 00:00:47 | 22 | Q. | How long have you been a lieutenant? |
| 00:00:49 | 23 | A. | I was promoted to lieutenant in December of |
| 00:00:51 | 24 | | 2005. |

### Page 6

| Time | # | Speaker | Text |
|---|---|---|---|
| 00:00:53 | 1 | Q. | Congratulations. |
| 00:00:55 | 2 | A. | Thank you. |
| 00:00:56 | 3 | Q. | What was your position before you were |
| 00:00:58 | 4 | | promoted to lieutenant? |
| 00:00:59 | 5 | A. | Prior to lieutenant, I held the rank of |
| 00:01:03 | 6 | | sergeant. I was promoted to sergeant in June of |
| 00:01:07 | 7 | | 1999. I was assigned for that entire period to the |
| 00:01:13 | 8 | | 4:00 to 12:00 shift as a patrol supervisor. |
| 00:01:23 | 9 | Q. | What was your position prior to being a |
| 00:01:25 | 10 | | sergeant? |
| 00:01:25 | 11 | A. | I was assigned to the detective division, |
| 00:01:32 | 12 | | maintained the rank of patrol officer. I was in |
| 00:01:36 | 13 | | that position for a period of approximately five |
| 00:01:39 | 14 | | years. |
| 00:01:39 | 15 | Q. | So going back to 1994ish? |
| 00:01:42 | 16 | A. | Thereabouts, yes. |
| 00:01:45 | 17 | Q. | What about prior to 1994, what did you do? |
| 00:01:48 | 18 | A. | From 1994 back to August of 1989, I was a |
| 00:01:58 | 19 | | patrol officer. |
| 00:02:02 | 20 | Q. | Prior to August of '89? |
| 00:02:04 | 21 | A. | From August of '89 and back to November of |
| 00:02:11 | 22 | | 1986, my classification was reserve police officer. |
| 00:02:19 | 23 | Q. | What is a "reserve police officer"? |
| 00:02:24 | 24 | A. | A reserve police officer is a police officer |

### Page 7

| Time | # | Speaker | Text |
|---|---|---|---|
| 00:02:28 | 1 | | with a minimal amount of training that the town used |
| 00:02:33 | 2 | | to supplant openings to fill in the shifts, usually |
| 00:02:38 | 3 | | to cover sick time or vacation time. It was seen, I |
| 00:02:42 | 4 | | think, by the town as a means to supplement their |
| 00:02:46 | 5 | | work force at a lower rate of pay. |
| 00:02:49 | 6 | | When I was hired, I made like $75 a shift |
| 00:02:53 | 7 | | and was hired on that contingency. You did not go |
| 00:02:58 | 8 | | through the full academy. You received a smaller |
| 00:03:01 | 9 | | version of the academy where you were tested on the |
| 00:03:05 | 10 | | general laws, things such as that. |
| 00:03:06 | 11 | Q. | Have you since gone through the full academy |
| 00:03:09 | 12 | | training? |
| 00:03:09 | 13 | A. | Yes, I did in 1989. |
| 00:03:12 | 14 | Q. | And this whole period of employment has been |
| 00:03:16 | 15 | | with the Town of Natick and the Natick Police |
| 00:03:20 | 16 | | Department? |
| 00:03:20 | 17 | A. | Yes, it has. |
| 00:03:21 | 18 | Q. | Do you have a particular role as lieutenant |
| 00:03:26 | 19 | | in the Natick Police Department currently? |
| 00:03:28 | 20 | A. | Yes, I am in charge of what they term |
| 00:03:34 | 21 | | "communications." I am in charge of report review. |
| 00:03:40 | 22 | | I also oversee some of the records functions, and I |
| 00:03:47 | 23 | | also work as a liaison with the dispatch staff in |
| 00:03:53 | 24 | | case any kind of difficulty that needs the chief's |

### Page 8

| Time | # | Speaker | Text |
|---|---|---|---|
| 00:03:57 | 1 | | attention. |
| 00:03:57 | 2 | Q. | Let's take each of those in turn, please. |
| 00:04:00 | 3 | | Can you tell me more specifically what your |
| 00:04:02 | 4 | | communications responsibilities include, -- |
| | 5 | A. | Okay. |
| 00:04:05 | 6 | Q. | -- and what do you do day to day? |
| 00:04:08 | 7 | A. | Okay. The communications -- the term |
| 00:04:11 | 8 | | "communications" is something that the chief has |
| 00:04:14 | 9 | | assigned to my position. My position, which I've |
| 00:04:18 | 10 | | held for what, 19 months or so, is absent a full job |
| 00:04:22 | 11 | | description. There's nothing written down. My |
| 00:04:24 | 12 | | primary function is that of report review. The |
| 00:04:32 | 13 | | officers when they're in the field -- |
| 00:04:34 | 14 | Q. | Patrol officers? |
| 00:04:36 | 15 | A. | Patrol officers, when they are in the field |
| | 16 | | are assigned the calls, and frequently, they're |
| 00:04:40 | 17 | | assigned to conduct some level of investigation, |
| 00:04:42 | 18 | | which needs to be documented. |
| 00:04:44 | 19 | | The officers generally come in off the |
| 00:04:47 | 20 | | street. They have an electronic version of the |
| 00:04:50 | 21 | | report that they work with. They fill out that |
| 00:04:53 | 22 | | report. They fill in the involved parties, the |
| 00:04:57 | 23 | | dates of birth, biographical information, things |
| 00:05:01 | 24 | | such as that, and then they typically dictate the |

**9**

1  reports into a transcription machine.
2         That report is first sent to their sergeant,
3  who's working their shift. The sergeant is supposed
4  to review the primary information. Are the parties
5  there? Is there a crime? Does it involve a crime,
6  or does it involve an event that's not necessarily a
7  criminal event but needs to be documented for
8  insurance or something like that, and that sergeant
9  would in turn send it to me in my function of report
10 review.
11 Q.    How is it sent?
12 A.    It's electronic. They're electronic files
13 that are numbered sequentially based upon the type
14 of event that has occurred. There's offense
15 reports, both criminal and noncriminal. There's
16 accident reports, which shouldn't come to me. They
17 should go to traffic division, but sometimes they
18 end up there. And there's also reports in which the
19 desire would be to forward criminal charges, known
20 as an "AR report," an arrest report.
21        I receive the electronic file. At the same
22 time, there's two ladies that are in charge of
23 transcription within the records division. They
24 work -- it's similar to, like, an in basket-type

**10**

1  process.
2         They come in in the morning. They turn on
3  their computers, and they find out that 30, 40
4  reports have been dictated. Their job is to
5  transcribe the report. They put it into a word
6  processing document, and they paste it into the
7  appropriate electronic file. And then that file is
8  when I look at it, and I review the content of that
9  report.
10 Q.    What do you do with the report after you
11 review it?
12 A.    It depends upon -- it depends upon the
13 report. My primary function, again, as report
14 review is to ensure that the officers can touch all
15 the bases. If it's a criminal event, all criminal
16 charges, have to meet certain elements, elements of
17 crimes, and the elements are dictated by the
18 legislature, --
19 Q.    Right.
20 A.    -- as well as the courts. The clerk of
21 courts, they wouldn't accept a report from me or
22 from the police department if it was missing
23 elements.
24        Sometimes when people dictate, they may do

**11**

1  it from the top of their head, as opposed to by
2  notes. They may miss an element, or they may not be
3  articulate in a certain perspective of the report.
4  If it doesn't meet the threshold set by the clerk of
5  courts or the courts or the DA's Office, it's
6  typically sent back to the officer for further work.
7  If it's a report that may need follow-up
8  investigation, say, it's a larceny by credit card or
9  something like that where there was activity and we
10 know that a store has videotape, it may be sent to
11 detectives, for assignment to a detective to conduct
12 a latent investigation to fortify the prosecution.
13 Q.    Do you send a report back that needs either
14 follow-up or further work to the patrol officer who
15 generated it or to the sergeant that was in the
16 intermediary?
17 A.    It goes back to the officer. They're
18 specific, you know, by employee number. So
19 typically, especially with shift work, you want to
20 get it back to the person that has the greatest
21 basis of knowledge for the report.
22 Q.    If you forward something to a detective, do
23 you forward it to Lieutenant Mabardy, or do you
24 forward it to a specific detective for further

**12**

1  work?
2  A.    I typically send them to Lieutenant Mabardy.
3  It goes into his inbox. They're separate inboxes
4  for traffic and report review, detectives to
5  support. They've also created one for internal
6  affairs.
7  Q.    And then is it your understanding that
8  Lieutenant Mabardy will then forward that report to
9  one of his detectives for further follow-up?
10        MR. CANZONERI: Objection.
11 BY MS. NORTH:
12 Q.    You can answer.
13 A.    It's my understanding that if he looks at
14 it and if he agrees, that the report either is not
15 sufficient to forward for prosecution, or that
16 there is something that should be followed up to
17 bolster, that he would then assign it to a
18 detective.
19 Q.    If you had sent a report back to a patrol
20 officer for further follow-up, do they send it back
21 to you directly once they have done what you
22 directed them to do?
23 A.    No, it should go back to the sergeant that
24 they're working for. It kind of shows activity,

13

00:09:55 1  and then the sergeant is, again, supposed to go
00:09:58 2  through their process of looking at it. And then
00:10:01 3  it gets sent to me. If the sergeant -- obviously,
00:10:04 4  if the sergeant sees something that's less than
00:10:08 5  acceptable, they should direct it back to the
00:10:11 6  officer as well.
00:10:11 7  Q.     What do you do as your records function?
00:10:18 8  A.     My office sits within the records division.
00:10:22 9  My exact function within the records room, it's
00:10:26 10 pretty much it runs by itself. Again, my office is
00:10:30 11 downstairs in records.
00:10:32 12       The previous person who was in charge of
00:10:34 13 records or held the seat that I hold worked on the
00:10:37 14 second floor, was not within the confines of the
00:10:40 15 office. The previous person that did report review,
00:10:42 16 who is my brother Alfred, was actually on the second
00:10:47 17 floor. He wasn't in the records room, either.
00:10:49 18       I suppose it is my ultimate responsibility
00:10:52 19 that it's secure, but pretty much I see -- I see the
00:10:57 20 ladies come in, do their transcription. The court
00:11:01 21 prosecutor also works in that office. We prepare
00:11:04 22 cases to be brought by the prosecutor to the court.
00:11:09 23 We also maintain the files that insurance companies
00:11:13 24 would require for motor vehicle accidents or any

14

00:11:17 1  complaints of vandalism or damage to property,
00:11:20 2  things such as that. We're kind of the point of
00:11:23 3  contact for the public or for lawyers if they're
00:11:25 4  seeking information that the police department
00:11:28 5  holds.
00:11:28 6  Q.     Do you direct the transcription people?
00:11:32 7  A.     I wouldn't say, "direct." Again, they were
00:11:37 8  there before I arrived, and --
00:11:40 9  Q.     Is it your role as --
00:11:42 10      MR. CANZONERI: Objection.
00:11:43 11 BY MS. NORTH:
00:11:43 12 Q.     -- records supervisor to direct them?
00:11:46 13      MR. CANZONERI: Objection.
00:11:46 14      THE WITNESS: Again, I don't -- I don't feel
00:11:48 15 as though I direct them. It's more of an inbox
00:11:52 16 thing. They know what their job is to do. They put
00:11:55 17 on a set of headphones. They transcribe, and again,
00:12:01 18 they have their inbox. And they're going to
00:12:02 19 transcribe until that inbox is empty, and that gets
00:12:02 20 forwarded to me.
00:12:02 21      I have never had an occasion where I had to
00:12:06 22 say, "Hey, you know, go transcribe something."
00:12:09 23 BY MS. NORTH:
00:12:09 24 Q.     Okay.

15

00:12:09 1  A.     They pretty much -- they're working on their
00:12:13 2  own. Again, the guy that was in charge of it before
00:12:13 3  wasn't even in the same room.
00:12:13 4  Q.     What about your role as liaison with the
00:12:17 5  dispatch staff?
00:12:18 6  A.     Right. The chief felt that records was a
00:12:26 7  part of the communications process of the police
00:12:29 8  department. Our dispatchers are typically the first
00:12:32 9  interaction people have with the police department.
00:12:36 10 They, again, generally run themselves. There are
00:12:40 11 nine full-time dispatchers.
00:12:42 12      By contract, if someone wanted a day off,
00:12:45 13 they're the first one to take a day off, that person
00:12:48 14 would get it, and they kind of back fill that slot
00:12:52 15 themselves. If two people want the same day off,
00:12:57 16 the second person has to find someone to replace
00:13:00 17 them.
00:13:00 18 Q.     Do they involve you in that process at all?
00:13:03 19 A.     The only involvement I have with that
00:13:03 20 process is I will eventually get the slips to
00:13:04 21 document their absence, and I ensure that it's been
00:13:08 22 marked appropriately in the database to show
00:13:11 23 attendance.
00:13:13 24 Q.     What else do you do for the liaison dispatch

16

00:13:18 1  staff?
00:13:18 2  A.     If they had some form of complaint, I would
00:13:21 3  be the one that they would probably seek to get
00:13:26 4  audience for the chief of police.
00:13:31 5  Q.     Are there any other duties as your role of
00:13:35 6  lieutenant in charge of communications that we
00:13:38 7  haven't talked about?
00:13:39 8  A.     I also take care of the log, the log which
00:13:46 9  would be viewed by the public. The --
00:13:47 10 Q.     What do you mean by "take care of the log"?
00:13:49 11 A.     Because of -- well, you go back to colonial.
00:13:53 12 I won't give you the whole lesson, but back to
00:13:53 13 colonial times and the transparency of police
00:13:57 14 departments, harken back to the days when you used
00:13:57 15 to just go through the door and place someone under
00:14:01 16 arrest and you wouldn't know why, we are required by
00:14:02 17 statute to maintain a log of our activity, which
00:14:05 18 keeps the organization transparent to society at
00:14:09 19 large.
00:14:10 20      The dispatchers keep a running toll, which
00:14:14 21 is numbered of the events that they receive and
00:14:17 22 authors and types of calls that officers are
00:14:19 23 dispatched to.
00:14:21 24      In my role, again, governed by the public

### 17

1  records laws, I go through that log. I check many
2  times for grammatical errors, spelling errors. I
3  also make sure that if someone's placed under
4  protective custody there is a box to hit in that
5  report to ensure that that name doesn't appear in a
6  log, as department policy is we don't release names
7  of people who are placed in protective custody.
8  Department policy is we don't release the names of
9  juvenile offenders after they've been arrested.
10  Also, because of our style of reporting, if someone
11  does what's called an "arrest report" but has
12  actually asked for a summons, you don't hit the
13  correct box, that name will appear in a log, and it
14  will appear as though they've been arrested. I make
15  sure that that's not been in there. It's typically
16  that.
17        It's also -- I'll also add that medical
18  calls. Imagine the horror if your parents lived at
19  10 Main Street, and they called because of some kind
20  of a medical problem, their neighbors reading that,
21  "64-year-old male called because of Crohn's
22  disease," or something like that, releasing
23  information that's typically or technically HIPPA
24  information, we wouldn't want to release information

### 18

1  to the public that would be embarrassing to other
2  people.
3  Q.    And in your review process, what happens
4  after you review it and you find errors, mistakes,
5  names that have to be redacted, do you make the
6  changes, or do you direct someone else to make the
7  changes?
8  A.    I make the change. Once I've completed the
9  process, I notify the executive officer, Lieutenant
10  Mason, and Lieutenant Mason then post --
11  Q.    Let me just interrupt --
12  A.    Sure.
13  Q.    -- you for a minute, if you don't mind.
14  When you say "completed the process," is that on a
15  daily basis, a shift basis, or as in a time period?
16  A.    We're required by statute to have the public
17  log available during regular business hours Monday
18  through Friday, and in the best of worlds, yes, I
19  would take care of that daily. Of course, when you
20  come in on Monday, you have eight shifts of arrests
21  and reports that need to be taken care of, so it may
22  be -- there may be a day or two delay in the log.
23  We try to keep as current as possible, and because,
24  again, because of statutory. So if someone came in

### 19

1  and asked us about activity, we would -- we'd have
2  to stop and try to give them information if it
3  wasn't readily available.
4        Again, I would take what I would consider a
5  finished product and let Lieutenant Mason know that
6  I had finished it. He would then in turn post it
7  on the web for public viewing, and I print a copy
8  of it and place it in a logbook available in the
9  lobby.
10  Q.    How many dispatchers are there?
11  A.    There's nine full-time dispatchers. There's
12  three assigned to each shift, and we run anywhere
13  between three or four part-time dispatchers.
14  Q.    Is there a minimum number per shift?
15  A.    There's always two on, one on the police and
16  one on the fire.
17  Q.    What is your work schedule?
18  A.    I'm assigned Monday through Friday. Are you
19  asking my personal work schedule? I generally get
20  to work around 7:15.
21  Q.    What is your shift?
22  A.    The day shift, the administrative day shift,
23  8:00 to 4:00.
24  Q.    Does that coordinate with patrol shift 2?

### 20

1  A.    Yes, except for the added bonus of no
2  holidays.
3  Q.    Who supervises your work?
4  A.    It's been made clear and is also present --
5  I think you have a copy of the chain of command --
6  that Lieutenant Mason oversees the divisions. I
7  will typically go through Lieutenant Mason if I had
8  an issue that I thought should be brought forward.
9  Q.    What kind of issue could you bring forward?
10  A.    If I had a dispatcher that was late on
11  several occasions. Lieutenant Mason is also in
12  charge of the professional standards section. If I
13  received some kind of complaint about the conduct
14  of anybody within the confines of the four walls of
15  the police department, I would bring it to his
16  attention as required by the professional standards
17  policy.
18  Q.    Does that include officers as well as civil
19  staff or just civil staff?
20  A.    Right, the professional standards policy
21  would cover civilian sworn staff. The requirement
22  of that is if you receive a complaint about anybody
23  that works for the police department in any regard
24  that that should be brought to the attention of the

Page 21

1  professional standards section.
2  Q.  Anything else you bring forward to
3  Lieutenant Mason?
4  A.  Other than the interaction with the log, you
5  know, issues that I have been directed to let him
6  know about, nothing comes to mind presently.
7  Q.  What sort of issues has he directed you to
8  let him know about?
9  A.  What I've already articulated. That's done
10 by policy.
11 Q.  A written policy?
12 A.  The professional standards policy is
13 written. It's rather lengthy, you know?
14 Q.  Where is the professional standards policy
15 kept?
16 A.  It's in the department manual.
17 Q.  Do you go to roll call?
18 A.  I do, not every day, but there are occasions
19 where I either do to catch up with what's going on
20 or if I have something that needs the attention of
21 someone working that shift. Sometimes in the
22 capacity of records, paperwork might get thrown into
23 an envelope which needs to go back out, summons,
24 restraining orders, things that -- things such as

Page 22

1  that. Those are typically the things I go through
2  before roll call, some of the things I typically go
3  through before roll call. Anything that I think
4  would be of importance to an officer safety issue or
5  something like that, I would -- I would go to roll
6  call and make that known. I'm not required to stand
7  roll call.
8  Q.  What is your typical workday like? When do
9  you get in, when do you leave?
10 A.  I typically get there by 7:15.
11 Q.  And your shift starts at 8:00?
12 A.  My shift starts at eight o'clock.
13 Q.  What do you do between 7:15 and eight
14 o'clock?
15 A.  I typically start with voice mails. I'm
16 told sometimes by voice mail that, you know, members
17 have been assigned inappropriately or that I should
18 pay special attention to a particular event.
19     I try to find out if anyone's presently
20 incarcerated. If someone's being held, they will
21 have to be brought to the court. That typically
22 moves their issue up in the shoe, and we have kind
23 of a tip-off to the transcription staff that, you
24 know, "This guy's been arrested for operating under

Page 23

1  the influence. He's going to be arraigned in an
2  hour. We need to get on this first."
3      I go through the envelopes as they came in.
4  Each shift is required to put all the paperwork into
5  an envelope, again, to recover restraining orders,
6  which need to go to court, summonses, subpoenas.
7  You'd have to take out the ones that are going to
8  the court, have to be given to the prosecutor and
9  return the ones that should be going back out in the
10 field.
11     I try to go over the -- at least view the
12 log of the previous 16 hours to see if there's any
13 issues of an emergent nature. There's probably
14 several more things I do within that 45-minute
15 period that don't come to mind presently.
16 Q.  Why do you do these between 7:15 and eight
17 o'clock, and why not do them when your shift starts?
18 A.  Because, generally speaking, the busiest
19 time of the day is in the morning. That's when you
20 have the crush of the paper, that's when people have
21 their fresh start of the day, and there's more
22 questions, there's more activity. I need to be able
23 to send or make sure that the court liaison officer,
24 the court prosecutor's going out with everything

Page 24

1  that he needs.
2      There's a department liability issue to
3  ensure that we don't keep someone in lockup longer
4  than they should be, to get them down to the court.
5  It's just it's much easier if I get a jump on it.
6      I'm also required to review the activity in
7  the log prior to the shift to ensure that I am aware
8  of what's going on within the department.
9  Q.  Who sets forth that requirement, or where is
10 that requirement set forth?
11 A.  You're testing my memory, but I believe it's
12 a policy set by Lieutenant Mason or perhaps, by the
13 chief, that the supervisors be aware of what's
14 transpired in their absence to better forewarn the
15 people that are working the street.
16 Q.  Do you consider yourself a supervisor?
17     MR. CANZONERI: Objection.
18     THE WITNESS: I maintain the rank of
19 lieutenant. With that, comes a certain amount of
20 authority, certainly have more leeway with patrol
21 officers. My direct interaction is limited. It
22 depends upon what your definition of "supervisor"
23 is. I don't --
24 BY MS. NORTH:

**25**

1  Q.    Your direct interaction with whom is
2  limited?
3  A.    With faces, with people. I usually get
4  electronic messages from a patrol officer, or I send
5  an electronic message. My face-to-face interaction
6  with subordinate officers is usually when they're at
7  the window picking up their court case. They may
8  ask questions about, you know, when their next court
9  date might be or something like that.
10        But at times, given my activity as a
11 detective and a supervisor before, I get several
12 questions about, you know, "How would I go about
13 asking questions of somebody, or, "What would I do
14 next?" But I'd say probably less than ten percent
15 of my day is with face-to-face interaction with
16 people of a lesser rank.
17 Q.    When does your day end?
18 A.    My day typically ends quarter of 5:00, 4:30,
19 quarter of 5:00.
20 Q.    When does your shift end?
21 A.    By the clock, four o'clock.
22 Q.    What are you doing after shift?
23 A.    Well, again, it's the end of the day. I try
24 to -- I try to set up what I may need for the next

**26**

1  day. I try to ensure that the files that are due
2  for the next day are in place. I may review the
3  day's log to see if I missed anything. There's the
4  paperwork that's gone out on the first shift of the
5  day, it's coming back. The sergeant usually
6  delivers that within a -- you know, within a short
7  period after four o'clock. That helps me get into
8  the next day. I'm pretty much trying to collate
9  things and set an importance for what needs to be
10 done with the next day that I appear, and again,
11 report review is an ongoing event.
12 Q.    Do you set your own priorities for what you
13 do during your day, during your shift period or the
14 time before and after?
15 A.    Do I set my own priorities? I'm --
16 Q.    Do you take direction from Lieutenant Mason
17 for every step of the day, or do you decide what you
18 need to work on when?
19 A.    No, it's pretty simple for me to organize
20 what needs to be done, usually based upon the
21 seriousness of the event. It's not at the direction
22 of Lieutenant Mason.
23        I know that if there's been a violation of a
24 restraining order, then I'm required by law to get

**27**

1  that reporting down to the court. We're either
2  going to go place a person under arrest, or we're
3  going to submit something to the court to get a
4  warrant for their arrest. So we're bound by law.
5         If there's been three housebreaks in the
6  same neighborhood, I might try to make sure that
7  that report gets done earlier than some, because the
8  detective division might be working on those
9  housebreaks, and having the totality of the
10 information available to them is to their benefit if
11 they get it earlier.
12 Q.    So use your own judgment in deciding which
13 reports to work on when?
14 A.    I don't think --
15      MR. CANZONERI: Objection.
16      THE WITNESS: It's judgment based upon the
17 practice of the police department of what's
18 important to the organization, what limits liability
19 to the organization. I can't just -- I don't just
20 pick and choose what I'm going to work on. It's
21 usually based upon previous experience and based
22 upon the needs of the organization and ultimately,
23 to our commitment to the community. Are we taking
24 care of them? Is the customer satisfied at the end

**28**

1  of my day?
2  BY MS. NORTH:
3  Q.    Is the communications division an
4  independent department or division?
5      MR. CANZONERI: Objection.
6      THE WITNESS: What's the definition of
7  "independent"?
8  BY MS. NORTH:
9  Q.    Is it sort of a separate entity within the
10 police department?
11     MR. CANZONERI: Objection.
12     THE WITNESS: It may be separate by -- you
13 know, by its function, but it's all -- I mean, I
14 don't have a separate budget to work from. I'm not
15 involved in the selection of the personnel who work
16 in that section.
17 BY MS. NORTH:
18 Q.    It is a separate entity within the chain of
19 command?
20     MR. CANZONERI: Objection.
21     THE WITNESS: You'd have to look at the
22 chain of command. They're separated, I think,
23 because it's different from placing people under
24 arrest. It's different from booking traffic

29

00:30:28  1   accidents. It lends to -- it lends to, you know,
00:30:31  2   the handling of information.
00:30:37  3           MR. CANZONERI: Just a quick break?
00:30:39  4           MS. NORTH: Sure.
00:31:03  5           (Discussion off the record.)
00:31:13  6   BY MS. NORTH:
00:31:14  7   Q.      Do you direct any employees of the police
00:31:16  8   department in your work?
00:31:18  9           MR. CANZONERI: Objection.
00:31:22 10           THE WITNESS: What's the -- what would be
00:31:24 11   your definition of directing? I mean, we
00:31:27 12   obviously -- certain jobs need to be done. There's
00:31:32 13   certain requirements of the job.
00:31:34 14           Again, I'll go back to a violation of a
00:31:38 15   restraining order. If someone takes a report of a
00:31:42 16   violation of a restraining order and they seem to be
         17   standing around, and I say -- and then they go,
00:31:44 18   "Well, what do I do next?"
00:31:46 19           I say, "Look, either go lock him up, or you
00:31:50 20   get a warrant." If that's your form of directing
00:31:51 21   them, yeah, yes, I do do that from time to time.
00:31:53 22   Again, my direct face-to-face interaction is very
00:31:57 23   limited.
00:32:00 24           The ladies that work in the office do their

30

00:32:03  1   job.
00:32:04  2           I haven't had an occasion where I had to
00:32:07  3   tell them, "Continue doing your job," or, "Do your
00:32:09  4   job faster."
00:32:11  5           And the court officer typically picks up his
00:32:15  6   bag and is out the door by nine o'clock, and I --
         7   there are some days or weeks I don't see him for a
00:32:19  8   couple of days at a time.
00:32:19  9   BY MS. NORTH:
00:32:19 10   Q.      What about the patrol officers that you
00:32:22 11   interact with over reports, --
00:32:24 12   A.      Right.
00:32:24 13   Q.      -- do you direct them to make changes in
00:32:27 14   their reports?
00:32:28 15           MR. CANZONERI: Objection.
00:32:28 16           THE WITNESS: A lot of times their questions
00:32:31 17   are more along of lines of making the computer work
00:32:36 18   the way it's supposed to work. With this new
00:32:40 19   computer system, if you don't fill out certain areas
00:32:43 20   or certain blocks, it comes back with an error. If
00:32:45 21   you don't quantify or qualify your evidence
         22   correctly, it comes back with an error. They're
00:32:49 23   asking me how to fix that to make that error
00:32:51 24   disappear, because they're not supposed to send it

31

00:32:55  1   forward until that error is fixed. I do that
00:32:59  2   frequently.
00:32:59  3   BY MS. NORTH:
00:33:00  4   Q.      What do you mean by "frequently"?
00:33:01  5   A.      **When my interaction with them, that can**
00:33:05  6   **happen, you know, a few times a day. We do have a**
00:33:08  7   **lot of people that are not that computer savvy.**
00:33:11  8   **They may ask me a question. Less and less since**
00:33:16  9   **they've gone through a new administrator of that**
00:33:19 10   **system, but since I do possess the knowledge from**
00:33:20 11   **having worked with the computer on almost every**
00:33:24 12   **aspect of my job, they ask me on a personal level**
00:33:28 13   **because I'll answer their question without**
00:33:31 14   **belittling them. And they can get it done. You**
00:33:34 15   **know, again, it's their express route not to expose**
00:33:36 16   **themselves to others to embarrass themselves.**
00:33:38 17   **They'll come to me more because they have a rapport**
00:33:42 18   **with me and ask me how to do it. So I'll tell them**
00:33:44 19   **how to get it done, not so much direction as an**
00:33:48 20   **assistance.**
00:33:48 21   Q.      What about with respect to the content of
00:33:51 22   their reports?
00:33:52 23   A.      **That, again, is based upon department**
00:33:57 24   **specifications or expectations. Officers have been**

32

00:34:03  1   told by the department that they're to do a
00:34:05  2   complete, accurate report. They're supposed to
00:34:08  3   answer all the questions, the who, what, why, when,
00:34:12  4   where, and how.
00:34:13  5           Beyond that, you run, again, into elemental
00:34:16  6   problems that you can run into with reports. If
00:34:19  7   someone has committed an assault and battery, that's
00:34:24  8   a misdemeanor, not commanding your presence, not an
00:34:28  9   arrestable offense, but if it's in the domestic
00:34:29 10   umbrella, we now have a right of arrest.
00:34:32 11           So if I'm reading a report between two
00:34:33 12   brothers, that one brother struck another brother
00:34:37 13   with a closed fist on the side of the face, if I'm
00:34:41 14   reading the elements of the crime and they don't
00:34:43 15   list that the combatants are brothers, you lose the
00:34:48 16   element of the domestic assault and battery.
         17           So I would tell the officer, "Listen, you
00:34:51 18   need to articulate that these people are under the
00:34:54 19   domestic umbrella." Again, it's for the protection
00:34:59 20   of the department liabilitywise. It's also for the
00:35:02 21   protection of the customer. The end product is the
00:35:04 22   report. That's what the police department does. We
00:35:06 23   don't just jump fences. We don't just arrest
00:35:09 24   people. We document occurrences, and --

**Page 33**

1  Q.    But you do direct them to make changes in
2  the content if they don't have the who, what, where,
3  when, why, or the elements correctly; --
4  A.    Yeah, based --
5  Q.    -- is that correct?
6        MR. CANZONERI:  Objection.
7        THE WITNESS:  Again, based upon the
8  standards that have been established by the police
9  department, by your basic training in the police
10 academy, by the legislature, and the courts.  You
11 know, there's a certain -- certain things that must
12 be met before it becomes a finished product and it
13 leaves the police station.
14 BY MS. NORTH:
15 Q.    And are you the last person to have say or
16 approval that it is a finished report before it
17 leaves the police station?
18 A.    On some, on most I would say, exclude -- and
19 obviously, things that go to the detective division
20 I might never see again, but I'm the last word
21 within the building.  But it's not to say that the
22 clerk of courts couldn't refuse a complaint or that
23 the District Attorney's Office wouldn't refer it
24 back for further investigation.

**Page 34**

1  Q.    But in the context of the Natick Police
2  Department, you have --
3  A.    I'm supposed to be the end of the funnel on
4  a report.
5  Q.    You are the end of the line?
6  A.    I'm supposed to be, but there have been
7  occasions where it hasn't worked out quite that
8  way.
9  Q.    Do you participate in any way in the
10 discipline of employees of the Natick Police
11 Department?
12 A.    What would you consider "discipline"?
13 Q.    If someone is failing to do their job
14 correctly and there is some process that goes on at
15 the police department.  Is there a process that goes
16 on at the Natick Police Department?
17       MR. CANZONERI:  Objection.
18       THE WITNESS:  The process in and of itself
19 for anyone to get into that position is through the
20 professional standards.  As a person who works in
21 the police department and if you make notice that
22 someone's made a mistake or if you receive a
23 complaint, you're required by this policy to do
24 what's called a first -- a Supervisor's First Report

**Page 35**

1  of Complaint.  In that, you would put in the nature
2  of the complaint, the employees involved, the dates,
3  the times, and just a short paragraph of what's
4  transpired.
5        I will use an example.  An officer was rude.
6  So, "Okay.  Thank you, Mr. Smith.  The officer was
7  rude.  What happened," brief complaint, the officer
8  swore at him, and you write that down on paper.  And
9  you provide the complainant with -- it's like a
10 five-part copy, where they can write out their
11 complaint, and they're invited to sit down and write
12 it or return it.
13       That Supervisor's First Report of Complaint
14 is then supposed to be logged administratively that
15 you received a complaint, and then that envelope
16 goes up again to Lieutenant Mason.
17 BY MS. NORTH:
18 Q.    What happens after it goes to Lieutenant
19 Mason?
20 A.    Lieutenant Mason will either investigate it
21 himself, or there are times, depending upon the
22 nature of the complaint, it may go back to another
23 lieutenant to investigate or --
24 Q.    Does it ever go back to you?

**Page 36**

1        MR. CANZONERI:  Objection.
2        THE WITNESS:  I have investigated as a
3  lieutenant one complaint.  Actually, there's a
4  couple.  I'm sorry.  I don't mean to misspeak, but
5  they weren't big moments in my life.
6        I can give you an example of one.  On
7  occasion, I will get assigned to conduct an
8  investigation.  So what I would do is I would
9  conduct the investigation, interview people.  I
10 would put that all into a report, and again, that
11 report is required to be sent to Lieutenant Mason
12 for his review.
13       And then he -- I assume, he and the chief
14 then collaborate as to what the appropriate response
15 would be.
16 BY MS. NORTH:
17 Q.    Do you know what they would do, or you have
18 not been involved in any final decision making or
19 actual discipline?  Have you been involved in any --
20 strike that.
21 A.    Okay.
22 Q.    After your report goes to Lieutenant
23 Mason, --
24 A.    Uh-huh.  (Indicates affirmatively).

### Page 37

```
00:39:22   1   Q.      -- do you know what happens next?
00:39:24   2   A.      I could only use an example of the few
00:39:28   3   internal investigations that I have been directed to
00:39:32   4   conduct.
           5           Most recently, this past June, I was to
00:39:33   6   conduct one on a dispatcher. This was the first
00:39:36   7   occasion out of the few occasions that I've had
00:39:40   8   where I was directed by Lieutenant Mason to
00:39:44   9   formulate a recommendation. After I completed my
          10   investigation, it was the first time my -- my
00:39:48  11   opinion was never sought prior to this of what I
00:39:52  12   thought was the appropriate response to this
00:39:55  13   person's behavior.
00:39:59  14           My recommendations, based upon my
00:40:06  15   investigation and based upon previous interaction
00:40:07  16   with this employee, that the conduct was so aberrant
00:40:08  17   that this employee should be discharged. That
00:40:12  18   recommendation went to Lieutenant Mason.
00:40:15  19           I was invited with the lieutenant to go to
00:40:18  20   the chief's office, and the chief looked at it.
00:40:23  21           And the chief says, "Well, we're not -- I'm
00:40:28  22   not going to make this decision. I want you to take
00:40:31  23   this," meaning my report, "and bring it to the human
00:40:35  24   resources director across the street."
```

### Page 38

```
00:40:36   1   So I hand carried that document to the human
00:40:39   2   resources person and left it there with my
00:40:43   3   understanding that support -- supporting documents,
00:40:47   4   previous incidents of aberrant behavior, were going
00:40:53   5   to be supplied to this person.
00:40:54   6           There was some deliberation over a period of
00:40:57   7   time, and I learned later on through the chief that
00:41:01   8   this employee was not going to be discharged but
00:41:05   9   that they were going to be given a last-and-final
00:41:10  10   warning to not continue this particular aberrant
00:41:13  11   behavior.
00:41:14  12           To which my response was, and I might have
00:41:16  13   done this in writing, but you're, again, testing my
00:41:19  14   memory. It's not fresh in my mind, that I felt at
00:41:24  15   the very least because this behavior involved a
00:41:25  16   particular dispatcher and a particular supervisor,
00:41:30  17   that had removed this dispatcher's group, it would
00:41:32  18   lessen interaction between her and this particular
00:41:34  19   supervisor. The two nights that they worked
00:41:36  20   together, the supervisor actually would be outside,
00:41:37  21   and that wasn't done, either.
00:41:39  22           So, again, this is the first event where my
00:41:44  23   recommendations were sought, and it doesn't seem as
00:41:53  24   though they were given very much weight.
```

### Page 39

```
00:41:57   1   Q.      Okay.
00:41:57   2   A.      So I would say that the more direct answer
           3   is, no, I can't discipline. I can't suspend. The
00:42:00   4   chief has even said on occasion that, "I need to
00:42:02   5   speak to the selectmen," or something like that, to
00:42:04   6   convey to the lieutenants the authority to suspend
00:42:07   7   people.
00:42:07   8   Q.      Does the chief ask your opinion if he is
00:42:12   9   considering suspending anybody or disciplining
00:42:13  10   anybody as a lieutenant and as a member of his
00:42:16  11   command staff?
00:42:17  12   A.      I think that this particular event where
00:42:19  13   they asked for my recommendation was either
00:42:21  14   Lieutenant Mason's or the chief's manner of asking
00:42:25  15   me what my opinion is. I complied to the
00:42:28  16   directive, and again, I don't see that it was of
00:42:34  17   much value.
00:42:38  18   Q.      Do you participate in selecting candidates
00:42:41  19   for open positions either as a patrol officer or as
00:42:46  20   a sergeant?
00:42:49  21   A.      In a very limited fashion. When we have
00:42:53  22   openings, typically through, you know, retirements,
00:42:58  23   things such as that. I usually learn either through
00:43:01  24   a staff meeting or some level of meeting afterwards
```

### Page 40

```
00:43:05   1   that we're going to fill a position. I have been
00:43:11   2   asked to attend during the interviewing of some
00:43:15   3   officers candidates.
00:43:17   4           On the two occasions, I think, that I was
00:43:23   5   present, there may be three, I was provided with
00:43:27   6   questions to ask the candidate, and I offered that
00:43:30   7   as a question. It was, you know, the chief was
00:43:33   8   present. The executive officer present. The other
00:43:35   9   lieutenants were there. There's been more meetings
00:43:38  10   with -- and interviews with candidates that I've
00:43:40  11   not been involved in than actually been involved in.
00:43:45  12   I --
00:43:45  13   Q.      At the end of the meeting, was your opinion
00:43:48  14   about the candidate sought?
00:43:52  15   A.      Yeah, I can give you two instances. On an
00:43:56  16   officer's candidate, the background investigation
00:43:56  17   showed that he was -- let me see, challenged
00:44:03  18   economically. This person has himself into a
00:44:07  19   situation in which he has a mortgage of over
          20   $600,000, who's presently employed with a job that
00:44:08  21   pays $14 an hour. I saw this as nocuous, and that
00:44:16  22   if you go with some of the things that you read,
00:44:18  23   that this is not a situation in which you want to
00:44:22  24   put a person in a position of power over
```

**Page 41**

1  individuals, having access to different things.
2  It's a red flag in a police community to have
3  someone under that much stress at home and have that
4  much authority at work. I expressed my concern.
5      The conclusion of that meeting was from the
6  chief, "Yes, I understand that, but I'm going to
7  hire him anyway."
8      Fine. We had a short conversation about the
9  ascension of one young man from patrol officer to
10 sergeant. When I was asked not so much my opinion
11 but my assessment of his capabilities, I reported
12 that he hadn't done anything for several years.
13 He's not very good with a computer. He abused sick
14 time. I didn't consider him a leader. I didn't
15 consider him to have the capacity to work
16 independently.
17     The chief told me, "I understand that. I
18 promised him I was going to make him a sergeant."
19 And, again, the opinion did not have any weight.
20 Again, I don't think it was so much an opinion as he
21 was seeking some kind of information. Usually when
22 someone seeks your opinion, it's because they want
23 your opinion because that could factor into the
24 decision making. I don't feel as though the

**Page 42**

1  information I conveyed had any effect on the chief's
2  decision-making process.
3  Q.    Are you a member of the command staff?
4  A.    Yes.
5  Q.    And what is your role as a member of the
6  command staff?
7  A.    As I told you, I'm the lieutenant in charge
8  of communications. When he calls a command staff
9  meeting, generally on Mondays, my worst day of the
10 week, we go up, and there may be a short
11 conversation about what's ongoing.
12     A typical command staff meeting, I don't
13 want to -- and I know it's going to get back to the
14 chief. I don't want to sound inappropriate, but
15 typically, command staff meetings only have two
16 voices in them, the chief's and Lieutenant Mason's.
17 I may be asked how things are going.
18     But, you know, it's more or less I think
19 he's trying to ask, "Do you have an opinion?" And
20 typically, things run pretty smoothly.
21 Q.    Do you perform regular patrol work at all
22 anymore?
23 A.    By "regular patrol work," you mean
24 answering alarms and barking dog calls, things like

**Page 43**

1  that?
2  Q.    Out in a cruiser, out on the street.
3  A.    I am allowed -- I am allowed to work extra
4  shifts as patrol supervisor. It doesn't happen
5  frequently enough, because I do enjoy it. But, yes,
6  I am still capable of going out and putting hands on
7  people.
8  Q.    How much time do you think you spend doing
9  that?
10 A.    Again, it's infrequent. I don't -- I don't
11 think I get eight or ten extra shifts in that
12 capacity a year.
13 Q.    Do you --
14 A.    I don't lack the capacity to do so. I can
15 do that.
16 Q.    Do you receive a fixed salary every week?
17 A.    I could show you my pay stub.
18 Q.    Okay.
19 A.    I receive -- based upon this pay stub, I
20 receive what they term a "base salary."
21 Q.    What is that "base salary"?
22 A.    Let me get the right one. I don't want to
23 give you bad information.
24     Here we go. All right. What the town has

**Page 44**

1  termed "base" is $1,162. I also receive $69.72 for
2  supervisory pay. This is -- that's for work
3  performed before and after the shift, which I
4  believe is six percent of that alleged base salary.
5  I receive $290.50 under the Quinn Bill, under the
6  education incentive for my master's degree, and
7  because of my length of time served with the police
8  department, I receive a longevity payment of $34.86.
9  If I was to work overtime, there'd be another line
10 showing that I worked overtime. It may show a
11 difference between working a day shift overtime and
12 a night shift overtime. It would also show if I
13 worked a detail, details either for a private
14 contractor or for the Town of Natick. It doesn't
15 differentiate on the -- on the slip whether it was
16 a Town of Natick detail or a private contractor.
17 Just it's a separate line item within the payroll
18 itself.
19 Q.    Are you paid differently for private versus
20 town details?
21 A.    I am not presently paid differently, no.
22 Q.    So it is the same, and you are paid hourly
23 for details?
24 A.    We're paid hourly and in four-hour blocks.

# EXHIBIT Z

9

1  A.     The remaining nine sergeants are assigned to
2  patrol.
3  Q.     Who else on this list of plaintiffs in the
4  superior officer section is assigned to
5  administration?
6  A.     Sergeants?
7  Q.     Yes.
8  A.     Yeah, Sergeant Brian G. Lauzon, and while he
9  was employed, he has since retired, Robert L. Davis,
10 Jr.
11 Q.     I'm sorry. What was the first name?
12 A.     Robert L. Davis, Jr.
13 Q.     What was the name before that?
14 A.     Brian Lauzon.
15 Q.     Okay.
16 A.     Each was the traffic safety officer, which
17 is an administrative position. Sergeant Davis
18 retired. Sergeant Lauzon took his place.
19 Q.     Do you share your position any longer?
20 A.     No, not since February of 2000.
21 Q.     Could you describe for me your job duties?
22 A.     As best I can, detail and overtime
23 administration, payroll, budgeting, grant writing,
24 attendance, and other special duties as assigned by

10

1  the chief.
2  Q.     So detail and overtime administration.
3  Payroll?
4  A.     Payroll, yes.
5  Q.     Grant writing?
6  A.     Attendance.
7  Q.     Attendance. Special assignments?
8  A.     From the chief, yes.
9  Q.     Do you report directly to the chief?
10 A.     Yes.
11 Q.     So in terms of detail and overtime
12 administration, what are your job responsibilities
13 there?
14 A.     I compile the list of availability of
15 officers and assign the jobs for details. For
16 overtime, I compile and pay for the officers for all
17 the slips they submit.
18 Q.     Do you confirm that the overtime being
19 reported is correct, or do you --
20 A.     The officer and a supervisor has to sign the
21 slip. They turn in the slip to me, and I process
22 the slip for payroll.
23 Q.     Why does a supervisor have to sign the slip,
24 too, if you are a sergeant?

11

1  A.     It's processing. I wasn't necessarily
2  present when they perform the job or the work. In
3  some cases, a patrol officer -- the court officer
4  will be able to sign an overtime slip, also, because
5  he was at the court when the officer was there. But
6  I am not -- I generally do not sign slips.
7  Q.     So somebody who had oversight over the
8  overtime has --
9  A.     Yes.
10 Q.     -- to sign it?
11 A.     Yes.
12 Q.     Somebody in a supervisory capacity?
13 A.     Right. If a patrol officer --
14        MR. CANZONERI: Objection.
15 BY MS. MURPHY:
16 Q.     Is it somebody --
17        MR. CANZONERI: You can answer the question.
18 I just --
19        THE WITNESS: If a patrol officer worked an
20 overtime shift, most likely the supervisor
21 overseeing that shift would sign the overtime slip.
22 BY MS. MURPHY:
23 Q.     Before you put in for overtime or submit
24 slips for overtime, do you have to give them to the

12

1  chief for approval?
2  A.     No.
3  Q.     So do you have ultimate responsibility for
4  the detail and overtime administration?
5  A.     I have responsibility to process and to make
6  sure they're accurate. The signing supervisor is
7  responsible to make sure that the work was actually
8  performed.
9  Q.     So you are ultimately responsible for the
10 oversight of the administrative part of that
11 process, or --
12        MR. CANZONERI: Objection.
13        THE WITNESS: I'm responsible for the
14 compilation and payment.
15 BY MS. MURPHY:
16 Q.     And before you submit that for payment, does
17 anyone have to look at your work?
18 A.     No.
19 Q.     Is there anything else you can tell me about
20 your job duties in terms of detail and overtime
21 administration?
22 A.     I believe I just did, no.
23 Q.     Yes. I am saying is there anything else?
24 A.     Oh, no. I'm sorry.

                                                                13
1  Q.      What about in terms of payroll
2  administration, what are your job duties there?
3  A.      Compile the detail and overtime slips for
4  the extra work and general payroll duties, including
5  steps, benefits -- not -- benefits is inaccurate,
6  that the right stipends are assigned at the right
7  levels, and then submission to town hall on a weekly
8  basis.
9  Q.      Do you give that information to the chief
10 before it goes to town hall?
11 A.      The chief is responsible for signing the
12 payroll.
13 Q.      Do you give him the payroll to sign, or does
14 that come from the town offices?
15 A.      I complete the payroll, and then the chief's
16 signature is affixed.  And it's returned to town
17 hall for processing.
18 Q.      What are your job duties in terms of grant
19 writing?
20 A.      Generally, most grants the chief will have
21 an idea of where he wants to spend the money, and
22 I'm responsible to write something up for him to
23 review and change as necessary.
24 Q.      How much of your time is spent grant

                                                                14
1  writing?
2  A.      It's seasonal, generally, at the beginning
3  of fiscal year.  It's not the main function.  It's
4  not my main function.  It's just one.
5  Q.      What is your main function?
6  A.      The general administrative -- making sure
7  the administrative portion of the officers's
8  employment runs smoothly.
9  Q.      Do you have a job description?
10 A.      I don't have -- there might be a job
11 description in the department manual.  I don't know
12 how applicable it is to what I do.  As I said, it
13 was -- it used to be split between two people, and
14 now, it's just myself.  So I'm sure it's -- but I'm
15 not aware of any written job description.
16 Q.      What about in terms of attendance, what are
17 your responsibilities there?
18 A.      To record and review the attendance of all
19 members of the department.
20 Q.      And what does that mean?
21 A.      Officers submit day-off slips, time-off
22 slips that I review to make -- well, don't review.
23 I compile and make sure they have the appropriate
24 time available.  I don't approve the time off.

                                                                15
1  That's done by a lieutenant, but I make sure that
2  they actually have time available, you know, and
3  record it as such.
4  Q.      Does anybody assist you in any of these job
5  duties?
6  A.      No.
7  Q.      What type of other special assignments do
8  you perform for the chief?
9  A.      It's all as things occur.  For instance, the
10 town report, he might need some direction or have
11 ideas that he wants compiled to kind of produce his
12 own town report, but he wants, like, a framework to
13 get an idea of where to start or where to go, what
14 direction, something like that.
15 Q.      So is your position administrative officer
16 for the Town of Natick Police Department, or do you
17 work within the -- in a department within the
18 department?
19 A.      I'm -- within the police department, I am
20 the administrative officer.
21 Q.      Okay.
22 A.      Reporting directly to the chief.
23 Q.      And I think I already asked you this, but I
24 can't remember.  Do you have anyone reporting to

                                                                16
1  you?
2  A.      No.
3  Q.      Do you perform any patrol work?
4  A.      No.
5  Q.      If you are not going to be at work, who do
6  you call?
7  A.      I would assume it would be the chief.  I
8  haven't called out sick since 1997.
9          THE REPORTER:  I'm sorry?
10         THE WITNESS:  Oh, I haven't called out sick
11 since 1997.
12 BY MS. MURPHY:
13 Q.      Congratulations.
14 A.      Well, I love my job.
15 Q.      That is amazing.  So is it fair to say your
16 job duties are pretty different from the other
17 sergeants and lieutenants?
18 A.      Yes.
19 Q.      Would you tell me what the documents look
20 like that you gather and collect in the -- I am
21 going to ask you about the detail, the overtime, and
22 the payroll area.  So why don't we start with the
23 detail areas, or the detail area and just walk me
24 through the whole process?

# EXHIBIT AA

```
                                         5
 1   A.    24 Cypress Ave, Shrewsbury, Massachusetts.
 2   Q.    Are you currently employed?
 3   A.    I am.
 4   Q.    Where are you employed?
 5   A.    Town of Natick.
 6   Q.    Who employs you in the Town of Natick?
 7   A.    The department of police.
 8   Q.    What is your rank or position?
 9   A.    Sergeant.
10   Q.    How long have you been a sergeant with the
11   Natick Police Department?
12   A.    Since January of 2000.
13             MR. CANZONERI:  Off the record for just one
14   second.
15             (Discussion off the record.)
16   BY MS. NORTH:
17   Q.    What was your position before becoming a
18   sergeant?
19   A.    Patrol officer.
20   Q.    How long were you a patrol officer?
21   A.    Since 1992, September.
22   Q.    Do you have any particular special
23   responsibilities as a sergeant with the Natick
24   Police Department?
```

```
                                         6
 1   A.    I am the town's safety officer.
 2   Q.    The town safety officer?
 3   A.    Town's safety officer, right, Town of Natick
 4   safety officer.
 5   Q.    What does it mean to be the Town of Natick
 6   safety officer?
 7   A.    I meet with the various neighborhood groups
 8   and outside governmental agencies.  I represent the
 9   chief on his town's safety committee.  I appro- --
10   make recommendations to the board of selectmen
11   through the secretary of the board, approval for
12   block party permits, road closures, races, special
13   events.
14             What happens is a request is made to the
15   board of selectmen for, say, a road closure for a
16   block party.
17             Donna Challis, who is the secretary for the
18   board, will send a request to me saying, "Do you
19   have any recommendations that the board would be
20   interested in hearing?"
21             Usually, I'd take a look at the area and
22   send the recommendations.  Usually, to be perfectly
23   honest with you, it's kind of boilerplate all the
24   time.
```

```
                                         7
 1   You know, "We have cones available to you.
 2   Come and get them before you close the road, notify
 3   the dispatcher area," things along those lines that
 4   are standard within the department over the last few
 5   years since this position has been in effect.
 6   Q.    Now, you said you have meetings with outside
 7   groups, neighborhood groups, and agencies.  What are
 8   those meetings about?
 9   A.    Neighborhood issues.  Primarily, my role
10   would be in the traffic arena.  I'm talking
11   pedestrian, vehicular traffic but also, neighborhood
12   concerns regarding streetlights, noise complaints,
13   abandoned motor vehicles, all things that are
14   governed by bylaws and/or statutory laws.  So we
15   would meet with those people regarding their
16   complaints, and then I report back to the chief.
17   Q.    After you have had a meeting and you report
18   back to the chief, what forms do your reports take,
19   and --
20   A.    Very few times they're in a written form,
21   but more often than not it's in a verbal, "This is
22   what I learned, Chief."
23             And then he renders either a recommendation
24   to submit a violation, we'll say, to the board of
```

```
                                         8
 1   selectmen, may be an alcohol license issue, may be
 2   an abandoned car issue that's got to do with bylaws.
 3   I'll report the facts to them, and he makes a
 4   decision as far as if it should proceed to the board
 5   of selectman or district court, the ABCC, any number
 6   of governmental agencies, but I report primarily the
 7   facts, what I've learned to the chief.
 8   Q.    Do you ever report -- do you ever deliver
 9   your opinion?
10   A.    No.
11   Q.    Does he ever ask you for your opinion?
12   A.    No, he pretty much renders the opinion to us
13   or to me.
14   Q.    So you never come to any conclusion based on
15   your evaluation of the facts?
16   A.    No, I just report the facts.
17   Q.    If you were to have filed a written report,
18   can you tell me what would happen to that written
19   report, where it would -- you said it would be
20   delivered to the chief.  Where would it be stored or
21   maintained, or who would have responsibility for
22   that?
23   A.    Okay.  A couple different venues that that
24   could -- or vehicles, we'll say, that that could be
```

9

1  an E-mail. It could be verbal, or it could be in an
2  offense report.
3       Most typically, recently, we did a MADD
4  sting of the area package stores and liquor
5  establishments, and I worked with Mothers Against
6  Drunk Drivers and a couple of underage children or
7  kids that we used. And I had the officers involved
8  with me generate an offense report, and then I
9  forwarded those offense reports, which is just a
10 description or summary of events to the chief.
11      And he never -- I don't even know if he
12 rendered a decision, because I don't know what
13 happened to it after that. So that's where I end.
14 I'm the vehicle to get that information to him, and
15 then sometimes he talks to me about it and tells me
16 what he did. And sometimes he doesn't.
17 Q.   Is an offense report a formal form that you
18 fill out, or is it your own construction of the
19 facts and events?
20 A.   I'm not clear as far as your question.
21 Q.   Is there a form titled, "Offense Report"
22 that you fill out?
23 A.   We're computer driven.
24 Q.   Okay.

10

1  A.   So there is -- under the IMC system, there
2  are mandatory fields that need to be generated into
3  the offense report, but what -- primarily, what I'm
4  talking about is a narrative.
5  Q.   Right.
6  A.   Because there's a narrative attached to
7  every offense report. Primarily, what I'm involved
8  in is the narrative, the summary of events.
9  Q.   But the completion of the offense report is
10 facilitated through the IMC computer system; is --
11 A.   Yes.
12 Q.   -- that correct?
13 A.   I think I'm understanding what your question
14 was, yes.
15 Q.   I think you are. Do you have any other
16 responsibilities as town safety officer?
17 A.   Oh, meeting with various governmental
18 agencies. Pretty much the chief receives a
19 complaint, may be traffic related or worker,
20 workplace related, may have to do with speeding
21 vehicles, or volumes of vehicles, and he asks me to
22 take a look at it and then report back to him.
23 Again, that vehicle I would use would either be in
24 some cases an E-mail. Sometimes, if it was a

11

1  serious incident, it would be more of with a
2  narrative, but more often than not, it's just a
3  conversation that I'll have with him in his office.
4       "This is what I learned."
5  Q.   If he has a complaint about, say, for
6  example, speeding vehicles, what would you do to
7  investigate that complaint?
8  A.   We have a three-step process. What we do is
9  we actually go out there and generate some data. We
10 have speed tubes that we put down on the ground. We
11 have computer-aided devices that we can capture
12 volume, speed, classification of vehicles. So I get
13 a general idea and more stealth mode of what's going
14 on without the -- without the person or the motorist
15 seeing what's out there, and it's not like we put
16 big signs or an officer out there with a speed gun.
17 I don't have anybody in particular that works for
18 me. I use equipment.
19      And so I'll get an understanding of, well,
20 the volume and the speed of the vehicles. I'll do a
21 study, okay? And then I'll report back to him with
22 that study.
23      If that study elects that there's a problem
24 over there, that vehicles are exceeding 85 percent

12

1  of what the speed limit is, then we do an
2  educational process. We put out speed trailers.
3  You've probably seen them around. This is how fast
4  you're going and what the speed limit is.
5       And lastly, I'll work with the patrol
6  supervisors and the sergeants that are on the shift
7  and advise them of the data that I got, and what
8  they'll do is they'll assign people to that
9  location. And all this I just report back to the
10 chief. (Witness indicating.)
11 Q.   You said that, We go through a three-step
12 process. Who did you mean --
13 A.   I mean --
14 Q.   -- by "we"?
15 A.   -- the department.
16 Q.   Okay.
17 A.   That's something that the chief generated in
18 a general order years ago before my time.
19 Q.   Okay.
20 A.   And we pretty much just follow his general
21 order.
22 Q.   You mentioned that at some point you
23 interact with the patrol sergeant or patrol
24 commander or the sergeants. What sort of

**Page 13**

1 information do you transmit to them, and what do
2 they do with that information?
3 A.   I'm the clearinghouse for it. What happens
4 is, in a typical case where Jane Smith will call the
5 dispatch area and say "People are speeding down my
6 street," they'll automatically dump it into my voice
7 mail, or if I'm there, I'll get a call upstairs if
8 I'm in the office.
9       At that time we kick into this three-step
10 process if it's speed related, and then we'll send
11 out for an E-mail to the sergeants -- or I will send
12 out an E-mail to the sergeants, saying, Listen, Jane
13 Smith of such and such street says people are
14 complaining about the speeding of the motor
15 vehicles. Could you see that an officer may be
16 assigned there periodically during their shift to
17 see, to substantiate, if we're not going to go
18 through the three-step process or, you know, try to
19 give them some satisfaction, where there's some
20 satisfaction with what's going on?
21 Q.   So if, for example, you decide you think it
22 is more appropriate to send a patrol officer out
23 first before you go through the three-step process,
24 is that a decision that you make yourself?

**Page 14**

1 A.   Yeah, I think so. Uh-huh. (Indicates
2 affirmatively).
3 Q.   And then who reports back to you what --
4 A.   Let me just back step on that. That would
5 be something that the patrol sergeant would make the
6 decision. I get that information to the patrol
7 sergeant. Because of our staffing levels and things
8 like that, that's not always the case that it's
9 available.
10 Q.   Okay.
11 A.   What I'll do is I'll say, "Listen, this is
12 what the complaint is. Could you see that, you
13 know, we get it addressed somehow?"
14       So I don't technically see if the person
15 gets assigned out there because they're assigned --
16 Q.   Right.
17 A.   -- to the sergeant, not me.
18 Q.   But you communicate to the sergeant that you
19 would like, if there is staffing available, to have
20 somebody out there?
21 A.   Yeah. True.
22 Q.   And you decide to do that sometimes instead
23 of automatically going through this three-step
24 computer --

**Page 15**

1 A.   Yeah, if there is --
2 Q.   -- equipment analysis? Okay. So after,
3 say, for example, that someone has been assigned out
4 there and they have information that they have
5 gathered, what happens with that information?
6 A.   The patrol sergeant gets it, or the shift
7 sergeant gets it. And sometimes they'll let me know
8 what's going on. Sometimes it just falls by the
9 wayside, which is probably more often than not.
10 Q.   And if the information gets back up to you,
11 what do you do with the information?
12 A.   Really nothing, to be honest with you.
13 It --
14 Q.   Do you -- I'm sorry. Go ahead.
15 A.   Depending on what the case would be, more
16 often than not, the patrol officer would come back
17 and tell me there's no problem at all or tell the
18 sergeant, who tells me there's no problem at all,
19 and then we kind of -- there's certain streets that
20 you know every year we're going to get the same
21 complaint at the same times.
22       A typical example is now that the kids go
23 back to school, so we'll all -- we'll get all of a
24 sudden, we'll get four or five this week, citizens

**Page 16**

1 calling up saying, you know, "No one's stopping for
2 the school buses," what have you.
3       And I'll say, "Listen, got a complaint, you
4 know, a usual complaint, no one stopping for school
5 buses at this location," and he'll take care of it.
6 And that's the end of it.
7 Q.   Sometimes after you receive information back
8 from the patrol officer, do you then decide to
9 engage in this three-step analysis with equipment?
10       MR. CANZONERI: Objection.
11       THE WITNESS: Yes.
12 BY MS. NORTH:
13 Q.   Okay.
14 A.   But the more appropriate or more often case
15 response would be that this issue may have to go to
16 the safety committee, and that's where if it's -- if
17 it's an issue that we can't resolve on the patrol
18 level where they're doing enforcement, it's now
19 going to shift into an engineering type of issue,
20 signage, things along those lines, where we'll have
21 to now propose that the safety committee, which is
22 made up of all types of people, from the DPW. The
23 chief is the chairman, and they decide to make
24 recommendations. We bring the issue to them. They

25

1  no, but once a year, I am required to go to an
2  update class.
3  Q.      But you don't make it a practice of keeping
4  yourself apprised of changes in the law?
5  A.      Personally, I try to but not for the
6  department, no. I mean, I like to keep myself
7  updated.
8  Q.      Is that important for you to do your job?
9  A.      Yeah, it is, very important to me. I spend
10 a lot of money taking classes on my own time.
11 Q.      What kind of classes do you take on your own
12 time?
13 A.      Professional, professional-type classes,
14 Commonwealth Police Services classes, promotional
15 update classes, which includes statutory and
16 criminal law, management, managerial classes,
17 promotional. I mean, if you want to study -- if you
18 want to get promoted, you got to study.
19 Q.      So do you take these classes on your days
20 off?
21 A.      Yes.
22 Q.      Do you pay for them yourself?
23 A.      Yes. Well, let me see. Let me rephrase
24 that. We receive a stipend every year for

26

1  in-service training credits, okay?
2  Q.      Yes.
3  A.      That stipend is, let's say for the sake of
4  argument -- I don't even know what it is. It's
5  really $1200 maybe. In the course of a year, I
6  probably spend $2500, okay?
7  Q.      So some of it is from the stipend, and some
8  of it is --
9  A.      Yes.
10 Q.      -- from your own pocket?
11 A.      Right.
12 Q.      Do you have any staff in the traffic --
13 A.      None. I'm an island amongst myself.
14 Q.      Do you have occasion to interact with or
15 direct the patrol officers at all?
16 A.      Yes.
17 Q.      How do you do that?
18         MR. CANZONERI: Objection.
19         THE WITNESS: When -- if I'm available, and
20 if I'm on the road and there's a major incident
21 that comes down, in the last year and a half, I can
22 count on one hand the amount of times they've asked
23 me to step in to augment -- or supplement, rather,
24 the patrol supervisor who is on a day off or

27

1  whatever.
2          Sometimes Lieutenant Mason or Lieutenant
3  Pagliarulo will call me on my Nextel and say, "Are
4  you around? We got an incident, going over a
5  deceased person in a home. Could you take a ride
6  over there and make sure everything is done
7  correctly?"
8  BY MS. NORTH:
9  Q.      Do you have the occasion to interact with
10 and direct any patrol officers in your role as town
11 safety officer?
12 A.      No. Not really, no. There are officers
13 that are assigned to highway safety positions, but
14 they report to the supervisor of that shift. But if
15 they needed batteries for the LIDAR or radar,
16 they'll come to me, and I'll give them to them.
17 Q.      Do you interact with the supervisor of the
18 shift that then interacts with the police officers
19 who are assigned to highway safety?
20         MR. CANZONERI: Objection.
21         THE WITNESS: Usually, before the shift and
22 after the shift. We're required to be on duty to do
23 our research 15 minutes before and 15 minutes after.
24 Which in a lot of our cases, it's more like an hour

28

1  before, an hour after, a half hour before, and a
2  half hour after. I'll interact with them prior to
3  roll call, prior to my situation because I cover two
4  roll calls.
5          The day shift roll call, I usually meet with
6  them at 7:30, quarter of 8:00, and say, "Okay.
7  Listen, I sent you a bunch of E-mails today about
8  Jane, and all these complaints that came in," or,
9  "Officers aren't filling in the RMV required blocks
10 on an accident report or crash report, and could you
11 take care of that?"
12         And at 4:00 to 12:00 roll call, I'll have to
13 stay till 4:15 or 4:30 or most often than not, 4:45
14 or five o'clock to go over those issues with them,
15 especially, -- primarily, a lot of it's got to do
16 with crash reports, because we have the RMV form
17 that needs to be filled out. And there's specific
18 blocks on that form that are required by the RMV.
19 And in haste, -- we're a very busy department, okay,
20 and we don't have a lot of staff. So a lot of guys
21 are trying to do things rather quickly, and they
22 miss the insurance company on a name of an accident
23 report. Well, that's required by the RMV. So we
24 need to make sure that, you know, that gets back to

```
                                          29
 1  the supervisor, who can talk to the officer about
 2  getting it done.
 3  BY MS. NORTH:
 4  Q.      So let me just try to break down what you
 5  said in a couple of steps, if you don't mind. On a
 6  daily basis before every shift, you interact with
 7  the sergeants regarding complaints and transmitting
 8  information to officers assigned to highway safety;
 9  is that --
10  A.      No, this would be for all officers, not just
11  highway safety.
12  Q.      Okay.
13  A.      But it can on specific days be for their
14  highway safety officers. Specifically today, I met
15  with a sergeant before eight o'clock and asked him
16  to get his highway safety officer out of roll call
17  right at eight o'clock and get him over to one of
18  the schools. So, yes, we do interact on highway
19  safety issues.
20  Q.      And I take it from your testimony recently,
21  that you also have some sort of responsibility for
22  report review?
23  A.      Yes.
24  Q.      And this is a responsibility of in your role
```

```
                                          30
 1  as town safety officer?
 2  A.      Right.
 3  Q.      What is your responsibility for report
 4  review?
 5  A.      All crash reports after they're generated by
 6  the officer go to their shift station supervisor or
 7  shift commander to be reviewed. Once they're
 8  reviewed by that person, they send them to me, okay?
 9  Q.      What do you do with them?
10  A.      I review them. It's a second-tier review.
11  Q.      What do you do when you have completed your
12  review?
13  A.      If the review is a positive one where all
14  the blocks have been filled out, I hit a little
15  button that says, "Approved," and it goes to
16  records. If it's not, I send it back to the
17  sergeant, and with a little description, "He forgot
18  the insurance company name," or "He left out the
19  address of the property owner who's mailbox got run
20  over," or what have you. And he has that go back to
21  the officer to take care of.
22  Q.      After the report has been changed, does it
23  come back to you directly, or does it go through the
24  sergeant again?
```

```
                                          31
 1  A.      It's supposed to go through the sergeant and
 2  then come back to me.
 3  Q.      Do you have any direct interaction with
 4  patrol officers about their reports?
 5  A.      Yeah, sometimes I send -- well, most of the
 6  time it goes to the sergeant, but there is a case
 7  activity block that says what my comments were. So
 8  I imagine they see them, but if you're talking
 9  direct, not really.
10  Q.      But you provide comments on reports --
11  A.      Comments.
12  Q.      -- that you send back?
13  A.      That's a good description.
14  Q.      And this is all crash reports by all
15  officers?
16  A.      Yeah.
17  Q.      Any other reports that you have
18  responsibility for reviewing?
19  A.      No, they don't go through me.
20  Q.      What about traffic stops or incidents
21  arising out of traffic stops?
22  A.      No.
23  Q.      You testified previously that you come in
24  prior to the start of your shift.
```

```
                                          32
 1  A.      Right.
 2  Q.      What time do you usually start work in the
 3  mornings?
 4  A.      You don't even want to know. My shift
 5  starts at eight o'clock. I'm in at 6:15.
 6  Q.      What do you do between 6:15 and eight
 7  o'clock?
 8  A.      My first thing is, I go and read all my
 9  E-mails, because we have two E-mail system. We
10  have Outlook, and then we have an IMC E-mail
11  system. I read those and usually try to respond to
12  those.
13          And then I look in the crash activity box to
14  see how many crash reports have been submitted. If
15  it's only a few, then I'll try to handle them right
16  then and there.
17          Then I turn around and check my voice mail,
18  which has usually got eight to ten messages on that.
19  Hopefully, that's all done by seven o'clock, and
20  then I go to the gym, and I try to work out my
21  frustrations from listening to all these complaints.
22          And then I take a shower, and I go -- I go
23  to roll call or go to meet with them downstairs.
24          On the midnight shift, I usually try to,
```