THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| |
|---|
| Robert F. Murphy, III, Lead Plaintiff for Patrol Officer Plaintiffs, et al. and, Brian C. Grassey, Lead Plaintiff for Superior Officer Plaintffs, et al., Plaintiffs, v. Town of Natick, et al. Defendants |

USDC Case No.:  04-11996 RGS

**PLAINTIFFS' RULE 56.1 CONCISE STATEMENT
OF THE MATERIAL FACTS OF RECORD AS TO
WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

**BACKGROUND**

1.    The Plaintiffs in this action are fifty-six (56) current and former

patrol and superior officers who are or were employed by the Town of Natick,

Massachusetts, within its Police Department.[1]  (Federal District Court

Complaint.)

---

[1]    At relevant times the patrol officer plaintiffs ("Patrol Officer Plaintiffs") and the superior officer plaintiffs ("Superior Officer Plaintiffs") will be referred to separately.  A reference to "Plaintiffs" or "all Plaintiffs" is inclusive of both groups.

2.     The Town of Natick, Massachusetts is and was the Plaintiffs'
employer for all times relevant to the claim, i.e., from September 15, 2001
onward.[2]  (Ex. 7 at Responses 1, 2, 3 and 4.)

3.     The terms and conditions of employment for the Patrol Officer
Plaintiffs are set forth in a collective bargaining agreement ("CBA") between the
Natick Patrol Officers Association ("NPOA")[3] and the Town of Natick.  An
Interest Arbitration Award in the matter of Natick Patrol Officers Association
and the Town of Natick, JLMC-04-04P established the terms for a successor
CBA which was in effect by its own terms for the period of July 1, 2003 to June
30, 2006 and remains in effect pending negotiation of a successor CBA. (Ex. 1
and Ex. 2.)

4.     The terms and conditions of employment for the Superior Officer
Plaintiffs are set forth in a CBA between the Town of Natick and the
International Brotherhood of Police Officers, Local 622 ("Local 622")[4] for the
period July 1, 2004 to June 30, 2007 that sets the terms of a successor CBA
(i.e. a successor to their 2000-2003 CBA).  (Ex. 3 and Ex. 4.)

---

[2]     The relevant period is from three years prior to September 15, 2004 (the
date the complaint was filed in Federal District Court) or September 15, 2001 –
September 15, 2004.

[3]     The NPOA is the union that represents the Patrol Officer Plaintiffs.  (Ex. 1
at Article I.)

[4]     Local 622 is the union that represents the Superior Officer Plaintiffs.
(Ex. 4 at Article I.)

5.     The Town has not established a qualifying work period in excess of seven days per week for Plaintiffs within the meaning of FLSA, 29 U.S.C. §207(k), i.e., the "Section 207(k) Exemption".  (Ex. 7 at Resp. No. 37.)

6.     The Town has no records that reflect that the Town has established a Section 207(k) Exemption for any Plaintiffs.  (Ex. 7 at Resp. No. 38.)

7.     From at least September 2001 to September 2004 the Town has not sought a legal opinion from the Department of Labor relating to the lawfulness of its overtime practices.  (Ex. 7 at Resp. No. 39.)

8.     On July 31, 2003, during the third negotiation session for a successor collective bargaining agreement between the Town and Local 622, Local 622 added a proposal to have overtime compensated in accord with the FLSA.  On November 25, 2003 negotiations broke down and the union decided to move to mediation.  The FLSA issue was never resolved.  (Ex. 28 at ¶ 7.)

## WAGE AUGMENTS AND OVERTIME CALCULATION

9.     From at least September 2001 onward all Plaintiffs have been eligible to receive an Education Incentive Differential pursuant to M.G.L. c. 41, §108L and Article XII of the NPOA CBA and Article XV of the Local 622 CBA. The amount of the differential is based on the level of education a police officer has completed.  (Ex. 2 at Article XII; Ex. 4 at Article XV.)

10.     From at least September 2001 onward the Town has failed to include the Education Incentive Differential for use in calculating the overtime rate paid to the Plaintiffs.  (Exhibit 7 at Resp. No. 5.; Ex. 29 at ¶ 11.)

11.     From at least September 2001 onward the Town paid Plaintiffs a Longevity Differential pursuant to Article IX of the NPOA CBA and pursuant to Article XIV of the Local 622 CBA.  (Ex. 2 at Article IX; Ex. 4 at Article XIV.)

12.     From at least September 2001 onward the Town has failed to include the Longevity Differential for use in calculating the overtime rate paid to the Plaintiffs.  (Ex. 7 at Resp. No. 6.; Ex. 29 at ¶ 11.)

13.     From at least September 2001 onward the Plaintiffs were eligible for and many receive an In-Service Training Incentive Differential pursuant to Article XIII of the NPOA CBA and Article XVI of the Local 622 CBA.  (Ex. 2 at Article XIII; Ex. 4 at Article XVI.)

14.     From at least September 2001 onward the Town has failed to include the In-Service Training Incentive Differential for use in calculating the overtime rate paid to the Plaintiffs.  (Ex. 7 at Resp. No. 4; Ex. 29 at ¶ 11.)

15.     From at least September 2001 onward the Patrol Officer Plaintiffs received a Compstat/Technology Differential pursuant to Article XXVIII of the NPOA CBA.  This differential is paid in recognition of the Compstat Policing Program model utilized by the police department and for the advanced technological skills possessed by Natick Patrol Officers.  (Ex. 2 at Article XXVIII.)

16.     From at least September 2001 onward the Town has failed to include the Compstat/Technology Differential for use in calculating the overtime rate paid to the Patrol Officer Plaintiffs.  (Ex. 7 at Resp. No. 8; Ex. 29 at ¶ 11.)

17.     From at least September 2001 onward certain Patrol Officer Plaintiffs received a Specialist Differential when assigned to special assignments such as detective duty or administrative officer.  (Ex. 2 at Articles XI and XXXII.)

18.     From at least September 2001 onward the Town has failed to include the Specialist Differential for use in calculating the overtime rate paid to the Patrol Officer Plaintiffs.  (Ex. 7 at Resp. No. 9; Ex. 29 at ¶ 11.)

19.     From at least September 2001 onward Patrol Officer Plaintiffs received a Community Service Differential when they complete eight or more hours of community service in a year pursuant to Article XXXV of the NPOA CBA.  (Ex. 2 at Article XXXV.)

20.     From at least September 2001 onward the Town admits it failed to include the Community Service Differential for use in calculating the overtime rate paid to the Patrol Officer Plaintiffs.  (Ex. 7 at Resp. No. 10; Ex. 29 at ¶ 11.)

21.     Since at least 1997 overtime rates for both patrol and superior officers have been determined by dividing Base Pay by 40 and multiplying this figure by 1.5 for any overtime work performed between the hours of 8:00 a.m. and 4:00 p.m.  Overtime rates for both patrol and superior officers for work performed between 8:00 a.m. and 4:00 p.m. are calculated by dividing the base pay plus 6% by 40 and multiplying this figure by 1.5.  No differentials (other than shift differential to the extent mentioned above) have been included in these calculations of overtime by the Town.  (Ex. 29 at ¶ 11.)

22.    Leo Fitzpatrick[5], as part of his duties as the Administrative Officer for the police department, prepares and maintains a spreadsheet on the software program EXCEL to list each patrol and superior officer, the hours that they worked each workweek, every differential that they are paid, the rate that they are paid for overtime or details, and the gross pay owing to the officer for that week. The file that contains these calculations and data are called "paybooks". The workweek starts on a Tuesday and ends on a Monday. When he has completed the spreadsheet entries for a particular week, he then provides that data to Town Hall and Town Hall processes the paychecks based upon that data. During the course of discovery in or about June 2005 Fitzpatrick provided CD ROMs to the Town and its attorneys that contained the data of these EXCEL spreadsheets, which contained the paybooks for FY02, FY03, FY04, and FY05. The fiscal year is from July 1 in one year to June 30 in the next. (For example, FY04 is from July 1, 2003 to June 30, 2004.) He has continued to compile payroll data on such paybooks as well to present and has prepared that data in the same way. The electronic EXCEL files contained on the CD ROM provided as Exhibit 29, Attachment A are true and accurate copies of the original computer business records for paybooks for FY02, FY03, FY04, and FY05 and are labeled as such.

---

[5]    Fitzpatrick shared the assignment of Administrative Officer for the police department from August 1997 through February 2000 with another officer. From February 2000 to present he has held the position by himself. Prior to November 2003 Fitzpatrick worked that assignment as a patrol officer. In November 2003 he was promoted to the rank of sergeant and has continued in the assignment of Administrative Officer to present as Sergeant. His job duties have remained the same as the Administrative Officer and did not change when he was promoted. (Ex. 29 at ¶ 3.)

(Ex. 29 at ¶ 4; Ex. 29 at Att. A.)

### SUPERIOR OFFICERS

23.    The Superior Officer Plaintiffs are Natick police officers who have attained either the title of "Sergeant" or "Lieutenant" within the police department. (Ex. 4 at Article I.)

24.    In addition to the seventeen (17) officers identified as Superior Officer Plaintiffs in the Complaint, four (4) other officers are now Superior Officers.  These four Superior Officers are Sergeant Joseph Hayes, Sergeant Robert Hoffman, Sergeant Richard Vieira and Sergeant Cara Rossi-Carafelli. Each was a patrol officer during the relevant period and is therefore listed as Patrol Officer Plaintiff.  (Ex. 16 at ¶ 3; Ex. 17 at ¶ 3; Ex. 18 at ¶ 3; Ex. 19 at ¶ 3.)

25.    From at least September 2001 to present, the Superior Officer Plaintiffs have worked under the following assignments:  (a) one Lieutenant assigned as Sergeant Patrol Supervisor: (b) approximately eleven (11) Sergeants assigned as Patrol Supervisors:  (c) three (3) of the eleven (11) Sergeants assigned as Patrol Supervisors also were assigned as Area Commander: (d) one Lieutenant assigned as Community Services Officer: (3) one Lieutenant assigned as Executive Officer: (f) one Sergeant assigned as Traffic Services Division Officer: (g) one Sergeant assigned as Administrative Officer: (h) one Lieutenant assigned as Investigative Services Commander; and (i) one Lieutenant assigned as Operations Commander.  (Ex. 7 at Resp. 21.)

26.     <u>Article XVIII – Supervisory Compensation</u> in the Local 622 CBA provides that Superior Officers "shall arrive a reasonable amount of time prior to the start of their regular shift to prepare themselves to provide supervisory guidance during their shift and shall stay on duty a reasonable amount of time after each shift to conclude any administrative tasks that have arisen during their shift."  (Ex. 4 at Article XVIII.)

27.     Superior Officers receive compensation in the form of a Supervisory Differential (5% of the officer's base salary from September 2001 through June 30, 2005 and 6% from July 1, 2005 onward) pursuant to Article XVIII of the Local 622 CBA.  (Ex. 4 at Article XVIII; Ex. 29 at ¶ 10.)

28.     The Superior Officers receive no compensation other than their 5% or 6% differentials for their pre/post shift work.  (Ex. 7 at Resp. No. 18.)

29.     The Town admits that "generally, depending on the specific facts and circumstances of each shift, Superior Officers may perform duties immediately before or directly after the regular starting and ending times of their shift, for a reasonable amount of time…"  (Ex. 8 at p. 2, Plaintiff Resp. No. 1.[6])

30.     Based upon Administrative Officer Fitzpatrick's knowledge of the rates paid to each officer, there is no occasion where the supervisory stipend, if computed as an hourly amount, is greater than the base hourly salary rate

_____

[6]     Counsel for the Plaintiffs attests that the Town's answers to all RFA's in Exhibit 8 were always answered in the same language for each Superior Officer Plaintiff.  In order to save space the Exhibit then only contains the RFA for all 17 Plaintiffs and the Town's response to the first of 17 Superior Officer Plaintiffs – the same answer it went on to provide for each and every named Superior Officer Plaintiff.  This is true for any RFA from Exhibit 8.

paid to superior officers, let alone equal to or greater than the contract overtime rate. The table below provides an example of this based upon the middle-tier base pay for superior officers, computing what their supervisory stipend would be, and the base hourly rate (excluding differentials):

| Fiscal Year & Salary | Supervisory Stipend As Hourly Amount | Base pay – hourly rate (no diffs) |
|---|---|---|
| FY 02 – $44,668 | $17.180  (5%) | $21.475 |
| FY 03 - $46,020 | $17.700  (5%) | $22.125 |
| FY 04 - $46,020 | $17.700  (5%) | $22.125 |
| FY 05 - $47,164 | $18.140  (5%) | $22.675 |
| FY 06 - $48,360 | $22.320  (6%) | $23.250 |

(Ex. 29 at ¶ 10.)

31.     The Town "admits that generally, depending on the specific facts and circumstances of each shift, Superior Officers may engage in the work of communication with on-coming and off-going superior officers immediately before or directly after the regular starting time and ending time of their shift about matters such as the number of sick calls, patrol officer assignment, cruisers that are down (not working), and policing activity that transpired on one shift as may implicate activity on the next shift."  (Ex. 8 at p. 8, Plaintiff Resp. No. 1.)

32.     The Town "admits that generally, depending on the specific facts and circumstances of each shift, Superior Officers may, immediately before or directly after the regular starting time and ending times of their shift, engage in

the work of going to the appropriate police department resources (e.g. computers, documents) to review attendance logs, to make assignments of officers to cruisers and geographical sectors of the Town, to obtain information on paperwork that must be delivered or retrieved as is necessary to the operations of the police department (e.g. service of subpoenas, restraining orders) to discern the number and nature of detail assignments that will be scheduled on the shift of the superior officer reviewing such data (otherwise known as "allocation of personnel assets"), and to review overtime data pertaining to patrol or superior officers."  (Ex. 8 at p. 14, Plaintiff Resp. No. 1.)

33.    The Town admits that the duties of some Superior Officers include, among other things, the duty to review public logs at the beginning of their shift to become acquainted with police activity that transpired on the day or days off that the superior officer had prior to such working day, and to use data from public logs and other resources to inform patrol officers of either events that would impact their daily activities or bring to their attention emerging trends in crime."  (Ex. 8 at p. 28, Plaintiff Resp. No. 1.)

34.    The Town admits that "the duties of some Superior Officers include, among other things, the duty to ensure the accuracy and completion of forms generated by patrol officers such as racial profiling forms" and "that on those occasions, if any, where Superior Officers are not able to complete their duties during their regular shift, the Defendant expects that Superior Officers will complete their duties by performing them immediately before or directly after their regular shift."  (Ex. 7 at Resp. No. 17.)

35.    All Superior Officer Plaintiffs except Administrative Officer Leo Fitzpatrick work at least an additional thirty (30) minutes outside of their regular eight-hour shifts on a daily basis.  Typically, though not always, the 30 minutes is allocated at roughly fifteen (15) minutes before the official start of a shift and at least fifteen (15) minutes of work after the official conclusion of a shift.  See Paragraphs 36 – 56 below.

## SUPERIOR OFFICER PRE/POST SHIFT DUTIES

36.    Plaintiff Robert F. Murphy, III, has been a patrol officer for 16 years.  He is not a supervisor.  He works the 8:00am – 4:00pm shift.  On any given day he might report to Sergeant Thompson, Sergeant O'Callaghan and Sergeant Dunlop.  Each of these Sergeants reports to work at least 15 minutes before the start of the 8:00am – 4:00pm shift to prepare for roll call. (Ex. 14 at 7-8.)

37.    Plaintiff Brian C. Grassey became a Sergeant in 1994 and became a Lieutenant in December 2005.  While a Patrol Sergeant from September 2001 through December 2005 his routine was as follows:  He would arrive at least 15 minutes before the shift started and stay for at least 15 minutes after the shift ended.  His pre shift work routinely consisted of reviewing attendance logs; reviewing the public log; obtaining information on paperwork that had be delivered or retrieved (e.g. service of subpoenas, restraining orders); discerning the number and nature of detail assignments; reviewing overtime data and generally preparing for roll call.  His post shift work consisted of similar duties

to the above as well as communication with the on-coming Sergeant; going over the detail and overtime assignments, and reviewing reports.  (Ex. 28 at ¶ 3.)

As a Lieutenant Plaintiff Grassey works 8:00am – 4:00pm.  His routine from December 2005 to present has been as follows:  He routinely arrives at 7:15am.  When he arrives he checks voicemail; checks on prisoners; evaluates court paperwork; and goes over the police log for the previous 16 hours.  When his shift ends at 4:00pm he stays until between 4:30 and 5:00.  During this period he checks to make sure that all reports and court paperwork due the next day are in order; he reviews the day's log; and he reviews reports for ongoing events that need to be followed up on.  (Ex. 28 at ¶ 4.)

38.     Plaintiff Sergeant Thomas G. Lamont has been a Sergeant in the Natick Police Department for 22 years.  From at least September 2001 to present his routine on assignment as Patrol Sergeant for the 12:00am – 8:00am shift has been as follows:  He arrives at least 15 minutes before the shift starts and stays for at least 15 minutes after the shift ends.  During his pre shift work he confers with off-going Sergeant; checks prisoners; reviews the public log; and prepares for roll call.  His post shift work routinely consists of updating the on-coming Sergeant and reviewing reports.  (Ex. 23 at ¶¶ 3-4.)

39.     Plaintiff Mark St. Hilaire has been a Sergeant since October 2003.  Prior to that he was a patrol officer in Natick since 1991.  From October 2003 to present his routine for his assignment as Patrol Sergeant has been as follows:  He comes in at least 15 minutes early to talk to the outgoing Sergeant;

12

check on prisoners; checks to see who's called in sick; checks to make sure the patrol cars are working; and to prepare for roll call.  He stays 15-20 minutes after his shift ends, sometimes as long as a half hour.  During his post shift work he reviews patrol officer reports; confers with the on-coming Sergeant; and continues performing his regular job duties.  (Ex. 22 at ¶¶ 3-4.)

40.    Plaintiff Richard Vieira became a patrol officer in Natick in 1989 and became a Sergeant in December 2004.  As a Patrol Sergeant he works the 12:00am – 8:00am shift.  His routine as a Patrol Sergeant has been and is as follows:  He arrives at least 15 minutes before the shift starts and he stays for at least 15 minutes after the shift ends.  His pre and post shift work consists of communication with the on-coming or off-going Sergeant; going over the detail and overtime assignments; reviewing reports; and preparing for roll call.  (Ex. 18 at ¶ 3.)

41.    Plaintiff Cara M. Rossi-Cafarelli became a patrol officer in Natick since January 1994 and became a Sergeant in December 2004.  As a Patrol Sergeant she works the 4:00pm – 12:00am shift.  Her routine as a Patrol Sergeant has been and is as follows:  She always arrives at least 15 minutes before the shift starts and always stay for at least 15 minutes after the shift ends.  Her pre shift work consists of checking notices, memos and information for dissemination at roll call; checking on prisoners; reviewing the log; and generally preparing for roll call.  Her post shift work is comprised of collecting and organizing paperwork, closing down computers and updating the on-coming Sergeant about relevant police activity.  (Ex. 19 at ¶ 3.)

42.    Plaintiff Paul W. Thompson has been a Sergeant since 1984.  From at least September 2001 to present he has worked the 8:00am – 4:00pm shift. His routine as Patrol Sergeant has been and is as follows:  He routinely arrives at 7:30am.  Between 7:30am and the start of his shift he confers with the off-going Sergeant; checks the cellblock; checks for new orders and information to disseminate at roll call; and generally prepares for roll call.  He always works after his shift ends, typically staying until around 5:00pm.  His post shift work includes cleaning the police cruiser; doing and reviewing reports on the computer; and updating his Lieutenant.  (Ex. 25 at ¶ 3.)

43.    Plaintiff Brian Lauzon became a Patrol Sergeant in January 2000. From that date through July 1, 2005 his routine as a Patrol Sergeant was as follows:  He would arrive at least 15 minutes before the shift began to confer with the out-going Sergeant; review the public log; check which officers were out sick or had details or court appearances; check for information and notices that needed to be disseminated at roll call; and generally prepare for roll call and my shift.  He would stay for at least 15 minutes after his shift concluded to confer with the on-coming Sergeant about on-going police activity; review reports and other paperwork; and check the public log as necessary.  (Ex. 27 at ¶ 4.)

44.    Plaintiff Lauzon has worked as the Town Safety Officer (TSO) since July 1, 2005.  As the Town Safety Officer he works an 8:00am – 4:00pm shift, Monday through Friday.  As the TSO his routine has been as follows:  Before his shift officially starts he spends 45 minutes reading work emails, listening to

voicemail, and reviewing crash reports.  He routinely works until 4:45pm or

5:00pm every day.  His post shift work consists of attending the 4:00 roll call,

conferring with other Sergeants, and he often sets up instructive videos or

performs other tasks as directed.[7] (Ex. 27 at ¶ 5.)

45.    Plaintiff Robert D. Dunlop has been a Sergeant in the police

department since 1997.  From at least September 2001 to present he has

worked the 8:00am to 4:00pm shift.  His routine as a Patrol Sergeant has been

and is as follows:  He arrives a half hour before his shift starts and he reviews

the public log; speaks with a supervisor; checks on prisoners; checks which

officers have overtime or detail duties; and then he goes into the roll call room

around 7:45am to check the "black book" for notices and other information to

disseminate at roll call.  He continues to work 20 minutes after his shift ends

to update the on-coming Sergeant, review reports and perform other work

duties.  (Ex. 21 at ¶ 3.)

46.    Plaintiff Joseph W. Hayes was promoted to Sergeant in early 2005.

Prior to that he was a patrol officer for at least 29 years.  He works the 4:00pm

– 12:00am shift.  His routine as a Patrol Sergeant has been and is as follows:

He comes in to work around 3:30pm and receives updates from the off-going

Sergeant; checks warrants and summonses; checks email; checks which

officers are on duty and further checks the notice book for information about

which officers have training or details or court appearances.  Around 3:50 he

---

[7]    Lauzon's predecessor as TSO was Plaintiff Robert Davis.  Davis was a
TSO from at least September 2001 though July 26, 2005 when he retired.
Davis' routine was the same as Lauzon's as described in Paragraph 44.  (Ex. 27
at ¶ 6.)

goes into the office to prepare roll call.  The earliest he ever leaves is 12:15am and he is frequently there until 12:30am or 1:00am.  Post shift work routinely consists of telephone calls, checking prisoners and reviewing reports and other paperwork.  (Ex. 16 at ¶ 3.)

47.    Plaintiff Robert A. Hoffman, Jr., has been a Sergeant since around August 2005.  Prior to that he was a patrol officer for 16 years.  From August 2005 to present he has worked the 4:00pm – 12:00am shift.  His routine as a Patrol Sergeant is as follows:  He comes in 15-45 minutes before his shift to confer with the off-going Sergeant; read memos or notices from Lieutenants or the Chief and prepare for roll call.  He typically works 30-60 minutes after his shift concludes.  This work includes updating the on-coming Sergeant; reviewing reports; reviewing the log; and checking on prisoners and prisoner arrangements.  (Ex. 17 at ¶ 3.)

48.    Plaintiff Daniel O'Callaghan has been a Sergeant since 1975.  Since at least September 2001 to present his routine as a Patrol Sergeant on the 8:00am – 4:00pm shift has been and is as follows:  He starts work 20 minutes prior to his shift.  During this period he reviews activity with the off-going Sergeant; checks on prisoners; and generally prepares for roll call.  He stays for 20 minutes after the shift concludes to review reports and other paperwork and to confer with the on-coming Sergeant.  (Ex. 20 at ¶ 3.)

49.    Plaintiff Peter Mason has been a Lieutenant assigned as Executive Officer since 1994.  He works the 8:00am – 4:00pm shift.  From at least September 2001 to present his routine has been as follows:  He typically

arrives 5 to 10 minutes before the shift starts and routinely works 30 or more minutes after the shift ends.  His pre and post shift work is generally an extension of his regular work duties.  He is routinely engaged in setting up training, working on the computer system, and addressing equipment and building issues during his pre and post shift work.  (Ex. 15 at ¶ 3.)

50.     Plaintiff Steven J. Pagliarulo was a Sergeant from January 1995 through November 2003.  His routine as a Patrol Sergeant from September 2001 though November 2003 was as follows:  He arrived at least 15 minutes before the shift started and he stayed for at least 15 minutes after the shift ended.  His pre and post shift work consisted of communication with the on-coming or off-going Sergeant about on-going activity; going over the detail and overtime assignments; reviewing reports; and preparing for roll call.  (Ex. 28 at ¶ 3.)

Plaintiff Pagliarulo's routine as a Lieutenant in charge of the patrol division since November 2003 has been and is as follows:  He works an 8:00am – 4:00pm shift and he arrives 5-10 minutes before the shift starts to put on his gun belt, and check court cases and overnight arrests.  Sometimes he will make sure that reports are approved and sent to court in a timely manner. After the shift ends he rarely leaves before 4:30.  During his post shift work he routinely confers with other officers about on going police activity; reviews the log and generally continue his regular duties.  (Ex. 28 at ¶ 4.)

51.     Plaintiff Richard P. Douglas was a police officer in Natick for 22 years.  (Ex. 12 at p. 5.)  From September 2001 to his retirement in September

2003 he held the position of Sergeant on the 8:00am – 4:00pm shift.  (Ex. 12 at p. 7.)  His routine as a Patrol Sergeant was as follows:  He would arrive 20 minutes before the shift started in order to check officer assignments, check lockup and prepare for his shift.  He would routinely continue his work duties anywhere from 10 to 30 minutes after the shift ended.  (Ex. 12 at p. 8-10.)

52.     Plaintiff Jeffrey Longtine worked as a Patrol Sergeant from at least September 2001 until his retirement October 2004.  (Ex. 11 at p. 5.)  He worked the 4:00pm – 12:00am shift.  During this period he began work between 3:15pm and 3:30pm when he would confer with the off-going Sergeant; check email; review the log and otherwise prepare for his shift.  He would work until 12:30am or 1:00am reviewing reports, collecting equipment and updating the on-coming Sergeant.  (Ex. 11 at p. 21-26.)

53.     Plaintiff Lawrence Fleming was a Sergeant from at least September 2001 to his retirement in December 2005.  (Ex. 10 at p. 6-7.)  He worked the 12:00am – 8:00am shift for the relevant period and always began work at 11:40pm.  During his pre shift work he would talk to the off-going Sergeant, check the log and generally ready himself for his tour of duty.  (Ex. 10 at p. 11-13.)  He stayed 15 minutes or later after his shift to review reports and update the on-coming Sergeant.  (Ex. 10 at p. 12.)

54.     Plaintiff Alfred B. Grassey worked as a Lieutenant from at least September 2001 until he retired in September 2004.  (Ex. 9 at 6-7.)  He worked from 8:00am – 4:00pm.  He routinely stayed until 4:30pm or later.  During his post shift work he would usually stand at the 4:00 roll call, speak to the night

detectives, and receive updates from other officers about on-going activity.  (Ex. 9 at p. 51-53.)

55.    Plaintiff Alfred F. Morgan worked as a Lieutenant from at least September 2001 until he retired in November 2003.  (Ex. 13 at p. 6.)  He worked the 8:00am – 4:00pm, Monday through Friday shift.  He would arrive at 7:00am.  During his pre shift work he discuss ongoing activity with the off-going Sergeant; read the police log; go to lockup and check on prisoners; review reports; and make or return telephone calls.  (Ex. 13 at p. 10, 21.)  He never left right at 4:00pm.  (Ex. 13 at p. 40-41, 51.)

56.    Plaintiff Nicholas Mabardy has been a Lieutenant since 1996.  His assignment from at least September 2001 through August 2002 was as a Community Services Officer. His regular shift in this assignment was from 8:00 a.m. to 4:00 p.m.  He routinely worked to 6:00 p.m. each shift.  His post shift work consisted of a continuation of his regular duties including coordinating aspects of community policing and training.  Routinely this involved, among other things, setting up meetings with community groups, attending meetings, coordinating the logistics for community events, and seeking financial and logistical support from businesses in the Town to support such community events or activity.  (Ex. 26 at ¶ 3.)

From August 2002 to present Plaintiff Mabardy's assignment has been as Field Investigative Services Officer.  For this assignment he also works an 8:00 a.m. to 4:00 p.m. shift.  He rarely, if ever, leaves before 6:00 p.m. During the period after 4:00 p.m. his work entails, among other things,

reviewing reports of detectives; contacting witnesses or victims of crime who often cannot be reached during the regular day shift; interaction with detectives who work the evening shift and start at 4:00 p.m. to apprise them of any information he learned during their off-duty time; contacting other departments of the police department; advising Area Commanders of area-specific crime information; communicating with employees who work in the records area of the police department about cases and records that are pertinent to the investigative services division and talking via phone with the District Attorneys office and to employees at the Natick District Court.  (Ex. 26 at ¶ 4.)

## EXTRA PAID DETAILS

57.    In addition to work performed by the Plaintiffs during regular shifts and overtime shifts, they also perform work known as "extra paid details". Details are paid by a flat hourly rate pursuant to Article XVIII of the NPOA CBA and Article XXIII of the Local 622 CBA.  (Ex. 2 at Article XVIII; Ex. 4 at Article XXIII.)

58.    Detail work is work done for either a private vendor, or for the Town or one of its departments or the school district, rather than directly for the police department.  (Ex. 29 at ¶ 5.)

59.    The Plaintiffs are "sometimes" compensated at the flat detail rate but if the Chief of Police assigns the officer to an unfilled detail the officer is compensated for such work at the overtime rate.  (Ex. 7 at Resp. No. 19.)

60.    The flat detail rate for patrol officers was $27 on July 1, 2001, $30 upon ratification of contract agreement approximately April 2002, and $32 effective January 1, 2003.  The flat rate for superior officers was as follows: $29 effective July 1, 2001, $30 effective January 1, 2002, $35 upon ratification of contract agreement approximately June 2005,  $36 effective July 1, 2005 and $37 effective July 1, 2006 onward.  (Ex. 29 at ¶ 9.)

61.    For all details, the Town advances the money for payroll to compensate the officer for the detail, and then the specific vendor reimburses the Town for that expenditure.  In the case of details for the Town, the so-called "vendor" is indicated by an account and that relates to the specific Town department that is accountable for such cost.  (Ex. 29 at ¶ 5.)

62.    Exhibit 29 Attachment B contains printouts from the ACCESS database, which truly and accurately reflect the business records of the department for the period September 2001 through June 13, 2005.  The data in Exhibit 29 Attachment B indicates, among other things, the detail vendor number, the name of the vendor, the date of the paid detail, the officer who worked the paid detail, the hours paid for such detail, and the workweek in the "paybook" in which such detail was worked (e.g., an entry under the column for "Week" that states "200221" means the 21st week of the payroll for FY02).  (Ex. 29 at ¶ 5; Ex. 29 at Att. B.)

63.    With respect to Exhibit 29, Attachment B, the table below states a "code" that corresponds with each vendor for Town details.  Below, are

examples of the types of details that are performed for some of those

departments of the Town:

| Code | Town Operation |
|------|----------------|
| 1260 | Town Recreation Department:  Traffic control in connection with a recreational events of the Recreation Department |
| 0017 | Town Selectmen:  Traffic control detail in connection with a signal light at a major intersection |
| 0073 | Town Department of Public Works – Building and Maintenance Division |
| 0325 | Town School Department:  Details for this department usually are for crowd and traffic control for an event at the high school. |
| 0110 | Town Department of Public Works – general – Details under this code are usually for traffic control in connection with any work performed by DPW including street repair, tree removal, traffic control for DPW project, etc. |
| 0870 | Town Clerk:  Details for the Town Clerk include standing in polling stations during elections as well as traffic and crowd control. |
| 0310 | Town High School.  Similar to other school details mentioned above; for this code usually limited to detail work at the auditorium or gym |
| 5290 | Town School Committee |
| 0630 | Town Board of Health:  There is a detail under this code relating to hazardous waste collection day to control traffic. |
| 0640 | Town Fire Department:  Details arising under this code to provide traffic control for the Natick Fire Department communications unit when that unit works on utility poles throughout the Town. |
| 0100 | Town Department of Public Works – Water and Sewer Division:  Similar to DPW details noted above.  In the case of details billed for this code, it often includes DPW work of the Water Division of the DPW to control traffic at a scene where the Water Division is opening the street for work on the water main and other water work. |
| 0320 | Town of Natick High School Athletic Department:  Details under this code routinely relate to crowd and traffic control for sporting events of the high school athletic department. |

(Ex. 29 at ¶ 6.)

64.    Further, with respect to Exhibit 29, Attachment B there are details where the vendor is the name of a private company[8].  In each case such details are still details of the Town, usually the DPW, where the Town's DPW contracts for work of a private company, and the Town's DPW is accountable for the cost of the detail (not the private company).  In those cases, the detail usually relates to traffic control at the scene of such work.  (Ex. 29 at ¶ 7.)

65.    There are a few details, which appear on the list of Exhibit B, which are not Town details.  They appear on the list only because the search criteria used in the ACCESS database in generating the list does not exclude these particular vendors.  The search criteria that Fitzpatrick used is whether the vendor is charged an administrative fee by the Town.  Town details are never charged that fee, whereas private detail vendors are charged.  There are a handful of details for entities other than the Town for which there is a special arrangement where they are not charged the administrative fee.  Consequently, the following fourteen (14) vendor entries appear on Exhibit B even though they are not Town details:

---

[8] General contractors contracted by the Town include Fletcher Creamer, Abelli Construction Company, Severn Trent, Walsh Construction, and the Cardillo Construction Company.  (Ex. 14 at p. 57.)

| 0039 | Natick Rotary Club |
|------|--------------------|
| 0157 | Town of Wellesley |
| 0199 | Holliston High School Athletic Dept. |
| 0346 | Town of Framingham Water Department |
| 0390 | MASS Highway |
| 0415 | MIG Corp. |
| 0914 | Town of Framingham |
| 0918 | Town of Wayland |
| 4550 | Dover-Sherborn Hockey/High School |
| 5340 | MWRA |
| 9785 | Natick Soldier System Command |
| 9871 | Town of Sherborn DPW |
| 9913 | Wellesley Police Department |
| 9999 | Administrative Billing Code |

(Ex. 29 at ¶ 8.)

Respectfully submitted,

For Plaintiffs,

By Plaintiffs' Counsel:

/s/ Jack J. Canzoneri
Jack J. Canzoneri, BBO #564126
McDonald, Lamond & Canzoneri
Cordaville Office Center
153 Cordaville Road, Suite 210
Southborough, Massachusetts 01772
(508) 485-6600

Dated:  October 27, 2006

## CERTIFICATE OF SERVICE

I, Jack J. Canzoneri, hereby certify that I have this day via the Electronic Case File system, served a copy of the foregoing Plaintiffs' Rule 56.1 Concise Statement Of The Material Facts Of Record As To Which There Is No Genuine Issue To Be Tried upon opposing counsel John P. Flynn, Jr. Esq., Karis North, Esq., Kathryn Murphy, Esq., and Geoffrey B. McCullough, Esq., Murphy, Hesse, Toomey & Lehane, LLP, 300 Crown Colony Drive, P.O. Box 9126, Quincy, Massachusetts  02269.

Dated:  October 27, 2006                    /s/ Jack J. Canzoneri
                                            Jack J. Canzoneri