THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Robert F. Murphy, III, Lead Plaintiff for Patrol Officer Plaintiffs, et al.<br><br>and<br><br>Brian C. Grassey, Lead Plaintiff for Superior Officer Plaintiffs, et al.<br><br>                    Plaintiffs<br><br>v.<br><br>Town of Natick, Natick Police Department, and Dennis R. Mannix, in his capacity as Chief of Police<br><br>                    Defendants | Docket No.: 04-11996RGS |

## DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXISTS A GENUINE DISPUTE

Pursuant to Local Rule 56.1, and in Opposition to Plaintiffs' Motion for Summary Judgment, Defendants submit the following concise Statement of Material Facts to Which They Contend There Exists a Genuine Dispute. Although Defendant contends there are certain facts in dispute, as outlined more specifically below, none of these disputed facts preclude judgment for the Defendants on their Motion for Partial Summary Judgment, submitted on October 27, 2006. However, because certain of Plaintiffs material facts are disputed, judgment for Plaintiffs is unwarranted.

Defendants do not contest the statements set forth in Plaintiffs' Rule 56.1 Concise Statement of the Material Facts of Record as to Which There Is No Genuine Issue To Be Tried,

1

as set forth in paragraphs 1, 3-7, 9, 11, 23-27, 29, 31-34, 57-60, 65. Defendants contest the following facts, set forth in the paragraphs referenced below:

2.   The Town of Natick, Massachusetts is and was the Plaintiffs' employer for all times relevant to the claim, i.e., from September 15, 2001 onward.[1]  (Ex. 7 at Responses 1, 2, 3 and 4.)

**Defendants' Response:** Whether the "relevant" time period is 3 years or 2 years is a question of law to be determined by the Court.  As Plaintiffs have not made any motion supporting the expansion of the "relevant time period" beyond September 15, 2002, there should not be any dispute as to this point.

Further, the Exhibits submitted by Plaintiffs on this point establish only that the Defendants admit that the two most recent CBAs do indeed apply to this matter, and set forth the terms of Plaintiffs employment.  The Exhibits do not in any way establish the "relevant" time frame.

8.   On July 31, 2003, during the third negotiation session for a successor collective bargaining agreement between the Town and Local 622, Local 622 added a proposal to have overtime compensated in accord with the FLSA.  On November 25, 2003 negotiations broke down and the union decided to move to mediation.  The FLSA issue was never resolved.  (Ex. 28 at ¶ 7.)

---

[1] The relevant period is from three years prior to September 15, 2004 (the date the complaint was filed in Federal District Court) or September 15, 2001 – September 15, 2004. [NOTE: This footnote is from Plaintiffs' original document, and is not a statement by Defendants]

**Defendants' Response.** Defendants' dispute Plaintiffs' characterization of the proposals discussed during the course of the negotiations between the Superior Officers and the Town. Regardless of the characterizations, however, ultimately during the course of the negotiations, the Union withdrew these proposals and the resulting contract is as previously set forth by the parties.

10. From at least September 2001 onward the Town has failed to include the Education Incentive Differential for use in calculating the overtime rate paid to the Plaintiffs. (Exhibit 7 at Resp. No. 5.; Ex. 29 at ¶ 11.).

**Defendants' Response.** The Plaintiffs' entitlement to the "Education Incentive Differential," if any, was unresolved until at least the date of the Agawam decision, issued in December 2003.

12. From at least September 2001 onward the Town has failed to include the Longevity Differential for use in calculating the overtime rate paid to the Plaintiffs. (Ex. 7 at Resp. No. 6.; Ex. 29 at ¶ 11.)

**Defendants' Response.** The Plaintiffs' entitlement to the "Longevity Differential," if any, was unresolved until at least the date of the Agawam decision, issued in December 2003.

13. From at least September 2001 onward the Plaintiffs were eligible for and many receive an In-Service Training Incentive Differential pursuant to Article XIII of the NPOA CBA and Article XVI of the Local 622 CBA. (Ex. 2 at Article XIII; Ex. 4 at Article XVI.)

**Defendants' Response.** Payments made for In-Service Training are on-time incentive or stipend payments, made when a certain number of hours of training are competed. They are not

weekly differential payments. (See Ps Appendix,[2] Tab 1, Art. XIII; Tab 4, Art. XVI). These payments are made to reimburse Officers for the costs of additional training. (See Ex. A, Excerpts from the Deposition of B. Lauzon, 25:19-26:6).

14.     From at least September 2001 onward the Town has failed to include the In-Service Training Incentive Differential for use in calculating the overtime rate paid to the Plaintiffs. (Ex. 7 at Resp. No. 4; Ex. 29 at ¶ 11.)

**Defendants' Response.** The Plaintiffs' entitlement to the "Inservice Training Differential," if any, was unresolved until at least the date of the Agawam decision, issued in December 2003.

15.     From at least September 2001 onward the Patrol Officer Plaintiffs received a Compstat/Technology Differential pursuant to Article XXVIII of the NPOA CBA. This differential is paid in recognition of the Compstat Policing Program model utilized by the police department and for the advanced technological skills possessed by Natick Patrol Officers. (Ex. 2 at Article XXVIII.)

**Defendants' Response.** The "Comstat/Technology Differential" is an annual stipend, not a weekly differential. (Ps Appendix, Tab 1, Art. XXVIII).

16.     From at least September 2001 onward the Town has failed to include the Compstat/Technology Differential for use in calculating the overtime rate paid to the Patrol Officer Plaintiffs. (Ex. 7 at Resp. No. 8; Ex. 29 at ¶ 11.)

---

[2] "Ps Appendix" refers to the Appendix of Exhibits submitted by Plaintiffs in connection with their Statement of Facts Not in Dispute.

**Defendants' Response.** The Plaintiffs' entitlement to the "Inservice Training Differential," if any, was unresolved until at least the date of the <u>Agawam</u> decision, issued in December 2003. Defendants dispute any such entitlement.

17. From at least September 2001 onward certain Patrol Officer Plaintiffs received a Specialist Differential when assigned to special assignments such as detective duty or administrative officer. (Ex. 2 at Articles XI and XXXII.)

**Defendants' Response.** The "Specialist Differential" is an annual stipend, not a differential. (Ps. Appendix, Tab 1, Arts. XI, XXXII).

18. From at least September 2001 onward the Town has failed to include the Specialist Differential for use in calculating the overtime rate paid to the Patrol Officer Plaintiffs. (Ex. 7 at Resp. No. 9; Ex. 29 at ¶ 11.)

**Defendants' Response.** The Plaintiff's entitlement to the "Specialist Differential" did not vest, if at all, until the <u>Agawam</u> decision, issued in December 2003. Defendants dispute any such entitlement.

19. From at least September 2001 onward Patrol Officer Plaintiffs received a Community Service Differential when they complete eight or more hours of community service in a year pursuant to Article XXXV of the NPOA CBA. (Ex. 2 at Article XXXV.)

**Defendants' Response.** Community Service pay is not a "differential" but a one-time annual payment, paid only when the Officers have accumulated a certain amount of community service time. The payment is only an incentive, to encourage the Officers to engage in such service. (Ps Appendix, Tab 1, Art. XXXV).

20.     From at least September 2001 onward the Town admits it failed to include the Community Service Differential for use in calculating the overtime rate paid to the Patrol Officer Plaintiffs.  (Ex. 7 at Resp. No. 10; Ex. 29 at ¶ 11.)

**Defendants' Response.**  The Plaintiffs' entitlement to the " Community Service Differential," if any, was unresolved until at least the date of the <u>Agawam</u> decision, issued in December 2003.  Defendants dispute any such entitlement.

21.     Since at least 1997 overtime rates for both patrol and superior officers have been determined by dividing Base Pay by 40 and multiplying this figure by 1.5 for any overtime work performed between the hours of 8:00 a.m. and 4:00 p.m.  Overtime rates for both patrol and superior officers for work performed between 8:00 a.m. and 4:00 p.m. are calculated by dividing the base pay plus 6% by 40 and multiplying this figure by 1.5.  No differentials (other than shift differential to the extent mentioned above) have been included in these calculations of overtime by the Town.  (Ex. 29 at ¶ 11.)

**Defendants' Response.**  Overtime rates for Patrol and Superior Officers for work performed between 4:00 p.m. and 8:00 a.m. are calculated by dividing the base pay plus 6% by 40 and multiplying this figure by 1.5.  The Plaintiffs' entitlement to additions to this overtime rate, if any, was unresolved until at least the date of the <u>Agawam</u> decision, issued in December 2003.  Defendants dispute any such entitlement.

22. Leo Fitzpatrick[3], as part of his duties as the Administrative Officer for the police department, prepares and maintains a spreadsheet on the software program EXCEL to list each patrol and superior officer, the hours that they worked each workweek, every differential that they are paid, the rate that they are paid for overtime or details, and the gross pay owing to the officer for that week.  The file that contains these calculations and data are called "paybooks".  The workweek starts on a Tuesday and ends on a Monday.  When he has completed the spreadsheet entries for a particular week, he then provides that data to Town Hall and Town Hall processes the paychecks based upon that data.  During the course of discovery in or about June 2005 Fitzpatrick provided CD ROMs to the Town and its attorneys that contained the data of these EXCEL spreadsheets, which contained the paybooks for FY02, FY03, FY04, and FY05.  The fiscal year is from July 1 in one year to June 30 in the next.  (For example, FY04 is from July 1, 2003 to June 30, 2004.)  He has continued to compile payroll data on such paybooks as well to present and has prepared that data in the same way.  The electronic EXCEL files contained on the CD ROM provided as Exhibit 29, Attachment A are true and accurate copies of the original computer business records for paybooks for FY02, FY03, FY04, and FY05 and are labeled as such.(Ex. 29 at ¶ 4; Ex. 29 at Att. A.)

**Defendants' Response.**  At this time, Defendants are unable to ascertain whether these are indeed true and accurate records copies of the original computer records.  Defendants have

---

[3]   Fitzpatrick shared the assignment of Administrative Officer for the police department from August 1997 through February 2000 with another officer.  From February 2000 to present he has held the position by himself.  Prior to November 2003 Fitzpatrick worked that assignment as a patrol officer.  In November 2003 he was promoted to the rank of sergeant and has continued in the assignment of Administrative Officer to present as Sergeant.  His job duties have remained the same as the Administrative Officer and did not change when he was promoted. (Ex. 29 at ¶ 3.) [NOTE: This footnote is from Plaintiffs' original document, and is not a statement by Defendants]

been unable to compare these records to the payroll records, which were produced to Plaintiffs in the course of this litigation, because the printed records of the CD ROM provided by Plaintiffs contains errors that Defendants have been unable to resolve.

Defendants further contest the characterization in the footnote that Sergeant Fitzpatrick's duties have not changed since he was promoted to Sergeant. By virtue of his promotion, his duties and responsibilities necessarily changed. (See DSOF, ¶ 32).[4]

28.     The Superior Officers receive no compensation other than their 5% or 6% differentials for their pre/post shift work.  (Ex. 7 at Resp. No. 18.)

**Defendants' Response:**  As an initial matter, Defendants dispute that the Superior Officers, as exempt employees, are even entitled any additional compensation, other than that specified in their contract. (See Defendants Motion for Partial Summary Judgment, and documents submitted in support thereof).

To the extent that the Superior Officers seek overtime compensation for their pre and post-shift work, their requests have generally not been denied. (See Excerpts from Deposition of B. Grassey, attached hereto as, Ex. B, at 52:13-14). Further, Defendants dispute that every Superior Officer Plaintiff does indeed do pre/post shift work. (See 2nd Aff. Mannix ¶ 21).

30.     Based upon Administrative Officer Fitzpatrick's knowledge of the rates paid to each officer, there is no occasion where the supervisory stipend, if computed as an hourly amount, is greater than the base hourly salary rate paid to superior officers, let alone equal to or greater than the contract overtime rate.  The table below provides an example of this based upon

---

[4] DSOF refers to Defendants' Statement of Facts, submitted in conjunction with its Motion for Partial Summary Judgment.

the middle-tier base pay for superior officers, computing what their supervisory stipend would be, and the base hourly rate (excluding differentials):

| Fiscal Year & Salary | Supervisory Stipend As Hourly Amount | Base pay – hourly rate (no diffs) |
| --- | --- | --- |
| FY 02 – $44,668 | $17.180  (5%) | $21.475 |
| FY 03 - $46,020 | $17.700  (5%) | $22.125 |
| FY 04 - $46,020 | $17.700  (5%) | $22.125 |
| FY 05 - $47,164 | $18.140  (5%) | $22.675 |
| FY 06 - $48,360 | $22.320  (6%) | $23.250 |

(Ex. 29 at ¶ 10.)

**Defendants' Response:** Without seeing the specifics of the calculations, Defendants are unable to respond to this allegation.

35.     All Superior Officer Plaintiffs except Administrative Officer Leo Fitzpatrick work at least an additional thirty (30) minutes outside of their regular eight-hour shifts on a daily basis. Typically, though not always, the 30 minutes is allocated at roughly fifteen (15) minutes before the official start of a shift and at least fifteen (15) minutes of work after the official conclusion of a shift.  See Paragraphs 36 – 56 below.

**Defendants' Response to Paragraphs 35-56**. As an initial matter, Defendants dispute that the Superior Officers, as exempt employees, are even entitled to FLSA overtime. (See Defendants Motion for Partial Summary Judgment, and documents submitted in support thereof).

In addition, Defendants dispute that Plaintiffs worked the alleged extra time, on every day of every shift.  Chief Mannix believes, based on his observations, that not every Superior Officer takes as much as 30 minutes per day to complete those activities.  It is his observation that not every Superior Officer comes in early, or stays late, on every shift.  Even if Superior Officers arrive early, or stay late, they do not always spend that time doing work that they could

not otherwise have completed during the course of their shift. From time to time it may be necessary for a Superior Officer to stay late, or arrive early, because of the circumstances of that particular shift. However, in those instances, the time required to complete that additional work may be minimal, and could require less than 15 minutes of time. Finally, the Chief does not believe that it is necessary for every Superior Officer to arrive early or stay late every day, in order for them to complete their responsibilities as supervisors. (2nd Aff. Mannix, ¶ 21).

All of these duties are those expected of the Superior Officers, and for which they receive extra compensation in the form of the Supervisory Stipend. Superior Officers are also more highly paid than Patrol Officers. Such higher level of pay takes into account their increased responsibilities. (DSOF ¶¶ 4-6).

During the course of their employment, the Superior Officers could have sought overtime for their pre- and post-shift activities. In their depositions, many of these Officers testified that working some extra time is part of their job as Superior Officers, and something that they do as a matter of personal choice. They do seek overtime for pre- and post-shift activities, but only if their hours worked exceeded a certain, individually defined threshold. (See Ex. A at 35:14-36:13; see also Ex. B at 51: 4-52:12; Ex. C, Excerpts from Deposition of Pagliarulo at 13:23-14:9; Ex. D, Excerpts from Deposition of Rossi-Cafarelli at 26:9-14; 30:18-31:13; Ex. E, Excerpts from the Deposition of Hoffman at 27:12-29:2; Ex. F, Excerpts from Deposition of Morgan at 37: 16-38:3; 41:7-42:4).

61.    For all details, the Town advances the money for payroll to compensate the officer for the detail, and then the specific vendor reimburses the Town for that expenditure. In

the case of details for the Town, the so-called "vendor" is indicated by an account and that relates to the specific Town department that is accountable for such cost. (Ex. 29 at ¶ 5.)

**Defendants' Response:** Payment for Details comes from a revolving fund, not the Department budget. Each vendor is billed for the Detail work by the Town, and in fact pays the Town for such work. 2nd Aff. Mannix, ¶ 18. Work on behalf of the Department which is outside of the Officers regular shifts, and which the Plaintiffs have characterized as "Town" detail work is more typically assigned and paid as Overtime. (See Ex. B at 53: 13-54:7; see also 2nd Aff. Mannix, at ¶ 10).

62.     Exhibit 29 Attachment B contains printouts from the ACCESS database, which truly and accurately reflect the business records of the department for the period September 2001 through June 13, 2005. The data in Exhibit 29 Attachment B indicates, among other things, the detail vendor number, the name of the vendor, the date of the paid detail, the officer who worked the paid detail, the hours paid for such detail, and the workweek in the "paybook" in which such detail was worked (e.g., an entry under the column for "Week" that states "200221" means the 21st week of the payroll for FY02). (Ex. 29 at ¶ 5; Ex. 29 at Att. B.)

**Defendants' Response:** At this time, Defendants are unable to ascertain whether these are indeed true and accurate records copies of the original business records of the Department. In order to do so, Defendants would have to compare every entry in Attachment B with the original detail slips, and then with the final Town payroll records. Such a voluminous project has not been possible, given the time frames in this litigation.

63. With respect to Exhibit 29, Attachment B, the table below states a "code" that corresponds with each vendor for Town details. Below, are examples of the types of details that are performed for some of those departments of the Town:

| Code | Town Operation |
|------|----------------|
| 1260 | Town Recreation Department: Traffic control in connection with a recreational events of the Recreation Department |
| 0017 | Town Selectmen: Traffic control detail in connection with a signal light at a major intersection |
| 0073 | Town Department of Public Works – Building and Maintenance Division |
| 0325 | Town School Department: Details for this department usually are for crowd and traffic control for an event at the high school. |
| 0110 | Town Department of Public Works – general – Details under this code are usually for traffic control in connection with any work performed by DPW including street repair, tree removal, traffic control for DPW project, etc. |
| 0870 | Town Clerk: Details for the Town Clerk include standing in polling stations during elections as well as traffic and crowd control. |
| 0310 | Town High School. Similar to other school details mentioned above; for this code usually limited to detail work at the auditorium or gym |
| 5290 | Town School Committee |
| 0630 | Town Board of Health: There is a detail under this code relating to hazardous waste collection day to control traffic. |
| 0640 | Town Fire Department: Details arising under this code to provide traffic control for the Natick Fire Department communications unit when that unit works on utility poles throughout the Town. |
| 0100 | Town Department of Public Works – Water and Sewer Division: Similar to DPW details noted above. In the case of details billed for this code, it often includes DPW work of the Water Division of the DPW to control traffic at a scene where the Water Division is opening the street for work on the water main and other water work. |
| 0320 | Town of Natick High School Athletic Department: Details under this code routinely relate to crowd and traffic control for sporting events of the high school athletic department. |

(Ex. 29 at ¶ 6.)

**Defendants' Response:** The descriptions of the codes are not part of the business records of the Town, but represent Plaintiffs' characterizations.

64. Further, with respect to Exhibit 29, Attachment B there are details where the vendor is the name of a private company[5]. In each case such details are still details of the Town, usually the DPW, where the Town's DPW contracts for work of a private company, and the Town's DPW is accountable for the cost of the detail (not the private company). In those cases, the detail usually relates to traffic control at the scene of such work. (Ex. 29 at ¶ 7.)

**Defendants' Response:** Details worked for private companies are, in fact, private details. Plaintiffs are mixing legal and factual questions, to which Defendants object and contest. The Details described above are for private companies, for example at construction sites, and the private contractors are responsible for the costs of the Detail. (2nd Aff. Mannix, ¶ 13).

Respectfully submitted,

Defendants, TOWN OF NATICK,
NATICK POLICE DEPARTMENT, and
DENNIS R. MANNIX, CHIEF OF POLICE

By their attorneys,

/s/ John P. Flynn
John P. Flynn, BBO# 172640
Geoffrey B. McCullough, BBO# 558207
Kathryn M. Murphy, BBO#564789
Karis L. North, BBO # 648998
MURPHY, HESSE, TOOMEY & LEHANE, LLP
300 Crown Colony Drive, Suite 410
Quincy, MA 02169
(617) 479-5000

Dated: November 20, 2006

---

[5] General contractors contracted by the Town include Fletcher Creamer, Abelli Construction Company, Severn Trent, Walsh Construction, and the Cardillo Construction Company. (Ex. 14 at p. 57.). [NOTE: This footnote is from Plaintiffs' original document, and is not a statement by Defendants]

**CERTIFICATE OF SERVICE**

    I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be send to those indicated as non registered participants on November 20, 2006.

                                      /s/ John P. Flynn
                                      John P. Flynn