UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Robert F. Murphy, III, Lead Plaintiff for
Patrol Officer Plaintiffs, et al. and,

Brian C. Grassey, Lead Plaintiff for
Superior Officer Plaintiffs, et al.,

      Plaintiffs,

      v.                                                             USDC Case No.:  04-11996 RGS

Town of Natick, et al.

      Defendants

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS FOR WHICH THERE IS
NO GENUINE ISSUE IN SUPPORT OF PLAINTIFFS' CROSS MOTION FOR
SUMMARY JUDGMENT, OR IN THE ALTERNATIVE PLAINTIFFS'
STATEMENT OF DISPUTED FACTS IN REBUTTAL OF DEFENDANTS'
STATEMENT OF MATERIAL FACTS UNDER LOCAL RULE 56.1**

Pursuant to Local Rule 56.1, Plaintiffs submit this statement of material

facts ("Statement") in support of its cross motion for summary judgment and in

response and rebuttal to Defendants' "Concise Statement of Material Facts Not

In Dispute" (referred to hereinafter as "Defendants' Statement").  Each

paragraph below under the heading "Plaintiffs' Responses" correlate to the

enumerated paragraphs of Defendants' Statement and additional rebuttal

paragraphs are delineated as necessary.

Documents cited in this Statement of Plaintiffs shall be as follows:

Exhibit 1:     Affidavit of Lt. Brian Grassey with two attachments, i.e., Attachment A which contains selected pages of the Police Chief's Departmental Rules, Regulations, Policies, Procedures and General Orders in effect for all or a portion of the period from September 2001 to present; and, Attachment B which is an example of a Background Investigation Report on a civil service candidate for hire as patrol officer.

Exhibit 2:     Affidavit of Lt. Peter Mason

Exhibit 3:     Affidavit of Lt. Steven Pagliarulo

Exhibit 4:     Affidavit of Lt. Nicholas Mabardy

Exhibit 5:     Affidavit of Detective Patrol Officer Kevin Delehanty

Exhibit 6:     Affidavit of Detective Patrol Officer John Hasswell

Exhibit 7:     Affidavit off Detective Patrol Officer James Ordway

Exhibit 8:     Affidavit of Sgt. Leo Fitzpatrick – Administrative Officer

Exhibit 9:     Affidavit of Sgt. Paul Lauzon – Traffic Safety Officer

Exhibit 10:   Affidavit of Sgt. Dunlop – Patrol Sgt./Area Commander

Exhibit 11:   Aff. of Sgt. Thomas Lamont - Patrol Sgt/Area Comm.

Exhibit 12:   Aff. of Sgt. Paul Thompson - Patrol Sgt./Area Comm.

Exhibit 13:   Affidavit of Sgt. Robert Hayes – Patrol Sergeant

Exhibit 14:   Affidavit of Sgt. Mark St. Hilaire – Patrol Sergeant

Exhibit 15:   Affidavit of Sgt. Robert Hoffman – Patrol Sergeant

Exhibit 16:   Affidavit of Sgt. Cara Rossi-Cafarelli - Patrol Sergeant

Exhibit 17:   Affidavit of Sgt. Richard Vieira – Patrol Sergeant

Exhibit 18:   Chief Mannix Deposition

## PLAINTIFFS' RESPONSES

1.    Agreed.

2.    Agreed to the extent that such documents are identical to the contact material attached to Plaintiffs' Appendix of Exhibits in support of its Statement of Material Facts Of Record filed on November 1, 2006 in support of Plaintiffs' own Motion For Summary Judgment at Exhibits 1-4.[1]  (Pl. Nov. 1 Appx. at Ex. 1-4.)

3.    It is agreed that Plaintiffs receive a fixed base amount of compensation each week, regardless of the number of hours that they work, which in all instances exceeds $455.  With respect to subparts "a", "b" and "c", Plaintiffs respond as follows:

       a.    With respect to the allegation regarding Supervisory compensation, Plaintiffs admit this fact only to the extent that the paraphrase comports with express language of the collective bargaining agreement (CBA) between the Superior Officers' union, I.B.P.O. Local 622 ("Local 622") and the Town of Natick ("Town") at Article XVIII entitled "Supervisory Compensation", and otherwise denied.  (Pl. Nov. 1 Appx. at Ex. 3 at page 8.)  The language of that article speaks for itself.[2]

---

[1]    Said Plaintiffs' Statement filed on November 1, 2006 shall hereinafter be referred to as "Pl. Nov. 1 Facts at __" and said supporting appendix as "Pl. Nov. 1 Appx. at __".

[2]    Any legal argument about the meaning of that argument asserted by Defendants will be addressed, as necessary, in Plaintiffs' memorandum of reasons.

b.     The allegation regarding other compensation is true. Plaintiffs further reference the specifics at ¶¶3-4, ¶¶9-20 of their November 1 Statement of Facts and supporting documentation and incorporate same.

c.     The allegation regarding overtime for Superior Officer Plaintiffs is admitted only to the extent it comports with the express language of the Local 622 CBA.  (Pl. Nov. 1 Appx. at Ex. 3-4.)[3]

5.     Paragraph five of Defendants' Statement is the same allegation as appears at ¶4(a) above, except that it includes further paraphrase and quotation of the exact language.  Plaintiffs incorporate their response at ¶4(a) above as relates to this allegation.

6.     Agreed to the extent that the contractual material cited by Defendants is identical to that set forth at Exhibits 3-4 of Plaintiffs' November 1 Statement of Facts.

7.     Agreed except to the extent that Defendants imply the level of management or direction by one level of the chain to the other by use of the word "supervision".  The exact relationship between the ranks and the degree of management and direction between them is the topic of extensive factual discussion below and that is incorporated in this response.  (See infra at ¶¶10-53)

8.     Agreed.

9.     Agreed.

---

[3]     Any legal argument about the meaning of that argument asserted by Defendants will be addressed, as necessary, in Plaintiffs memorandum of reasons.

10.    Agreed, except to the extent that specific duties are implied by use of the word "authority".

    a.    Agreed, except to the extent that specific duties are implied (without specification) by use of the words "supervision", "coordinating", and "purchases".

    b.    Agreed, except to the extent that specific duties are implied by the use of the phrase "he has the assets of all of the supervisors".

    c.    Agreed, except to extent that specific duties are implied by the use of the expression "According to".

11.    Agreed, only to the following extent:  While it is true that the Department contains units referred to as "Divisions", the so-called "Commanders" of those divisions do not operate those divisions "independently" to the extent that each Division Commander must run the Division in accordance with specifications outlined by the Police Chief, longstanding techniques of police work, laws of the Commonwealth, and the rules, regulations, policies, procedures and general orders established by the Police Chief.  Decisions of the commander are not independently made, but subject to specifications from these external sources (i.e., sources other than the superior officer's own personal beliefs and opinions).  (Ex. 1-4 at ¶7(a)) None of the Superior Officer Plaintiffs are in control of any portion of the budget or discretionary funds.  (Ex. 1 at ¶7(a); Ex. 2 at ¶7(a), Ex. 9 at ¶7(a); Ex. 10-17 at ¶7(a))

12.    Agreed that Sergeants Fitzpatrick and Lauzon are currently assigned to the posts stated, but denied to the extent that the assignments are characterized as "independent command-level positions".  With regard to this denial Plaintiffs refer the Court below in general to ¶¶13-53, and to the specific discussion of the positions of these Sergeants below at ¶¶32-33, all of which describe the level of "independence" or lack thereof of those position and that evidence is incorporated here.

13.    Agreed that the individuals so referenced are <u>currently</u> assigned to such identified units of the Police Department, but denied to the extent that the word "Division" in Defendants' statement is intended to mean that each "Division" is a separate and independent Division of the Police Department. With regard to this denial Plaintiffs refer the Court below in general to ¶¶10, 14-53, which otherwise describes the relationship of each of the labeled "Divisions" and their Commanders to the Police Department.

14.    Agreed that all individuals who have held the assignment of Lieutenant, Traffic Safety Officer, and Administrative Officer from at least 2001 to present have been members of the Chief's Command Staff, but denied to the extent that the allegation is ambiguous insofar as it may imply that the same individuals held those assignments for the entire time from 2001 to present. Sgt. Lauzon has only been on the Command Staff since his reassignment from Patrol Sergeant to Traffic Safety Officer since July 2005; Lauzon's predecessor as Traffic Safety Officer was retired Superior Officer Plaintiff Robert L. Davis. (Ex. 9 at ¶¶2, 7(f), 7(g))

15.    Agreed that the Command Staff typically works a Monday through Friday, 8AM to 4PM schedule, "commonly referred to as a 5 and 2"  With respect to the allegation at subparagraph "a" of ¶15, it is denied that the Command Staff meets "regularly, as often as several times a week, to discuss and consult on significant issues in the Department."  Rather, the following are the facts relating to the frequency of the Command Staff meetings:  Some weeks there are command staff meetings and sometimes there are no Command Staff meetings for several weeks.  Rarely are there more than one Command Staff meeting in a week.  Individual lieutenants such as Lt. Mabardy are sometimes not even informed of the Command Staff meetings and do not attend.  Sgt. Lauzon is not requested to attend nor does he regularly attend these meetings.  A command staff meeting most often consists of a short conversation about what is happening in the Department.  Typically only two people speak during a command staff meeting – Chief Mannix and Lieutenant Mason.  At best up to two to three times per year there may be a week with multiple Command Staff Meetings.  (Ex. 1 at 7(h); Ex. 4 at ¶7(f); Ex. 3 at 7(i); Ex. 2 at 7(e); Ex. 8 at 7(f); Ex. 9 at 7(f))  The Defendants' citation in this paragraph to the testimony of now-retired Sgt. Jeffrey Longtine relates to staff meetings, not Command Staff meetings.  (Def. Exh. G at 20:5-23.)

16.    Agreed regarding the 4-2 schedule for other officers and that this means that, by operation of math, some weeks they work four regular shifts (1/3 of the time) and some weeks they work five regular shifts (2/3 of the time).

17.    Agreed that various duties and responsibilities of the Patrol Officers, Sergeants, and Lieutenants are "spelled out" in the Department Policies and Procedures, and other duties are as assigned by the Police Chief.  With regard to the allegation that some "other duties" are assigned by "a supervisor with authority to so delegate" this is denied to the extent that the Defendants imply that such supervisor independently fashions his/her own standards rather than applying longstanding techniques of police work, knowledge and techniques of police work obtained from Police Academy training, formal education and annual inservice training, standards established by constitutional and statutory at the federal and state level, and the vast sum of Rules, Regulations, Policies, Procedures and General Orders of the Police Chief that dictate the course of how such duties must be performed.  (Ex. 1 at ¶¶3-6, ¶7(g), and generally at ¶7, and at Attach. A; Ex. 4 at ¶¶3-6, ¶7(e), and generally at ¶7; Ex. 2, 3, 8, 9 at ¶¶3-6 and generally at ¶7; Ex. 10-17 at ¶¶ 3-6, ¶7(a), and generally at ¶7)) The citation to Chief Mannix's affidavit at ¶21 in support of this paragraph of the Defendants' Statement supported the indented item "a"; the balance of the paragraph has no citation.

18.    Agreed that the job description of the Patrol Officer makes such statements at Part B, ¶¶1 and 3.  (Def. Facts at Ex. H.)

19.    Agreed that the job description of the Sergeants states the words paraphrased by Defendant at Part A Summary, first paragraph.  (Def. Facts at Exh. I.)  To the extent that Defendants imply in such paraphrase that his is how the duties are actually performed, the allegation is denied and Plaintiffs

8

incorporate by reference ¶¶10-53 of this Statement to the extent such generalized allegation is more specifically stated by Defendants and responded to by Plaintiffs.

20.    Agreed that the job description of the Sergeants in the Summary states the words quoted by Defendant.  (Def. Facts at Exh. I.)

21.    The job description speaks for itself and is controlling as to its contents.  As a general matter, Plaintiffs agree that the job description states that Sergeants are "charged with ensuring compliance with the Department's regulations" and "monitoring the patrol officers performance and discipline" (i.e., discipline in the sense of maintaining professionalism, not imposing corrective action for wrongdoing).  There is reference at Part B, ¶1(c) of the Sergeant's job description to "discipline" in the job description and "referral" of matters to the superior officer, but Plaintiffs deny that any such authority actually exists to issue discipline or authority to do more by such referral than report the allegations via a document entitled Supervisor's First Report of Complaint.  With regard to the claim that Sergeant provide "instruction" to the Patrol Officers, it is true that the job description states words to the effect that each Sergeant must be equipped with knowledge of the Police Department's rules, as well as laws and regulations relating to police work, so that they are capable of providing instruction to patrol officers in the "proper discharge of their duties" at Part B, ¶1(a) of the Sergeant's job description.  However, Plaintiffs deny any implication that this instruction is given based upon independent judgment, but rather that such instructions are given occasionally

by application of external standards dictated by the Chief, longstanding techniques of police work, and the law, and Plaintiffs deny any implication as to the frequency or primacy of that function in the overall role as Sergeants. (Ex. 1 at ¶7(c)(d), ¶8, and ¶7 generally; Ex. 9 at ¶7(b)(c), ¶8, and ¶7 generally; Ex. 10-12 at ¶¶7 (a), ¶7(d) and ¶7 generally; Ex. 13-17 at ¶7(a), ¶7(c), ¶7(n) and ¶7 generally)

22.    Agreed that the Lieutenant's job description addresses the topics stated at ¶22 of Defendants' Statement, although the job description speaks for itself.  Denied to the extent that Defendants imply that the text of such job description is fully accurate in describing the actual job duties of the Lieutenants.  (Ex. 1 at ¶¶7(e), 9, and ¶7 generally; Ex. 4 at ¶¶7(b), 8, and ¶7 generally; Ex. 2 at ¶7 generally; Ex. 3 at ¶7(d)-(g) and ¶7 generally)

23.    Agreed.

24.    Agreed that the Town is divided into three physical areas as delineated.  However, Plaintiffs deny that the duties of the Sergeant designated as "Area Commander" include any substantial direction of other employees; any substantial frequency of such direction; or that such direction is based upon anything other than an application of external criteria, i.e., longstanding techniques of police work, knowledge obtained from the Academy and annual inservice training, mandates of the federal and state laws and constitutions, and the Chief's Rules, Regulations, Policies, Procedures and General orders, all of which combine to dictate the decisions made by the "Area Commander".  The duties that come with the scope of Area Commander account for very little of

the work time of the three Patrol Sergeants assigned to this function.  The Defendants' citation of the deposition testimony of Sgt. Lamont in this paragraph includes Sgt. Lamont's statement that he is not "in charge of the problem-solving process", which is omitted from Defendant's Facts in ¶24. (Def. Facts Exh. M at 6:19-21)  There is no reference to Area Command at the pages cited by Defendant for Sgt. Thompson in Defendants' Statement.  (Ex. 10 at ¶¶3-6, ¶7(a), (c), (d); Ex. 11 at ¶¶3-6, ¶7(a), (c), (d); Ex. 12 at ¶¶3-6, ¶7(a), (c), (d))

25.    **[Lt. Pagliarulo]**  Plaintiffs agree that Lt. Pagliarulo leads the Patrol Services Division, and that said Division was formerly lead by Lt. Alfred Grassey.  To the extent that the Defendants imply duties by use of the word "command" or "commanded", it is denied.  The Chief admits he does not know how much time Lt. Pagliarulo spends on directing any department employees. (Ex. 18 at p. 364-365)  Rather, the duties of the position are as otherwise stated herein.  With respect to the subparagraphs "a" through "f" in ¶25 of Defendants' Statement, Plaintiffs respond as follows:

a.    Agreed, except to the extent that specific duties are implied (without specification) by use of the expressions "in charge", "report directly", "report" and "supervises".  The specific duties of Patrol Division Commander are as otherwise stated herein.  With respect to scheduling the deposition citation set forth by Defendants indicates that scheduling and days off are established by the Chief and that the Patrol Division Commander simply applies those rules.  (Def. Facts at Ex. E at 7:1-21; see also Ex. 3 at ¶7(g))

b.     Agreed, except to the extent that specific duties are implied (without specification) by use of the words "supervises", "directs", "manages", "inspects", and "reviews".  The specific duties of Patrol Division Commander are as otherwise stated herein.

c.     Agreed.

d.     Agreed, except to the extent that specific duties are implied (without specification) by use of the words "Command", "suggestions", "guidance", "opinion", and "consults".  The specific duties of the Patrol Division Commander as a member of the Command Staff are as otherwise stated herein.

e.     Agreed, except to the extent that specific duties are implied (without specification) by use of the word "input".

f.     Denied.  There is no known requirement that the Chief give any weight to Lt. Pagliarulo's input.  (Ex. 3 at ¶7(p), (r)-(u) and ¶7 generally) There is no foundation to establish what weight if any is given to Lt. Pagliarulo's infrequent input.  The allegation in the affidavit is too non-specific to be valuable.

Much of Lt. Pagliarulo's work consists of "housekeeping duty" such as scheduling other officers.  Staffing requirements are set by the Chief and officers can only bid on shifts in accord with the union contracts.  Lt. Pagliarulo does scheduling in accord with the above rules and documents.  Lt. Pagliarulo oversees the auxiliary police and he occasionally alerts Sergeants to an ongoing situation in the Town.  (Ex. 3 at 7(d)-(g)) With regard to the inconsistent instances when Lt. Pagliarulo did give input on

matters of hiring, firing, discipline or promotion, at no time has the Chief stated, prior to this litigation, that he will "give substantial, significant, and meaningful weight" to his input on hiring, firing, discipline or promotions.  This litigation is the first time this statement has been made.  Nor are there any documents that identify the specific weight that should be accorded to any input that Lt. Pagliarulo gives.  For discipline in excess of a five day suspension the authority for imposing such discipline or termination rests solely with the Town's Board of Selectmen.  In that context, Lt. Pagliarulo has made no recommendations and does not communicate with the Board.  Nor is there any known document where the Board of Selectmen was provided with Lt. Pagliarulo's views and where the Board articulated that his view would be followed.  (Ex. 3 ¶¶7(j), 7(l), 7(o) and generally at ¶7)

26.    Agreed that each shift is lead by a Sergeant, one inside referred to as the Station Supervisor, and one outside referred to as the "Patrol Supervisor" (or "Field Supervisor").  Agreed that assignments to shifts are determined based upon seniority, as outlined in the CBA.  However, to the extent that, by use of the expression "supervised" without specification, Defendants imply facts relating interaction between Sergeants and Patrol Officers, any such implication is denied.  Rather, the interactions between the Sergeants and the Patrol Officers is very limited and Patrol Sergeants engage in very little observation or monitoring of the work of Patrol Officers as defined with greater particularity in the attached affidavits.  (Ex. 1 at ¶7(c); Ex. 10-12 at ¶7(a), ¶7(d), ¶8(e) and ¶9; Ex. 13-17 at ¶7(a), ¶7(c), ¶8(e) and ¶9)  The Chief

admits he does not know how much time Patrol Sergeants spend directing patrol officers. (Ex. 18 at 343)

27.    Agreed that the Sergeants are the "first line supervisors of the Patrol Officers in the Chain of Command," and they have responsibility albeit infrequent to interact with patrol officers to interact with patrol officers to guide them to performance that is consistent with external mandates and longstanding techniques of police work when an issue arises. None of the deposition material presented by the Town provides specifics relating to this allegation of "supervision" or the frequency of such "supervisory" interaction. (Ex. 10-17 at ¶7(a))

28.    The Town's allegations relating to specific duties in ¶28 are disputed in sub-paragraphs "a" through "k", as follows:

a.    Given the length of Plaintiffs' rebuttal to subparagraph "a" it is broken into five parts:

a-1.    The Defendants' Facts contains a typographical error to the extent that at ¶28(a) it states that "Patrol Officers conduct roll call". This is denied and there is no evidence attached which reflects this. Agreed that Patrol Sergeants perform roll call, but this task is clerical in nature. With respect to the information that is provided as described in ¶28(a), it is a matter of the Sergeant simply repeating what has been handed down from the ranks that must be read at roll call. With regard to assignments, they are made in advance by others and not by the Sergeants at roll call.

There are times when Sergeants make a minor adjustment in assignments due to a patrol officer from one Area being absent (e.g., sickness, vacation). The Sergeant in this instance would simply observe the staffing shortage on the roster in one Area and assign someone from an Area that has double coverage to work in Area with no officer assigned. That decision requires nothing more than a rote application of existing standards, which require that there be at least one officer assigned to patrol each designated area. That decision in any event would be based upon longstanding principles of police work that each Sergeant learned over the years relating to volume of activity and the need for an officer to patrol such area. Roll call typically lasts about fifteen or so minutes. (Ex. 1 at ¶7(d); Ex. 10-12 at ¶7(d); Ex. 13-17 at ¶7(c))

a-2. <u>Station Supervisor.</u> With regard to the allegation that Sergeants are responsible for "directing and overseeing the Patrol Officers at all times", this is not accurate. Throughout the balance of a shift there is at best infrequent interaction and monitoring of Patrol Officers. Regarding the Patrol Sergeant's role as Station Supervisor, the Station Supervisor is involved in activities such as booking prisoners (which in many police departments is done by patrol officers), administering breathalyzer tests, checking station security, and responding to calls from the public. None of that entails affording guidance to Patrol Officers. While it is true that

the Station Supervisor would monitor what dispatchers were saying in routing call responses to officers in the field, it would be an anomaly for there to be such intervention.  Another interaction that happens occasionally between the Station Supervisor and the dispatchers would be when the dispatchers come to the Sergeant and say that they just received a phone call and are confused on how to proceed.  As Station Supervisor the Sergeant would respond by explaining what they should do.  Furthermore, where Sergeant's infrequently would find that a second car should be sent or explain in response to a dispatcher question how they should proceed in a confusing situation, the instructions would not based upon my the Sergeant's own personal opinions or special brand of police work, but instead based upon long known standards and techniques of police work as well as knowledge that they obtained from the Police Academy and the Chief's printed guidelines (i.e. two officers should be assigned to a Domestic).  (Ex. 1 at ¶7(d), Attach A generally; Ex. 10-12 at ¶7(d); Ex. 13-17 at ¶7(c))

a-3.   Station Supervisor – report review and other "monitoring".  In a given week there may be a couple instances where a Station Supervisor, who has the responsibility to review reports submitted by Patrol Officer, would have a conversation with an officer about writing a report about an incident.  Under the report writing system that has been used since December 2003,

report writing is even more automatic since that system prompts officers for information under each category necessary.  Some reports are even more rote since they are governed by guidelines of the federal or state government.  For example, state guidelines and the Chief's established procedures dictate the type and content of the report for particular crimes such as for domestic violence and situations of "use of force".  This review is nothing more than detecting discrepancies between the report filed and what the external mandates require.  As Station Supervisor the only monitoring that takes place is by aforementioned report review process, listening to what the dispatchers say, and listening to the radio for what patrol officers state on the radio.  With respect to the radio, what patrol officers say over the radio gives little if any indication of whether a patrol officer is even performing up to standard.  Therefore, by monitoring the radio Sergeants are not effectively monitoring the performance of Patrol Officers for discrepancies.  In fact, since September 2001, there has not been a single instance where a Sergeant discerned any sub-standard performance of a Patrol Officer by radio.  There are no other instances of interactions, which require instruction when the Patrol Sergeant functions in the role of Station Supervisor other than as set forth above.  (Ex. 1 at ¶7(b), ¶7(d); Ex. 10-12 at ¶7(a) and ¶7(d); Ex. 13-17 at ¶7(a) and ¶7(c))

17

a-4.  Field Supervisor.  With regard to interaction between Patrol Officers and the Field Supervisor, it as well is infrequent and limited.  This is because the patrol officers are equipped with the same or similar training as the Sergeants and are governed by the same external standards that dictate how they must perform their jobs.  Sometimes a Patrol Officer may seek guidance from the Sergeant and ask a question about how to proceed, and in that instance the Sergeant explains what those external mandates require, not what the Sergeant is requiring them to do from his/her own independent discretion.  Likewise, if a Field Supervisor happened to observe performance that violated such standards, the Field Supervisor could re-direct the Patrol Officer to the course of conduct that conforms with those standards, all of which are determined by sources external to Sergeant rather than the Sergeant's own personal independent discretion.  Furthermore, Sergeant's are forbidden from issuing guidance or direction to Patrol Officers that would be inconsistent with that established by special techniques long known to the field of police work, Academy training, and rules, regulations, policies, procedures and general orders of the Police Chief.  Finally, although a Sergeant may report to a particular incident, it is not the Sergeant that takes command of the situations necessarily.  Rather Departmental policy referred to as the "Incident Command System" ("ICS") dictates how the

18

response will occur and it provides for the most knowledgeable officer at the scene to take charge. (Ex. 1 at ¶7(d); Ex. 10-17 at ¶¶7(a), 8(e), 8(f); Ex. 1 at Attach. A at Item 33 (p. 128))

a-5.  Summary.  In summary, each Sergeant has testified that the department is so well formatted by virtue of the Chief's guidelines and the other sources mentioned above, that responses are automatic and not subject to independent discretion.  The benefit of that system is the comfort that someone has already devised a response to each situation and the sergeant involved with that system is simply applying those external standards in responding to each given situation.  (Ex. 1 at ¶7(d); Ex. 10-12 at ¶7(d); Ex. 13-17 at ¶7(c))

b.    At ¶28(b) the Town states that Sergeants make sure that "Patrol Officers are following the policies and procedures of the Department." This is true, but only to the extent delineated supra at ¶28(a) including a-1 through a-5.

c.    At ¶28(c) the Town states that Sergeants provide guidance and feedback to Patrol Officers who are not performing their duties properly, referring to this as "verbal counseling", or that they provide written reports if the incident rises to the level of requiring reporting.  The frequency and scope of such guidance and feedback is only as indicated above, supra at ¶28a including at a-1 through a-5.  When such "verbal counseling" occurs it is simply based upon observation of performance that is not in accord with the

external guidelines established by the laws, the Chief, and by longstanding well-known techniques of police work.  It is no in way established by any special rule that the Sergeant's independently fashion.  With respect to written reports being submitted there is not one instance since 2001 where a Sergeant has submitted such supposed written reports.  To the extent that the Town is referring to submission of document entitled "Supervisor's First Report of Complaint" as required by the Chief's General Order On Professional Standards, said report simply summarizes the citizen complaint allegations and no findings are made by the superior officer completing such report  Completion of the Supervisor's First Report is nothing more than a rote activity of simply listing allegations and passing those allegations via this Form up the chain of command for review by someone else.  No other reports are provided or have been provided since at least 2001.  (Ex. 1 at ¶7(b), (s), (v)**;** Ex. 10, 12 at ¶7(m), ¶7(o), ¶7(q); Ex. 11, 16 at ¶7(m); Ex. 13-15, 17 at ¶7(l))

       d.    Agreed only to the extent set forth in ¶28(a-3) <u>supra.</u>

       e.    Agreed only to the extent set forth in ¶28(a-1) <u>supra.</u>

       f.    Agreed that Sergeant Longtine attended staff meetings and that he brought the information he received back to the Patrol Officers, as reflected by his deposition testimony cited by Defendants, Def. Ex. G at pages 20-21.  In addition to the sergeants and lieutenants, the Union President for the Patrol Officers Union also attends such meeting.  (Ex. 4 at ¶7(f))

       g.    Denied that Sergeant's independently have the right to authorize overtime.  The citation referenced by Defendants simply states that

an overtime shift can be "assigned", but it does not state the parameters or enough specifics to know whether such overtime is issued pursuant to mandates as a matter of course (e.g., compliance with mandate of Chief relating to staffing levels). The facts are as follows: Sergeants are authorized to fill overtime if staffing falls below the minimum established by the Chief. This minimum, although not set in stone is reflective of staffing needs as established by calls for service in times past. Openings can be caused by illness or scheduled time off. Officers (up to five) are allowed to take a day off if staffing levels are met without invoking mandatory overtime. In fact, overtime may not be assigned unless it follows the Chief's specific rules regarding when it must be assigned to maintain minimum "manning" per shift or filling a specific need established by the Chief. Therefore, the assignment of overtime is a function of application of mandates of the Chief, not independent decision-making of the Sergeants. (Ex. 1 at ¶10; Ex. 10-17 at ¶8(j))

h.    Agreed that Sergeants, as testified to in the supporting affidavit cited by Defendants, may sign an overtime slip, but "generally" they do not do so, and when they do it is part of processing and verification of the overtime worked and that the slip is "accurate", not authorizing its performance. The citations of Defendants show nothing more than this. (Def. Facts at Ex. Z at pages 10:18 to page 12:8, especially at page 11 line 6 and page 12 lines 5-8)

i.    Denied that Sergeants have the authority to relieve a Patrol Officer duty "in circumstances warranting such action", without specification.

Rather, since at least 2001 no Sergeant has relieved anyone from duty as claimed. Moreover, to the extent that Town is referring to a serious issue such as a patrol officer, sergeant, lieutenant or the Chief himself, proceeding to engage in police duties while inebriated or otherwise incapacitated, all officers from patrol officer up the ranks have the power if not duty to relieve another of duty in such situation for public safety reasons. There are no other situations, other than situations where the officer or superior officer's performance will endanger the public, that allows for such relief from duty. There are no rules, regulations, policies, procedures, general orders, or any other Town document, which affords superior officers the right to suspend someone from duty. This power is vested solely in the Chief and the Board of Selectmen for suspensions from one to five days, and solely with the Board of Selectmen for suspensions of greater than five days up to termination, per Civil Service Law. (Ex. 1 at ¶7(w); Ex. 10, 12 at ¶7(p); Ex. 11 at ¶7(m); Ex. 16 at ¶7(n); Ex. 13-15, 17 at ¶7(m))

j.      Agreed generally that each Sergeant who is working as Field Supervisor drives a cruiser labeled "Supervisor".

k.      Agreed that Sergeant Thompson conducts training as the "firearms instructor" of the Department as cited by Defendants. (Def. Facts at Exh. V at 20:9 to 22:21) There is no evidence otherwise cited and therefore no facts establishing that any other Sergeant has such training. Further, with respect to this, Thompson is applying standards and techniques of firearms

that are longstanding, and not based upon any personal brand of firearms use that he devised.  (Ex. 12 at ¶¶3, 3(j), 4, and 6)

l.    Additional cross motion point:  As a general matter each Sergeant does not participate in interviewing and selecting Department employees; does not set or adjust rates of pay and hours of work; does not direct any employee's work, except in accordance with external standards and only to the limited extent set forth above; does not maintain production records for use in supervision or control; does not appraise employee productivity and efficiency for the purpose of recommending promotions or other changes in status; does not handle employees' complaints and grievances except when addressing informal "grievances" about matters like detail assignments to the extent set forth above;  does not plan any employee's work except to the limited extent set forth above; does not determine or set the work techniques to be used;  does not participate in apportioning the work among the workers, except in rare occasions noted above; and does not participate in determining the type of materials, supplies, or tools to be used in the course of an employee's duties.  (Ex. 10-17 at ¶9)

29.    **[Detective Patrol Officers – Investigative Services Div.]**  Agreed that Detectives are organized into the Investigative Services Division and that said Division is lead by Lieutenant Mabardy currently, and that each of them holds the rank of "Patrol Officer", just like Patrol Officers assigned to the Patrol Division.  With respect to each of the sub-paragraphs "a" through "d" of ¶29 of Defendants Facts, Plaintiffs respond as follows (there is an addition sub-

paragraph "e" which contains additional rebuttal facts pertaining to Detectives and ¶29 generally):

a.    Regarding ¶29(a), agreed that the detectives are experienced Patrol Officers, many of whom have developed greater knowledge in specific areas of investigation.  Denied that this greater knowledge is "expertise" in the formal sense of that phrase.  None of the Detectives who have such greater knowledge is qualified to testify in court as an "expert" relating to such matters. The claim of Defendants that Lieutenant Mabardy testified to the contrary of this is mis-reading of his deposition, i.e., the cited sections of his deposition do not establish that they are "experts", but instead that through "experience" they have gained greater knowledge in specific areas.  (Ex. 4 at ¶¶10-11; Ex. 5 at ¶¶10-11; Ex. 6 at ¶¶10-11; Ex. 4 at ¶7(c); see also Def. Facts at Ex. X at page16:6-7 and at page 19:22-23 compare at Def. Facts at Ex. X at page 20:1-2 where Lt. Mabardy refers to accumulation of knowledge as "expertise")

b.    At ¶29(b) the Town states that "The detectives work independently, when it comes to making case-specific decision about the direction of the investigation and the collection of evidence, and related activities".  This is not accurate.  The Detectives may make an evaluation of what to do to investigate, but it is not independent to the extent that (1) they do so subject to longstanding techniques of police work that they are all trained in and pursuant to rules and regulations and other printed rules of the department and the law; (2) the Detective's work product is presented in a report which is submitted to the Lieutenant for review and referral back to

24

them for revision at times to ensure compliance with such standards (i.e., to correct any discrepancies); and (3) there is discussion on a daily basis of the status of case investigations. (Ex. 5 at ¶9; Ex. 6 at ¶9; Ex. 7 at ¶9; Ex. 4 at 7(c))

        c.     At ¶29(c) the Town states, "Each detective exercises discretion and relies on his or her own experience and expertise, in the conduct of investigation." This is inaccurate to the extent that Detectives use discretion, but it is subject to standards that they do not establish. Rather, those standards are governed by sources external to them, including training at the Academy, the requirements of the General Laws and state police crime investigation criteria, longstanding techniques of police work that they have all been trained to understand and apply by more experienced colleagues, sergeants, and lieutenants over the years, and the standards set forth by the Chief in his Rules, Regulations, Policies, Procedures, and General Orders. Moreover, this is the same as police work of a patrol division patrol officer, but the detective work focuses exclusively on crime investigation. The only difference between the Patrol Officers in the Patrol Division and those assigned as Detectives is that the Detectives have the luxury of more time to follow up on all aspects of the investigation than Patrol Officers in the Patrol Division. Each Detective testifies that there are no decisions that he/she makes in the conduct of an investigation that is based upon independent, self-created standards and discretion. Rather, all aspects of the investigative work including decision-making is governed and dictated by the external mandates

and longstanding police techniques.  (Ex. 5 at ¶¶3-6, 10; Ex. 6 at ¶¶3-6, 10; Ex. 7 at ¶¶3-6, 10; see also Ex. 4 at ¶3-6, ¶7(c), (d))

       d.     Agreed to the extent consistent with <u>supra</u> at ¶29(a) and the discussion of the distinction between greater knowledge as compared to being an "expert".  (Ex. 4 at ¶¶10-11; Ex. 5 at ¶¶10-11; Ex. 6 at ¶¶10-11; Ex. 4 at ¶7(c); see also Def. Facts at Ex. X at page16:6-7 and at page 19:22-23 compare at Def. Facts at Ex. X at page 20:1-2 where there is reference to "expertise".)

       e.     <u>Additional rebuttal regarding ¶28 of Defendants' Statement.</u>

       (i)     The work of Patrol Officers assigned as Detectives is similar to the work of Patrol Officers in the Patrol Division to the extent that each Patrol Officer, regardless of whether he or she is assigned as a detective or patrol officer in the patrol division, is required to apply the external mandates referenced above, as well as longstanding techniques of police work.  Those standards dictate how said patrol officers must investigate crimes and enforce the law.  The only difference between a patrol officer in the patrol division and one assigned as detective is that the detective are afforded more time, more frequently to follow-up on investigations.  Detective patrol officers, just like patrol officers in the patrol division examine the evidence before them, determine whether there is probable cause, and determine whether to cease investigation.  The terminology for ceasing an investigation by a patrol officer at a motor vehicle accident is referred as to "clearing"

the scene.  The same police analysis is applied when the detective patrol officers completes his or her own investigation and submits a report stating that no further investigation is required and that a case may be closed without charges.  Similarly, just like patrol officers in the patrol division who may choose to take no enforcement action at a motor vehicle accident or other incident, detective patrol officers as well look at the facts before them and apply police knowledge to decide whether to issue a warrant, take out a criminal complaint in district court, seek a warrant, or other disposition.  (Ex. 4 at ¶¶8, 10; Ex. 5 at ¶¶8, 10; Ex. 6 at ¶¶8, 10; Ex. 4 at ¶7(d))

(ii)    The Chief reinforces that detectives are not separate and distinct patrol officers, and that they are just another assignment of a patrol officer.  For example, the Chief has detectives attend roll call side by side along with patrol offices of the patrol division, and the Chief makes the assignment of patrol officers to detective on a temporary basis so that the Chief can attempt to reassign detectives as the Chief sees fit.  (Ex. 4 at ¶¶2, 8; Ex. 5 at ¶¶2, 8; Ex. 6 at ¶¶2, 8; Ex. 4 at ¶7(d))

(iii)    There is not one shred of work by a detective that has to do with creating policies or servicing the internal operation of the police department itself.  Rather, the vast sum of Detective work is actual police work as noted above.  Again, the very decision

27

to close an investigation is an application of police knowledge to the case file, and it is identical (albeit in a different context) to a police patrol officer making a decision to clear the scene of a motor vehicle accident and take no enforcement action. None of the detectives have anything to do with administering payroll, distributions of details, or other payroll or other internal human resource functions. Nor do any of the patrol officers or detectives control of any portion of the budget or discretionary funds. (Ex. 4 at ¶12(a); Ex. 5 at ¶12(a); Ex. 6 at ¶12(a); Ex. 7 at ¶12(a))

(iv)    The Detectives do not work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. (Ex. 4 at ¶12(b); Ex. 5 at ¶12(b); Ex. 6 at ¶12(b); Ex. 7 at ¶12(b))

(v)    The Detectives from at least 2001 to present have not had authority to formulate, affect, interpret, or implement management policies or operating practices; they have not carried out major assignments in conducting the operations of the business itself; they have not performed work that affects business

operations to a substantial degree; they have not had authority to commit the Town or Department in matters that have significant financial impact; they have not had the authority to waive or deviate from established policies and procedures without prior approval; they have not had the authority to negotiate and bind the Town or the Department on significant matters; they have not provided consultation or expert advice to management, and their collaborative discussions with each other and others is identical to what patrol officers do when they process information and it is based upon accumulated knowledge in police work in general and particular areas thereof and longstanding techniques of same; they have not been involved in planning long- or short-term business objectives; they have not investigated and resolved matters of significance on behalf of management but instead engaged in the investigative police work of the police department; and they have not represented the Town or the Department in handling complaints, arbitrating disputes or resolving grievances. (Ex. 4 at ¶12(c); Ex. 5 at ¶12(c); Ex. 6 at ¶12(c); Ex. 7 at ¶12(c))

(vi)    Nor do patrol officers in general, or detective patrol officers in the patrol division, perform functions that relate to management. None of the patrol officer detectives or patrol officers in the Patrol Division have anything to do with the process relating to hiring, firing, promotion, discipline or causing any other

29

changes in working conditions.  Nor do any of employees in the

classification of patrol officer have anything to do with directing the

work of others.  Rather, they perform their jobs as patrol officers,

albeit in different assignments, under the foregoing external

standards and special longstanding techniques of police work.  (Ex.

4 at ¶13(a); Ex. 5 at ¶13(a); Ex. 6 at ¶13(a); Ex. 7 at ¶13(a))

30.    **[Lt. Mabardy – Investigative Services Div.]**  Agreed that

Lieutenant Mabardy assigns cases for follow-up, coordinates the work of the

detectives by ensuring that their case loads are even, that he reviews the

detectives work insofar as the Lieutenant has daily discussions with the

detectives about their investigations, and that he engages in report review.

Agreed that there are seven detectives and that he leads the unit and that all

seven detectives work under his leadership.  Agreed as to ¶30 and sub-

paragraphs "a" through "e" except to the extent they imply facts other than the

following:

No independent discretion.  Denied that in performing these functions Lt.

Mabardy makes his own rules and decisions on how the Division will be

operated.  Rather, he operates the Division in accordance with departmental

procedures, laws, and longstanding techniques of police work.  There is no

element of the operation that Lt. Mabardy has simply decided upon without

regard to such departmental procedures, laws, and longstanding techniques of

police work.  (Ex. 4 at ¶¶6, 7(c))

<u>Assigning cases – clerical task.</u>  Further, the allegation is denied to the extent it implies that the task of allocating cases to these seven detectives is something other than a clerical activity that requires discretion.  Rather, Lt. Mabardy sends cases of a particular area to the detectives who have greater knowledge in that area, and otherwise assigns general investigations in a manner that makes the caseload of each detective relatively equal.  (Ex. 4 at ¶7(c))

<u>Coordinating investigations – ordering different course of investigation rare and not primary function.</u>  With regard to "coordinating" the Defendants' statement is denied to the extent it implies facts other than as follows:  On a daily basis when Lt. Mabardy engages in such discussions with the detectives he routinely offer no suggestions.  Sometimes he discusses different options with detectives and they reach a common understanding.  It is rare that there are divergent views on how the investigation should proceed.  If that were to happen the Detectives must proceed in accordance with Lt. Mabardy's position on that matter.  The reason why divergence in this regard is rare is because the detectives and Lt. Mabardy share a common basis of training, exposure to long established techniques of police work and investigations, rights and limitations placed upon them by the Chief's rules, regulations, policies, procedures, and general orders that dictate how they must proceed in many cases, as well as the General Laws of Massachusetts and guidelines of the state police relating to investigative work.  Because of this, and because the divergence of how to proceed is so rare, Lt. Mabardy testifies that this is not the "primary function"

of his job.  Rather, by far, the discussion itself and the collaboration that leads
to Lt. Mabardy learning what the detectives are doing is far more prevalent and
crucial to his assignment as Lieutenant.  In fact, right now there are
approximately ninety-seven open cases under investigation and it would be
impossible for Lt. Mabardy to engage in the kind of "direct supervision" and
micro-management alleged by Defendants in their statement.  (Ex. 4 at ¶7(c);
Plaintiffs' Nov. 1 Statement of Facts, Ex. 24 at ¶3)

Report Review.  With regard to report review, to the extent that
Defendants imply that such function is other than as follows it is denied:  The
detectives, upon completion of an investigation, provide Lt. Mabardy with a
report that states the findings, areas of investigation, whether a complaint will
be filed, and whether they believe that there is no further area of investigation
and the case should be closed.  When Lt. Mabardy refers a report back to the
detective for further work it is not based upon his own independent rules and
style of police work, but rather based upon the external guidelines referenced
above and longstanding techniques of police work.  It is infrequent that Lt.
Mabardy sends a report back to an officer for follow up or revision.  (Ex. 4 at
¶7(c))

Power to assign patrol officers as detective.  With respect to the allegation
relating to the right of Lt. Mabardy to reassign Patrol Officers from the Patrol
Division to the detectives unit, agreed that during his tenure as Lieutenant in
the Investigative Services area there have been only two patrol officers
reassigned to this unit, Detective Daniel Brogan and Detective Kevin

Delehanty, about one year apart and that he was involved in this process.
However, this is a small fraction of Lt. Mabardy's role since there is little
turnover in the ranks of the patrol officer detectives.  Moreover, the decision to
reassign is made by the Chief, not Lt. Mabardy.  The Chief has never
articulated that he "expects" that Lt. Mabardy to select detectives prior to this
litigation.  (Ex. 4 at ¶7(d))

     <u>Authority to submit reports.</u>  The Town claims that Mabardy at
subparagraph "e" of ¶30 has the authority to submit reports about violations of
the rules.  The citation of Defendants reflects that this has never happened,
that Mabardy has not completed a report, and that any report would contain
the facts (rather than findings and conclusions).  (Def. Ex. X at pages 38-39.)

     31.   **[Lieutenant Grassey – Information/Communications Div.]**
Agreed that since December 2004 the Informational Services and
Communications Division is under the leadership of Lieutenant Brian Grassey.

     a.   <u>Supervision.</u>  Agreed that Lt. Grassey works as "a liaison
with the dispatch staff in case of any kind if difficulty that needs the Chief's
attention", as testified to by Lt. Grassey at the page of his transcript cited by
Defendants.  (Def. Ex. Y at 7:18 to 8:1)  Denied that his interactions with the
dispatchers constitute supervision in any meaningful way.  There are four-
subparts to the fact evaluation in this regard:

          (i)   Defendants' citation of testimony from Lt. Pagliarulo,
who does not work in this Division, about Lt. Grassey being a supervisor
of the dispatchers is an answer to an objected-to question asking for his

"opinion" rather than fact.  Therefore, the cited testimony lack foundation sufficient to establish fact about Lt. Grassey's actual job function.

(ii)     Defendants in this regard also cite the affidavit of Chief Mannix at ¶28.  There is no foundation to establish his first hand knowledge of this area and the allegation in the affidavit is too non-specific to be valuable.

(iii)     In opposition to said citations, Lt. Grassey's attached affidavit establishes based upon first hand knowledge that Chief Mannix's assertions about his job duties are inaccurate.  The position of Lt. Grassey does not even have a job description.  The primary duty of Lt. Grassey is to review reports rather than supervise anyone.  With regard to report review, he receives patrol officer reports in the form of an electronic file.  After he reviews the report he transmits it to the clerk of the courts and the district attorney's office if it complies with the law, printed guidelines of the Chief, and the clerk of the courts, and, if not, he must send it back to the officer for correction to remedy such discrepancy.  When Lt. Grassey finds such errors, it is based upon an application of the same external mandates mentioned above, rather than his own personal, independent decision-making about the form and content of a report.  This review of Patrol Officer's reports (and even more limited review of Detective's reports) is the full extent of his interaction with patrol officers regarding report review.  (Ex. 1 at ¶7(f))

      (iv)     In addition to report review, Lt. Grassey has interactions with the division staff itself. However, this requires little intervention since the "records division pretty much runs itself." The staff includes two transcriptionists who work independent of Lt. Grassey. They receive audio recordings of patrol officers' reports and transcribe them and provide them to Lt. Grassey. They require no direction. With respect to the Court Liaison Officer said Officer receives the finished reports and transports them to the Court and Lt. Grassey provides him no direction, and, at times the Court Liaison Officer even requests that Lt. Grassey repair some missing facet in the reporting dictated by external guidelines. With respect to the dispatchers, Lt. Grassey's involvement with them is minimal; it is limited to obtaining absence slips when one of them misses a day of work or presenting a complaint that they may have to the Chief. In short, Lt. Grassey does not directly supervise these employees, has at best infrequent interaction with all of them as relates to discussing the course of their work, and he issues no discipline to them. (Ex. 1 at ¶7(f))

    b.     Agreed to the extent expressed in subparagraph "a" above, that Lt. Grassey's main function is report review, and agreed that he reviews the reports for "completeness and accuracy" and transmits them back to the officers to correct any discrepancies as described in subparagraph "a" above. Denied that he "directs their further work", and the citations provided by

Defendants do not establish that his interaction is more than simply causing the Patrol Officer to correct the discrepancy as described above.

      c.     Agreed that Lt. Grassey is usually the last step in the review of reports before they go to the clerk of the courts or the District Attorney's Office. Denied that he is the "final authority" to the extent that the deposition testimony cited by Defendants does not state this phrase and denied to the extent it indicates that he is other than the last step in ensuring the quality and completeness of the reports in accordance with the external mandates such as from the Chief, the law, and the requirements of the Clerk of the Courts.  (Def. Ex. Y at 33-34; Ex. 1 at ¶7(f))

      d.     Agreed that Lt. Grassey oversees the dispatchers, and his interaction with them is to the limited extent described in subparagraph "a" above.

      e.     Agreed that Lt. Mason oversees Lt. Grassey, but denied that this is "supervision" to the extent that anything more than oversight is meant.  The deposition material cited by Defendants in his subparagraph does not reflect Lt. Grassey using the word "supervision".  With respect to the allegation that he "generally works independently" this is denied and the deposition testimony cited by Defendants indicates that Lt. Grassey's decision-making is dictated by longstanding techniques of police work, the mandates of the law (which govern for example that certain reports be processed immediately), and the rules of the Department.  Lt. Grassey applies those external standards; as he put it, "I don't

just pick and choose what I'm going to work on." (Def. Ex. Y at 20:3 to 21:6, and 26:12 to 28:1; Ex. 1 at ¶7(f), and generally at ¶¶3-6)

    f.    Agreed that Lt. Grassey as a member of the Command Staff had involvement in hiring and firing decisions, and disciplinary action, and that his opinions were sought in those decisions. Denied to the extent that his involvement or opinion was relied upon, meaningful, consistent, or was accorded specific or particular weight by the Chief or the Town. Rather, the facts in that regard are as follows:

    (i)    Command staff meetings are held inconsistently and when they are held, typically the Chief (and sometimes the Chief and Lt. Mason) are the only ones speaking and it generally relates to updates about what is happening in the Department. (Ex. 1 at ¶7(h))

    (ii)    <u>Hiring.</u> With regard to hiring, since December 2004 (i.e., when Lt. Grassey was promoted to Lieutenant) Lt. Grassey attended the interviews of six patrol officer candidates. At interviews he is actually given a question to ask. In any case the issue of whether to hire the candidate is a rote decision based upon application of civil service standards that require that someone be hired absent a disqualifying condition. Even where Lt. Grassey believed that there was a disqualifying condition in one case, his input on that was dismissed by the Chief and the Chief hired the candidate anyway. The presumption of hiring the first individual listed on the civil service list is so strong, as applied by the Chief (properly under Civil Service Law), that even if Lt.

Grassey or another were to express the strongest opposition to hiring someone, that candidate would remain first on the list and would not be bypassed absent an objective serious disqualifying condition. Moreover, even then, when a serious concern is raised as in the case of an officer who was hired that had serious financial difficulties (i.e., $600,000 mortgage, earning $14 per hour), still the Chief dismissed the concern in this regard when raised by Lt. Grassey. With respect to hiring dispatchers, although the Town alleges that Grassey is the supervisor of them, the Chief has hired two dispatchers without any consultation whatsoever with Lt. Grassey. In fact, the only time that he sought Lt. Grassey's input was after this litigation and depositions were underway in August and September 2006. (Ex. 1 at ¶7(i); Def. Ex. Y at 40)) For others like Lt. Mabardy who have been on the Command Staff for longer than Lt. Grassey (i.e., since at least 2001), they have not even been consulted in 40% of the occasions when someone was hired (i.e., 8 out of 12 times over five years). (Ex. 4 at ¶7(g)) The only person since 2001 who was first on the list that was bypassed was a candidate who actually lied in the interview about not having a serious disciplinary record when the Background Investigation showed otherwise. All others that were first on the list were hired. (Ex. 1 at ¶7(i); Ex. 4 at ¶7(g); Ex. 3 at ¶7(i))

      (iii)   <u>Firing.</u> With respect to Lt. Grassey's authority to effectively recommend termination of employment, there was only one incident that arose in this regard since his promotion to lieutenant in

38

December 2004.  In that case Lt. Grassey recommended that the Chief take out disciplinary charges for termination against Dispatcher Deborah Barnes.  The Chief rejected that recommendation and then Lt. Grassey recommended an alternate, more lenient response, of at least reassigning Dispatcher Barnes to a shift where the discipline problem could be avoided.  In that case the Chief rejected Lt. Grassey's alternate recommendation, without explanation, and without even notifying Lt. Grassey of his decision.  (Ex. 1 at ¶¶ 7(i), 7(u))

(iv)    Discipline.  There have been three suspension situations (other than Lt. Grassey's own suspension while a Sergeant) that arose since 2001.  Lt. Grassey was not consulted on two of those. With respect to the third, which occurred only after this lawsuit and discovery was underway, the Chief asked Lt. Grassey to address a situation involving tardiness of a Dispatcher.  Lt. Grassey presented a recommendation and it was rejected (the Dispatcher Biusi case).  The Chief then issued a reprimand with less severe language than that recommended by Lt. Grassey.  There have been no other situations when Lt. Grassey was involved in any way with discipline.  (Ex. 1 at 7(i), 7(u))

(v)    Promotions.  Two patrol officers were promoted to Sergeant since Lt. Grassey was promoted to Lieutenant in December 2004.  As a Lieutenant he was present during some discussions about filling those two open Sergeant slots.  Lt. Grassey concurred with the Chief's assessment that one of the individuals (Hoffman) was a fine

39

candidate for Sergeant, but offered dissent in regards to the second candidate.  In that second case he was not asked for his input.  He initiated it as an opinion outside of a Command Staff meeting.  In response the Chief dismissed Lt. Grassey's opinion stating, "I promised him I will promote him".  The Chief did not discuss Lt. Grassey's opinion or the basis for it.  Even the Executive Officer, Lt. Mason, was present for this exchange and had concurred with the opinion of Lt. Grassey.  That informal discussion concluded and the Chief promoted the officer at issue.  In each case the Chief presented the issue as though the matter had already been decided before the discussion.  (Ex. 1 at 7(i), 7(t))

g**.**    <u>"Substantial Weight".</u>  Denied with respect to the unsubstantiated allegation that the Chief accords substantial weight to the input of Lt. Grassey.  Until this very litigation, the Chief has never before stated that he will "give substantial, significant, and meaningful weight" to the input of Lt. Grassey or the other lieutenants on hiring, firing, discipline or promotions.  Moreover, that claim does not appear in any document.  There are no documents that identify the specific weight that should be accorded to any input given by lieutenants.  Finally, with respect to suspension of more than 5 days, hiring, firing and promotion decisions, the Town's Board of Selectmen makes the decision, not the Chief.  The Chief makes recommendations to the Board.  Lieutenants' opinions or recommendations are not communicated with the Board.  There is no document reflecting the claim that the Board of Selectmen was provided and/or relied upon the views of lieutenants when deciding such issues.

Rather, in each case the Board of Selectmen follows what the Chief recommends regardless of whether the lieutenants disagree or agree with the Chief. There is no documentation or communications of the Town or the Chief. (Ex. 1 at ¶¶7(i), 7(k), 7(l), 7(m), 7(o), 7(p); see also Ex. 2 at ¶¶7(j)-(m); Ex. 3 at ¶¶7(j)-7(m); Ex. 4 at ¶¶7(k)-7(m); Ex. 8 at ¶¶7(j), 7(k), 7(m), 7(n))

32.    **[Sgt. Leo Fitzpatrick – Administrative Officer]**  Agreed that Fitzpatrick prepares budget materials, payroll, and coordinates the assignment of paid details, but denied that he engages in these functions with independent judgment. Rather, the Chief dictates all facets of what Sgt. Fitzpatrick does in this regard, collective bargaining agreement rules pertaining to such matters, and/or the Department's procedures as established by the Chief. These rules include General Order 2003-01 (and two subsequent 2006 revisions) which dictate the process by which detail and overtime assignments are allocated. He does not exercise independent discretion when he applies any of these materials. The Chief admits that Sgt. Fitzpatrick does not use discretion in the performance of his administrative duties:

> Q.    I wanted to talk about the Administrative Officer position for a little bit more. Is there any component of the duties of Leo Fitzpatrick which requires him to use discretion in the decision-making?
>
> A.    I don't believe so.

(Ex. 8 at ¶7(d); Ex. 18 at 375:22 to 376:3)  As a further rebuttal points, Plaintiff Fitzpatrick asserts:

> a.    As a Sergeant and Administrative Officer he has not participated in interviewing and selecting Department employees except to the

limited extent described in his affidavit; he has not set or adjusted rates of pay and hours of work; he has not directed any employee's work; he has not maintained production records for use in supervision or control except for payroll documents; he has not appraised employee productivity and efficiency for the purpose of recommending promotions or other changes in status; he has not handled employees' complaints and grievances other than answering payroll, detail or overtime questions for which all answers are based on the applicable contracts and other rules and regulations, not his own independent opinion or discretion; he has not planned any employee's work other than his own; he has not participated in apportioning the work among the workers; and he has not participated in determining the type of materials, supplies, or tools to be used in the course of an employee's duties.  (Ex. 8 at ¶9)

b.    Sgt. Fitzpatrick does not direct any employees.  (Ex. 8 at ¶7(c); Ex. 18 at 355)  No contrary statement is made in Defendants' Statement at ¶32 regarding this Plaintiff.

c.    Since 2001 there were twenty-three people hired and Sgt. Fitzpatrick was present for the interview of only three of these.  In the other twenty cases the Chief did not ask for his input and he learned of the hiring decision after it was made.  (Ex. 8 at ¶7(g)).

d.    Since 2001 there was only one person fired and that person's termination was not discussed at a Command Staff meeting.  (Ex. 8 at ¶7(g))

e.    Since 2001 there have been approximately three disciplinary suspensions imposed and in none of those cases did the Chief seek input from Sgt. Fitzpatrick.  (Ex. 8 at ¶7(g))

f.    Since 2001 there have been eight promotions and the Chief asked Sgt. Fitzpatrick's input on only one of those eight.  (Ex. 8 at ¶7(g))

g.    With regard to the inconsistent, sporadic and rare instances when Sgt. Fitzpatrick did give input on these matters, at no time has the Chief stated, prior to this litigation, that he will "give substantial, significant, and meaningful weight" to his input on hiring, firing, discipline or promotions.  This litigation is the first time this statement has been made.  Nor are there any documents that identify the specific weight that should be accorded to any input that Sgt. Fitzpatrick gives.  For discipline in excess of a five day suspension the authority for imposing such discipline or termination rests solely with the Town's Board of Selectmen.  In that context, Sgt. Fitzpatrick has made no recommendations and does not communicate with the Board.  Nor is there any document where the Board of Selectmen was provided with Sgt. Fitzpatrick's views and where the Selectmen articulated that my view would be followed.  (Ex. 8 at ¶¶7(g), 7(j), ¶7(m))

h.    Sgt. Fitzpatrick's position as Administrative Officer entails no occasion for him to report to the Chief on employee work performance or productivity, and he does not even observe patrol officer performance.  (Ex. 8 at ¶¶7(h), 7(w))  In fact Sgt. Fitzpatrick has never completed a report relating to

the conduct of another employee.  (Ex. 8 ¶7q))  Nor has he ever verbally counseled an employee.  (Ex. 8 at ¶7(t)).

      i.    Sgt. Fitzpatrick has no authority to resolve grievances.  (Ex. 8 at 7(x))

33.    **[Sgt. Brian Lauzon – Traffic Safety Officer]**  Denied as to the allegations in ¶33 including subparagraphs "a" through "d" except to the extent consistent with the following:  As Traffic Safety Officer ("TSO") Sgt. Lauzon does not "make assignments", traffic related or otherwise.  He does not assign directed patrols.  More accurately he is a clearinghouse for safety and traffic information in the Town of Natick.  He receives information about road and other safety concerns and passes that information on to other Sergeants and Lieutenants.  In doing so he is simply following a course of conduct dictated by the Department's rules and regulations, as well as procedures that he learned from the previous TSO Sgt. Davis.  He also reviews crash reports.  He has no staff and rarely interacts with patrol officers.  He makes no recommendations to the Town Safety Committee, is not the Chief's "delegate", and the Chief rather than Lauzon is the chairperson of the Town Safety Committee.  Sgt. Lauzon's participation in that committee is only when the Chief asks Lauzon to state facts or show a picture that he has taken as related to a safety condition or issue.  At no point in his job does he make independent policy recommendations to the Town Safety Committee.  (Ex. 9 at ¶¶7(d), 7(e)

As further cross motion points, Plaintiff Lauzon asserts:

a.    As a Sergeant and TSO Lauzon has not participated in interviewing and selecting Department employees; has not set or adjusted rates of pay and hours of work; has not directed any employee's work, except in accordance with external standards and only to the limited extent set forth in his affidavit; has not maintained production records for use in supervision or control; he has not appraised employee productivity and efficiency for the purpose of recommending promotions or other changes in status; he has not handled employees' complaints and grievances;  he has not planned any employee's work except to the limited extent set forth in his affidavit; he has not determined or set the work techniques to be used; he has not participated in apportioning work among the workers; and he has not participated in determining the type of materials, supplies, or tools to be used in the course of an employee's duties.  (Ex. 9 at ¶9)

b.    As a Sergeant and Traffic Safety Officer he has not worked in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.  (Ex. 9 at ¶10(a))

c.    As a Sergeant and Traffic Safety Officer he has not had authority to formulate, affect, interpret, or implement management policies or operating practices; he has not carried out major assignments in conducting

45

the operations of the business itself; he has not performed work that affects business operations to a substantial degree; he has not had authority to commit the Town or Department in matters that have significant financial impact; he has not had the authority to waive or deviate from established policies and procedures without prior approval; he has not had the authority to negotiate and bind the Town or the Department on significant matters; he has not provided consultation or expert advice to management, except to the extent that he has had collaborative discussions wherein he shared his views, just like patrol officers do, based upon accumulated knowledge in police work in general and particular areas thereof and longstanding techniques of same; he has not been involved in planning long- or short-term business objectives, but instead has applied his police knowledge just like patrol officers do; he has not investigated and resolved matters of significance on behalf of management but instead engaged in the investigative work of the police department; and, he has not represented the department in handling complaints, arbitrating disputes or resolving grievances. (Ex. 9 at ¶10(b))

d.    While on the Command Staff since July 2005 Sgt. Lauzon has not even once provided input relating to hiring, firing, promotion, and/or discipline of police officers of the Department. (Ex. 9 at ¶7(g))

e.    To the extent that the Chief asserts that he gives "substantial weight" to the input from members of the Command Staff like Sgt. Lauzon, this is false. There is no documentation in the Town establishing the degree to which the Chief or the Selectmen should place weight, if any, on

anything that the TSO Lauzon says.  Further, there is no requirement even that the Chief solicit input from the TSO Lauzon in connection with any decisions. The first time that the Chief has communicated that he places "substantial weight" or "a great deal of weight and consideration" or other similar expression on input from TSO Lauzon, it has not been stated prior to this litigation.  (Ex. 9 at ¶¶7(g), (i), (j), (k), (m), (n), (o), (r), (s))

       f.    TSO Lauzon rarely attends Command Staff meetings.  On the infrequent occasions that he has attended he has rarely if ever offered an opinion on any topic.  When the Chief asks TSO Lauzon to brief the Command Staff on a traffic safety issue, he simply states the facts and status of the situation.  (Ex. 9 at ¶7(f))

34.    Agreed that there is discretion in making the hiring decision, but that it is very limited and subject to a strong presumption in favor of the first person on the civil service list, unless there is a serious disqualifying factor, and this is how the Chief has applied the standard.  (Ex. 1 at ¶7(i), (k)-(m); Ex. 2 at ¶7(h); Ex. 3 at ¶7(l); Ex. 4 at ¶7(g))

35.    Agreed.

36.    Agreed that the Chief oversees the selection process for hiring and promoting officers, but deny that he gathers input from Patrol Sergeants or the Command Staff about such hires or input, or where he does in the case of Command Staff that there is any objective manifestation that he places any weight on such sporadic input.  Agree that he is responsible for making the recommendation to the Selectmen and that Selectmen make the decision.  As

cross motion points, Plaintiffs state that, in fact, where sporadic input is given in the case of individuals such as Lt. Mabardy often times the Chief fails to even indicate that he will consider the input or disregards it (e.g., Ex. 2 at ¶7f); in the case of Lt. Grassey and Lt. Mason and Lt. Pagliarulo he has received input and disregarded it without substantive explanation. (Ex. 1 at ¶7(i), (k)-(u); Ex. 2 at ¶7(f), (h), (j), (k), (l); Ex. 3 at ¶7(j), (l)-(t), (w), (x); Ex. 4 at ¶7(f), (g)-(u), (x); Ex. 8 at ¶7(g), (i)-(s); Ex. 9 at ¶7(g),  (i)-(t); Ex. 10-17 at ¶9))

37.    Denied.  See citations <u>supra</u> at ¶36.

38.    Agreed that all new Sergeants and Lieutenants have been by internal promotion.

39.    Agreed regarding how Patrol Officers are assigned and that this is governed by collective bargaining agreements and shift bidding protocols.

40.    Agreed that Sergeants perform background checks, and denied that reliance on those is significant other than as factual information setting forth data about the applicant on possible areas of disqualification dictated by the Chief.  Agreed that the Sergeants use their police knowledge and experience to conduct such investigations, but denied that they engage in any self-made standards in conducting such investigations.  The reports are factual and reflect no recommendation or none that is based upon anything other than the lack of a disqualifying factor.  No discretion is required or independent judgment.  (Ex. 1 at ¶7(k), ¶7(i), and at Attach. B (sample background investigation report); Ex. 3 at ¶7(m), (n); Ex. 10 at ¶7(g), (h); Ex. 16 ¶7(f), (g))

41.    Agreed regarding background investigations to the extent consistent with supra ¶40.  Therefore, denied as to the report stating anything other than factual findings.

42.    Denied; Plaintiffs incorporate their response to supra ¶40.

43.    Denied that there is consistency with respect to the Chief holding Command Staff meetings and/or that each Command Staff member always attends.  (See infra at ¶36)  Denied that the Chief places substantial reliance on input and often time ignores it or may not even consider the opinion. Sometimes the Chief hires people without even notifying the Command Staff member whose division the person will work in.  (Ex. 1 at ¶¶7 (i), (l), (m), (o), (p); Ex. 2 at ¶¶7(f), (h), (i), (j), (k); Ex. 3 at ¶¶7 (m), (n), (l), (o), (p), (s); Ex. 4 at ¶7(f), (g), (i), (j), (k), (l), (m); Ex. 8 at ¶7(g), (i), (j), (k), (m), (n); Ex. 9 at ¶7(g), (i), (j), (k), (m), (n); see also Ex. 1 at Attach. B, sample background investigation report)

44.    Agreed that the candidates may be interviewed by the Command staff, but sometimes the questions are actually provided to the Command Staff to pose to the candidate.  Nor is there a requirement for attendance at such Command Staff meetings or that any input be given.  Often times  notice of the interview is not given in advance and sometimes no Command Staff meeting is held for interviews.  In the case of Sgt. Lauzon, he has not even attended any interviews since joining the command staff in July 2005, even though six new officers and at least two dispatchers were hired during that time.  (Ex. 1 at

¶7(m) and ¶7i; Ex. 2 at ¶7(h); Ex. 3 at ¶7(p); Ex. 4 at ¶7(g) and generally at ¶7;

Ex. 8 at ¶7(k); Ex. 9 at ¶7(k); see also Ex. 1 at ¶ 7 generally)

45.    Denied.  Other than a few sergeants who have done background

investigations (pure fact inquiry into the candidates background), supra at

¶¶40-41, there has not been a single time that the Patrol Sergeants have

provided input, let alone had their input sought by the Chief, on the issue of

hiring.  (Ex. 1 at ¶7(n), (r); Ex. 8 at ¶7(l); Ex. 9 at ¶7(l); Ex. 10 at ¶7(i) ("As a

Sergeant the Chief never solicited my opinion on any topic."); Ex. 11 at ¶7(g);

Ex. 12 at ¶7(i); Ex. 13 at ¶7(f); Ex. 14 at ¶7(f); Ex. 15 at ¶7(f); Ex. 16 at ¶7(d);

Ex. 17 at ¶7(f))

46.    Denied.  The Chief has never before indicated, nor is there any

Town documentation that indicates any criteria relating to whether the Chief

must present input to the Selectmen that references the opinions of others, or

criteria for how much weight the Chief or the Selectmen should place on such

opinions.  Those that have attended Selectmen's hearing have not observed

discussion by the Selectmen of the views of anyone other than the Chief in any

meaningful way.  This litigation is the first that the Chief has indicated to the

staff that he communicates to the Selectmen the views of individual superior

officers.  (Ex. 1 at ¶7(p); Ex. 2 at ¶7(k); Ex. 3 at ¶7(s); Ex. 4 at ¶7(m); Ex. at

¶7(m); Ex. 9 at ¶7(n); Ex. 10 at ¶7(j); Ex. 11 at ¶7(h); Ex. 12 at ¶7(j); Ex. 13 at

¶7(g); Ex. 14 at ¶7(g); Ex. 15 at ¶7(g); Ex. 16 at ¶7(h); Ex. 17 at ¶7(g))

47.    Denied to the extent that the Town contends that all superior

officers have the right to relieve somebody from duty that is different than the

general right of all officers, from patrol officers up through the ranks to remove
someone from duty that is inebriated or otherwise incapacitated.  Apart from
that, there is no right to suspend by the superior officers and the superior
officers have never been informed that they had such right until this litigation.
(Ex. 1 at ¶7(w); Ex. 2 at ¶7(o); Ex. 3 at ¶7(z); Ex. 8 at ¶7(u); Ex. 9 at ¶7(u); Ex.
10, 12 at ¶7(p); Ex. 11 at ¶7(n); Ex. 13-15, 17 at ¶7(m); Ex. 16 at ¶7(n))

48.    Denied that Sergeants play a "significant material role in the
disciplinary process" and no such statement has been made until this
litigation.  (Ex. 10 at ¶7(r); Ex. 11 at ¶7(o); Ex. 12 at ¶7(r); Ex. 16 at ¶7(o); Ex
13-15, 17 at ¶7(n)).  Admitted as to "verbal counseling" to the extent that
Sergeants may infrequently comment on employee performance based on
external guidelines established by the laws, the Chief and by longstanding well-
known techniques of police work.  (Ex. 10, 12 at ¶7(q); Ex. 11 at ¶7(o), Ex. 13-
15, 17 at ¶7(n); Ex. 16 at ¶7(p))

a.    Denied that Sergeants are responsible for dealing with day to
day conduct issues that are not serious to the extent that this statement
implies anything more than the following:  Some Sergeants, on rare occasions,
may note an instance of a minor rule violation, perhaps an unkempt uniform
or minor rudeness and address the issue on the spot.  Some Sergeants have
not even found it necessary to deal with any issues such as these.  (Ex. 10, 12
at ¶7(q), Ex. 11 at ¶7(o); Ex. 13-15, 17 at ¶7(n), Ex. 16 at ¶7(p))

b.    Denied that Sergeants are responsible for "acting on any
misconduct or performance" that is more serious in nature than as described

above.  A Sergeant might be assigned to write a Supervisor's Report of First

Complaint as required by Department policy.  This document contains only

facts.  (Ex. 10, 12 at ¶7(q); Ex. 11 at ¶7(o); Ex. 13-15, 17 at ¶7(n); Ex. 16 at

¶7(p))

      c.     Denied that Sergeants input is either sought or expected in

any disciplinary process.  No Sergeant has ever given input or an opinion on

any disciplinary matter.  Neither the Chief nor the Town nor any

documentation issued has ever communicated this expectation to any

Sergeant.  Most Sergeants have not provided any input in any disciplinary

action at any time.  (Ex. 10, 12 at ¶7(n); Ex. 11 at ¶7(l); Ex. 13-15, 17 at ¶7(k);

Ex. 16 at ¶7(l))

      d.     Admitted to the extent that the job description at Defendants

Facts Ex. 1 and Ex. A speaks for itself.

    49.    Agreed that under the patrol officers' CBA the first step in the

grievance process is to discuss the grievance with their immediate supervisor.

Denied that Sergeants have any authority whatsoever to resolve grievances.  No

Sergeant has ever been presented with a written grievance or any other

grievance from a patrol officer.  At most, some Sergeants may have had an

informal discussion with a patrol officer about a vacation or overtime issue.

The Town does not vest the Sergeants with an ability to sustain a grievance

and thereby create a binding precedent.  Grievance type issues, on the rare

occasion they are discussed with a Sergeant, are routinely passed up the chain

of command for a decision by the Chief.  (Ex. 10, 12 at ¶7(s); Ex. 11 at ¶7(q);

Ex. 13-15, 17 at ¶7(p); Ex. 16 at ¶7(q))

50.    Agreed that the investigation of a complaint about an officer

generally beings with the filing of a report called the Supervisor's Report of

First Complaint.  Denied to the extent that specific duties are implied by the

word "investigation" beyond a general notation and/or summary of the relevant

facts.  At most, Sergeants infrequently fill out these reports and some

Sergeants have had zero or only one instance of filling out such a report during

their entire tenure as a Sergeant.  (Ex. 10, 12 at ¶7(q); Ex. 11 at ¶7(p); Ex. 16

at ¶7(p); Ex. 13-15, 17 at ¶7(n))  Admitted to the extent that Lt. Mason is

generally the next Department employee to receive the Report.  Denied to the

extent that the word "initiates" implies any specific duties or that all or that

most complaints even warrant and therefore cause an "investigation".

51.    Agreed to the extent that Sergeants do report the facts of a

situation in a Supervisor's Report of First Complaint if they are assigned to do

so.

52.    Denied that a Sergeant has ever made a recommendation for

discipline in any "report" at any time.  Uniformly, all Sergeants who have had

occasion to fill out a Supervisor's Report of First Complaint report only the

facts of a situation and have never made a finding or recommendation in a

report.  Further denied that the facts reported by a Sergeant or a Lieutenant

are "always relied upon" to the extent this implies that the Report does

anything more than pass along allegations.  (Ex. 10, 12 at ¶7(q); Ex. 11 at

¶7(p); Ex. 16 at ¶7(p); Ex. 13-15, 17 at ¶7(n))

53.    Denied that the Chief has ever, with the possibility of a rare

exception, discussed any measure of discipline with a Sergeant, including all

Patrol Sergeants, Sergeant Lauzon and Sergeant Fitzpatrick.  Though there is

no known rule, regulation or documentation requiring him to do so, the Chief

has on occasion discussed discipline with the Lieutenants.  (Ex. 8 at ¶7(s); Ex.

9 at ¶7(s); Ex. 10, 12 at ¶7(n); Ex. 11 at ¶7(l); Ex. 13-15, 17 at ¶7(k); Ex. 16 at

¶7(l))  The Chief has had a few discussions with Lt. Pagliarulo and has rejected

Lt. Pagliarulo's opinion.  (Ex. 3 at 7(ff))   On a rare occasion the Chief has

discussed discipline with Lt. Mabardy and rejected his opinion.  (Ex. 4 at 7(d))

The Chief has discussed discipline with Lt. Mason.  The Chief has rejected Lt.

Mason's opinion on multiple occasions. (Ex. 2 at 7(n))  The Chief has rarely

discussed discipline with Lt. Grassey.  On two occasions when he did, the Chief

rejected Lt. Grassey's opinion.  (Ex. 1 at 7(k))

## ADDITIONAL CROSS MOTION POINTS

54.    Patrol Officers including all detectives do not perform any

managerial or administrative work.  The vast majority of the work of patrol

officers is actual police itself.  No patrol officers participate in any process

relating to hiring, firing, promotion, discipline, or causing any changes in

working conditions.  Patrol officers do not direct the work of others.  Patrol

officers are not in control of any portion of the budget or discretionary funds

and they do no work in functional areas such as tax, finance, accounting;

budgeting; auditing, safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; and legal and regulatory compliance.  (Ex. 3 at ¶¶11(a), 11(b); Ex. 5-7 at ¶¶ 13(a), 13(b))

55.    Patrol officers including all detectives do not maintain production records or appraise employee productivity and efficiency.  Patrol officers do not handle employee complaints or grievances.  Patrol officers do not apportion work and they do not determine the type of materials, supplies, or tools to be used in the course of an employee's duty. (Ex. 3 at ¶¶11(a), 11(b); Ex. 5-7 at ¶¶ 13(a), 13(b))

56.    The deposition testimony of Chief Mannix shows that facts attested to in his affidavit are without adequate foundation and otherwise fail to demonstrate the non-exempt status of the Plaintiffs, as follows:

a.    Throughout his deposition the Chief testified that the specific weight that he would accord to input from superior officers was purely a subjective decision that he made, that it was codified no where, and that any weight he decided to accord such input was subject to an overriding arbitrary consideration of whether he subjectively believed that his own experience, knowledge and judgment was more reliable and should supersede that of the superior officer offering such input.  (Ex. 18 at 75-76, 86-88, 110-111, 125, 174, 268-269, 275, 311)  The Chief has no first hand knowledge of the majority of the actual job duties performed by Superior Officers on a day-to-day basis**.** (Ex. 18 at 343, 356-365)

b.      The Chief admits that he cannot recall any discussions with Command Staff member Sgt. Lauzon and Sgt. Fitzpatrick about internal promotions.  (Ex. 18 at 137-139)

c.      The Chief admits that he does not solicit information about new hire candidates from anyone other than Command staff.  (Ex. 18 at 94-95)

d.      The Chief is either uncertain about or admits that superior officers do not have the delegated authority to suspend.  (Ex. 18 at 286-288)

e.      The Chief admits that in at least the past 5 years he has no recollection that a Sergeant has ever investigated the misconduct of another police officer. (Ex. 18 at 322)

f.      The Chief admits that TSO Sgt. Lauzon doesn't directly supervise any officers, that no officers report directly to him and that Sgt. Lauzon has no line responsibility for officers. (Ex. 18 at 354)

g.      The Chief admits that it is not a job duty of Lieutenants (the core of his Command Staff) to provide him with input on promotions.  (Ex. 18 at 151)

h.      The Chief admits that no superior officer has ever been disciplined for failing to submit an employee of the month nomination.  (Ex. 18 at 267)

57.      The difference in pay between a patrol officer and a superior officer is less than 20%.  (Plaintiffs' Nov. 1 Appendix of Exhibits at Ex. 1, 2.)

58.      Lt. Mabardy worked as the Community Services Officer from at least September 2001 to August 2002.  There were no employees assigned to

56

the Community Services Division at that time other than himself.  He directed

no employees in that area.[4]  The position did not require supervision of any

employees.  He was the liaison between different communities, organizations,

and towns and the Police Department.  The Chief decided the programs that

would be provided to the community.  The programs that were run were not

new ideas.  One time Chief Mannix summarized this aptly when he told Lt.

Mabardy that he was not "reinventing the wheel".  This is true to the extent

that these types of programs were already established and they were adopting

them and formatting them for use in the Town.  As a Community Services

Officer Lt. Mabardy did not participate in interviewing and selecting

Department employees; he did not set or adjust rates of pay and hours of work;

he did not direct any employee's work; he did not maintain production records

for use in supervision or control; he did not appraise employee productivity and

efficiency for the purpose of recommending promotions or other changes in

status; he did not handle employees' complaints and grievances;  he did not

plan any employee's work except to the limited extent that he would implement

programs and once in a while have to coordinate the work for that program; he

did not determine or set the work techniques to be used;  he did not participate

in apportioning the work among the workers, except in the occasional situation

when he was coordinating a community project; and he did not participate in

determining the type of materials, supplies, or tools to be used in the course of

---

[4]       There was an approximate three-month period that then-Patrol Officer (now Sergeant)
Cara Rossi-Cafarelli was assigned to this area in the later stages of a pregnancy.  Because she
was new to the area (and temporary) he did guide her on how to help him, and among other
things she aided in organizing his files and making calls to community groups.

an employee's duties.  Rather, by far, the vast sum of the work that he did as Community Services Officer had to do with interacting with the community and establishing links between such groups and the Police Department.  (Ex. 4 at ¶9(a), 9(b))

59.    From September 2001 through November 2003 Lt. Pagliarulo was a Sergeant Detective.  In this position he did not perform the same duties as a Patrol Sergeant.  As a Sergeant Detective he primarily worked with one other detective, Jack Doherty.  Nominally, he was Doherty's supervisor but he typically spent less than a half hour per day engaging in any supervision of Doherty or monitoring his work.  Instead, the overwhelming majority of his time was spent functioning as a plainclothes detective.  He investigated domestic abuse crimes, identity theft crimes and credit card fraud.  He would do victim follow-ups and provide information regarding crime prevention, credit repair and other possible action a victim might take.  The work he performed as a Sergeant Detective was guided by the General Laws of the Commonwealth, information about longstanding special techniques of police work that he learned at the Police Academy, Natick Police Rules, Regulations, Policies, Procedures and General Orders, and what he had been taught by his predecessors.  (Ex. 3 at 7(c))

Respectfully submitted,

For Plaintiffs,

By Plaintiffs' Counsel:

*/s/ Jack J. Canzoneri*
Jack J. Canzoneri, BBO #564126
McDonald, Lamond & Canzoneri
Cordaville Office Center
153 Cordaville Road, Suite 210
Southborough, Massachusetts 01772
(508) 485-6600

Dated:  November 20, 2006

## CERTIFICATE OF SERVICE

I, Jack J. Canzoneri, hereby certify that I have this day via the Electronic Case File system, served a copy of the foregoing Rule 56.1 Plaintiffs' Statement of Facts upon opposing counsel John P. Flynn, Jr. Esq., Karis North, Esq., Kathryn Murphy, Esq., and Geoffrey B. McCullough, Esq., Murphy, Hesse, Toomey & Lehane, LLP, 300 Crown Colony Drive, P.O. Box 9126, Quincy, Massachusetts  02269.

Dated:  November 20, 2006                    */s/ Jack J. Canzoneri*
                                             Jack J. Canzoneri