THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Robert F. Murphy, III, Lead Plaintiff for
Patrol Officer Plaintiffs, et al. and,

Brian C. Grassey, Lead Plaintiff for
Superior Officer Plaintiffs, et al.,

      Plaintiffs,

      v.

Town of Natick, et al.

      Defendants

USDC Case No.:  04-11996 RGS

## Affidavit of Brian C. Grassey

    I, Brian C. Grassey, attest to the following based upon my own personal knowledge:

    **1.**    My name is Brian C. Grassey and I reside at 28 Miller Street, Franklin Massachusetts.

    **2.**    I have been employed by the Town of Natick within its police department since 1986 as a reserve police officer and since 1989 as a patrol officer.  In June 1999 I was promoted to Sergeant and in December 2005 I was promoted to Lieutenant. Currently, I am the Lieutenant in charge of Communications.

    **3.**    <u>Academy training.</u>  I attended the police academy at Foxboro, Massachusetts for 18 weeks.  While at the Academy I was trained in all the specific techniques of law enforcement for police officers in Massachusetts as well as the General Laws affecting police work and how it guides such techniques.  Some examples of this include the following:

        **(a)**    <u>Vehicle Crash Investigation</u>.  Training in this regard included learning the specific procedures relating to laying the foundation of an motor vehicle crash investigation including the specific information that should be included in a "report", what should be done with respect to "investigation", the purposes of reporting and investigating including enforcement of traffic law to facilitate public safety on the roads and deter unsafe practices, educate drivers and the community, and prevent accidents.  With regard to this I was also taught about the elements of investigation including witness observations, interviewing all available witnesses, the importance of

gathering information relating to the accident's time, place and type of accident, and the final resting place of the vehicle.

**(b)** <u>Causes for vehicle crash.</u>  Training in this regard included examining the reasons why the driver did not or was not able to evade the accident.  This includes considering the driver's decision as to the speed of the vehicle prior to the accident and whether excess speed was factor in the accident; driver distraction due to any number of factors (i.e., children fighting car, conversation); impairment of senses due to vision, glare, auditory capacity, knowledge of traffic laws, driver skill and years of driving experience, driver motivation such as anger, fear, timidity, and exhibitionism, and ailments caused by medicines, drugs, poisons (like carbon monoxide), fatigue, or heart or other health conditions.  Training also instructed officers to consider the condition of the vehicle and its potential cause (headlights, wheels, brakes, windows, windshield wipers), and the condition of the road and weather.  There is also specific training on what observations to make of the driver and determining whether the driver is Operating Under the Influence ("OUI") within the meaning of G.L. c. 90.  With regard to these, as well, training involved information on what is probable cause and what steps can and cannot be taken with or without probable cause, as well as the circumstances that allow the officer to require the driver to take a Field Sobriety Test ("FST") and the implications of driver refusal, as well as the appropriate use of a breathalyzer.

**(c)** <u>Other details relating to vehicle crash response.</u>  Training also included other longstanding police techniques relating to what to do when responding to a vehicle crash such as where to place the police cruiser, which vehicle to attend to first in a multi-vehicle crash, using lights and siren when traveling to a crash scene after radio dispatch, crowd control, special traffic control techniques depending on the location of the vehicles, what information to collect from drivers and passengers, and what information if any to collect from the interior of the vehicle.

**(d)** <u>Domestic disturbances and other response situations.</u>  Training also included information on the criteria for report writing, investigation, and other longstanding police techniques relating to other response situations, with detail similar to that noted above for vehicle crash situations.

**(e)** <u>Criminal procedure.</u>  At the academy I was given detailed information on the constitutional and statutory standards governing criminal procedure and how those standards affect police work.  This includes, e.g., standards relating to probable cause, affording citizens' their constitutional rights, how to not endanger the investigation by improper conduct under those standards, and review of case law applying such constitutional and statutory standards.

**(f)** <u>Criminal law.</u>  I was also given detailed information on the statutes of the Commonwealth of Massachusetts that a police officer must enforce.  I learned which offenses are ones for which an individual may be arrested; which require a warrant; and key exceptions to these general rules including those set forth in statutes.  I

2

also learned the importance of each element of the crime and why an investigation must identify each element.

**(g)** <u>Motor Vehicle law.</u>  In addition to learning how to investigate a vehicle crash scene as noted above, I also learned each of the statutes that a police officer must enforce relating to motor vehicles, the elements pertaining to each offense, and the importance of identifying the existence of those elements.  There was also specific focus on which motor vehicle laws are arrestable offenses.

**(h)** <u>Elements of self defense.</u>  At the Academy, as well, I was given detailed information on techniques of self defense and the laws applicable to that.  I was taught about handcuffing technique for passive situations and force situations.  There was also role playing in situations such as bar room brawls and how to handle those situations.

**(i)** <u>Driving.</u>  I was taught about driving a police cruiser and the laws that relate to that.  I was also taught on an emergency driving course techniques of driving and about the tolerance (limitations) of a vehicle (e.g., turns, skidding).

**(j)** <u>Firearms.</u>  At the academy there was extensive information on the laws governing the use of firearms by law enforcement officials, as well as the safe and effective use of a firearms (e.g., proper stances, target shooting, no shoot situations).  In addition, there was education on a concept called the "use of force continuum", where you learn about how to escalate force and deescalate force, from police presence alone, to verbal commands, to hand tactics, to use of pepper spray, to use of a baton, to handgun use.  I was taught how to recognize and control a situation and move up and down this continuum, using the least force necessary to obtain control.

**(k)** <u>Interview techniques.</u>  I was also taught about interview techniques and the key elements of information that should be obtained from witnesses and how that varied based upon the elements of the crime that I may be investigating.  I learned about judging a person's credibility and veracity based upon eye contact (or lack of eye contact), covering mouth when speaking, and/or non-responsive answers to questions posed, as well as separating witnesses.

**(l)** <u>Report writing.</u>  At the academy I was also taught about report writing.  That in part included an application of other information I learned relating to elements of the crime, criminal procedure and criminal law, as well as issues relating to witness credibility and veracity.  I was taught about the key elements that must be included in a report and otherwise how to complete a satisfactory police report so that is will be objective and support the crime for which it was written.

**(m)** <u>Annual In-service training.</u>  All patrol and superior officers, including myself, are required to attend yearly in-service training to keep abreast of any changes in the law.

**4.**     Natick Police Department Rules, Regulations, Policies, Procedures, General Orders.  In addition to knowledge relating to the General Laws of the Commonwealth and information reviewed above pertaining to longstanding special techniques of police work that I learned at the Police Academy that provide the criteria for how I must perform my job, the Natick Police Department's Police Chief has issued a vast number of Rules, Regulations, Polices, Procedures and General Orders that also dictate how I am must perform my job, from patrol officer, to detective, to sergeant, to my current position as Lieutenant.  They relate to matters such as how to proceed to an accident scene (lights, sirens, speed, marked cruiser), and what to do at an accident scene to collect information, what information to incorporate in a report, how to investigate domestic crimes, and what investigation to do at an accident scene and other matters.  Most of these same principles were taught to me on the job, from the time I was a patrol officer onward, with more senior patrol officers or sergeants and lieutenants offering guidance to me as a junior patrol officer etc.  This guidance related to reinforcing the principles of police technique and reinforcing the expectations required under the General Laws and the Police Chief's rules, regulations, policies, procedures and general orders applicable to the Natick Police Department.  Attached to this affidavit as <u>Attachment A</u>, is a true and accurate copy of some such departmental materials that were in effect for all or a portion of the period from September 2001 to present, to the best of my knowledge.  Where there is a duplicate item, that generally means that it was superseded during this period by another rule (e.g., domestic disturbance policy was updated in 2002).[1]

**5.**     Education.  My education includes a B.S. in law enforcement from Western New England College in 2001, and a Masters degree in criminal justice administration from the same college in 2003.  That education reinforces much of the knowledge and standards of police work noted above.

**6.**     Virtually all duties governed by longstanding techniques and other external standards.  Based upon the training and education that I received as reviewed above, and the documentation of the Department that otherwise describes standards of performance, virtually every aspect of what I did as a patrol officer, sergeant and now as a Lieutenant was governed by the aforementioned material, rather than by me deriving my own brand of police work unique to me. While a Patrol Sergeant and currently as a Lieutenant, I simply applied those same external guidelines to others.  To the best of my knowledge I have established no guidelines for performance of police work myself.  I apply no discretion in my decision making that is independent of these external mandates to the best of my knowledge.

**7.**     Mannix Affidavit – disagreement on facts.  I am aware of the following topics covered in the Affidavit of Chief Mannix in this matter and, respectfully, submit that the allegations identified below are inaccurate:

---

[1] The Domestic Violence Guidelines, including in Attachment A, are the same in substance as those of the Police Department, but they are paginated in a couple of places that is different than the actual version of the Police Department.

(a)  **[Superior Officers – Organization of Department]**  At ¶6 of his affidavit, Chief Mannix states that the "Department is organized into several Divisions, and several independent command level positions."  This is also mentioned at ¶8 of this affidavit.  While it is true that the Department contains divisions, the Commanders of those divisions do not operate those divisions "independently" to the extent that each Division Commander must run the Division in accordance with specifications outlined by the Police Chief, longstanding techniques of police work, laws of the Commonwealth, and the rules, regulations, policies, procedures and general orders established by the Police Chief.  Decisions of the commander are not independently made, but subject to specifications from these external sources (i.e., sources other than the superior officer's own personal beliefs and opinions).  I am not in control of any portion of the budget or discretionary funds.

(b)  **[Sergeant – "independent decisions"]**  At ¶15(b), Chief Mannix states that "Sergeants are independent and expected to use their skills, knowledge, and experience, in making decisions about how to guide and direct the Patrol Officers."  It is not true that I was "independent" when I worked as a Patrol Sergeant.  Also, regardless of whether I was Station Supervisor or Field Supervisor (also known as "Street Supervisor") I did not exercise discretion independent of the mentioned above, including Police Academy training, longstanding techniques of police work that I was taught at the Academy and as a patrol officer by more senior officers, the General Laws of the Commonwealth, and the detailed rules, regulations, policies, procedures and general orders issued by the Police Chief.  Moreover, I rarely gave instruction or direction to Patrol Officers.  The patrol officers are equipped with the same or similar training as I, and are governed by the same external standards that dictate who we must perform our jobs.  If they have a question about how to proceed, I can explain to them what those sources require, not what I am requiring them to do from my own independent discretion.  Likewise, if I happened to observe performance that is in violation of such standards, I could re-direct the Patrol Officer to the course of conduct that conforms with those standards, all of which are determined by sources external to me rather than my own personal independent discretion.  Furthermore, with regard to this, to my knowledge, I have always been forbidden from issuing guidance or direction to Patrol Officers that would be inconsistent with that established by the sources set forth above.  I will provide one example of this to illustrate the point.  If I were to go to an accident scene and learn that the officer failed to get statements from all witnesses, I may speak to the officer and suggest that he/she get statements from the remaining witnesses.  When I do this it is not because it is the week that I have decided that it important to interview all witnesses and the following week I can change that some other concept.  Rather, it is because of the special techniques long known to the field of police work, Academy training, and rules, regulations, policies, procedures and general orders mentioned above that I know and reinforce in others that we must interview all witnesses.

(c)  **[Sergeants – job description]**  At ¶¶16, 18 and 19 the Chief states that the job description attached to the Town's motion is a fully accurate description of how sergeants have performed that assignment.  I respectfully disagree with the chief.  I am familiar with and have reviewed the job description for the Sergeant position in

question and find that it is not fully accurate in describing the actual duties of that position. Below in general, and in a separate paragraph of this affidavit relating to the job description, I will more specifically explain the degree to which each element of the job description is inaccurate.

      **(d)**     **[Sergeants – "primary duty to direct"]**  At ¶17 the Chief states that the "primary duty" of the sergeant "is to direct the activities of the Patrol Officers, or to monitor their activities. This applies whether the Sergeants are in the station or out on patrol" The facts as I know them do not support the Chief's statement in this regard.

      When I performed the assignment of Sergeant I mainly worked in the station (not in the field) so my comments which follow relate to that particular role, known as "Station Supervisor". As Station Supervisor I performed roll call on each shift. This was simply repeating messages that I was required to read to the patrol officers at roll call. There was nothing that I presented to the patrol officers at roll call that was more than repeating what was handed down to me through the ranks to read. It was a clerical function that required no discretion. At roll call I would learn if there was a hole in the staffing. For example the Town is divided into three Areas. The officers are already assigned to each area and shift by authority higher than the sergeant. If one Area is not covered due to absence (e.g., sick call, vacation) then I would observe that on the roster and assign someone from an Area that had two officers to work that Area. That decision required nothing more than a rote application of existing standards which require that there be at least one officer assigned to patrol each designated area. That decision in any event would be based upon longstanding principles of police work that I learned over the years relating to volume of activity and the need for an officer to patrol such area. Roll call typically lasts about fifteen or so minutes.

      The balance of my eight hours shift rarely involved direction because I was involved in duties such as booking prisoners (which in many police departments is done by patrol officers), administering breathalyzer tests, checking station security, and responding to calls from the public. It is true that I would monitor what the dispatchers were saying in routing call responses to officers in the field, but it would be an anomaly for me to correct or change a dispatch. For example, I would rarely have to intervene and advise a dispatcher to send another patrol cruiser to the scene of a call. Another interaction with dispatchers would be when they would come to me and say that they just received a phone call and are confused on how to proceed. As Station Supervisor I respond by explaining what they should do. Furthermore, where I would find that a second car should be sent or explain in response to a dispatcher question how they should proceed in a confusing situation, my instructions would not based upon my own personal opinions or special brand of police work, but instead based upon long known standards and techniques of police work as well as knowledge that I obtained from the Police Academy and the Chief's printed guidelines reviewed above (i.e. two officers should be assigned to a Domestic).

      In addition to the above, a couple of times per week, as Station Supervisor, I would typically have a conversation with an officer about writing a report

about an incident.  Under the report writing system that has been used since December 2003, report writing is even more automatic since that system prompts officers for information under each category necessary.  Some reports are even more rote since they are governed by guidelines of the federal or state government.  For example, state guidelines and the Chief's established procedures dictate the type and content of the report for particular crimes such as for domestic violence and situations of "use of force".  The Chief also mentions "monitoring" at ¶17.  As Station Supervisor the only monitoring that takes place is by report review, which I have described above, listening to what the dispatchers say, and listening to the radio for what patrol officers state on the radio.  What is said over the radio gives little indication of whether a patrol officer is performing up to standard.  Therefore, by monitoring the radio I was not effectively monitoring for performance that violated any rules.  In fact, since September 2001, to the best of my knowledge, there has not been a single instance where I discerned any sub-standard performance by a radio.  In summary, the department is so well formatted by virtue of the Chief's guidelines and the other sources mentioned above, that responses are automatic and not subject to independent discretion.  The benefit of that system is the comfort that someone has already devised a response to each situation and the sergeant involved with that system is simply applying those external standards in responding to each given situation.  To the best of my knowledge, there are no other instances of interactions which require instruction in the role as Station Supervisor, other than as set forth above.

      **(e)**    **[Lieutenants – job description]**  At ¶20 the Chief states that the job description attached to the Town's motion is a fully accurate description of how lieutenants have performed that assignment.  I respectfully disagree with the chief.  I am familiar with and have reviewed the job description for the lieutenant's position in question and find that it is not fully accurate in describing the actual duties of that position.  Below in general, and in a separate paragraph of this affidavit relating to the job description, I will more specifically explain the degree to which each element of the job description is inaccurate.

      **(f)**    **[Lt. Grassey – supervision]**  At ¶28 the Chief states, "Lieutenant Grassey supervises the dispatchers generally, and the Patrol Officers and other supervisors with regard to the report review and investigations and case management.  These duties constitute the bulk of his time and responsibilities."  This is an inaccurate description of my work.  First, my position is absent an official description.  I have never been provided with nor have I seen a written description of my job duties.  My primary duty is to review reports.  I receive patrol officer reports in the form of an electronic file.  After I review a report I will send it to the clerk of the courts and the district attorney's office if it complies with the law, printed guidelines of the Chief, and the clerk of the courts, and, if not, then I send it back to the officer for correction to remedy such deficiencies.  When I review the detectives reports I apply the same external mandates mentioned above and send it back to Lieutenant Mabardy if there is a discrepancy for correction.  Generally, though, the detective's reports are ready for printing and transmission to the courts when they arrive in my unit for further processing.  This report review process requires no judgment based upon standards that I establish independently, but instead is simply an application of the external standards and mandates mentioned

above and then communicating as necessary to correct any discrepancies. That is the extent of my interaction with patrol officers regarding report review. In addition to report review, I oversee the records division staff itself. The records division pretty much runs itself. The two transcriptionists work independently of me. They receive audio recordings of patrol officers reports and transcribe them and provide them to me. The Court Liaison Officer receives the finished reports and transports them to the Court. My interaction with him is generally limited to a few minutes each day and entails no direction from me. These conversations with the Court Liaison Officer often include requests that I repair some missing facet in the reporting. With respect to the dispatchers, as a lieutenant my involvement with the dispatchers is further diminished as compared to that described above when I was a station supervisor. In general my limited involvement with the employees in this area generally consists of obtaining absence slips when one of them misses a day of work. If any of these employees had a complaint, I would be the person they would probably approach to obtain an audience with the Chief. Regardless, I do not directly supervise these employees, and I do not issue discipline to them.

     (g)    **[Command Staff – the Chief's "delegates"]** At ¶31 the Chief refers to the Command staff and that each member of the Command staff is the "delegate" of the Chief. To the extent this implies that, in my role as Lieutenant I independently make decisions, without regard to standards established by the Chief this is false. Nor is there any communication to my knowledge declaring me a "delegate" of the Chief, until this litigation.

     (h)    **[Command Staff – frequency of command staff meetings]** At ¶32 the Chief states that he holds "Command Staff meetings regularly, as often as several times a week", and that he holds general staff meetings "up to 10 times per year." I disagree with the frequency of Command Staff meetings stated by the Chief. Some weeks there are command staff meetings and sometimes there are no Command Staff meeting for several weeks. Rarely are there more than one Command Staff meeting in a week. A command staff meeting most often consists of a short conversation about what is happening in the Department. Typically only two people speak during a command staff meeting – Chief Mannix and Lieutenant Mason. I am also unfamiliar with what the Chief refers to as a "general staff meeting".

     (i)    **[Command Staff – Chief seeking input from command staff on hiring, firing, promotions and disciplinary actions]** At ¶33 the Chief states, "I seek input from the Command Staff and, while I am not required to follow their recommendations, I always give substantial, significant, and meaningful weight to that input in making my decision, on many issues within the department, including decisions regarding the hiring, firing, promotion, and/or discipline of the police officers of the Department." I respectfully disagree with the Chief's statement in this regard.

     <u>Hiring</u>: The only individuals hired while I was on the Command Staff were those hired on and after December 2004 when I was promoted to Lieutenant. Of those I was present for each interview and provided a question to ask at the interviews of Hall, Howard, Lacerra, Nguyen, Payne and Thurston. I also provided a background

investigative report for Howard. The scope of that kind of factual report is discussed otherwise in this affidavit. In the case of candidate Payne I raised concerns about his financial status and that this may be an impediment to hiring him. The Chief dismissed my comment and hired Payne anyway. In addition, with respect to the selection process, given Civil Services rules, there is a presumption in favor of hiring the first candidate on the list unless there is substantial documented reason not to hire such person. It is for this reason that I am aware of no instances when anyone other than the first person was hired on the list since at least 2001. The only exception to this was when a candidate named Mark Clifford was bypassed in September 2005 because there was a blatant disqualifying condition, i.e., Mr. Clifford lied about a fairly extensive disciplinary record in his prior employment. Even in connection with this case, the Chief was steadfast, adamant in his conclusion that he would not hire Mr. Clifford. He noted what the background investigation revealed, the misrepresentation of what Mr. Clifford stated in his interview and then pronounced, "I am not going to hire him." There was absolutely no debate over the issue. In addition, in general the interviews for candidates are orchestrated and I am actually provided with questions to ask the candidate. Even if I or any of the other members of the Command Staff expressed the strongest opinion to hire someone who was second on the list, it still wouldn't place that person higher on the civil service list. The first person on the list must be chosen absent a disqualifying condition, regardless of the recommendations of Command Officers at the meeting. With respect to non-police personnel hired since I have been a Lieutenant, Dispatcher Scanlon was hired in early September 2006 and the Chief sought some input from me on this hire. But I note that this was only after the lawsuit was filed in this matter, and right around the time that depositions were underway for the Chief and the other superior officers where each was questioned on their involvement or lack thereof in the process of hiring employees. Prior to the period in which depositions were being held (i.e., prior to August and September 2006), I was not asked about dispatchers being hired. This includes Dan Leavit and Tony Nigro who were hired as dispatchers after a skills test and passing a background investigation; I was not included in the process, even though the Chief claims that they are under my supervision.

Firing:  The only individual fired since September 2001 was a probationary officer (i.e., he was fired in his first year of employment) named Andrew Thorpe. I was not on the command staff at that time. As a Lieutenant, there was only one instance where potential termination issue was discussed. In that case the Chief asked for a recommendation and I recommended that Dispatcher Deborah Barnes be terminated for what I considered aberrant misconduct related to another employee in the Department. The Chief rejected that recommendation. I then offered a secondary recommendation which was that Ms. Barnes be moved to a different work group to limit her contact with such employee. He rejected this as well, without offering any explanation and without responding to me.[2] No other termination issue has come up.

---

[2] In this deposition the Chief testified that, in response to a difficult situation, Barnes was reassigned to a different work group. This happened, but it was years earlier, well before I was a Lieutenant. That situation had nothing to do with this event.

Discipline**:**  With regard to discipline, there have been approximately three suspensions or disciplines since 2001 (i.e., B. Grassey, K. Fitzgerald, M. St. Hillaire).  On none of those three did the Chief solicit my input (I filed an appeal challenging my own suspension noted above).  Also, in January of 2006, when discovery in this lawsuit was underway, I was involved in working with the Chief in discussing facts relating to a Dispatcher Biuso's tardiness which ultimately lead to the Chief issuing the dispatcher a reprimand.  I had recommended stronger language in the reprimand but the Chief rejected it and ultimately issued a reprimand with less severe language.  There have been no other situations where I was involved in discussing discipline with the Chief as a member of the Command Staff.  Beyond the events described herein, the Chief has not sought my opinion as to whether someone should be disciplined.

Promotions:  The following individuals were promoted since September 2001:  Mark V. St. Hilaire (10/03 to Sgt.); Leo Fitzpatrick (to Sgt) and Steven Pagliarulo (11/03 to Lt); Cara Rossi-Cafelli and Richard Vieira (12/04 to Sgt); Brian C. Grassey (12/04 to Lt); Robert Hoffman (7/05 to Sgt); and Joseph Hayes (1/06 to Sgt).  My opinion was not sought in any promotional matters during my tenure as a Sergeant, by the Chief or anyone else.  As a Lt. I was present during some discussions about filling open Sergeant slots with Hoffman and Hayes.  I concurred with the Chiefs assessment that Hoffman was a fine candidate for Sergeant.  I offered dissent in regards to Hayes but the Chief nevertheless promoted Hayes.  In each case the Chief presented the issue as though the matter had already been decided before the discussion.

"Substantial, significant weight":  In addition, the Chief has never stated, prior to this litigation, that he will "give substantial, significant, and meaningful weight" to my input on hiring, firing, discipline or promotions.  This litigation is the first I have heard that this.  Also, to my knowledge there are no documents that identify the specific weight that should be accorded to any input that I give.  Moreover, in the area of suspensions of greater than 5 days, hiring, firing and promotion decisions, the Town's Board of Selectmen makes the decision, not the Chief.  The Chief makes recommendations to the Board.  I make no recommendations and do not communicate with the Board.  I am aware of no documentation where the Board of Selectmen was provided with my views and where they articulated that my view would be followed.  Rather, to my knowledge, in each case, the Board of Selectmen follows what the Chief recommends, regardless of whether I disagree or agree with the Chief.

(j)    **[Command Staff – Input on employee of the month and officer of the year – input on poor performance]**  At ¶34 the Chief states that he seeks "input" from the command staff regarding Employee of the Month and Officer of the Year awards, and he says that he "considers it part of their duty to provide feedback on good work of employees, as well as the employees whose work needs improvement."  In response to this allegation I state the following:

Employee of the Month.  Some months the Chief solicits input on Employee of the Month, and some months he does not.  I have given input some months; and some months I have not.  I have never been told that I must give such input.  In a

given year I may give input to as few as three or four employees. All employees in the department, not just superior officers, may give input to the Chief on this issue, and all employees are subject to the same voluntary standard, i.e., they choose whether to communicate with the Chief their opinion without any rule requiring them to do so. To highlight the lack of the value of my input in the process I note that the Chief selected Marsha Kelly as employee of the month and she is a transcriptionist who works in the records division with me. I concur with his assessment that she deserved the award However, at no time did the Chief ask for my opinion before selecting Ms. Kelly and did not even learn that she received the award until the day it was issued to her. This award was given even though I never nominated Ms. Kelly for the award. I have never been told that I am required to submit input for Employee of the Month. To my knowledge, there is no documentation indicating what weight, if any, would be accorded to input from me on this. The Chief says in his affidavit that he considers it part of my duty but this is the first I have heard this and it is not delineated in any documentation of the Police Department to my knowledge. To the best of my knowledge no one that I identified as a candidate for Employee of the Month was selected.

Officer of the Year. With respect to Officer of the Year, it is true that the Chief has solicited my input for this Award. The process for selection in terms of my involvement is as follows: The Chief asks for input at a staff meeting prior to May and a rough outline of why you think the person would be appropriate. To my knowledge, all employees in the department, not just superior officers, may give input to the Chief on this issue, and all employees are subject to the same voluntary standard in giving input, i.e., they choose whether to communicate with the Chief their opinion without any rule requiring them to do so. There is no requirement to provide this input. Nor, to my knowledge, is there any documentation indicating what weight, if any, would be accorded to input from me or others for this award. If you are awarded Officer of the Year you receive a plaque, three days off with pay, and a parking spot for the year. I have never heard or read any documentation, until this lawsuit, to the effect that my input Officer of the Year was a "duty" or that the Chief places any weight on my input.

Input on employee performance improvement. With respect to input on employees whose work needs improvement, the Chief stated that if I had a problem with an employee I should let the Chief know. I do not recall any other communication by the Chief about this beyond this generalized statement.

(k)    [Superior Officers - Hiring] l At ¶39 the Chief states among other things that "[a]s Chief [he] oversees the selection process and gather[s] input and information about candidates developed in the process and with that information and input, [the Chief] ultimately [is] responsible for making the final recommendation to the Selectmen about who should be hired. . . ." The Chief states as well that he does "not recall an instance where [he] did not give substantial and significant weight to others in the Department involved in the process, or where [the Chief] did not rely materially on their input."

11

<u>As a Sergeant.</u>  From 2001 until December 2004, as a Sergeant, I gave no input on hiring.  The only exception to this was when I did a few background investigations of candidates for factual verification of specific background elements identified by the Chief.  I would write a report relating to that.  An example of such a report is one attached hereto for candidate (now officer) Brian Bosselman, attached hereto as <u>Attachment B</u>.

<u>As a Lieutenant.</u>  From December 2004 onward as a Lieutenant during the interview process I am more of an observer than an active participant.  The only patrol officers hired since I have been Lieutenant to the best of my memory are Officers Ryan Hall, Chad Howard, Scott Lacerra, Toan Van Nguyen, and Ryan Elliot Payne and a transfer from another department Joseph Thurston.  In each case I was present at interviews which were orchestrated and I am actually provided with a question to ask the candidate.  Nor has the Chief at anytime stated, prior to this litigation, that he will "give substantial and significant weight" to my input.  To my knowledge there are no documents that identify the specific weight that should be accorded to any input I give.  The Chief makes recommendations to the Board.  I make no recommendations and do not communicate with the Board.  I am aware of no documentation where the Board of Selectmen were provided with my views and where they articulated that my view would be followed.  Rather, to my knowledge, in each case, the Board of Selectmen follows what the Chief recommends, regardless of whether I disagree or agree with the Chief.  Finally, with respect to the selection process, given Civil Services rules, there is a presumption in favor of hiring the first candidate on the list unless there is substantial documented reason not to hire such person.  It is for this reason that I am aware of no instances when anyone other than the first person was hired on the list.  The only exception to this was when a candidate named Mark Clifford was bypassed in September 2005 because there was a blatant disqualifying condition, i.e., Mr. Clifford lied about a fairly extensive disciplinary record in his prior employment.  Even in connection with this case, the Chief was steadfast, adamant in his conclusion that he would not hire Mr. Clifford.  He noted what the background investigation revealed, the misrepresentation of what Mr. Clifford stated in his interview and then pronounced, "I am not going to hire him."  There was absolutely no debate over the issue.

**(l)      [Command Staff - Hiring process – "weight" given to input]**
At ¶45 the Chief states that, after the background investigation is completed, he meets with the Command staff to "discuss and evaluate the candidates".  The discussion typically centers around the candidates' lack of disqualifiers During my time as Lieutenant and member of Command Staff from December 2005 to present I only once expressed a negative opinion on a candidate for hire (Payne).  Payne was hired.  The only other exception to this is when I was assigned the background investigation of Chad Howard, and found nothing that disqualified him under the standards and criteria set forth by the Chief and reported that to the Chief.  The Chief also states that "[o]pinion and suggestions are expressed and given a great deal of weight and consideration in developing the Department recommendation."  Again, although the Chief states this, to my knowledge there is no documentation in the Town establishing the degree to which he should place weight, if any, on anything that the Command staff say.  Further, to my

knowledge, there is no requirement even that the Chief solicit input from the Command staff in connection with making recommendations for hire.  Furthermore, to my knowledge, the first time that the Chief has stated that he places "a great deal of weight and consideration" on input from the Command Staff meeting is in this litigation. Finally, the issue of hiring a candidate is straightforward under Civil Service law in that the issue is whether there is a disqualifying condition.  Absent a disqualifying condition, the person that is first on the list must be hired and that is what has happened in each case, except for the case of Mr. Clifford described above since at least 2001.

(m)    **[Command Staff – hiring – interviews]**  At ¶46 the Chief says that candidates "may be interviewed" by the Command staff and that following the interview there is discussion and opinions expressed about the candidates.  While on the Command Staff from December 2004 to present, the few interviews that I have attended I cannot recall when I was informed of the interview ahead of time.  I generally learned on the day that they occurred.  I may have provided an opinion at the interview but it was not required and, in any event, the selection decision is based upon the presence of a disqualifying condition which is governed by Civil Service Law and Chief standards.  I am not clear on what value is given to my attendance or discussion given the late notice and that I am given the question to ask.  If there are no disqualifying conditions, I understand that the interview plays no weight or little weight in the decision under civil service law.  Therefore, setting aside situations such as Mr. Clifford when a disqualifying condition is patent and ascertained at an interview, which has happened only once since 2001, the interview otherwise have no bearing on the selection process.  Further, there is no documentation requiring that I attend interviews, or that I provide an opinion. Furthermore, there is no documentation indicating how much weight, if any, the Chief should place on my opinion, if any.

(n)    **[Sergeants – hiring – input]**  At ¶47 the Chief states that "[a]t times [he] may . . . seek out further opinions of one or more other Sergeants" regarding hiring a candidate for Patrol Officer.  In my tenure as a Sergeant there was no occasions when my opinion was solicited regarding hiring an applicant.  I did provide background investigation reports on some applicants as noted above.  I filed the report and there was never any discussion of that report with me.

(o)    **[Command Staff and Sergeants – general  – input and weight]** At ¶48 the Chief states that he gives "serious weight to the thoughts and opinions of [the] Command Staff and Sergeants, and [that he takes] their recommendations seriously.  At times, however, I may choose to not follow their recommendations, based on my own knowledge and experience."  While employed as a Sergeant the Chief never solicited my opinion on any topic.  (When I was a union official and would occasionally ask me to state the union's opinion on a contract issue so that he could formulate his response.)  Nor did he or the Town in general ever express to me or in documentation to my knowledge that whatever opinion I expressed would be given "serious weight".  This litigation is the first time I heard that sentiment expressed.  As a Lieutenant, I now attend Command Staff meetings, and sometimes I express my thoughts or opinions on any issue at these meetings.  I have never been told what weight is placed on my view or that it is required

that I express an opinion.  However, the vast majority of the time the format of the Command Staff meeting is that Chief Mannix and Lieutenant Mason speak and I listen.

(p)    **[Hiring process – memorandum to the Selectmen]**  At ¶49 the Chief states that he communicates his recommendation (I assume relating to hiring a candidate) he presents it in a memorandum and that "typically [he mentions] whether the recommended candidate is a unanimous choice or a consensus choice."  The Chief has never before indicated, nor is there any Town documentation to my knowledge, that indicates any criteria relating to whether the Chief must present input to the Selectmen that references the opinions of others, or criteria for how much weight the Chief or the Selectmen should place on such opinions.  The Chief has never discussed this with me and this litigation is the first that I have heard of any communication to the Selectmen of views of individuals other than the Chief.  I have attended Selectmen's meetings relating to hiring decisions and to the best of my recollection that there is no reference at the meeting to the views of anyone other than the Chief on the selection decision.

(q)    **[Sergeant – promotions – input]**  At ¶52 the Chief states that he expects that, "as part of a Sergeant's duty, [the Sergeant] would report to me directly, or through chain of command, any information they possess which could impact a decision about promotion."  Until this litigation, there has been no communication by the Chief or the Town in any form relating to this expectation and I never gave input on any promotion decision while a Sergeant.  Nor, to my knowledge, is there any documentation in the Town which establishes how much weight should placed on the opinion, if any was given, by a Sergeant relating to a promotion decision.

(r)    **[Patrol Services Division Commander – seek information – promotions – this is for sergeants and lieutenants too]**  At ¶53 the Chief states that he expects the Patrol Services Division Commander to "seek information from other Superior Officers, with respect to the promotability of a particular Officer seeking advancement."  At no time has the Patrol Services Division Commander sought my input on any promotions.  Nor at any time has the Chief or the Town communicated any such expectation until this lawsuit.

(s)    **[Reports of supervisors – promotions]**  At ¶54 the Chief states that "the work records of persons seeking promotions, including reports by their supervisors over the years (if any) are taken into consideration."  To the best of my memory, from at least September 2001 to present, there have been no occasions when I have filed any reports on patrol officers in the regular course of duties.  The Chief has established a procedure which requires that a sergeant file a document known as the Supervisor's First Report of Complaint when a citizen complaint is filed.  The report simply summarizes the citizen complaint allegations and no findings are made by the superior officer completing such report.  This is a rote activity of simply listing allegations and passing those allegations via this paperwork up the chain of command for review by someone else.  With respect to the supposed reports that supervisors file regarding employee performance, the Chief nor the Town has communicated that it would use any such reports in making promotion decisions or, if so, how much weight

14

would be placed on such reports.  This lawsuit is the first I have heard of this issue.
There is no Performance Appraisal system in place.

(t)    **[Command Staff – Promotions – opinions - weight]**  At ¶55 the
Chief states that when considering officers for promotions he "involve[s] the Command
Staff in the decision, assign[s] significant weight to their opinion, and consider[s]
seriously what they have to say."  The only promotions that have occurred since I have
been a Lieutenant were the promotions of officer Robert Hoffman to Sergeant in July
2005, and the promotion of Officer Joseph Hayes to Sergeant in January 2006.  With
respect to those I was not asked for my opinion with respect to the promotion of either
officer.  I did initiate my opinion on promotion of Joseph Hayes.  In that case, outside of
a Command Staff meeting, the Chief told me he was going to promote Officer Joe Hayes
(now Sgt. Hayes).  I initiated my opinion that the Chief should not promote Officer
Hayes and stated the reasons why.  Lt. Peter Mason was present for this interchange, and
he stated words to the effect that he agreed with my assessment.  The Chief responded, "I
promised him I will promote him".  He did not discuss my opinion with me or the basis
for it.  That was the end of the discussion and the Chief promoted Hayes.  Also, this is
another instance where neither the Chief nor the Town has ever expressed to me or in
documentation to my knowledge that whatever opinion I express will be given
"significant weight" or be considered "seriously" on promotion situations.  Nor to my
knowledge is there any documentation in the Town stating a requirement to solicit my
opinion on promotions or that it should be presented to the Board of Selectmen.  The
decision is made by Board upon recommendation of the Chief.  In truth, this litigation is
the first time I heard it expressed that any weight would be placed on my opinions
regarding promotions.

(u)    **[Superior Officers - Input – discipline and firing – weight]**  At
¶56 the Chief states that the process for imposing discipline or termination is similar to
the process for obtaining input as in the case of promotions or hiring.  He further states
that, when the Selectmen are involved in discipline, "they have indicated to [the Chief]
that they rely on my recommendations, and the fact that I seek input in developing that
recommendation from other officers."  As a Sergeant I gave no input on any such
decisions.  As a Lieutenant I gave my input one time as reviewed above regarding
Dispatcher Barnes, and my recommendation that she be fired was rejected, and my
recommendation that she be reassigned to a new work group was rejected without
explanation or response.  In a second event involving the tardiness of Dispatcher Biuso
the requested draft was changed by the Chief of Police.  The Chief nor the Town ever
expressed to me or in documentation that the Board will "rely" on my input until this
litigation.  This litigation is the first time I have ever heard this claim.

(v)    **[Superior Officers – verbal counseling]**  At ¶59 the Chief states:
"Verbal counseling happens very frequently, and is part of the job duties of the Sergeants
and the Lieutenants."  To the extent that the Chief is referring to input on performance
where the superior officer comments on employee performance, this has happened, but to
say it happens frequently is not true.  When this happens, it is simply based upon
observation of performance that is not in accord with the external guidelines established

by the laws, the Chief, and by longstanding well-known techniques of police work, rather than any special rule that I independently fashion.

(w) **[Superior Officers – relieve someone from duty]** At ¶60 the Chief states that all superior officers have the power to relieve "someone of duty, when the situations requires such action." I have never done this. Moreover, to the extent that the Chief is referring to a serious issue such as a patrol officer, sergeant, lieutenant or the Chief himself, proceeding to engage in police duties while inebriated or otherwise incapacitated, all officers from patrol officer up the ranks to my knowledge have the power to relieve another of duty in such situation for public safety reasons. There are no other situations, other than situations where the officer or superior officer's performance will endanger the public, that allows for such relief from duty. There are no rules, regulations, policies, procedures, general orders, or any other Town document which affords superior officers the right to suspend someone from duty. This power is vested solely in the Chief and the Board of Selectmen for suspensions from one to five days, and solely with the Board of Selectmen for suspensions of greater than five days up to termination, per Civil Service Law.

(x) **[Sergeants – disciplinary process – "major role"]** At ¶61 the Chief states that "[s]ergeants play a significant and material role in the disciplinary process of Patrol Officers. They are responsible for dealing with the day to day conduct issues that are not serious (serious meaning things such as flagrant refusal to obey orders or commission or crime). They are responsible for acting on any misconduct or performance, and bringing forth the appropriate facts and reports about conduct that rises to the level of warranting more formal discipline or action." Respectfully, the Chief's statement in this regard is inaccurate. Regarding my role as a sergeant, first I note that if a superior officer engaged in criminal misconduct or other misconduct a patrol officer or any superior officer is obliged to report that up the chain of command. As a sergeant I played no role, let alone a "significant and material role" in disciplining of any patrol officer and issued no discipline. I had to handle non-serious issues that arise during the shift of violations of minor rules (e.g., uniforms appearance, minor rudeness). I would simply identify the conduct and explain how it violated said minor rule. From September 2001 to December 2004, as a sergeant, this occurred rarely, at most five times to the best of my recollection. For more substantial violations as a Sergeant I was required to complete a document entitled "Supervisors Report of First Complaint". This is required by the policy relating to professional standards. I simply reported the allegations up the chain of command. I never was involved with making findings or recommendation on the allegations as a Sergeant. This happened approximately five to ten times from September 2001 to December 2004 as a sergeant. To my knowledge there has been no communication by the Chief or the Town or documentation issued relating to the supposed "significant and material" role that the sergeant would have in the process or how much weight would be accorded to the input of a sergeant, until this litigation.

(y) **[Sergeants – disciplinary process – "major role"]** At ¶61 the Chief also states that, with regard to the discipline process, that sergeants are "required and expected as supervisors [to monitor] conduct and performance, and address[] problems as they arise in different ways depending upon the seriousness of the incident."

16

Respectfully this is inaccurate to the extent that it implies that I engaged in any significant first hand observation of the performance of patrol officers while a Sergeant. On a typical shift I did not observe their performance. Since I was routinely assigned as Station Supervisor, I listened to the radio just like all patrol officers do. What is said over the radio gives little indication of whether a patrol officer is performing up to standard. Therefore, by monitoring the radio I was not effectively monitoring for performance that violated any rules. To the best of my recollection there were no instances where I discovered a problem with performance over the radio. Regarding report review, as noted above, that is a function of applying external standards to the report, noting any discrepancies, and providing the report back to the patrol officer for revision to correct such discrepancy. In each case, any such input is based upon external mandates, rather than any rules that I independently fashion.

      **(z)**    **[Sergeants – authority to resolve grievances**] At ¶62 the Chief states that "Sergeants have the authority to resolve grievances" under the patrol officers collective bargaining agreement. This is false. The grievance procedure requires that the patrol officer speak to the immediate supervisor. As a Sergeant no one officer has given me a written grievance. It has always been an informal discussion. The most typical example of this relates to when an officer complained about not being awarded a paid details or concern about the number of officers required to be on a shift as a condition to granting a vacation day. As a sergeant I am unable to resolve these and bind the Town. With respect to details, there is a procedure which is contractual and I am not authorized to modify it. With respect to granting vacation days, this as well is contractual and the Chief has requirements as to how many officers must be on each shift. I do not have the authority to override the contracts negotiated by the Town and rules established by the Chief. Therefore, while it is true that the contract language in the patrol officers' contract states that a grievance initially should be discussed with the sergeant, this is at best an informal discussion. The actual process begins with submission of the written grievance to the Chief. The Town does not vest the Sergeant's with the ability to sustain a grievance and thereby create a binding precedent (as would be the case in the case of a truly sustained grievance). The grievances, if discussed with the Sergeant, are routinely routed up the chain of command for decision by the Chief.

      **(aa)**    **[Sergeants – Lt. Mason – referral and investigation of complaints]** At ¶63 the Chief states that if a complaint is lodged against a patrol officer that the sergeant is required to submit an incident report and then the matter is referred to Lt. Mason who initiates an investigation. As noted above, the Chief's rules require that the Sergeant complete a document entitled Supervisor's First Report of Complaint and that is merely listing the allegations and passing them up the chain of command for review. It involves no findings and is a clerical function.

      **(bb)**    **[Sergeants – Lt. Mason – other superiors - referral to investigate complaints]** At ¶64 the Chief states that "[i]nvestigative duties are usually assigned to the immediate supervisor, either a Sergeant or a Lieutenant." Other than as relates to completing the Supervisor's First Report of Complaint, this has not happened and the situation involving Dispatcher Barnes in which none of my recommendations

were followed, this has not otherwise occurred.  I have conducted a few 'investigations' but they generally involve minor indiscretions, rudeness, call mishandling, items not logged etc. These types of investigations generally are added to personnel files and not acted on specifically.  My belief is that they are compiled to show tendencies that may be acted upon later if the conduct continued.  The result is usually a counseling session conducted by Lt. Mason or the Chief.  In the particular case of Barnes, she has been the subject of several minor indiscretions.  It was the first time I was directed to make a recommendation for discipline, again the timing becomes suspect because it happened only after this lawsuit and discovery progressed.

(cc)    **[Sergeants – Lt. Mason – other superior officers – referral to investigate complaints]**  At ¶65 the Chief states that, "Superior Officers who investigate complaints are allowed to include recommendations for discipline in their reports, but do not always do so.  The facts provided by the Sergeant or Lieutenant are always relied upon in making a determination about if, or what, action should be taken."  With respect to the claim that the "facts provided" are always relied upon, this is a distortion in the case of the Supervisor's First Report of Complaint; that document merely passes along "allegations" not any findings or established facts.  The Barnes case, elaborated upon above is the only other situation where I investigated a very serious workplace concern.  All other investigations were for far less severe matters, as mentioned in the proceeding sub-paragraph.

(dd)    **[Sergeants – Command Staff – discussion of disciplinary action]**  At ¶66 the Chief states that when contemplating disciplinary action, he discusses the "measure of discipline with the appropriate supervisors.  I also typically discuss the situation with my Command Staff."  Above I have outlined that with respect to my role as sergeant this I have never had any communications about, or was asked for, my opinion relating to discipline.  As Lieutenant, I have reviewed the two situations that occurred above (Barnes and attendance issue for Biuso referenced above).  There have been no other communications about discipline.  To my knowledge the Chief or the Town has never communicated or issued documentation relating to a requirement that I provide such input or how much weight if any would be placed on my input.  The first I have heard of this claim is in this lawsuit.

**8.**    <u>Job description - Sergeant.</u>  I have reviewed the job description for Sergeant and find that it is not accurate in describing what my job was as Sergeant in multiple respects, as follows (citation refers to paragraph and section of the job description):[3]

(a)    B(1)(a): Although the job description stated that I was "responsible" for the "effectiveness" in which patrol officers working on my shift work, in reality this was not true. My role in monitoring the shift was only to the extent noted above.

---

[3]  I do not comment on the initial section referred to as "Summary" since I understand that it correlates with the items otherwise listed in the job description.

**(b)**     B(1)(b):  It is generally true that I should be familiar with the rules, regulations, policies, procedures and general orders of the Police Chief as relates to my job and those on my shift is correct, but the reference to patrol officers on my shift as "my personnel" is inaccurate to the extent it implies that I have authority over such personnel beyond that which I have described in this affidavit.

**(c)**     B(1)(c):  The job description states that it is my duty to "monitor the duty performance of departmental members" and "ensure that it is satisfactory through encouragement, explanation, discipline, referral to his superior officer or other methods consistent with departmental policy."  My role in interacting with patrol officers as may impact how they perform their job was limited to what I described above.

**(d)**     B(1)(d):  With regard to the job description's claim that I am to submit a "written report to the superior officer of any member of the Department when he commits a serious breach of the regulations of the Department and informal corrective measures prove inadequate," this was also not an accurate reflection of my job duties. The true extent of my duties in this regard are set forth above.

**(e)**     B(1)(h):  The job description repeats the concept that I am "accountable for the actions or omissions of officers under [the sergeant's] supervision which are contrary to the departmental regulations and which would have been avoided if [the sergeant] had been properly executing his supervisory responsibilities."  With regard to execution of "supervisory responsibilities", I had little if any communication with officers during the shift to remind them how to perform their job in accordance with rules, regulations, policies, procedures and general orders.

**(f)**     B(1)(i):  With regard to the job duty that I was to respond to "emergency or incident of a serious nature" and "[t]ake command of the situation until relieved by an officer of superior rank", the actual practice did not comport with this. Under the Department's policies, the individuals with greatest knowledge, not necessarily the sergeant, is the one who takes command of the situation.  This is set forth in the Incident Command System ("ICS") established by the Chief for the Department and included in Attachment A.

**(g)**     B(1)(j):  The job description states that the sergeant is to ensure that "all Patrolmen receive warrants, summonses, subpoenas, or other official papers, and serve or deliver or perform their duties regarding such papers promptly and accurately." This task is clerical in nature and requires no judgment.  I learned of such material to provide to officers and they serve or deliver them.  I did not monitor how they serve or deliver.  I simply note whether the documents are served and if not, according to the Chief's rules, I refer the matter back to the patrol officer to complete service.

**(h)**     B(1)(k):  With regard to the duty to review the log, it is true that I reviewed the log and the ministerial task of noting material on the log at roll call is one of the clerical functions that the sergeant performs.  That function requires no judgment or

discretion.  The content of the log is guided by Departmental practices in compliance with Public Records Laws and HIPPA regulations.

   **(i)**  B(2)(a)(b) and (c):  Regarding reporting and writing procedures of sub-section "2" of Section B of the job description, the actual duties performed in that regard vary from what is written.  The job description states "Be familiar with the Department's records and reporting system in detail and instruct officers in the proper method of reporting."  It is true that the Chief has established, in detail, the system and requirements for report writing, and those standards are also established by the Clerk of the Courts and the General Laws of Massachusetts, as well as training that all officers receive at the Academy.  Like patrol officers, as a sergeant I was also required to be familiar with the standards of report writing and to adhere to them.  The sergeant does review reports at the end of the shift, but this task requires no judgment or discretion.  It is a clerical task of ensuring that the certain established protocols are satisfied.  If they were not, as a sergeant I noted the discrepancy and returned the report to the officer with guidance on revising the report so as to conform with those standards.  The job description also states that the sergeant is to report to the "Commanding Officer and to the Chief all serious or unusual occurrences immediately".  This is another ministerial task since serious and unusual occurrences are obvious to all officers that have undergone the same training as me, and it is a matter of reporting the information.  There is no judgment or discretion involved in this task.

   **9.**  <u>Job description - Lieutenant.</u>  I have reviewed the job description for Lieutenant and find that it is not accurate in describing my job as Lieutenant in multiple respects, as follows (citation refers to paragraph and section of the job description):[4]

   **(a)**  B(1):  The job description states that I have a duty to "[m]aintain discipline and morale within the Department.  Investigate personnel complaints as assigned by the Chief."  There is nothing specifically that I do that relates to maintaining discipline, nor am I clear what this means.  With respect to maintaining "morale", everyone in the Department should be constructive in their communications.  However, other than doing my best to present in a constructive positive manner, there is nothing that I do specifically relating to "maintain[ing] morale".  My role as a Lieutenant with respect to investigating complaints is as otherwise set forth above.

   **(b)**  B(2):  The job description states the duty to "[p]romote harmony and cooperation among all units of the Department."  Other than the general principle that each person should be constructive and positive in their communications, I do nothing specifically relating to "promot[ing] harmony and cooperation".

   **(c)**  B(3):  With regard to the duty to "[o]versee preparation of correspondence and reports and maintain proper records of departmental activities. Communicate information as required," my duties involve report review and reviewing

---

[4] .  I do not comment on the initial section referred to as "Summary" since I understand that it correlates with the items otherwise listed in the job description.

the log to ensure it has appropriate language.  Again, this is an application of external mandates, not any impendent rules that I have personally established.

   **(d)**  B(4):  "Periodically inspect all members of the Department to assure proper maintenance of personnel and departmental equipment."  This is simply a function of knowing the standard established by the Chief's rules, and noting a discrepancy.  This falls under the discussion above relating to "minor infractions".

   **(e)**  B(5):  "Assist departmental personnel in the preparation of cases." I am not sure what this means other than normal police work that even patrol officers perform.

   **(f)**  B(6):  "Prepare evaluation of department personnel as directed by the Chief."  There are no periodic formal evaluations of departmental personnel and I have not engaged in such duty.

   **(g)**  B(7):  "At the direction of the Chief, observe probationary officers, and prior to the expiration of their probationary period, submit to the Chief a detailed written report concerning their qualification to secure permanent status and [the lieutenant's] opinion as to the desirability of their retention." I have never written a report relating to probationary status; nor have I been asked to provide input regarding same verbally.

  **10.**  <u>Overtime - Sergeants.</u>  Sergeants are authorized to fill overtime if staffing falls below the minimum established by the Chief.  This minimum, although not set in stone is reflective of staffing needs as established by calls for service in times past.  There is always a sentiment that calls for service will be higher on Friday and Saturday and often the minimum is greater on those days (in a department the size of Natick's an increase in manpower may be one officer).  The minimum has fluctuated over the years but has generally been 4-5 officers on each shift.  Openings can be caused by illness or scheduled time off.  Officers (up to five) are allowed to take a day off if staffing levels are met without invoking mandatory overtime.

**11.**     <u>Managerial regulatory factors - Sergeant.</u>  As a Sergeant I did not participate in interviewing and selecting Department employees; I did not set or adjust rates of pay and hours of work; I did not direct any employee's work, except in accordance with external standards and only to the limited extent set forth above; I did not maintain production records for use in supervision or control; I did not appraise employee productivity and efficiency for the purpose of recommending promotions or other changes in status; I did not handle employees' complaints and grievances except when addressing informal "grievances" about matters like detail assignments to the extent set forth above;  I did not plan any employee's work except to the limited extent set forth above; I did not determine or set the work techniques to be used;  I did not participate in apportioning the work among the workers, except in rare occasions noted above; and I did not participate in determining the type of materials, supplies, or tools to be used in the course of an employee's duties.

Sworn to under the pains and penalties of perjury this 15th day of November, 2006:

<u>s/Brian C. Grassey</u>
Brian C. Grassey, Lieutenant