THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Robert F. Murphy, III, Lead Plaintiff for<br>Patrol Officer Plaintiffs, et al. and,<br><br>Brian C. Grassey, Lead Plaintiff for<br>Superior Officer Plaintiffs, et al.,<br><br>      Plaintiffs,<br><br>      v.<br><br>Town of Natick, et al.<br><br>      Defendants | USDC Case No.: 04-11996 RGS |

**Affidavit of Peter Mason**

I, Peter Mason, attest to the following based upon my own personal knowledge:

1.    My name is Peter Mason and I reside at 4 Presbrey Place, Natick, Massachusetts.

2.    I have been employed by the Town of Natick within its police department since 1975. I was promoted to Lieutenant in 1994. Currently, I am the Executive Officer of the Natick Police Department.

3.    <u>Academy training.</u> I attended the State Police academy for approximately 14 weeks in 1975-76. While at the Academy, and at subsequent in-service trainings, I have been trained in all the specific techniques of law enforcement for police officers in Massachusetts as well as the General Laws affecting police work and how it guides such techniques. Some examples of this include the following:

> **(a)** <u>Vehicle Crash Investigation</u>. Training in this regard included learning the specific procedures relating to laying the foundation of an motor vehicle crash investigation including the specific information that should be included in a "report", what should be done with respect to "investigation", the purposes of reporting and investigating including enforcement of traffic law to facilitate public safety on the roads and deter unsafe practices, educate drivers and the community, and prevent accidents. With regard to this I was also taught about the elements of investigation including witness observations, interviewing all available witnesses, the importance of gathering information relating to the

1

accident's time, place and type of accident, and the final resting place of the vehicle.

**(b)** <u>Causes for vehicle crash.</u> Training in this regard included examining the reasons why the driver did not or was not able to evade the accident. This includes considering the driver's decision as to the speed of the vehicle prior to the accident and whether excess speed was factor in the accident; driver distraction due to any number of factors (i.e., children fighting car, conversation); impairment of senses due to vision, glare, auditory capacity, knowledge of traffic laws, driver skill and years of driving experience, driver motivation such as anger, fear, timidity, and exhibitionism, and ailments caused by medicines, drugs, poisons (like carbon monoxide), fatigue, or heart or other health conditions. Training also instructed officers to consider the condition of the vehicle and its potential cause (headlights, wheels, brakes, windows, windshield wipers, and the condition of the road and weather. There is also specific training on what observations to make of the driver and determining whether the driver is Operating Under the Influence ("OUI") within the meaning of G.L. c. 90. With regard to these, as well, training involved information on what is probable cause and what steps can and cannot be taken with or without probable cause, as well as the circumstances that allow the officer to require the driver to take a Field Sobriety Test ("FST") and the implications of driver refusal, as well as the appropriate use of a breathalyzer.

**(c)** Other details relating to vehicle crash response. Training also included other longstanding police techniques relating to what to do when responding to a vehicle crash such as where to place the police cruiser, which vehicle to attend to first in a multi-vehicle crash, using lights and siren when traveling to a crash scene after radio dispatch, crowd control, special traffic control techniques depending on the location of the vehicles, what information to collect from drivers and passengers, and what information if any to collect from the interior of the vehicle.

**(d)** <u>Domestic disturbances and other response situations.</u> Training also included information on the criteria for report writing, investigation, and other longstanding police techniques relating to other response situations, with detail similar to that noted above for vehicle crash situations.

**(e)** <u>Criminal procedure.</u> At the academy I was given detailed information on the constitutional and statutory standards governing criminal procedure and how those standards affect police work. This includes, e.g., standards relating to probable cause, affording citizens' their constitutional rights, how to not endanger the investigation by improper conduct under those standards, and review of case law applying such constitutional and statutory standards.

**(f)** <u>Criminal law.</u> I was also given detailed information on the statutes of the Commonwealth of Massachusetts that a police officer must enforce. I learned which offenses are ones for which an individual may be arrested; which require a warrant; and key exceptions to these general rules including those set forth in statutes. I also learned the importance of each element of the crime and why an investigation must identify each element.

**(g)** <u>Motor Vehicle law.</u> In addition to learning how to investigate a vehicle crash scene as noted above, I also learned each of the statutes that a police officer must enforce relating to motor vehicles, the elements pertaining to each offense, and the importance of identifying the existence of those elements. There was also specific focus on which motor vehicle laws are arrestable offenses.

**(h)** <u>Elements of self defense.</u> At the Academy, as well, I was given detailed information on techniques of self-defense and the laws applicable to that. I was taught about handcuffing techniques for passive situations and force situations. There was also role-playing in situations such as fights or brawls and how to handle those situations.

**(i)** <u>Driving.</u> I was taught about driving a police cruiser and the laws that relate to that. I was also taught on an emergency driving course, techniques of driving and about the tolerance (limitations) of a vehicle (e.g., turns, skidding).

**(j)** <u>Firearms.</u> At the academy there was extensive information on the laws governing the use of firearms by law enforcement officials, as well as the safe and effective use of a firearms (e.g., proper stances, target shooting, no shoot situations). In addition, there was education on a concept called the "use of force continuum", where you learn about how to escalate force and deescalate force, from police presence alone, to verbal commands, to hand tactics, to use of pepper spray, to use of a baton, to handgun use. I was taught how to recognize and control a situation and move up and down this continuum, using the least force necessary to obtain control.

**(k)** <u>Interview techniques.</u> I was also taught about interview techniques and the key elements of information that should be obtained from witnesses and how that varied based upon the elements of the crime that I may be investigating. I learned about judging a person's credibility and veracity based upon eye contact (or lack of eye contact), covering mouth when speaking, and/or non-responsive answers to questions posed, as well as separating witnesses.

**(l)** <u>Report writing.</u> At the academy I was also taught about report writing. That in part included an application of other information I learned relating to elements of the crime, criminal procedure and criminal law, as well as issues relating to witness credibility and veracity. I was taught about the key

3

elements that must be included in a report and otherwise how to complete a satisfactory police report so that is will be objective and support the crime for which it was written.

    4.    <u>Natick Police Department Rules, Regulations, Policies, Procedures, General Orders.</u>  In addition to knowledge relating to the General Laws of the Commonwealth and information reviewed above pertaining to longstanding special techniques of police work that I learned at the Police Academy and at subsequent inservice training that provide the criteria for how I must perform my job, the Natick Police Department's Police Chief has issued a vast number of Rules, Regulations, Polices, Procedures and General Orders that also dictate how I am must perform my job, from patrol officer, to detective, to sergeant, to my current position as Lieutenant.  They relate to matters such as how to proceed to an accident scene (lights, sirens, speed, marked cruiser), and what to do at an accident scene to collect information, what information to incorporate in a report, how to investigate domestic crimes, and what investigation to do at an accident scene and other matters.  Most of these same principles were taught to me on the job, from the time I was a patrol officer onward, with more senior patrol officers or sergeants and lieutenants offering guidance to me as a junior patrol officer etc.  This guidance related to reinforcing the principles of police technique and reinforcing the expectations required under the General Laws and the Police Chief's rules, regulations, policies, procedures and general orders applicable to the Natick Police Department.  I do not control any budget; when I have requested money for tasks like training in the past, I have been told by the Chief that "[he] will let [me] know when [I] can stop spending."

    5.    <u>Education.</u>  My education includes Associate's degree in Policing and a Bachelor's degree (1990) in Policing from Northeastern University, and a Master's Degree in Criminal Justice from Westfield State College in 2001.  That education reinforces much of the knowledge and standards of police work noted above.

    6.    <u>Virtually all duties governed by longstanding techniques and other external standards.</u>  Based upon the training and education that I received as reviewed above, and the documentation of the Department that otherwise describes standards of performance, virtually every aspect of what I did as a patrol officer, sergeant and now as a Lieutenant was governed by the aforementioned material, rather than by me deriving my own brand of police work unique to me. As a Lieutenant, I apply those same external guidelines to others.  To the best of my knowledge I have established no guidelines for performance of police work myself.  Any discretion I have with regard to the performance of my duties is limited by review and approval by the Chief prior to implementation of any policy guidelines.  For example, I make suggestions with regard to the improvement of department operations; these suggestions are sometimes adopted by the Chief and sometimes not.

    7.    <u>Mannix Affidavit – disagreement on facts.</u>  I am aware of the following topics covered in the Affidavit of Chief Mannix in this matter and, respectfully, submit that the allegations identified below are inaccurate:

**(a)** At ¶6 of his affidavit, Chief Mannix states that the "Department is organized into several Divisions, and several independent command level positions." This is also mentioned at ¶8 of this affidavit. While it is true that the Department contains divisions, the Commanders of those divisions do not operate those divisions "independently" to the extent that each Division Commander must run the Division in accordance with specifications outlined by the Police Chief, the budget established by the Chief, longstanding techniques of police work, laws of the Commonwealth, and the rules, regulations, policies, procedures and general orders established by the Police Chief. Decisions of the commander are not independently made, but are subject to specifications from these external sources (i.e., sources other than the superior officer's own personal beliefs and opinions). To the best of my knowledge, there is only one budget for the Department (thus, the divisions do not have separate budgets), and that budget is controlled by the Chief.

**(b)** At ¶7 there is reference to Lt. Mason being second in command and being responsible for Command when the Chief is not available. I generally work similar hours and days as the Chief. In the past twelve months, I estimate that this has happened about six times, generally when the Chief is on vacation or at out-of-state training. When I take over command I am not free to repeal or change rules, regulations, policies, procedures, or general orders issued by the Chief. I am required to follow those materials in performing this job. When I assume responsibility in the absence of the Chief I review his mail, forward his mail as appropriate for action, answer questions posed by department members and citizens, and serve as liaison with the Town administration as called upon. I generally remain in telephone contact with the Chief for major events and incidents, and notify him of any that may occur.

**(c)** At ¶20 the Chief states that the job description attached to the Town's motion is a fully accurate description of how lieutenants have performed that assignment. I respectfully disagree with the Chief. I am familiar with and have reviewed the job description for the lieutenant's position in question and find that it is not fully accurate in describing the actual duties of that position. Below in general, and in a separate paragraph of this affidavit relating to the job description, I will more specifically explain the degree to which each element of the job description is inaccurate.

**(d)** At ¶31 the Chief refers to the Command staff and says that each member of the Command staff is the "delegate" of the Chief. To the extent this implies that, in my role as Lieutenant I independently make decisions, without regard to standards established by the Chief, this is not accurate.

**(e)** At ¶32 the Chief states that he holds "Command Staff meetings regularly, as often as several times a week", and that he holds general staff meetings "up to 10 times per year." I disagree with the frequency of Command

Staff meetings stated by the Chief. Some weeks there are command staff meetings and sometimes there are no Command Staff meetings for several weeks. Occasionally, there is more than one Command Staff meeting in a week. A command staff meeting most often consists of a short conversation about what is happening in the Department, or is based on a current issue the department is facing (e.g., the quality of accident reports). Command Staff meetings may be held in my absence.

**(f)** At ¶33 the Chief states, "I seek input from the Command Staff and, while I am not required to follow their recommendations, I always give substantial, significant, and meaningful weight to that input in making my decision, on many issues within the department, including decisions regarding the hiring, firing, promotion, and/or discipline of the police officers of the Department." I respectfully disagree with the Chief's statement in this regard. The Chief has told me that he values my opinion, but he is free to disregard my input, and has done so. In particular, my recommendations are sometimes not followed with regard to promotions. To my knowledge, there are no documents that identify the specific weight that should be accorded to any input I give. In the area of suspensions of greater than 5 days, hiring, firing and promotion decisions, the Town's Board of Selectmen makes the decisions, not the Chief. The Chief makes recommendations to the Board. I make no recommendations to, and do not communicate with, the Board. I am aware of no documentation where the Board of Selectmen were provided with my views and where they articulated that my view would be followed. Rather, to my knowledge, in each case, the Board of Selectmen follows what the Chief recommends, regardless of whether I disagree or agree with the Chief.

**(g)** At ¶34 the Chief states that he seeks "input" from the command staff regarding Employee of the Month and Officer of the Year awards, and he says that he "considers it part of their duty to provide feedback on good work of employees, as well as the employees whose work needs improvement." In response to this allegation I state the following: The Chief solicits input on employee of the month from me. I have given input some months; and some months I have not. I have not been told that I must give such input. All employees in the department, not just superior officers, may give input to the Chief on this issue, and all employees are subject to the same voluntary standard, i.e., they choose whether to communicate with the Chief their opinion without any rule requiring them to do so. To my knowledge, there is no documentation indicating what weight, if any, would be accorded to input from me on this.

With respect to Officer of the Year, it is true that the Chief has solicited my input for this Award. To my knowledge, all employees in the department, not just superior officers, may give input to the Chief on this issue, and all employees are subject to the same voluntary standard in giving input, i.e., they choose whether to communicate with the Chief their opinion without any rule requiring them to do so. I have never heard or read any documentation, until this lawsuit, to the

6

effect that my input in Officer of the Year awards was a "duty." The Chief has made clear that the final decision as to Officer of the Year is his alone.

**(h)** At ¶39 the Chief states among other things that "[a]s Chief [he] oversees the selection process and gather[s] input and information about candidates developed in the process and with that information and input, [the Chief] ultimately [is] responsible for making the final recommendation to the Selectmen about who should be hired. . . ." The Chief states as well that he does "not recall an instance where [he] did not give substantial and significant weight to others in the Department involved in the process, or where [the Chief] did not rely materially on their input." The interviews are structured and I am sometimes provided with questions to ask the candidate. To my knowledge there are no documents that identify the specific weight that should be accorded to any input I give. The Chief makes recommendations to the Board of Selectmen. I make no recommendations and do not communicate with the Board of Selectmen. I am aware of no documentation providing the Board of Selectmen with my views and articulating that my view would be followed. Rather, to my knowledge, in each case, the Board of Selectmen follows what the Chief recommends, regardless of whether I disagree or agree with the Chief. Finally, with respect to the selection process, given Civil Service rules, there is a presumption in favor of hiring the first candidate on the list unless there is substantial documented reason not to hire such person.

**(i)** At ¶45 the Chief states that, after the background investigation is completed, he meets with the Command staff to "discuss and evaluate the candidates." In my role as a Lieutenant and member of Command Staff, I do participate in discussion with the Chief about candidates for hire. The Chief also states that "[o]pinion and suggestions are expressed and given a great deal of weight and consideration in developing the Department recommendation." To my knowledge there is no documentation in the Town establishing the degree to which he should place weight, if any, on anything that the Command staff says. Further, to my knowledge, there is no requirement even that the Chief solicit input from the Command staff in connection with making recommendations for hire. Finally, the issue of hiring a candidate is straightforward under Civil Service law in that the issue is whether there is a disqualifying condition. Absent a disqualifying condition, the person that is first on the list must be hired and that has what has generally happened.

**(j)** At ¶48 the Chief states that he gives "serious weight to the thoughts and opinions of [the] Command Staff and Sergeants, and [that he takes] their recommendations seriously. He also states: "At times, however, I may choose to not follow their recommendations, based on my own knowledge and experience." As a Lieutenant, I attend Command Staff meetings, and usually I express my thoughts or opinions on an issue at these meetings. However, the vast majority of the time the format of the Command Staff meeting is a general discussion, lead by the Chief, regarding the general goings-on of the Department.

7

**(k)** At ¶49 the Chief states that he communicates his hiring recommendation in a memorandum and that "typically [he mentions] whether the recommended candidate is a unanimous choice or a consensus choice." The Chief has never before indicated, nor is there any Town documentation to my knowledge, that indicates any criteria relating to whether the Chief must present input to the Selectmen that references the opinions of others, or criteria for how much weight the Chief or the Selectmen should place on such opinions.

**(l)** At ¶55 the Chief states that when considering officers for promotions he "involve[s] the Command Staff in the decision, assign[s] significant weight to their opinion, and consider[s] seriously what they have to say." At Command Staff meetings I have given an opinion on a candidate for promotion. Sometimes the candidate I prefer is selected, and sometimes not. To my knowledge, there is no documentation in the Town stating a requirement to solicit my opinion on promotions or that it should be presented to the Board of Selectmen. The decision is made by the Board upon recommendation of the Chief, and is tightly controlled by Civil Service law.

**(m)** At ¶56 the Chief states that the process for imposing discipline or termination is similar to the process for obtaining input as in the case of promotions or hiring. He further states that, when the Selectmen are involved in discipline, "they have indicated to [the Chief] that they rely on my recommendations, and the fact that I seek input in developing that recommendation from other officers." I have given input on discipline to the Chief on multiple occasions. To my knowledge there is no requirement that I give input or that the Board of Selectmen require my input in making any decision that they make on discipline or firing. Nor has the Chief or the Town ever expressed to me or in documentation that the Board will "rely" on my input.

**(n)** At ¶59 the Chief states: "Verbal counseling happens very frequently, and is part of the job duties of the Sergeants and the Lieutenants." To the extent that the Chief is referring to input on performance where the superior officer comments on employee performance, this has happened, but it is not a regular part of my duties or, for that matter, something I regularly observe. When this happens, it is simply based upon observation of performance that is not in accord with the external guidelines established by department policy, the general laws, the Chief, and by longstanding well-known techniques of police work, rather than any special rule that I independently fashion. Also, there is no formal employee evaluation system in place in the department.

**(o)** At ¶60 the Chief states that all superior officers have the power to relieve "someone of duty, when the situation requires such action." I have never done this. Moreover, to the extent that the Chief is referring to a serious issue such as a patrol officer, sergeant, lieutenant or the Chief himself, proceeding to engage in police duties while inebriated or otherwise incapacitated, all officers

from patrol officer up the ranks to my knowledge have the power to relieve another of duty in such situation for public safety reasons. There are no other situations, other than situations where the officer or superior officer's performance will endanger the public, that allows for such relief from duty. There are no rules, regulations, policies, procedures, general orders, or any other Town documents which afford superior officers the right to suspend someone from duty. This power is vested solely in the Chief and the Board of Selectmen for suspensions from one to five days, and solely with the Board of Selectmen for suspensions of greater than five days up to termination, per Civil Service Law.

**(p)** At ¶62 the Chief states that "Sergeants have the authority to resolve grievances" under the patrol officers' collective bargaining agreement. The grievance procedure requires that the patrol officer speak to the immediate supervisor. While it is true that the contract language in the patrol officers' contract states that a grievance initially should be discussed with the sergeant, this is at best an informal discussion. The actual process begins with submission of the written grievance to the Chief. The Town does not vest the Sergeants with the ability to sustain a grievance and thereby create a binding precedent (as would be the case in the case of a truly sustained grievance). The grievances, if discussed with the Sergeant, are routinely routed up the chain of command for decision by the Chief.

**(q)** At ¶63 the Chief states that if a complaint is lodged against a patrol officer that the sergeant is required to submit an incident report and then the matter is referred to Lt. Mason who initiates an investigation. The department policy requires that the Sergeant complete a document entitled Supervisor's First Report of Complaint and that is merely listing the allegations and passing them up the chain of command for review. It involves no findings and is an administrative function. The report simply summarizes the citizen complaint allegations and no findings are made by the superior officer completing such report. This is a rote activity of simply listing allegations and passing those allegations via this paperwork up the chain of command for review by someone else. Typically, a complaint is handled by the Lieutenant in charge of the area where the complaint originated. For example, a complaint about a detective would be investigated by the Lieutenant in charge of detectives. A complaint about a dispatcher would be investigated by the Lieutenant in charge of communications. When I receive a complaint, I alert the appropriate supervisor who then gathers the relevant facts and reports back to me. Once the facts are compiled and the report is complete I will forward it to the Chief who then makes a decision about the matter. Usually, officers do not make a recommendation in such a report.

     8.     **Job description - Lieutenant.**  I have reviewed the job description for Lieutenant and find that it is not accurate in describing my job as Lieutenant in multiple respects, as follows (citation refers to paragraph and section of the job description):[1]

     **(a)**     B(1):  The job description states that I have a duty to "[m]aintain discipline and morale within the Department. Investigate personnel complaints as assigned by the Chief."  With respect to maintaining "morale", everyone in the Department should be constructive in their communications.  Other than doing my best to present in a constructive positive manner, there is nothing that I do specifically relating to "maintain[ing] morale".  My role as a Lieutenant with respect to investigating complaints is as otherwise set forth above.

     **(b)**     B(2):  The job description states the duty to "[p]romote harmony and cooperation among all units of the Department."  Other than the general principle that each person should be constructive and positive in their communications, I do nothing specifically relating to "promot[ing] harmony and cooperation".

     **(c)**     B(3):  With regard to the duty to "[o]versee preparation of correspondence and reports and maintain proper records of departmental activities.  Communicate information as required," my duties include responding to requests for data received through the Chief's office and preparation of audio tapes of police incidents requested in the course of criminal litigation or otherwise.

     **(d)**     B(4):  "Periodically inspect all members of the Department to assure proper maintenance of personnel and departmental equipment."  This is done within each division and I personally have no one reporting directly to me.  The Lieutenant in charge of patrol inspects his direct reports; the Detective Lieutenant inspects his detectives etcetera. If I see a problem, I generally speak to the lieutenant responsible for the officer rather than jump the line of command. Inspection is a function of knowing the standard established by the Chief's rules, and noting a discrepancy.

     **(e)**     B(5):  "Assist departmental personnel in the preparation of cases."  I am not sure what this means other than normal police work that all police officers perform.

     **(f)**     B(6):  "Prepare evaluation of department personnel as directed by the Chief."  There are no periodic formal evaluations of departmental personnel and I have not engaged in such duty.

     **(g)**     B(7):  "At the direction of the Chief, observe probationary officers, and prior to the expiration of their probationary period, submit to the Chief a

---

[1] .  I do not comment on the initial section referred to as "Summary" since I understand that it correlates with the items otherwise listed in the job description.

10

    detailed written report concerning their qualification to secure permanent status and [the lieutenant's] opinion as to the desirability of their retention." I have never written a report relating to probationary status, and there is no formal Field Training Officer evaluation program in the department.

Sworn to under the pains and penalties of perjury this 16th day of November, 2006:

_____
Peter Mason, Lieutenant