THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Robert F. Murphy, III, Lead Plaintiff for<br>Patrol Officer Plaintiffs, et al. and,<br><br>Brian C. Grassey, Lead Plaintiff for<br>Superior Officer Plaintiffs, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>Town of Natick, et al.<br><br>    Defendants | <br><br><br><br><br><br><br><br>USDC Case No.: 04-11996 RGS |

**Affidavit of Steven J. Pagliarulo**

I, Steven J. Pagliarulo, attest to the following based upon my own personal knowledge:

1. My name is Steven J. Pagliarulo and I reside at 44 High Street Natick Massachusetts.

2. I have been employed by the Town of Natick within its police department since 1977. In 1995 I was promoted to Sergeant. From at least September 2001 to November 2003 I was a Sergeant Detective. From November 2003 to present I have been a Lieutenant. I am the Lieutenant in charge of the patrol division.

3. <u>Academy training.</u> I attended the police academy at the Massachusetts Criminal Justice Training Council Academy for about 18 weeks in 1982. While at the Academy then, and in subsequent training, I have been trained in all the specific techniques of law enforcement for police officers in Massachusetts as well as the General Laws affecting police work and how it guides such techniques. Some examples of this include the following:

>    **(a)** <u>Vehicle Crash Investigation</u>. Training in this regard included learning the specific procedures relating to laying the foundation of motor vehicle crash investigation including the specific information that should be included in a "report", what should be done with respect to "investigation", the purposes of reporting and investigating including enforcement of traffic law to facilitate public safety on the roads and deter unsafe practices, educate drivers and the community, and prevent accidents. With regard to this I was also

1

taught about the elements of investigation including witness observations, interviewing all available witnesses, distinguishing between the point of possible perception of a hazard versus the actual point of the driver's perception of hazard and how this bears on who is at fault, making determinations as to the point of no escape (i.e., the point <u>after</u> the point of possible perception at which no action can be taken by the driver to avoid the accident), the importance of gathering information relating to the accident's time, place and type of accident, criteria for determining the point of initial engagement (contact), the point of maximum engagement where the material forces cause the greatest collapse of material or overlap among two objects, the point of disengagement (i.e., where the vehicles begin to separate and force begins to wane from the point of maximum engagement), and understanding the final resting place of the vehicle in context of these issues.

     **(b)** <u>Causes for vehicle crash.</u>  Training in this regard included examining the reasons why the driver did not or was not able to evade the accident.  This includes considering the driver's decision as to the speed of the vehicle prior to the accident and whether excess speed was factor in the accident; driver distraction due to any number of factors (i.e., children fighting car, conversation); impairment of senses due to vision, glare, auditory capacity, knowledge of traffic laws, driver skill and years of driving experience, driver motivation such as anger, fear, timidity, and exhibitionism, and ailments caused by medicines, drugs, poisons (like carbon monoxide), fatigue, or heart or other health conditions.  Training also instructed officers to consider the condition of the vehicle and its potential cause (headlights, wheels, brakes, windows, windshield wipers, and the condition of the road and weather.  There is also specific training on what observations to make of the driver and determining whether the driver is Operating Under the Influence ("OUI") within the meaning of G.L. c. 90.  With regard to these, as well, training involved information on what is probable cause and what steps can and cannot be taken with or without probable cause, as well as the circumstances that allow the officer to require the driver to take a Field Sobriety Test ("FST") and the implications of driver refusal, as well as the appropriate use of a breathalyzer.

     **(c)** <u>Other details relating to vehicle crash response.</u>  Training also included other longstanding police techniques relating to what to do when responding to a vehicle crash such as where to place the police cruiser, which vehicle to attend to first in a multi-vehicle crash, using lights and siren when traveling to a crash scene after radio dispatch, crowd control, special traffic control techniques depending on the location of the vehicles, what information to collect from drivers and passengers, and what information if any to collect from the interior of the vehicle.

     **(d)** <u>Domestic disturbances and other response situations.</u>  Training also included information on the criteria for report writing, investigation, and other

longstanding police techniques relating to other response situations, with detail similar to that noted above for vehicle crash situations.

**(e)** <u>Criminal procedure.</u> At the academy I was given detailed information on the constitutional and statutory standards governing criminal procedure and how those standards affect police work. This includes, e.g., standards relating to probable cause, affording citizens' their constitutional rights, how to not endanger the investigation by improper conduct under those standards, and review of case law applying such constitutional and statutory standards.

**(f)** <u>Criminal law.</u> I was also given detailed information on the statutes of the Commonwealth of Massachusetts that a police officer must enforce. I learned which offenses are ones for which an individual may be arrested; which require a warrant; and key exceptions to these general rules including those set forth in statutes. I also learned the importance of each element of the crime and why an investigation must identify each element.

**(g)** <u>Motor Vehicle law.</u> In addition to learning how to investigate a vehicle crash scene as noted above, I also learned each of the statutes that a police officer must enforce relating to motor vehicles, the elements pertaining to each offense, and the importance of identifying the existence of those elements. There was also specific focus on which motor vehicle laws are arrestable offenses.

**(h)** <u>Elements of self defense.</u> At the Academy, as well, I was given detail information on techniques of self defense and the laws applicable to that. I was taught about handcuffing technique for passive situations and force situations. There was also role playing in situations such as multiple opponents and how to handle those situations.

**(i)** <u>Driving.</u> I was taught about driving a police cruiser and the laws that relate to that. I was also taught on an emergency driving course techniques of driving and about the tolerance (limitations) of a vehicle (e.g., turns, skidding).

**(j)** <u>Firearms.</u> At the academy there was extensive information on the laws governing the use of firearms by law enforcement officials, as well as the safe and effective use of a firearms (e.g., proper stances, target shooting, no shoot situations). In addition, there was education on a concept called the "use of force continuum", where you learn about how to escalate force and deescalate force, from police presence alone, to verbal commands, to hand tactics, to use of pepper spray, to use of a baton, to handgun use. I was taught how to recognize and control a situation and move up and down this continuum, using the least force necessary to obtain control.

**(k)** <u>Interview techniques.</u>  I was also taught about interview techniques and the key elements of information that should be obtained from witnesses and how that varied based upon the elements of the crime that I may be investigating. I learned about judging a person's credibility and veracity based upon eye contact (or lack of eye contact), covering mouth when speaking, and/or non-responsive answers to questions posed, as well as separating witnesses.

**(l)** <u>Report writing.</u>  At the academy I was also taught about report writing.  That in part included an application of other information I learned relating to elements of the crime, criminal procedure and criminal law, as well as issues relating to witness credibility and veracity.  I was taught about the key elements that must be included in a report and otherwise how to complete a satisfactory police report so that is will be objective and support the crime for which it was written.

**(m)** <u>Inservice Training.</u>  I am required to attend yearly inservice training to keep abreast of any changes in the law.

4. <u>Natick Police Department Rules, Regulations, Policies, Procedures, General Orders.</u>  In addition to knowledge relating to the General Laws of the Commonwealth and information about longstanding special techniques of police work that I learned at the Police Academy that dictates the parameters of how I must perform my job, the Natick Police Department's Police Chief has issued a vast number of Rules, Regulations, Polices, Procedures and General Orders that also address how I am supposed to do my job.  They relate to matters such as how to proceed to an accident scene (lights, sirens, speed, marked cruiser), and what to do at an accident scene to collect information, what information to incorporate in a report, and what investigation to do at an accident scene and other matters.  Most of these same principles were taught to me on the job, from the time I was a patrol officer onward, with more senior patrol officers offering guidance to junior patrol officers, and sergeants and other higher ranks similarly offering such guidance.  This guidance relates to reinforcing the principles of police technique and reinforcing the expectations required under the General Laws and the Departments own rules, regulations, policies, procedures and general orders.

5. <u>Education.</u>  I have a Master's degree from Boston University in criminal justice.  I also received sergeant's training at Babson College around 1995.  That education reinforces much of the knowledge and standards of police work noted above.

6. <u>Virtually all duties governed by longstanding techniques and other external standards.</u>  Based upon the training and education that I received as reviewed above, and the documentation of the Department that otherwise describes standards of performance, virtually every aspect of what I did as a patrol officer, sergeant and now do as a Lieutenant was or is governed by the aforementioned material, rather than by me deriving my own brand of police work unique to me. As a Lieutenant, I apply those same external guidelines to others.  To the best of my knowledge I have established no guidelines for performance of police work myself.  Any discretion I have with regard to

the performance of my duties is limited by review and approval by the Chief prior to implementation of any policy guidelines. For example, if I make suggestions with regard to the improvement of department operations; these suggestions are sometimes adopted by the Chief and sometimes not.

     7.    <u>Mannix Affidavit – disagreement on facts.</u> I am aware of the following topics covered in the Affidavit of Chief Mannix in this matter and, respectfully, submit that the allegations identified below are inaccurate:

     **(a)**  At ¶6 of his affidavit, Chief Mannix states that the "Department is organized into several Divisions, and several independent command level positions." This is also mentioned at ¶8 of this affidavit. While it is true that the Department contains divisions, the Commanders of those divisions do not operate those divisions "independently" to the extent that each Division Commander must run the Division in accordance with specifications outlined by the Police Chief, longstanding techniques of police work, laws of the Commonwealth, and the rules, regulations, policies, procedures and general orders established by the Police Chief. Decisions of the commander are not independently made, but subject to specifications from these external sources (i.e., sources other than the Commander's own personal beliefs).

     **(b)**  **[Sgt Job Description]** At ¶¶16, 18 and 19 the Chief states that the job description attached to the Town's motion is a fully accurate description of how sergeants have performed that assignment. I respectfully disagree with the Chief. I am familiar with and have reviewed the job description for the Sergeant position in question and find that it is not fully accurate in describing the actual duties I performed while a Sergeant Detective from September 2001 to November 2003. Below in general, and in a separate paragraph of this affidavit relating to the job description, I will more specifically explain the degree to which each element of the job description is inaccurate.

     **(c)**  **[Sgt Detective]** From September 2001 through November 2003 I was a Sergeant Detective. In this position I did not perform the same duties as a Patrol Sergeant. As a Sergeant Detective I primarily worked with one other detective, Jack Doherty. Nominally, I was Doherty's supervisor but I typically spent less than a half hour per day engaging in any supervision of Doherty or monitoring his work. Instead, the overwhelming majority of my time was spent functioning as a plainclothes detective. I investigated domestic abuse crimes, identity theft crimes and credit card fraud. I would do victim follow-ups and provide information regarding crime prevention, credit repair and other possible action a victim might take. While a Sergeant Detective I performed at least one background investigation. The work I performed as a Sergeant Detective was guided by my knowledge relating to the General Laws of the Commonwealth, information about longstanding special techniques of police work that I learned at the Police Academy, Natick Police Rules, Regulations,

Polices, Procedures and General Orders, and what I had been taught by my predecessors, including my supervisor at the time, Lt. Al Grassey.

**(d)  [Lieutenants - job description]** At ¶20 the Chief states that the job description attached to the Town's motion is a fully accurate description of how lieutenants have performed that assignment.  I respectfully disagree with the Chief.  I am familiar with and have reviewed the job description for the lieutenant's position in question and find that it is not fully accurate in describing the actual duties of that position.  Below in general, and in a separate paragraph of this affidavit relating to the job description, I will more specifically explain the degree to which each element of the job description is inaccurate.

**(e)** At ¶25 of its Statement of Undisputed Facts, the Town states that I command the Patrol Services Division, and that the Division was previously commanded by Lieutenant Alfred Grassey.  While it is true that Lt. Grassey is a predecessor in this position, my immediate predecessor was Lieutenant Alfred Morgan.

**(f)** At ¶25(a) of its Statement of Undisputed Facts, the Town states that I supervise the crossing guards and the auxiliary police.  While it is true that I oversee the auxiliary police through their chain of command, as of September 2006, I no longer supervise the crossing guards.

**(g)** At ¶25(b) of its Statement of Undisputed Facts, the Town alleges that I supervise the Sergeants assigned to the Division.  I do this based on current departmental general orders and polices; my own experience and training; direction from the Chief; and current accepted police practices.  Much of my work consists of "housekeeping duty" such as scheduling other officers.  The staffing requirements are set by the Chief.  Patrol areas were established by the Chief after examining department statistics, soliciting input from staff and taking into account geographical features**.**  Officers can only bid on shifts when there is a posted opening.  All my scheduling decisions are based on the Chief's guidelines and the Union contracts.  At other times, I supervise the Sergeants with regard to police work.  For example, I recently alerted the Sergeants (and expected them to alert the Patrol Officers) to a report of a homeless man having taken up residence in the back of a retail area, with the particular direction to be alert to this as they patrolled the relevant area.

**(h)  [Command Staff meetings]** At ¶31 the Chief refers to the Command staff and that each member of the Command staff is the "delegate" of the Chief.  To the extent this implies that, in my role as Lieutenant I independently make decisions, without regard to standards established by the Chief this is false.  Nor is there any communication that I am aware of declaring me as a "delegate" of the Chief.

6

  **(i)**  **[Command staff meetings; General Staff meetings]**  At ¶32 the Chief states that he holds "Command Staff meetings regularly, as often as several times a week", and that he holds general staff meetings "up to 10 times per year."  I disagree with the frequency stated by the Chief.  The Command Staff meetings are typically held only once per week and sometimes not held at all. Only occasionally are they held several times a week**.** They are typically short in duration.  The meeting might include just the Lieutenants and the Chief, or it might also include Sergeants Lauzon and Fitzpatrick.

  **(j)**  **[Command Staff meetings]**  At ¶33 the Chief states, "I seek input from the Command Staff and, while I am not required to follow their recommendations, I always give substantial, significant, and meaningful weight to that input in making my decision, on many issues within the department, including decisions regarding the hiring, firing, promotion, and/or discipline of the police officers of the Department."  I respectfully disagree with the Chief's statement in this regard.  In regard to hiring decisions the Chief frequently though not always will ask for input on a candidate for hire.  I have no idea how much weight if any is afforded to my input.  For example, the Chief did not consult me in the hiring of Dispatchers Tracey Rourke and Tony Nigro. In regard to terminations, only one employee, probationary officer Andrew Thorpe, has been fired since June 17, 2002.  I was not consulted regarding Thorpe's termination and accordingly provided no input.  Also, regarding discipline I have conducted some factual investigations, but have generally do not recommend punishment, and only state whether the investigation was sustained, not sustained, exonerated or unfounded. The policy states, "upon receipt of the report of the investigation, the Chief may take further action as I necessary based upon findings in the particular case."  In regard to promotions**,** I frequently though not always provide some commentary on a candidate for promotion.  I have no idea how much weight if any is given to my opinion.  In one instance where I diverged from the Chief, on the promotion of then-patrol officer Mark V. St. Hilaire to Sergeant, my recommendation was not followed.  In addition, the Chief has never stated, prior to this litigation, that he will "give substantial, significant, and meaningful weight" to my input.  This litigation is the first I have heard that this.  Also, to my knowledge there are no documents that identify the specific weight that should be accorded to any input I give.  In the area of suspensions of greater than 5 days, hiring, firing and promotion decision, the Town's Board of Selectmen makes the decision**,** not the Chief.  The Chief makes recommendations to the Board.  I make no recommendations and do not communicate with the Board.  I am aware of no documentation where the Board of Selectmen were provided with my views and where they articulated that my view would be followed.  Rather, to my knowledge, in each case, the Board of Selectmen follows what the Chief recommends, regardless of whether I disagree or agree with the Chief.

  **(k)**  **[Command Staff – Rewards]**  At ¶34 the Chief states that he seeks "input" from the command staff regarding Employee of the Month and

7

Officer of the Year awards, and he says that he "considers it part of their duty to provide feedback on good work of employees, as well as the employees whose work needs improvement." In response to this allegation I state the following: All employees in the department, not just superior officers, may give input to the Chief on this issue, and all employees are subject to the same voluntary standard, i.e., they choose whether to communicate with the Chief their opinion without any rule requiring them to do so. I have never been told that I am required to submit input for Employee of the Month though I have been solicited for input by the Chief on occasion. To my knowledge, there is no documentation indicating what weight, if any, would be accorded to input from me on this. The Chief says in his affidavit that he considers it part of my duty but this is the first I have heard this and it is not delineated in any documentation of the Police Department to my knowledge. With respect to input on employees whose work needs improvement, the Chief has occasionally stated that if the Command Staff has a problem with an employee we should let the Chief know. I do not recall any other communication by the Chief about this beyond this generalized statement.

      **(l)**     **[Hiring]** At ¶39 the Chief states among other things that "[a]s Chief [he] oversees the selection process and gather[s] input and information about candidates developed in the process and with that information and input, I am ultimately responsible for making the final recommendation to the Selectmen about who should be hired. . . . I do not recall an instance where I did not give substantial and significant weight to others in the Department involved in the process, or where I did not rely materially on their input." From September 2001 until November 2003, as a Sergeant Detective, I gave no input on hiring decisions. As a Lieutenant since November 2003, during the interview process I am more of a coordinator than an active participant. The interviews are orchestrated and I am actually provided with questions to ask the candidate. Nor has the Chief at anytime stated, prior to this litigation, that he will "give substantial and significant weight" to my input. To my knowledge there are no documents that identify the specific weight that should be accorded to any input I give. The Chief makes recommendations to the Board. I make no recommendations and do not communicate with the Board. I am aware of no documentation where the Board of Selectmen were provided with my views and where they articulated that my view would be followed. Rather, to my knowledge, in each case, the Board of Selectmen follows what the Chief recommends, regardless of whether I disagree or agree with the Chief. Finally, with respect to the selection process, given Civil Services rules, there is a presumption in favor of hiring the first candidate on the list unless there is substantial documented reason not to hire such person. It is for this reason that I am aware of no instances when anyone other than the first person was hired on the list. The only exception to this was when a candidate named Mark Clifford was bypassed in September 2005 because there was a blatant disqualifying condition, i.e., Mr. Clifford lied about a fairly extensive disciplinary record in his prior employment. Even in connection with this case, the Chief was steadfast,

8

adamant in his conclusion that he would not hire Mr. Clifford. He noted what the background investigation revealed, the misrepresentation of what Mr. Clifford stated in his interview and then pronounced, "I am not going to hire him." There was absolutely no debate over the issue.

        **(m) [Hiring process – Background investigations]** At ¶¶41-43 the Chief states that he has "established a process that involves material input by certain Sergeants performing the candidate selection background part of the process but does not involve every sergeant in every new hire." When I performed this function there was no discretion or judgment involved. Rather, there is a general order that identifies each item of information that I was to gather. I would gather that information and report it to the Chief in a report. As part of the background investigation I never have given an opinion on who should be selected. Rather I only reported the facts found through the background investigation. The Chief and previous department procedures determine the areas of investigation, not the background investigating officer.

        **(n) [Hiring process- Background investigations]** At ¶44 the Chief states that he relies heavily on the input of background investigatory sergeants. He states, "significant, substantial, meaningful, and essential weight and consideration is given to the Sergeant's reports". To my knowledge, those reports are important only because they state facts, as a result of investigation into various criteria identified by the chief, which go to the issue of whether the candidate may be disqualified (i.e. bypassed from selection). The reports are meaningful for that reason only. In the reports I presented no personal insight that bore on the issue of whether the person should be hired. The Chief has never articulated, and I am aware of no document that indicates the weight that should be placed on the report or the reasons why they are important.

        **(o) [Command Staff - Hiring process – "weight" given to input]** At ¶45 the Chief states that, after the background investigation is completed, he meets with the Command staff to "discuss and evaluate the candidates". During my time on the Command Staff since November 2003 I have sometimes given an opinion a candidate. The Chief also states that "[o]pinion and suggestions are expressed and given a great deal of weight and consideration in developing the Department recommendation." Again, although the Chief states this, to my knowledge there is no documentation in the Town establishing the degree to which he should place weight, if any, on anything that the Command staff says. Further, to my knowledge, there is no requirement even that the Chief solicit input from the Command staff in connection with making recommendations for hire. Furthermore, to my knowledge, the first time that the Chief has stated that he places "a great deal of weight and consideration" on input from the Command Staff meeting is in this litigation. Finally, the issue of hiring a candidate is straightforward under Civil Service law in that the issue is whether there is a disqualifying condition. Absent a disqualifying condition, the person that is first on the list must be

9

hired. In each case from September 2001 there was no disqualifying condition other than with Clifford as noted above.

      **(p)   [Command Staff – hiring – interviews]**  At ¶46 the Chief says that candidates "may be interviewed" by the Command staff and that following the interview there is discussion and opinions expressed about the candidates. I am unaware of any documentation requiring that I attend interviews, or that I provide an opinion. Furthermore, there is no documentation indicating how much weight, if any, the Chief should place on my opinion, if any.

      **(q)   [Sergeants – hiring – input]**  At ¶47 the Chief states that "[a]t times [he] may . . . seek out further opinions of one or more other Sergeants" regarding hiring a candidate for Patrol Officer. In my tenure as a Sergeant there were a few occasions when I informally provided input on an applicant. My background investigation provided factual material and when I provided those there was not necessarily any further communication with me about my background investigation report.

      **(r)   [Command Staff and Sergeants – general  – input and weight]**  At ¶48 the Chief states that he gives "serious weight to the thoughts and opinions of my Command Staff and Sergeants, and I take their recommendations seriously.  At times, however, I may choose to not follow their recommendations, based on my own knowledge and experience."  As a Sergeant from September 2001 to November 2003 the Chief only infrequently solicited my opinion on any topics.  Nor has he or the Town in general ever expressed to me or in documentation to my knowledge that whatever opinion I express will be given "serious weight".  This litigation is the first time I heard that expressed.  As a Lieutenant I now attend Command Staff meetings, and sometimes I express my thoughts or opinions on any issue at those meetings.  I have never been told what weight is placed on my view or that it is required that I express an opinion.

      **(s)   [Hiring process – memorandum to the Selectmen]**  At ¶49 the Chief states that he communicates his recommendation (I assume relating to hiring a candidate) he presents it in a memorandum and that "typically [he mentions] whether the recommended candidate is a unanimous choice or a consensus choice."  The Chief has never before indicated, nor is there any Town documentation to my knowledge, that indicates any criteria relating to whether the Chief must present input to the Selectmen that references the opinions of others, or criteria for how much weight the Chief or the Selectmen should place on such opinions.  The Chief has never discussed this with me and this litigation is the first that I have heard of any communication to the Selectmen of views of individuals other than the Chief.  I have attended Selectmen's meetings relating to hiring decisions and have observed that there is no reference to the views of anyone other than the Chief's on the selection decision.

**(t) [Sergeant – promotions – input]** At ¶52 the Chief states that he expects that, "as part of a Sergeant's duty, [the Sergeant] would report to me directly, or through chain of command, any information they possess which could impact a decision about promotion." Until this litigation, there has been no communication by the Chief or the Town in any form relating to this expectation and I only infrequently gave informal input on any promotions while a Sergeant Detective. Nor, to my knowledge, is there any documentation in the Town which establishes how much weight should placed on the opinion, if any was given, by a Sergeant relating to a promotion decision.

**(u)** At ¶53 the Chief states that he expects the Patrol Services Division Commander to "seek information from other Superior Officers, with respect to the promotability of a particular Officer seeking advancement." At no time has the Chief or the Town communicated any expectation regarding obtaining such input until this lawsuit. Moreover, as a matter of my job duties, at no time have I solicited such input in the form of the Sergeant's opinion, unless in the rare event the Sergeant is actually listed as a reference by a candidate.

**(v)** At ¶54 the Chief states "the work records of persons seeking promotions, including reports by their supervisors over the years (if any) are taken into consideration." From at least September 2001 to present there has been no occasion when I have written any promotions reports on patrol officers. Nor at any time has the Chief or the Town communicated that it would use such reports in making promotion decisions or, if so, how much weight would be placed on such reports. This lawsuit is the first I have heard of this issue.

**(w) [Command Staff – Promotions – opinions - weight]** At ¶55 the Chief states that when considering officers for promotions he "involve[s] the Command Staff in the decision, assign[s] significant weight to their opinion, and consider[s] seriously what they have to say." While a Sergeant the Chief did not solicited my opinion on any promotions in my recollection. As a Lieutenant since November 2003 the Chief will occasionally solicit an opinion on a promotion candidate. However, as a civil service community the Town would have to have a very strong exception not to promote in the order of the civil service list. In this respect, while the Chief does sometimes solicit an opinion, it's most a formality and a courtesy – a way to keep us in the loop. Nor has the Chief or the Town ever expressed to me or in documentation to my knowledge that whatever opinion I express will be given "significant weight" or be considered "seriously". Nor to my knowledge is there any documentation in the Town stating a requirement to solicit my opinion on promotions or that it should be presented to the Board of Selectmen. In truth, this litigation is the first time I heard this expressed.

      **(x)**   **[Input – discipline and firing – weight]**  At ¶56 the Chief states that the process for imposing discipline or termination is similar to the process for obtaining input as in the case of promotions or hiring.  He further states that, when the Selectmen are involved in discipline, "they have indicated to [the Chief] that they rely on my recommendations, and the fact that I seek input in developing that recommendation from other officers."  On a few occasions the Chief has asked for my thoughts on a discipline issue.  His solicitation is typically in the vein of, "Do you think this [allegation] is true?"  He has never sought my opinion on the type or level of discipline to impose, and I do not customarily recommend any specific level of discipline.  To my knowledge there is no requirement that I give input or that the Board of Selectmen require my input in making their decision.  Nor has the Chief or the Town ever expressed to me or in documentation that the Board will "rely" on my input.  Indeed, this litigation is the first time I have ever heard this claim.

      **(y)**   **[Verbal counseling]**  At ¶59 the Chief states: "Verbal counseling happens very frequently, and is part of the job duties of the Sergeants and the Lieutenants." To the extent that the Chief is referring to input on performance where the superior officer comments on employee performance, this has happened, but to say it happens very frequently is not true.  When this happens, it is simply based upon observation of performance that is not in accord with the external guidelines established by the laws, the Chief, and by longstanding well-known techniques of police work, rather than any special rule that I independently fashion.

      **(z)**   **[Relieve employees from duty]**  At ¶60 the Chief states that all superior officers have the power to relieve "someone of duty, when the situations requires such action." I have never done this.  Moreover, to the extent that the Chief is referring to a serious issue such as a patrol officer, sergeant, lieutenant or the Chief himself, proceeding to engage in police duties while inebriated or otherwise incapacitated, all officers from patrol officer up the ranks to my knowledge have the power to relieve another of duty in such situation for public safety reasons.  There are no other situations, other than situations where the officer or superior officer's performance will endanger the public, that allows for such relief from duty.  There are no rules, regulations, policies, procedures, general orders, or any other Town document, which affords superior officers the right to suspend someone from duty.  This power is vested solely in the Chief and the Board of Selectmen for suspensions from one to five days, and solely with the Board of Selectmen for suspensions of greater than five days up to termination, per Civil Service Law

      **(aa)**   **[Sergeants – disciplinary process – major role]**  At ¶61 the Chief states "[s]ergeants play a significant and material role in the disciplinary process of Patrol Officers.  They are responsible for dealing with the day to day conduct issues that are not serious (serious meaning things such as flagrant refusal to obey orders or commission or crime).  They are responsible for acting on any

12

misconduct or performance, and bringing forth the appropriate facts and reports about conduct that rises to the level of warranting more formal discipline or action." Respectfully, the Chief's statement in this regard is inaccurate. Regarding my role as a Sergeant Detective, I did not participate in the disciplinary process beyond writing a few first complaint reports in which I reported the facts. I never was involved with making findings or recommendations on complaint allegations as a Sergeant. This happened a few times from September 2001 to November 2003.

    **(bb)   [Sergeants – authority to resolve grievances]**  At ¶62 the Chief states that "Sergeants have the authority to resolve grievances" under the patrol officers collective bargaining agreement. This is false. The grievance procedure requires that the patrol officer speak to the immediate supervisor. As a Sergeant Detective no one officer ever gave me a written grievance. The Town does not vest the Sergeant's with the ability to sustain a grievance and thereby create a binding precedent (as would be the case in the case of a truly sustained grievance). The grievances, if discussed with the Sergeant, are routinely routed up the chain of command for decision by the Chief

    **(cc)   [Sergeants – Lt. Mason – referral and investigation of complaints]**  At ¶63 the Chief states that if a complaint is lodged against a patrol officer that the sergeant is required to submit an incident report and then the matter is referred to Lt. Mason who initiates an investigation. As noted above, the Chief's rules require that the Sergeant complete a document entitled Supervisor's First Report of Complaint and that is merely listing the allegations and passing them up the chain of command for review. It involves no findings and is a clerical function.

    **(dd)   [Sergeants – Lt. Mason – other superiors - referral to investigate complaints]**  At ¶64 the Chief states that "[i]nvestigative duties are usually assigned to the immediate supervisor, either a Sergeant or a Lieutenant." Other than as relates to completing the Supervisor's First Report of Complaint, this did not happen while I was a Sergeant Detective.

    **(ee)** At ¶65 the Chief states that, "Superior Officers who investigate complaints are allowed to include recommendations for discipline in their repots, but do not always do so. The facts provided by the Sergeant or Lieutenant are always relied upon in making a determination about if, or what, action should be taken." With respect to the claim that the "facts provided" are always relied upon, this is a distortion in the case of the Supervisor's First Report of Complaint; that document merely passes along "allegations" not any findings or established facts. I have written supervisor's first report of complaint, but have not made recommendations in them. As a lieutenant, I complete the report as stated above, sustained, not sustained, exonerated, or unfounded.

13

**(ff)**   At ¶66 the Chief states that when contemplating disciplinary action, he discusses the "measure of discipline with the appropriate supervisors. I also typically discuss the situation with my Command Staff." Above I have outlined that with respect to my role as sergeant this I have never had any communications about, or was asked for, my opinion relating to discipline. As Lieutenant, I have had a few discussions with Chief about discipline. For example, I did express that Officer Fitzgerald should be considered for a reprimand or a one day suspension. Instead, the Chief gave him a five day suspension. To my knowledge the Chief or the Town has never communicated or issued documentation relating to a requirement that I provide such input or how much weight if any would be placed on m input. The first I have heard of this claim is in this lawsuit

8.   <u>Job description - Sergeant.</u>  I have reviewed the job description for Sergeant and find that it is not accurate in describing what my job was as Sergeant Detective from September 2001 to November 2003 to the extent that it implies I performed any tasks beyond those already described above.

9.   <u>Primary duty to direct – Sergeant.</u>  At ¶17 the Chief states that the sergeant's "primary duty is to direct the activities of the Patrol Officers, or to monitor their activities. This applies whether the Sergeants are in the station or out on patrol." Respectfully I disagree with the Chief regarding this statement. As a Sergeant Detective from September 2001 to November 2003 I engaged in no more direction of patrol officers beyond the limited extent already described above.

10.  <u>Job description - Lieutenant.</u>  I have reviewed the job description for Lieutenant and find that it is not accurate in describing my job as Lieutenant in multiple respects, as follows (citation refers to paragraph and section of the job description):[1]

**(a)**   B(1):  The job description states that I have a duty to "[m]aintain discipline and morale within the Department. Investigate personnel complains as assigned by the Chief." With respect to maintaining "morale", everyone in the Department should be constructive in their communications. However, other than doing my best to present in a constructive positive manner, there is nothing that I do specifically relating to "maintain[ing] morale". My role as a Lieutenant with respect to investigating complaints is as otherwise set forth above.

**(b)**   B(2):  The job description states the duty to "[p]romote harmony and cooperation among all units of the Department." Other than the general principle that each person should be constructive and positive in their communications, I do nothing specifically relating to "promot[ing] harmony and cooperation".

---

[1] I do not comment on the initial section referred to as "Summary" since I understand that it correlates with the items otherwise listed in the job description.

    **(c)** B(3): With regard to the duty to "[o]verse preparation of correspondence and reports and maintain proper records of departmental activities. Communicate information as required," To the extent I do the above it is to see that log entries are correct and thorough as a sergeant and that reports are filed in line with the Chief's directives – making decisions in this regard based upon departmental procedures, laws, and longstanding techniques of police work, not based upon independent judgment or criteria that I have established.

    **(d)** B(4): "Periodically inspect all members of the Department to assure proper maintenance of personnel and departmental equipment." I do perform this role at certain times. Diaries are checked, as well as firearms by sergeants and first aid equipment. This is a rote function requiring no discretionary judgment.

    **(e)** B(5): "Assist departmental personnel in the preparation of cases." I am not sure what this means other than normal police work that even patrol officers perform.

    **(f)** B(6): "Prepare evaluation of department personnel as directed by the Chief." There are no periodic formal evaluations of departmental personnel and I have not engaged in such duty.

    **(g)** B(7): "At the direction of the Chief, observe probationary officers, and prior to the expiration of their probationary period, submit to the Chief a detailed written report concerning their qualification to secure permanent status and [the lieutenant's] opinion as to the desirability of their retention." I have never written a report relating to probationary status; nor have I been asked to provide input regarding the same verbally.

11.    <u>Patrol Officers – Not Managers; Not Administrators.</u>

    a.    The work of patrol officers in the Patrol Division does not entail creating policies or servicing the internal operation of the police department itself. Rather, the vast sum of their work is actual police work itself. The Patrol Officers in the Patrol Division are not in control of any portion of the budget or discretionary funds and they have not worked in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities

    b.    The work of Patrol Officers in the Patrol Division does not include participating in interviewing and selecting Department employees; setting or adjusting rates of pay and hours of work; directing the work of other employees; maintaining production records for use in supervision or control; appraising employee productivity

15

and efficiency for the purpose of recommending promotions or other changes in status; handling employees' complaints and grievances; planning the work of other employees except to the extent at a response scene they may apply their wealth of police knowledge, training, and longstanding techniques of police work to coordinate when there are multiple officers present; they have not determined or set the work techniques to be used as these are dictated by external standards; they have not participated in apportioning the work among the workers; and they have not participated in determining the type of materials, supplies, or tools to be used in the course of an employee's duties.

Sworn to under the pains and penalties of perjury this 16th day of November, 2006:

*/s/ Steven Pagliarulo*
Steven Pagliarulo, Lieutenant