THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Robert F. Murphy, III, Lead Plaintiff for
Patrol Officer Plaintiffs, et al. and,

Brian C. Grassey, Lead Plaintiff for
Superior Officer Plaintiffs, et al.,

    Plaintiffs,

    v.

Town of Natick, et al.

    Defendants

USDC Case No.:  04-11996 RGS

**Affidavit of Nicholas S. Mabardy**

I, Nicholas S. Mabardy, attest to the following based upon my own personal knowledge:

**1.** My name is Nicholas S. Mabardy and I reside in Natick Massachusetts

**2.** I have been employed by the Town of Natick within its police department for the last 38 years.  I was hired as a reserve patrol officer in May 21, 1968 and then on July 4, 1969 I was appointed as a permanent patrol officer.  On August 1, 1975 I was promoted to Sergeant.  On April 1, 1996 I was promoted to Lieutenant.  For many years prior to August 2002 I worked as a Lieutenant in a position known as Community Services Officer.  Then in August 2002 I was reassigned to the Field Investigative Services Officer position where I work with a team of detectives to investigate crimes.  I have continued in that assignment to present.

**3.** <u>Academy training; other later training.</u>  I went to the state police academy for six weeks starting in April 1970.  A police officer back then could be employed to perform police officer duties without completing the state police academy and the academy was only six weeks.  For about the past twenty or so years to present, academy training has been required as a condition to performing police work in Massachusetts and the training has grown to in excess of twenty weeks.  When I went to the academy it was located at various locations throughout Massachusetts that were owned by the United States government.  The training back then was less involved than it is today in Massachusetts.  While at the Academy I was trained in several of the specific techniques of law enforcement for police officers in Massachusetts as well as the General Laws affecting police work and how it guides such techniques.  Some examples of this include the following:

**(a)** <u>Vehicle Crash Investigation</u>. Training in this regard included learning the specific procedures relating to laying the foundation of an motor vehicle crash investigation including the specific information that should be included in a "report", what should be done with respect to "investigation", the purposes of reporting and investigating including enforcement of traffic law to facilitate public safety on the roads and deter unsafe practices, educate drivers and the community, and prevent accidents. With regard to this I was also taught about the elements of investigation including witness observations, interviewing all available witnesses, the importance of gathering information relating to the accident's time, place and type of accident, and the final resting place of the vehicle.

**(b)** <u>Causes for vehicle crash.</u> There was some specific training on drafting the accident report. Although not covered at the Academy, later in my career I received specific training on what observations to make of the driver and determining whether the driver is operating under the influence ("OUI"). With regard to this later training, it involved information on what is probable cause and what steps can and cannot be taken with or without probable cause, as well as the circumstances that allow the officer to require the driver to take a Field Sobriety Test ("FST") and the implications of driver refusal.

**(c)** <u>Other details relating to vehicle crash response.</u> Training also included other longstanding police techniques relating to what to do when responding to a vehicle crash such as where to place the police cruiser, which vehicle to attend to first in a multi-vehicle crash, using lights and siren when traveling to a crash scene after radio dispatch, crowd control, special traffic control techniques depending on the location of the vehicles, what information to collect from drivers and passengers, and what information if any to collect from the interior of the vehicle.

**(d)** <u>Domestic disturbances and other response situations.</u> Although not specifically covered at the Academy, later I received training on the criteria for report writing, investigation, and other longstanding police techniques relating to other response situations.

**(e)** <u>Criminal procedure.</u> At the academy I was given detailed information on the constitutional and statutory standards governing criminal procedure and how those standards affect police work. This includes, e.g., standards relating to probable cause, affording citizens' their constitutional rights, how to not endanger the investigation by improper conduct under those standards, and review of case law applying such constitutional and statutory standards.

**(f)** <u>Criminal law.</u> I was also given detailed information on the statutes of the Commonwealth of Massachusetts that a police officer must enforce. I learned which offenses are ones for which an individual may be arrested; which require a warrant; and key exceptions to these general rules including those set forth in statutes. I also learned

the importance of each element of the crime and why an investigation must identify each element.

     **(g)**     <u>Motor Vehicle law.</u>  In addition to learning how to investigate a vehicle crash scene as noted above, I also learned each of the statutes that a police officer must enforce relating to motor vehicles, the elements pertaining to each offense, and the importance of identifying the existence of those elements.  There was also specific focus on which motor vehicle laws are arrestable offenses.

     **(h)**     <u>Elements of self defense.</u>  Although not covered at the Academy, later I received training and was given detailed information on techniques of self defense and he laws applicable to that.  I was taught about handcuffing technique for passive situations and force situations.  There was also role playing in situations such as bar room brawls and how to handle those situations.

     **(i)**     <u>Firearms.</u>  At the academy there was extensive information on the laws governing the use of firearms by law enforcement officials, as well as the safe and effective use of a firearms (e.g., proper stances, target shooting, no shoot situations).  In addition, there was education on a concept called the "use of force continuum", where you learn about how to escalate force and deescalate force, from police presence alone, to verbal commands, to hand tactics, to use of pepper spray, to use of a baton, to handgun use.  I was taught how to recognize and control a situation and move up and down this continuum, using the least force necessary to obtain control.

     **(j)**     <u>Interview techniques.</u>  Although not covered at the Academy, I was later taught about interview techniques and the key elements of information that should be obtained from witnesses and how that varied based upon the elements of the crime that I may be investigating.  This was also covered in my college education referred to below.  I learned about judging a person's credibility and veracity based upon eye contact (or lack of eye contact), covering mouth when speaking, and/or non-responsive answers to questions posed, as well as separating witnesses.

     **(k)**     <u>Report writing.</u>  At the academy I was also taught about report writing.  That in part included an application of other information I learned relating to elements of the crime, criminal procedure and criminal law, as well as issues relating to witness credibility and veracity.  I was taught about the key elements that must be included in a report and otherwise how to complete a satisfactory police report so that is will be objective and support the crime for which it was written.

     **(l)**     <u>Inservice training.</u>  I am required to attend yearly in-service training to keep me abreast of any changes in the law.

     **4.**     <u>Natick Police Department Rules, Regulations, Policies, Procedures, General Orders.</u>  In addition to knowledge relating to the General Laws of the Commonwealth and information reviewed above pertaining to longstanding special techniques of police work that I learned at the Police Academy that provide the criteria

for how I must perform my job, the Natick Police Department's Police Chief has issued a vast number of Rules, Regulations, Polices, Procedures and General Orders that also dictate how I must perform my job, from patrol officer, to sergeant, to my current position as Lieutenant.  They relate to matters such as how to proceed to an accident scene (lights, sirens, speed, marked cruiser), and what to do at an accident scene to collect information, what information to incorporate in a report, how to investigate domestic crimes, and what investigation to do at an accident scene and other matters.  Most of these same principles were taught to me on the job, from the time I was a patrol officer onward, with more senior patrol officers or sergeants and lieutenants offering guidance to me as a junior patrol officer etc.  This guidance related to reinforcing the principles of police technique and reinforcing the expectations required under the General Laws and the Police Chief's rules, regulations, policies, procedures and general orders applicable to the Natick Police Department.

     **5.**    <u>Education.</u>  My education includes a B.S. in law enforcement from Northeastern University in 1979 (proceeded by an Associates Degree in the same area in 1975 from a community college), and a Masters degree in criminal justice from Anna Maria College in 1984.  I also went to the F.B.I. National Academy in 1998.  That education reinforced much of the knowledge and standards of police work noted above.

     **6.**    <u>Virtually all duties governed by longstanding techniques and other external standards.</u>  Based upon the training and education that I received as reviewed above, and the documentation of the Department that otherwise describes standards of performance, virtually every aspect of what I did as a patrol officer, sergeant and now as a Lieutenant was governed by the aforementioned material, rather than by me deriving my own brand of police work unique to me. While a Patrol Sergeant and currently as a Lieutenant, I simply applied those same external guidelines to others.  To the best of my knowledge I have established no guidelines for performance of police work myself.  I apply no discretion in my decision making that is independent of these external mandates to the best of my knowledge.

     **7.**    <u>Mannix Affidavit – disagreement on facts.</u>  I am aware of the following topics covered in the Affidavit of Chief Mannix in this matter and, respectfully, submit that the allegations identified below are inaccurate:

     **(a)**    **[Superior Officers – Organization of Department]**  At ¶6 of his affidavit, Chief Mannix states that the "Department is organized into several Divisions, and several independent command level positions."  This is also mentioned at ¶8 of this affidavit.  While it is true that the Department contains divisions, the Commanders of those divisions do not operate those divisions "independently" to the extent that each Division Commander must run the Division in accordance with specifications outlined by the Police Chief, longstanding techniques of police work, laws of the Commonwealth, and the rules, regulations, policies, procedures and general orders established by the Police Chief.  Decisions of the commander are not independently made, but subject to specifications from these external sources (i.e., sources other than the superior officer's own personal beliefs and opinions).

4

**(b)** **[Lieutenants – job description]** At ¶20 the Chief states that the job description attached to the Town's motion is a fully accurate description of how lieutenants have performed that assignment. I respectfully disagree with the chief. I am familiar with and have reviewed the job description for the lieutenant's position in question and find that it is not fully accurate in describing the actual duties of that position. Below in general, and in a separate paragraph of this affidavit relating to the job description, I will more specifically explain the degree to which each element of the job description is inaccurate.

**(c)** **[Lt. Mabardy – Commander of Investigative Services]** At ¶25, the Chief describes my duties as Commander of the Investigative Services Division of the Department. I respectfully disagree with his description. In that regard the Chief states that I "direct[] the investigation, assignment, and monitoring of cases assigned to this Division", that I am "responsible for the work of the investigators", and that I review and approve reports and "direct[] the case management process." I disagree with this, as follows:

<u>General issues and assignment.</u> To begin with to the extent that this description implies that I make my own rules and decisions on how the Division will be operated that is false. I operate the Division in accordance with departmental procedures, laws, and longstanding techniques of police work. There is no element of the operation that I have simply decided upon without regard to such departmental procedures, laws, and longstanding techniques of police work. Second, the description is inaccurate to the extent that it states my duties in a way that is different than the following: I assign cases to the detectives for investigation. In that regard most of the assignments I make are based on a particular detectives greater knowledge of a particular area of crime investigation. For example, James Ordway is assigned general investigations and crime scene investigations since he has greater knowledge on collecting evidence at a crime scene (e.g., lifting finger prints, obtaining foot or tire impressions); Elizabeth Blanchard is assigned general investigations and domestic violence cases as well as processing evidence and property (she also is involved with the clerical task of issuing firearms licensing and processing the paperwork for the sexual offender log according to the specific requirements of the law); Richard Halloran is assigned to general investigation and juvenile cases; Kevin Delehanty and Daniel Brogan are both assigned general investigations and narcotics cases; John Doherty is assigned general investigation and may aid in some elements of crime scene evidence collection; and John Hasswell is assigned general investigations and computer crime. The task of allocating cases to these seven detectives is clerical and requires no discretion in that I tend to send cases of a particular area to the detectives who have greater knowledge in that area, and otherwise assign general investigations in a manner that makes the case load of each detective relatively equal.

<u>Collaboration and communications.</u> Also, on a daily basis I converse with the detectives (depending on whether they are working that day) to discuss their case load and the status of the investigation. We engage in discussions about additional areas that I

5

think or they think should be investigated. Based upon that discussion I most routinely offer no suggestions. Sometimes we discuss different options and we reach a common understanding. In addition, theoretically if I believe that a particular area should be investigated, and the detective after constructive discussion disagrees, the detective will proceed in accordance with my position since I am of a higher rank. This is rare since the detectives have such greater experience in this area that I am in accord with nearly all of their decision-making. That is by no accident. It is because we all share a common basis of training, exposure to long established techniques of police work and investigations, rights and limitations placed upon us by the Chief's rules, regulations, policies, procedures, and general orders that dictate how we must proceed in many cases, as well as the General Laws of Massachusetts and guidelines of the state police relating to investigative work. Also, the District Attorney's Office knows what cases the detectives and I are working on and the D.A. communicates with me or a detective about a particular case. I do not consider the limited instances when, after I engage in a discussion with a detective and form divergent view and the detective must proceed in accordance with my view (because I out rank him/her) to be the "primary function" of my job. Rather, by far, the discussion itself and the collaboration that leads to my learning what they are doing to be far more prevalent and crucial to my assignment as Lieutenant in this area. In fact, for example, right now there are approximately ninety-seven open cases under investigation. It would be impossible for me, even if I wanted to, to micro-manage and marshal over all of those investigations. The work therefore is decentralized, with collaboration to ensure that work loads are kept even; and with discussion about cases so that we can all check on one another to ensure that none of us is missing an investigative issue.

<u>Report Review.</u>  Another part of my function is report review. The detectives, upon completion of an investigation, provide me with a report that states the findings, areas of investigation, whether a complaint will be filed, and whether they believe that there is no further area of investigation and the case should be closed. With regard to this, I note that, although a different format, this is similar to what a patrol officer does who is assigned to the patrol division. In all cases, the police officer applies the aforementioned sources of guidance (rules of the Department, laws, longstanding techniques, etc.), investigate to identify facts, and determine whether to arrest, obtain a warrant, complete a criminal complaint, and/or clear the scene or in this case close a case investigation. Sometimes Detectives will state in the report that certain leads could not be contacted or that the Detective was awaiting a call-back from a witness. In those cases it is routine to simply refer the report back to the Detective to follow up on those lingering matters. When I refer the report back for further work that is not based upon my own independent rules and style of police work, but rather based upon the external guidelines referenced above. In general, I would state that it is infrequent that I send a report back to an officer for follow up or revision.

**(d)    [Lt. Mabardy – Re-Assignment of Patrol Officers from Patrol Division to Investigative Services Division]**  At ¶26 the Chief states, "As a matter of practice, I expect Lieutenant Mabardy to select the Patrol Officers he wants as Detectives, and I approve those selections. He also has the right to determine

6

assignments within his Division." With respect to this at the outset I note that all detectives in the Investigative services division hold the Civil Service classification of "Patrol Officer". Generally, employees in that classification start work in the Patrol Division in the traditional role of a uniformed police officer driving a cruiser and otherwise working in the field. These individuals may be re-assigned from the Patrol Division to the Investigative Services Division. When that happens they retain the same civil service classification, but simply perform a different set of duties as a detective. They may be moved in and out of the unit, and they are appointed on a "temporary" basis so that the Chief retains discretion to make such reassignments as he sees fit. During my tenure as Lieutenant in the Investigative Services area there have been only two patrol officers reassigned to this unit, Detective Daniel Brogan and Detective Kevin Delehanty, about one year apart. On both occasions I recommended the reassignment of them and they were selected. This is a small fraction of my role since there is little turnover in the ranks of the patrol officer detectives. Moreover, the decision to reassign them is made by the Chief, not me. I note that the Chief in his affidavit states that he "expects" that I select detectives. This statement has never been articulated to me prior to this litigation.

**(e)** **[Command Staff – the Chief's "delegates"]** At ¶31 the Chief refers to the Command staff and that each member of the Command staff is the "delegate" of the Chief. To the extent this implies that, in my role as Lieutenant I independently make decisions, without regard to standards established by the Chief this is false. Nor is there any communication to my knowledge declaring me a "delegate" of the Chief, until this litigation.

**(f)** **[Command Staff – frequency of command staff meetings]** At ¶32 the Chief states that he holds "Command Staff meetings regularly, as often as several times a week", and that he holds general staff meetings "up to 10 times per year." This is false. We have gone weeks without command staff meetings. Sometimes I do not even learn of a Command Staff meeting and therefore sometimes I do not even attend. There are no regular weekly command staff meetings. With regard to multiple meetings in a week, this happens infrequently, I would estimate perhaps two to three times per year. A command staff meeting most often consists of a short conversation about what is happening in the Department. Typically only two people speak during a command staff meeting – Chief Mannix and Lieutenant Mason. At Command Staff meetings I make suggestions sometimes and know that sometimes they are not even considered. It is for this and other reasons that I believe that I am not part of the decision-making process under the Chief. I understand that by the expression "general staff meeting" he means the meeting where the patrol officers union president, president of the superior officers union, the representative of the dispatchers union, and all sergeants and all lieutenants attend a meeting. These may occur up to 10 times per year.

**(g)** **[Command Staff – Chief seeking input from command staff on hiring, firing, promotions and disciplinary actions]** At ¶33 the Chief states, "I seek input from the Command Staff and, while I am not required to follow their recommendations, I always give substantial, significant, and meaningful weight to that input in making my decision, on many issues within the department, including decisions regarding the hiring,

7

firing, promotion, and/or discipline of the police officers of the Department." I respectfully disagree with the Chief's statement in this regard.

<u>Hiring</u>: The following individuals were hired since 2001: Brian Bosselman and S. Christopher Salis (10/01); John Frissore (11/03); Brett P. Conaway (2/04); Anthony Gaieski (2/04); Kenneth Fitzgerald (9/04); Kevin P. Kelley, Jason Sutherland, and Gregory Lanoue (10/04); Ryan Hall, Chad Howard, and Scott Lacerra (10/05); Joseph Thurston (4/06); Toan Nguyen and Ryan Payne(8/06); Jamie Quilty (exact date uncertain). Non-police officer hires: Amy Rourke, Tony Nigro, Dan Leavitt, and Susan Bauer. I was present for the interview of only twelve of the twenty people listed above and in those cases the Chief asked for my opinion. In the case of the following eight individuals I was never asked for input and learned of the hiring decision after it was made: Kenneth Fiztgerald, Amy Rourke, Jason Sutherland, Tony Nigro, Jamie Quilty, Dan Leavitt, Greg Lanoue, Susan Bauer. In addition, with respect to the selection process, given Civil Services rules, there is a presumption in favor of hiring the first candidate on the list unless there is substantial documented reason not to hire such person. It is for this reason that I am aware of no instances when anyone other than the first person was hired on the list since at least 2001. The only exception to this was when a candidate named Mark Clifford was bypassed in September 2005 because there was a blatant disqualifying condition, i.e., Mr. Clifford lied about a fairly extensive disciplinary record in his prior employment. Even in connection with this case, the Chief was steadfast, adamant in his conclusion that he would not hire Mr. Clifford. He noted what the background investigation revealed, the misrepresentation of what Mr. Clifford stated in his interview and then pronounced, "I am not going to hire him." There was absolutely no debate over the issue. In addition, in general the interviews for candidates are orchestrated. Even if I or any of the other members of the Command Staff expressed the strongest opposition to hiring a person who was first on the list, it still wouldn't place that person higher on the civil service list. The first person on the list must be chosen absent a disqualifying condition, regardless of the recommendations of Command Officers at the meeting.

<u>Firing:</u> The only individual fired since September 2001 was a probationary officer (i.e., he was fired in his first year of employment) named Andrew Thorpe. To the best of my memory there was no command staff meeting where it was discussed. Nor did the Chief seek my input on that decision.

<u>Discipline</u>: With regard to discipline, there have been approximately three suspensions or disciplines since 2001 (i.e., B. Grassey, K. Fitzgerald, M. St. Hillaire). On none of those three did the Chief solicit my input. I initiated my input on the B. Grassey case that no suspension should be issued, and the Chief rejected my opinion and issued a suspension.

<u>Promotions</u>: The following individuals were promoted since September 2001: Mark V. St. Hilaire (10/03 to Sgt.); Leo Fitzpatrick (to Sgt) and Steven Pagliarulo (11/03 to Lt); Cara Rossi-Cafelli and Richard Viera (12/04 to Sgt); Brian C. Grassey (12/04 to Lt); Robert Hoffman (7/05 to Sgt); and Joseph Hayes (1/06 to Sgt). With regard to the

above eight promotions the Chief asked for my opinion only on the promotion then-Officer Mark V. St. Hilaire and then-Sergeant Brian C. Grassey. On the other hand, with respect to the other five individuals who were promoted the Chief never asked for my input, i.e., Cara Rossi-Caferelli, Robert Hoffman, Leo Fitzpatrick, Richard Vieira, Steven Pagliarulo and Joseph Hayes. In these cases he announced his decision, without seeking my input. I agree with those promotions, but was not asked for input.

"Substantial, significant weight": In addition, the Chief has never stated, prior to this litigation, that he will "give substantial, significant, and meaningful weight" to my input on hiring, firing, discipline or promotions. This litigation is the first I have heard that this. Also, to my knowledge there are no documents that identify the specific weight that should be accorded to any input that I give. Moreover, in the area of suspensions of greater than 5 days, hiring, firing and promotion decisions, the Town's Board of Selectmen makes the decision, not the Chief. The Chief makes recommendations to the Board. I make no recommendations and do not communicate with the Board. I am aware of no documentation where the Board of Selectmen was provided with my views and where they articulated that my view would be followed. Rather, to my knowledge, in each case, the Board of Selectmen follows what the Chief recommends, regardless of whether I disagree or agree with the Chief.

(h)   [Command Staff – Input on employee of the month and officer of the year – input on poor performance] At ¶34 the Chief states that he seeks "input" from the command staff regarding Employee of the Month and Officer of the Year awards, and he says that he "considers it part of their duty to provide feedback on good work of employees, as well as the employees whose work needs improvement." In response to this allegation I state the following:

Employee of the Month. Some months the Chief solicits input on Employee of the Month, and some months he does not. I have given input some months; and some months I have not. I have never been told that I must give such input. All employees in the department, not just superior officers, may give input to the Chief on this issue, and all employees are subject to the same voluntary standard, i.e., they choose whether to communicate with the Chief their opinion without any rule requiring them to do so. I have never been told that I am required to submit input for Employee of the Month. To my knowledge, there is no documentation indicating what weight, if any, would be accorded to input from me on this. The Chief says in his affidavit that he considers it part of my duty but this is the first I have heard this and it is not delineated in any documentation of the Police Department to my knowledge.

Officer of the Year. With respect to Officer of the Year, it is true that the Chief has solicited my input for this Award. The process for selection in terms of my involvement is as follows: The Chief asks for input at a staff meeting in May and a rough outline of why you think the person would be appropriate. To my knowledge, all employees in the department, not just superior officers, may give input to the Chief on this issue, and all employees are subject to the same voluntary standard in giving input,

i.e., they choose whether to communicate with the Chief their opinion without any rule requiring them to do so. There is no requirement to provide this input. Nor, to my knowledge, is there any documentation indicating what weight, if any, would be accorded to input from me or others for this award. If you are awarded officer of the year you receive a plaque, three days off with pay, and a parking spot for the year. I have never heard or read any documentation, until this lawsuit, to the effect that my input Officer of the Year was a "duty" or that the Chief places any weight on my input.

<u>Input on employee performance improvement.</u> With respect to input on employees whose work needs improvement, the Chief has never told me to tell him if I have a problem with an employee.

**(i)** **[Superior Officers - Hiring]** At ¶39 the Chief states among other things that "[a]s Chief [he] oversees the selection process and gather[s] input and information about candidates developed in the process and with that information and input, [the Chief] ultimately [is] responsible for making the final recommendation to the Selectmen about who should be hired. . . ." The Chief states as well that he does "not recall an instance where [he] did not give substantial and significant weight to others in the Department involved in the process, or where [the Chief] did not rely materially on their input." I have responded to this allegation above. In addition, I respond by stating that the Chief has never stated, to my knowledge, prior to this litigation, that he will "give substantial and significant weight" to my input. To my knowledge there are no documents that identify the specific weight that should be accorded to any input I give. The Chief makes recommendations to the Board. I make no recommendations and do not communicate with the Board. I am aware of no documentation where the Board of Selectmen were provided with my views and where they articulated that my view would be followed. Rather, to my knowledge, in each case, the Board of Selectmen follows what the Chief recommends, regardless of whether I disagree or agree with the Chief.

**(j)** **[Command Staff - Hiring process – "weight" given to input]** At ¶45 the Chief states that, after the background investigation is completed, he meets with the Command staff to "discuss and evaluate the candidates". The Chief also states that "[o]pinion and suggestions are expressed and given a great deal of weight and consideration in developing the Department recommendation." Although the Chief states this, to my knowledge there is no documentation in the Town establishing the degree to which he should place weight, if any, on anything that the Command staff say. Further, to my knowledge, there is no requirement even that the Chief solicit input from the Command staff in connection with making recommendations for hire. Furthermore, to my knowledge, the first time that the Chief has stated that he places "a great deal of weight and consideration" on input from the Command Staff meeting is in this litigation. Finally, the issue of hiring a candidate is straightforward under Civil Service law in that the issue is whether there is a disqualifying condition. Absent a disqualifying condition, the person that is first on the list must be hired and that is what has happened in each case, except for the case of Mr. Clifford described above since at least 2001. I refer as well to my testimony above relating to the individuals hired since 2001 which shows that

in eight out of twenty situations, 40% of the time, the Chief never sought my input and I simply learned of the hiring decision after it was made.

**(k)** **[Command Staff – hiring – interviews]**  At ¶46 the Chief says that candidates "may be interviewed" by the Command staff and that following the interview there is discussion and opinions expressed about the candidates.  While on the Command Staff from at least 2001 to present, the few interviews that I have attended I cannot recall when I was informed of the interview ahead of time.  I generally learned on the day that they occurred.  I may have provided an opinion at the interview but it was not required and, in any event, the selection decision is based upon the presence of a disqualifying condition which is governed by Civil Service Law and Chief standards.  I am not clear on what value is given to my attendance or discussion given the late notice and that I am given the question to ask.  If there are no disqualifying conditions, I understand that the interview plays no weight or little weight in the decision under civil service law.  Therefore, setting aside situations such as Mr. Clifford when a disqualifying condition is patent and ascertained at an interview, which has happened only once, the interview otherwise have no bearing on the selection process.  Further, there is no documentation requiring that I attend interviews, or that I provide an opinion.  Furthermore, there is no documentation indicating how much weight, if any, the Chief should place on my opinion, if any.

**(l)** **[Command Staff and Sergeants – general  – input and weight]**  At ¶48 the Chief states that he gives "serious weight to the thoughts and opinions of [the] Command Staff and Sergeants, and [that he takes] their recommendations seriously.  Since at least 2001 as a Lieutenant I attend some Command Staff meetings, and sometimes I express my thoughts or opinions on any issue at these meetings.  I have never been told what weight is placed on my view or that it is required that I express an opinion.  Nor have I been told even that my opinion will be taken into consideration.  In addition, as stated above, the vast majority of the time the format of the Command Staff meeting is that Chief Mannix and Lieutenant Mason speak and I listen.  At no time to my knowledge has the Chief or the Town in general ever expressed to me or in documentation that whatever opinion I expressed would be given "serious weight".  This litigation is the first time I heard that claim.

**(m)** **[Hiring process – memorandum to the Selectmen]**  At ¶49 the Chief states that he communicates his recommendation (I assume relating to hiring a candidate) he presents it in a memorandum and that "typically [he mentions] whether the recommended candidate is a unanimous choice or a consensus choice."  The Chief has never before indicated, nor is there any Town documentation to my knowledge, that indicates any criteria relating to whether the Chief must present input to the Selectmen that references the opinions of others, or criteria for how much weight the Chief or the Selectmen should place on such opinions.  The Chief has never discussed this with me and this litigation is the first that I have heard of claim.  I have attended Selectmen's meetings relating to hiring decisions and to the best of my recollection there has been no statement at the meeting to the views of anyone other than the Chief on the selection decision.

**(n)** **[Patrol Services Division Commander – seek information – promotions – this is for sergeants and lieutenants too]** At ¶53 the Chief states that he expects the Patrol Services Division Commander to "seek information from other Superior Officers, with respect to the promotability of a particular Officer seeking advancement." At no time has the Patrol Services Division Commander sought my input on any promotions. Nor at any time has the Chief or the Town communicated any such expectation until this lawsuit.

**(o)** **[Reports of supervisors – promotions]** At ¶54 the Chief states that "the work records of persons seeking promotions, including reports by their supervisors over the years (if any) are taken into consideration." To the best of my memory, from at least September 2001 to present, there have been no occasions when I have filed any reports on patrol officers in the regular course of duties. The Chief has established a procedure which requires that a sergeant file a document known as the Supervisor's First Report of Complaint when a citizen complaint is filed. The report simply summarizes the citizen complaint allegations and no findings are made by the superior officer completing such report. This is a rote activity of simply listing allegations and passing those allegations via this paperwork up the chain of command for review by someone else. With respect to the supposed reports that supervisors file regarding employee performance, the Chief nor the Town has communicated that it would use any such reports in making promotion decisions or, if so, how much weight would be placed on such reports. This lawsuit is the first I have heard of this issue.

**(p)** **[Command Staff – Promotions – opinions - weight]** At ¶55 the Chief states that when considering officers for promotions he "involve[s] the Command Staff in the decision, assign[s] significant weight to their opinion, and consider[s] seriously what they have to say." I disagree with the facts stated by the Chief in this regard and refer to my testimony above relating to my limited involvement in promotions. Also, this is another instance where neither the Chief nor the Town has ever expressed to me or in documentation that whatever opinion I express will be given "significant weight" or be considered "seriously" on promotion situations. Nor to my knowledge is there any documentation in the Town stating a requirement to solicit my opinion on promotions or that it should be presented to the Board of Selectmen. The decision is made by Board upon recommendation of the Chief. In truth, this litigation is the first time I heard it expressed that any weight would be placed on my opinions regarding promotions.

**(q)** **[Superior Officers - Input – discipline and firing – weight]** At ¶56 the Chief states that the process for imposing discipline or termination is similar to the process for obtaining input as in the case of promotions or hiring. He further states that, when the Selectmen are involved in discipline, "they have indicated to [the Chief] that they rely on my recommendations, and the fact that I seek input in developing that recommendation from other officers." I disagree with the Chief's statement in this regard and refer to my testimony above. In addition, to my knowledge there is no requirement that I give input or that the Board of Selectmen require my input in making any decision that they make on discipline or firing. Nor has the Chief or the Town ever expressed to

12

me or in documentation that the Board will "rely" on my input. This litigation is the first time I have ever heard this claim.

   **(r)** **[Patrol Services Division Commander – seek information – promotions – this is for sergeants and lieutenants too]** At ¶53 the Chief states that he expects the Patrol Services Division Commander to "seek information from other Superior Officers, with respect to the promotability of a particular Officer seeking advancement." At no time has the Patrol Services Division Commander sought my input on any promotions. Nor at any time has the Chief or the Town communicated any such expectation until this lawsuit.

   **(s)** **[Reports of supervisors – promotions]** At ¶54 the Chief states that "the work records of persons seeking promotions, including reports by their supervisors over the years (if any) are taken into consideration." To the best of my memory, from at least September 2001 to present, there have been no occasions when I have filed any reports on patrol officers in the regular course of duties. The Chief has established a procedure which requires that a sergeant file a document known as the Supervisor's First Report of Complaint when a citizen complaint is filed. The report simply summarizes the citizen complaint allegations and no findings are made by the superior officer completing such report. This is a rote activity of simply listing allegations and passing those allegations via this paperwork up the chain of command for review by someone else. With respect to the supposed reports that supervisors file regarding employee performance, the Chief nor the Town has communicated that it would use any such reports in making promotion decisions or, if so, how much weight would be placed on such reports. This lawsuit is the first I have heard of this issue.

   **(t)** **[Command Staff – Promotions – opinions - weight]** At ¶55 the Chief states that when considering officers for promotions he "involve[s] the Command Staff in the decision, assign[s] significant weight to their opinion, and consider[s] seriously what they have to say." I disagree with the Chief's statement in this regard and refer to my testimony above. In addition, this is another instance where neither the Chief nor the Town has ever expressed to me or in documentation to my knowledge that whatever opinion I express will be given "significant weight" or be considered "seriously" on promotion situations. Nor to my knowledge is there any documentation in the Town stating a requirement to solicit my opinion on promotions or that it should be presented to the Board of Selectmen. The decision is made by Board upon recommendation of the Chief. This litigation is the first time I heard it expressed that any weight would be placed on my opinions regarding promotions.

   **(u)** **[Superior Officers - Input – discipline and firing – weight]** At ¶56 the Chief states that the process for imposing discipline or termination is similar to the process for obtaining input as in the case of promotions or hiring. He further states that, when the Selectmen are involved in discipline, "they have indicated to [the Chief] that they rely on my recommendations, and the fact that I seek input in developing that recommendation from other officers." I disagree with the Chief's statement in this regard and refer to my testimony above. The Chief nor the Town ever expressed to me or in

13

documentation that the Board will "rely" on my input. This lawsuit is the first time I heard that claim.

**(v)** **[Sergeants – Lt. Mason – other superiors - referral to investigate complaints]** At ¶64 the Chief states that "[i]nvestigative duties are usually assigned to the immediate supervisor, either a Sergeant or a Lieutenant." Other than as relates to completing the Supervisor's First Report of Complaint, this has not happened.

**(w)** **[Sergeants – Lt. Mason – other superior officers – referral to investigate complaints]** At ¶65 the Chief states that, "Superior Officers who investigate complaints are allowed to include recommendations for discipline in their reports, but do not always do so. The facts provided by the Sergeant or Lieutenant are always relied upon in making a determination about if, or what, action should be taken." I disagree with this statement and refer to my testimony above on this issue. With respect to the claim that the "facts provided" are always relied upon, this is a distortion in the case of the Supervisor's First Report of Complaint; that document merely passes along "allegations" not any findings or established facts.

**(x)** **[Sergeants – Command Staff – discussion of disciplinary action]** At ¶66 the Chief states that when contemplating disciplinary action, he discusses the "measure of discipline with the appropriate supervisors. I disagree with this statement and refer to my testimony above. To my knowledge the Chief or the Town has never communicated or issued documentation relating to a requirement that I provide such input or how much weight if any would be placed on my input. This lawsuit is the first that I have heard this claim.

**8.** <u>Job description - Lieutenant.</u> I have reviewed the job description for Lieutenant and find that it is not accurate in describing my job as Lieutenant in multiple respects, as follows (citation refers to paragraph and section of the job description):[1]

**(a)** B(1): The job description states that I have a duty to "[m]aintain discipline and morale within the Department. Investigate personnel complaints as assigned by the Chief." There is nothing specifically that I do that relates to maintaining discipline, nor am I clear what this means. With respect to maintaining "morale", everyone in the Department should be constructive in their communications. However, other than doing my best to present in a constructive positive manner, there is nothing that I do specifically relating to "maintain[ing] morale". My role as a Lieutenant with respect to investigating complaints is as otherwise set forth above.

**(b)** B(2): The job description states the duty to "[p]romote harmony and cooperation among all units of the Department." Other than the general principle that each person should be constructive and positive in their communications, I do nothing specifically relating to "promot[ing] harmony and cooperation".

---

[1]. I do not comment on the initial section referred to as "Summary" since I understand that it correlates with the items otherwise listed in the job description.

14

**(c)** B(3): With regard to the duty to "[o]versee preparation of correspondence and reports and maintain proper records of departmental activities. Communicate information as required." I disagree with this to the extent it differs from my testimony above. Further I note that my work in reviewing reports is merely an application of external mandates and longstanding techniques, not any independent rules that I have personally established.

**(d)** B(4): "Periodically inspect all members of the Department to assure proper maintenance of personnel and departmental equipment." This is simply a function of knowing the standard established by the Chief's rules, and noting a discrepancy.

**(e)** B(5): "Assist departmental personnel in the preparation of cases." I am not sure what this means other than normal police work that even patrol officers perform. In the Investigative Services unit I assist detectives, to the extent explained above.

**(f)** B(6): "Prepare evaluation of department personnel as directed by the Chief." There are no periodic formal evaluations of departmental personnel and I have not engaged in such duty.

**(g)** B(7): "At the direction of the Chief, observe probationary officers, and prior to the expiration of their probationary period, submit to the Chief a detailed written report concerning their qualification to secure permanent status and [the lieutenant's] opinion as to the desirability of their retention." I have never written a report relating to probationary status; nor have I been asked to provide input regarding same verbally.

9.   Community Services Officer.

**a.** General. In my affidavit above I testified to general matters from 2001 to present, as well as facts pertaining specifically to my job as Lieutenant in the Investigative Services unit from August 2002 to present. Prior to my current assignment I held the position, as Lieutenant, of Community Services Officer for several years prior to August 2002. There were no employees assigned to the Community Services Division at that time other than myself. I directed no employees in that area.[2] The position did not require supervision of any employees. I was the liaison between different communities, organizations, and towns and the Police Department. The Chief decided the programs that would be provided to the community. The programs that were run were not new ideas. One time Chief Mannix summarized this aptly when he told me that I was not "reinventing the wheel". This is true to the extent that these types of programs were already established and we were adopting them and formatting them for use in the Town.

**b.** Managerial regulatory factors – Community Services Officer. Above I have already defined the extent to which I did or did not engage in certain "managerial

---

[2] There was an approximate three month period that then-Patrol Officer (now Sergeant) Cara Rossi-Cafarelli was assigned to this area in the later stages of a pregnancy. Because she was new to the area (and temporary) I did guide her on how to help me, and among other things she aided in organizing my files and making calls to community groups.

15

functions" as a member of the Command Staff.  Setting that aside, and referring exclusively to my position as a Community Services Officer I did not participate in interviewing and selecting Department employees; I did not set or adjust rates of pay and hours of work; I did not direct any employee's work; I did not maintain production records for use in supervision or control; I did not appraise employee productivity and efficiency for the purpose of recommending promotions or other changes in status; I did not handle employees' complaints and grievances;  I did not plan any employee's work except to the limited extent that I would implement programs and once in a while have to coordinate the work for that program; I did not determine or set the work techniques to be used;  I did not participate in apportioning the work among the workers, except in the occasional situation when I was coordinating a community project; and I did not participate in determining the type of materials, supplies, or tools to be used in the course of an employee's duties.  Rather, by far, the vast sum of the work that I did as Community Services Officer had to do with interacting with the community and establishing links between such groups and the Police Department.

      Sworn to under the pains and penalties of perjury this 15th day of November, 2006:

*s/Nicholas Mabardy*
Nicholas Mabardy, Lieutenant