THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| |
|---|
| Robert F. Murphy, III, Lead Plaintiff for<br>Patrol Officer Plaintiffs, et al. and,<br><br>Brian C. Grassey, Lead Plaintiff for<br>Superior Officer Plaintiffs, et al.,<br><br>     Plaintiffs,<br><br>     v.<br><br>Town of Natick, et al.<br><br>     Defendants |

USDC Case No.:  04-11996 RGS

**Affidavit of Leo J. Fitzpatrick**

I, Leo J. Fitzpatrick, attest to the following based upon my own personal knowledge:

1.    My name is Leo Fitzpatrick and I reside at 25 Elmwood Ave., Natick, Massachusetts.

2.    I have been employed by the Town of Natick within its police department since September 25, 1995.  I have been an Administrative Officer since 1997.  I have been a Sergeant since November 13, 2003.

3.    <u>Academy training.</u>  I attended the police academy at Norwood from September 25, 1995 to January 30, 1996.  While at the Academy I was trained on all the specific techniques of law enforcement for police officers in Massachusetts as well as the General Laws affecting police work and how it guides such techniques.  Some examples of this include the following:

    **(a)**    <u>Vehicle Crash Investigation</u>.  Training in this regard included learning the specific procedures relating to laying the foundation of motor vehicle crash investigation including the specific information that should be included in a "report", what should be done with respect to "investigation", the purposes of reporting and investigating including enforcement of traffic law to facilitate public safety on the roads and deter unsafe practices, educate drivers and the community, and prevent accidents.  With regard to this I was also taught about the elements of investigation including witness observations, interviewing all available witnesses, the importance of gathering information relating to the

1

accident's time, place and type of accident, and the final resting place of the vehicle.

   **(b)**   <u>Causes for vehicle crash.</u>  Training in this regard included examining the reasons why the driver did not or was not able to evade the accident.  This includes considering the driver's decision as to the speed of the vehicle prior to the accident and whether excess speed was factor in the accident; driver distraction due to any number of factors (i.e., children fighting car, conversation); impairment of senses due to vision, glare, auditory capacity, knowledge of traffic laws, driver skill and years of driving experience, driver motivation such as anger, fear, timidity, and exhibitionism, and ailments caused by medicines, drugs, poisons (like carbon monoxide), fatigue, or heart or other health conditions.  Training also instructed officers to consider the condition of the vehicle and its potential cause (headlights, wheels, brakes, windows, windshield wipers, and the condition of the road and weather).  There is also specific training on what observations to make of the driver and determining whether the driver is Operating Under the Influence ("OUI") within the meaning of G.L. c. 90.  With regard to these, as well, training involved information on what is probable cause and what steps can and cannot be taken with or without probable cause, as well as the circumstances that allow the officer to require the driver to take a Field Sobriety Test ("FST") and the implications of driver refusal, as well as the appropriate use of a breathalyzer.

   **(c)**   <u>Other details relating to vehicle crash response.</u>  Training also included other longstanding police techniques relating to what to do when responding to a vehicle crash such as where to place the police cruiser, which vehicle to attend to first in a multi-vehicle crash, using lights and siren when traveling to a crash scene after radio dispatch, crowd control, special traffic control techniques depending on the location of the vehicles, what information to collect from drivers and passengers, and what information if any to collect from the interior of the vehicle.

   **(d)**   <u>Domestic disturbances and other response situations.</u>  Training also included information on the criteria for report writing, investigation, and other longstanding police techniques relating to other response situations, with detail similar to that noted above for vehicle crash situations.

   **(e)**   <u>Criminal procedure.</u> At the academy I was given detailed information on the constitutional and statutory standards governing criminal procedure and how those standards affect police work.  This includes, e.g., standards relating to probable cause, affording citizens' their constitutional rights, how to not endanger the investigation by improper conduct under those standards, and review of case law applying such constitutional and statutory standards.

**(f)** <u>Criminal law.</u> I was also given detailed information on the statutes of the Commonwealth of Massachusetts that a police officer must enforce. I learned which offenses are ones for which an individual may be arrested; which require a warrant; and key exceptions to these general rules including those set forth in statutes. I also learned the importance of each element of the crime and why an investigation must identify each element.

**(g)** <u>Motor Vehicle law.</u> In addition to learning how to investigate a vehicle crash scene as noted above, I also learned each of the statutes that a police officer must enforce relating to motor vehicles, the elements pertaining to each offense, and the importance of identifying the existence of those elements. There was also specific focus on which motor vehicle laws are arrestable offenses.

**(h)** <u>Elements of self defense.</u> At the Academy, as well, I was given detailed information on techniques of self defense and the laws applicable to that. I was taught about handcuffing techniques for passive situations and force situations. There was also role playing in situations such as bar room brawls and how to handle those situations.

**(i)** <u>Driving.</u> I was taught about driving a police cruiser and the laws that relate to that. I was also taught on an emergency driving course techniques of driving and about the tolerance (limitations) of a vehicle (e.g., turns, skidding).

**(j)** <u>Firearms.</u> At the academy there was extensive information on the laws governing the use of firearms by law enforcement officials, as well as the safe and effective use of a firearm (e.g., proper stances, target shooting, no shoot situations). In addition, there was education on a concept called the "use of force continuum", where you learn about how to escalate force and deescalate force, from police presence alone, to verbal commands, to hand tactics, to use of pepper spray, to use of a baton, to handgun use. I was taught how to recognize and control a situation and move up and down this continuum, using the least force necessary to obtain control.

**(k)** <u>Interview techniques.</u> I was also taught about interview techniques and the key elements of information that should be obtained from witnesses and how that varied based upon the elements of the crime that I may be investigating. I learned about judging a person's credibility and veracity based upon eye contact (or lack of eye contact), covering mouth when speaking, and/or non-responsive answers to questions posed, as well as separating witnesses.

**(l)** <u>Report writing.</u> At the academy I was also taught about report writing. That in part included an application of other information I learned relating to elements of the crime, criminal procedure and criminal law, as well as issues relating to witness credibility and veracity. I was taught about the key

elements that must be included in a report and otherwise how to complete a satisfactory police report so that is will be objective and support the crime for which it was written.

**(m)** <u>Inservice Training.</u>  I am required to attend yearly inservice training to keep abreast of any changes in the law.

4. <u>Natick Police Department Rules, Regulations, Policies, Procedures, General Orders.</u>  In addition to knowledge relating to the General Laws of the Commonwealth and information reviewed above pertaining to longstanding special techniques of police work that I learned at the Police Academy that provide the criteria for how I must perform my job, the Natick Police Department's Police Chief has issued a vast number of Rules, Regulations, Polices, Procedures and General Orders that also dictate how I must perform my job as Administrative Officer.  This guidance relates to reinforcing the principles of police technique and reinforcing the expectations required under the General Laws and the Police Chief's rules, regulations, policies, procedures and general orders applicable to the Natick Police Department.

5. <u>Education.</u>  I have an Associate's degree from Massachusetts Bay Community College in the year 1993, with a major in criminal justice.  That education reinforces much of the knowledge and standards of police work noted above.

6. <u>Virtually all duties governed by longstanding techniques and other external standards.</u>  Based upon the training and education that I received as reviewed above, and the documentation of the Department that otherwise describes standards of performance, virtually every aspect of what I did as a patrol officer, sergeant and now as the Administrative Officer are governed by the aforementioned material, rather than by me deriving my own brand of police work unique to me.  To the best of my knowledge I have established no guidelines for performance of police work or administrative functions myself.  I apply no discretion in my decision making that is independent of these external mandates to the best of my knowledge.

7. <u>Mannix Affidavit – disagreement on facts.</u>  I am aware of the following topics covered in the Affidavit of Chief Mannix in this matter and, respectfully, submit that the allegations identified below are inaccurate:

**(a)** **[Sergeant – "independent decisions"]**  At ¶15(b), Chief Mannix states that "Sergeants are independent and expected to use their skills, knowledge, and experience, in making decisions about how to guide and direct the Patrol Officers."  I do not exercise discretion independent of the detailed rules, regulations, policies, procedures and general orders issued by the Police Chief and provisions of collectively bargained contractual agreements.  Moreover, as Administrative Officer I rarely give instruction or direction to Patrol Officers regarding the patrol function.  The patrol officers are equipped with the same or similar training as I, and are governed by the same external standards that dictate how we must perform our jobs.

4

**(b)** **[Sergeants – job description]** At ¶¶16, 18 and 19 the Chief states that the job description attached to the Town's motion is a fully accurate description of how sergeants have performed that assignment. I respectfully disagree with the chief. I am familiar with and have reviewed the job description for the Sergeant position in question and find that it is not fully accurate in describing the actual duties of that position. Below in general, and in a separate paragraph of this affidavit relating to the job description, I will more specifically explain the degree to which each element of the job description is inaccurate.

**(c)** **[Sergeants – "primary duty to direct"]** At ¶¶17 the Chief states that the "primary duty" of the sergeant "is to direct the activities of the Patrol Officers, or to monitor their activities. As Administrative Officer I do not direct or monitor officers' patrol activities.

**(d)** **[Sgt. Fitzpatrick]** At ¶30, the Chief states that in my job as Administrative Officer I have duties "generally in the areas of Department administration, including detail and overtime administration, payroll administration, budgeting, grant writing, recording and reviewing attendance of persons in the department." Each facet of what I do in this regard is dictated by the Chief, collective bargaining agreement rules pertaining to such matters, and/or the Department's procedures as established by the Chief. These rules include General Order 2003-01 (and two subsequent 2006 revisions) which dictate the process by which detail and overtime assignments are allocated. I do not exercise independent discretion when I apply any of these contracts, rules, regulations or procedures to my work. Apart from ongoing day-to-day administrative operations, no work product is disseminated or released without the Chief's approval.

**(e)** **[Command Staff – the Chief's "delegates"]** At ¶31 the Chief refers to the Command staff and that each member of the Command staff is the "delegate" of the Chief. To the extent this implies that, in my role as the Administrative Officer I independently make decisions, without regard to standards established by the Chief this is false.

**(f)** **[Command Staff – frequency of command staff meetings]** At ¶32 the Chief states that he holds "Command Staff meetings regularly, as often as several times a week", and that he holds general staff meetings "up to 10 times per year." Since 2001 I have been a regular attendee of Command Staff meetings. I am present to address any financial issues that may come up during the conversation or any other issues that may affect my areas of responsibility. Some weeks there are Command Staff meetings and sometimes there are no Command Staff meetings for several weeks. Occasionally there may be more than one Command Staff meeting in a week. A Command Staff meeting most often consists of conversations about what is happening in the Department.

**(g)** **[Command Staff – Chief seeking input from command staff on hiring, firing, promotions and disciplinary actions]** At ¶33 the Chief states, "I seek input from the Command Staff and, while I am not required to follow their recommendations, I always give substantial, significant, and meaningful weight to that input in making my decision, on many issues within the department, including decisions regarding the hiring, firing, promotion, and/or discipline of the police officers of the Department." My involvement in these areas as a member of the Command Staff are as follows:

Hiring: To the best of my knowledge, there have been 23 individuals, both police and civilian personnel, hired since September 2001. I was present for the interview of only 3 of the 23 people and in those cases the Chief asked for my opinion. In the other 20 cases I was never asked for input and learned of the hiring decision after it was made. In addition, with respect to the selection process, given Civil Service's rules, there is a presumption in favor of hiring the first candidate on the list unless there is substantial documented reason not to hire such person. It is for this reason that I am aware of no instances when anyone other than the first person on the list was hired. The only exception to this was when a candidate named Mark Clifford was bypassed in September 2005 because there was a blatant disqualifying condition, i.e., Mr. Clifford lied about a fairly extensive disciplinary record in his prior employment. Even in connection with this case, the Chief was steadfast, adamant in his conclusion that he would not hire Mr. Clifford. He noted what the background investigation revealed, the misrepresentation of what Mr. Clifford stated in his interview and then pronounced, "I am not going to hire him." There was absolutely no debate over the issue.

Firing: The only individual fired since September 2001 was a probationary officer (i.e., he was fired in his first year of employment) named Andrew Thorpe. To the best of my memory there was no command staff meeting where it was discussed. Nor did the Chief seek my input on that decision.

Discipline**:** With regard to discipline, there have been approximately three suspensions or disciplines that I am aware of (i.e., B. Grassey, K. Fitzgerald, M. St. Hilaire). On none of those three did the Chief ask for my recommendation as to the discipline to be imposed.

Promotions**:** To the best of my recollection there have been 8 individuals promoted since September 2001. With regard to the these eight promotions the Chief asked for my opinion only once, on the promotion of then-Sergeant Brian C. Grassey.

"Substantial, significant weight": In addition, the Chief has never stated, prior to this litigation, that he will "give substantial, significant, and meaningful weight" to my input on hiring, firing, discipline or promotions. This litigation is the first I have heard of this. Also, to my knowledge there are no documents that identify

the specific weight that should be accorded to any input that I give.  Moreover, in the area of suspensions of greater than 5 days, hiring, firing and promotion decisions, the Town's Board of Selectmen makes the decision, not the Chief.  The Chief makes recommendations to the Board.  I make no recommendations and do not communicate with the Board.  I am aware of no documentation where the Board of Selectmen was provided with my views and where they articulated that my view would be followed.  Rather, to my knowledge, in each case, the Board of Selectmen follows what the Chief recommends, regardless of whether I disagree or agree with the Chief.

      (h)    [**Command Staff – Input on employee of the month and officer of the year – input on poor performance**]  At ¶34 the Chief states that he seeks "input" from the command staff regarding Employee of the Month and Officer of the Year awards, and he says that he "considers it part of their duty to provide feedback on good work of employees, as well as the employees whose work needs improvement."  In response to this allegation I state the following:  Some months the Chief solicits input on employee of the month, and some months he does not.  I have given input some months; and some months I have not.  I have never been told that I must give such input.  In a given year I may give input to as few as three or four employees.  All employees in the department, not just superior officers, may give input to the Chief on this issue, and all employees are subject to the same voluntary standard, i.e., they choose whether to communicate with the Chief their opinion without any rule requiring them to do so.  To my knowledge, there is no documentation indicating what weight, if any, would be accorded to input from me on this.  The Chief says in his affidavit that he considers it part of my duty but to the best of my knowledge it is not delineated in any documentation of the Police Department.  I can not recall if anyone that I identified as a candidate for Employee of the Month was ever selected.

With respect to Officer of the Year, it is true that the Chief has solicited my input for this Award.  The process for selection in terms of my involvement is as follows:  The Chief asks for input at a staff meeting and a rough outline of why you think the person would be appropriate.  To my knowledge, all employees in the department, not just superior officers, may give input to the Chief on this issue, and all employees are subject to the same voluntary standard in giving input, i.e., they choose whether to communicate with the Chief their opinion without any rule requiring them to do so.  There is no requirement to provide this input.  Nor, to my knowledge, is there any documentation indicating what weight, if any, would be accorded to input from me or others for this award.  If you are awarded Officer of the Year one receives a plaque, three days off with pay, and a parking spot for the year.  I am unaware of any documentation to the effect that my input Officer of the Year is a "duty".

With respect to input on employees whose work needs improvement, my position as Administrative Officer is not one in which I would report to the Chief on an employee's work product or productivity

7

**(i)** **[Superior Officers - Hiring]** l At ¶39 the Chief states among other things that "[a]s Chief [he] oversees the selection process and gather[s] input and information about candidates developed in the process and with that information and input, [the Chief] ultimately [is] responsible for making the final recommendation to the Selectmen about who should be hired. . . ." The Chief states as well that he does "not recall an instance where [he] did not give substantial and significant weight to others in the Department involved in the process, or where [the Chief] did not rely materially on their input." As a member of the Command Staff I have only participated in a few interviews as noted above. At these interviews I was more of an observer than an active participant. The Chief has not at anytime stated, prior to this litigation, that he will "give substantial and significant weight" to my input. To my knowledge there are no documents that identify the specific weight that should be accorded to any input I give. The Chief makes recommendations to the Board. I make no recommendations and do not communicate with the Board. I am aware of no documentation where the Board of Selectmen were provided with my views and where they articulated that my view would be followed. Rather, to my knowledge, in each case, the Board of Selectmen follows what the Chief recommends, regardless of whether I disagree or agree with the Chief. Finally, with respect to the selection process, given Civil Service's rules, there is a presumption in favor of hiring the first candidate on the list unless there is substantial documented reason not to hire such person.

**(j)** **[Command Staff - Hiring process – "weight" given to input]** At ¶45 the Chief states that, after the background investigation is completed, he meets with the Command staff to "discuss and evaluate the candidates". The Chief also states that "[o]pinion and suggestions are expressed and given a great deal of weight and consideration in developing the Department recommendation." Again, although the Chief states this, to my knowledge there is no documentation in the Town establishing the degree to which he should place weight, if any, on anything that the Command staff say. Further, to my knowledge, there is no requirement even that the Chief solicit input from the Command staff in connection with making recommendations for hire. Finally, to the best of my knowledge, the issue of hiring a candidate is straightforward under Civil Service law in that the issue is whether there is a disqualifying condition. Absent a disqualifying condition, the person that is first on the list must be hired and that has what has happened in each case, except for the case of Mr. Clifford described above.

**(k)** **[Command Staff – hiring – interviews]** At ¶46 the Chief says that candidates "may be interviewed" by the Command staff and that following the interview there is discussion and opinions expressed about the candidates. While on the Command Staff , I cannot recall when I was informed of the 4 interviews that I have attended. I believe I learned of them on the day that they occurred. I may have provided an opinion at the interview but it was not

8

required and, in any event, the selection decision is based upon the presence of a disqualifying condition which is governed by Civil Service Law and Chief standards.  I am not clear on what value is given to my attendance or discussion.  If there are no disqualifying conditions, I understand that the interview may have no weight or little weight in the decision under Civil Service law.  Therefore, setting aside situations such as Mr. Clifford when a disqualifying condition is patent and ascertained at an interview, which has happened only once, the interview otherwise might seem to have no bearing on the selection process.  There is no documentation requiring that I attend interviews, or that I provide an opinion.  Furthermore, there is no documentation indicating how much weight, if any, the Chief should place on my opinion.

   **(l) [Sergeants – hiring – input]**  At ¶47 the Chief states that "[a]t times [he] may . . . seek out further opinions of one or more other Sergeants" regarding hiring a candidate for Patrol Officer.  In my tenure as a Sergeant there have been no occasions outside of the Command Staff when my opinion was solicited regarding hiring an applicant.

   **(m) [Command Staff and Sergeants – general – input and weight]**  At ¶48 the Chief states that he gives "serious weight to the thoughts and opinions of [the] Command Staff and Sergeants, and [that he takes] their recommendations seriously.  He also states: "At times, however, I may choose to not follow their recommendations, based on my own knowledge and experience."  To the best of my knowledge, it has never been expressed to me by the Chief or the Town in general, nor does documentation exist that whatever opinion I expressed would be given "serious weight".  This litigation is the first time I heard that sentiment expressed.  As the Administrative Officer, I attend Command Staff meetings, and sometimes I express my thoughts or opinions on an issue at these meetings.  I have never been told what weight is placed on my view or that it is required that I express an opinion.

   **(n) [Hiring process – memorandum to the Selectmen]**  At ¶49 the Chief states that he communicates his recommendation (I assume relating to hiring a candidate) he presents it in a memorandum and that "typically [he mentions] whether the recommended candidate is a unanimous choice or a consensus choice."  The Chief has never before indicated, nor is there any Town documentation to my knowledge, that indicates any criteria relating to whether the Chief must present input to the Selectmen that references the opinions of others, or criteria for how much weight the Chief or the Selectmen should place on such opinions.

   **(o) [Sergeant – promotions – input]**  At ¶52 the Chief states that he expects that, "as part of a Sergeant's duty, [the Sergeant] would report to me directly, or through chain of command, any information they possess which could impact a decision about promotion."  Until this litigation, there has been no communication by the Chief or the Town in any form relating to this

9

expectation. Nor, to my knowledge, is there any documentation in the Town which establishes how much weight should placed on the opinion, if any was given, by a Sergeant relating to a promotion decision.

**(p)    [Patrol Services Division Commander – seek information – promotions – this is for sergeants and lieutenants too]**  At ¶53 the Chief states that he expects the Patrol Services Division Commander to "seek information from other Superior Officers, with respect to the promotability of a particular Officer seeking advancement." At no time has the Patrol Services Division Commander sought my input on any promotions.

**(q)    [Reports of supervisors – promotions]**  At ¶54 the Chief states that "the work records of persons seeking promotions, including reports by their supervisors over the years (if any) are taken into consideration." To the best of my memory, there have been no occasions when I have filed any reports on patrol officers in the regular course of duties. The Chief has established a procedure which requires that a sergeant file a document known as the Supervisor's First Report of Complaint when a citizen complaint is filed. The report simply summarizes the citizen complaint allegations and no findings are made by the superior officer completing such report. This is a rote activity of simply listing allegations and passing those allegations via this paperwork up the chain of command for review by someone else. With respect to the supposed reports that supervisors file regarding employee performance, the Chief nor the Town has communicated that it would use any such reports in making promotion decisions or, if so, how much weight would be placed on such reports. This lawsuit is the first I have heard of this issue.

**(r)    [Command Staff – Promotions – opinions - weight]**  At ¶55 the Chief states that when considering officers for promotions he "involve[s] the Command Staff in the decision, assign[s] significant weight to their opinion, and consider[s] seriously what they have to say." With the exception of Brian C. Grassey's promotion to Lieutenant I have not been asked for my opinion with respect to promotions. Also, this is another instance where neither the Chief nor the Town has ever expressed to me or in documentation to my knowledge that whatever opinion I express will be given "significant weight" or be considered "seriously" on promotion situations. Nor to my knowledge is there any documentation in the Town stating a requirement to solicit my opinion on promotions or that it should be presented to the Board of Selectmen. The decision is made by Board upon recommendation of the Chief. In truth, this litigation is the first time I heard it expressed that any weight would be placed on my opinions regarding promotions.

**(s)    [Superior Officers - Input – discipline and firing – weight]**  At ¶56 the Chief states that the process for imposing discipline or termination is similar to the process for obtaining input as in the case of promotions or hiring. He further states that, when the Selectmen are involved in discipline, "they have

10

indicated to [the Chief] that they rely on my recommendations, and the fact that I seek input in developing that recommendation from other officers." I have never given any input on the issue of whether to discipline or fire an employee. To my knowledge there is no requirement that I give input or that the Board of Selectmen require my input in making their decision. Nor has the Chief or the Town ever expressed to me or expressed in documentation that the Board will "rely" on my input. This litigation is the first time I have ever heard this claim.

      **(t)** **[Superior Officers – verbal counseling]** At ¶59 the Chief states: "Verbal counseling happens very frequently, and is part of the job duties of the Sergeants and the Lieutenants." To the extent that the Chief is referring to input on performance where the superior officer comments on employee performance, my position as Administrative Officer and its responsibilities do not entail verbal counseling for job performance.

      **(u)** **[Superior Officers – relieve someone from duty]** At ¶60 the Chief states that all superior officers have the power to relieve "someone of duty, when the situations requires such action." I have never done this. Moreover, to the extent that the Chief is referring to a serious issue such as a patrol officer, sergeant, lieutenant or the Chief himself, proceeding to engage in police duties while inebriated or otherwise incapacitated, all officers from patrol officer up the ranks to my knowledge have the power to relieve another of duty in such situation for public safety reasons. There are no other situations, other than situations where the officer's or superior officer's performance will endanger the public, that allows for such relief from duty. There are no rules, regulations, policies, procedures, general orders, or any other Town document which affords superior officers the right to suspend someone from duty. This power is vested solely in the Chief and the Board of Selectmen for suspensions from one to five days, and solely with the Board of Selectmen for suspensions of greater than five days up to termination, per Civil Service Law.

      **(v)** **[Sergeants – disciplinary process – "major role"]** At ¶61 the Chief states that "[s]ergeants play a significant and material role in the disciplinary process of Patrol Officers. They are responsible for dealing with the day to day conduct issues that are not serious (serious meaning things such as flagrant refusal to obey orders or commission of crime). They are responsible for acting on any misconduct or performance, and bringing forth the appropriate facts and reports about conduct that rises to the level of warranting more formal discipline or action." Respectfully, the Chief's statements in this regard are true, but limited. If a superior officer engaged in criminal misconduct or other misconduct a patrol officer is obliged to report that up the chain of command. I have played no role, let alone a "significant and material role" in discipline of patrol officers and I have never issued discipline. On occasions when I have interaction with patrol officers, it is only to provide guidance to the officer relating to compliance with standards of the Department established by the Chief

11

and/or contractual provisions. When I give that input, it is never based upon some special standard that I have created.

**(w)** **[Sergeants – disciplinary process – "major role"]** At ¶61 the Chief also states that, with regard to the discipline process, that sergeants such as myself are "required and expected as supervisors [to monitor] conduct and performance, and address problems as they arise in different ways depending upon the seriousness of the incident." Respectfully this is inaccurate to the extent that it implies that I engage in any first hand observation of the performance of patrol officers. As the Department's Administrative Officer I do not monitor the conduct and performance of patrol officers.

**(x)** **[Sergeants – authority to resolve grievances]** At ¶62 the Chief states that "Sergeants have the authority to resolve grievances" under the patrol officers collective bargaining agreement. This is false. The grievance procedure requires that the patrol officer speak to the immediate supervisor. As Administrative Officer, no officer has given me a written grievance. As a sergeant I am unable to resolve these and bind the Town. With respect to details, there is a procedure which is both contractual and outlined in department policy and I am not authorized to modify it. With respect to granting vacation days, this is contractual as well and the Chief has requirements as to how many officers must be on each shift. I do not have the authority to override the contracts negotiated by the Town and rules established by the Chief. Therefore, while it is true that the contract language in the patrol officers' contract states that a grievance initially should be discussed with the sergeant, this is at best an informal discussion. The actual process begins with submission of the written grievance to the Chief. The Town does not vest the Sergeants with the ability to sustain a grievance and thereby create a binding precedent (as would be the case in the event of a truly sustained grievance). The grievances, if discussed with the Sergeant, are routinely routed up the chain of command for decision by the Chief.

**(y)** **[Sergeants – Lt. Mason – referral and investigation of complaints]** At ¶63 the Chief states that if a complaint is lodged against a patrol officer that the sergeant is required to submit an incident report and then the matter is referred to Lt. Mason who initiates an investigation. As noted above, the Chief's rules require that the Sergeant complete a document entitled Supervisor's First Report of Complaint and that is merely listing the allegations and passing them up the chain of command for review. It involves no findings and is a clerical function. I have never done this from November 2003 to present.

**(z)** **[Sergeants – Lt. Mason – other superiors - referral to investigate complaints]** At ¶64 the Chief states that "[i]nvestigative duties are usually assigned to the immediate supervisor, either a Sergeant or a Lieutenant."

12

As the department's Administrative Officer, I have never been assigned to investigate a formal complaint.

**(aa)   [Sergeants – Lt. Mason – other superior officers – referral to investigate complaints]** At ¶65 the Chief states that, "Superior Officers who investigate complaints are allowed to include recommendations for discipline in their reports, but do not always do so. The facts provided by the Sergeant or Lieutenant are always relied upon in making a determination about if, or what, action should be taken." As the department's Administrative Officer, I have never been assigned to investigate a formal complaint.

**(bb)   [Sergeants – Command Staff – discussion of disciplinary action]** At ¶66 the Chief states that when contemplating disciplinary action, he discusses the "measure of discipline with the appropriate supervisors. I also typically discuss the situation with my Command Staff." However, the Chief has never asked for my recommendation on discipline for any department member. To my knowledge the Chief or the Town has never communicated or issued documentation relating to a requirement that I provide such input or how much weight if any would be placed on my input.

8.   **Job description - Sergeant.**  I have reviewed the job description for Sergeant and find that it is not accurate in describing what my job is as Sergeant and Administrative Officer in multiple respects, as follows (citation refers to paragraph and section of the job description):[1]

**(a)**   B(1)(a): Although the job description stated that I was "responsible" for the "effectiveness" in which patrol officers working on my shift work, in reality this is not true. No patrol officers work for or with me. This job description does not apply to my duties as the Administrative Officer.

**(b)**   B(1)(b): It is generally true that I should be familiar with the rules, regulations, policies, procedures and general orders of the Police Chief as relates to my job and those on my shift, but the reference to patrol officers on my shift as "my personnel" is inaccurate to the extent it implies that I have authority over such personnel beyond that which I have described in this affidavit.

**(c)**   B(1)(c): The job description states that it is my duty to "monitor the duty performance of departmental members" and "ensure that it is satisfactory through encouragement, explanation, discipline, referral to his superior officer or other methods consistent with departmental policy." My role in interacting with patrol officers as it may impact how they perform their job was limited to what I described above.

---

[1]   I do not comment on the initial section referred to as "Summary" since I understand that it correlates with the items otherwise listed in the job description.

13

**(d)** B(1)(d): With regard to the job description's claim that I am to submit a "written report to the superior officer of any member of the Department when he commits a serious breach of the regulations of the Department and informal corrective measures prove inadequate," this was also not an accurate reflection of my job duties. The true extent of my duties in this regard are set forth above.

**(e)** B(1)(h): The job description repeats the concept that I am "accountable for the actions or omissions of officers under [the sergeant's] supervision which are contrary to the departmental regulations and which would have been avoided if [the sergeant] had been properly executing his supervisory responsibilities." I have never been held accountable for any conduct of a patrol officer. With regard to execution of "supervisory responsibilities", I have little to no communication with patrol officers during a shift as it pertains to reminding them how to perform their job in accordance with rules, regulations, policies, procedures and general orders.

**(f)** B(1)(i): With regard to the job duty that I was to respond to an "emergency or incident of a serious nature" and "[t]ake command of the situation until relieved by an officer of superior rank", the actual practice did not comport with this. This duty does not apply to me as the Administrative Officer.

**(g)** B(1)(j): The job description states that the sergeant is to ensure that "all Patrolmen receive warrants, summonses, subpoenas, or other official papers, and serve or deliver or perform their duties regarding such papers promptly and accurately." This task is clerical in nature and requires no judgment. I have nothing to do with this task and have never performed it. It is distinct from my duties as the Administrative Officer.

**(h)** B(1)(k): With regard to the duty to review the log, it is true that I review the log and the ministerial task of noting material on the log at roll call is one of the clerical functions that the sergeant performs. That function requires no judgment or discretion. I have nothing to do with this task and have never performed it. It is distinct from my duties as the Administrative Officer.

**(i)** B(2)(a)(b) and (c): Regarding reporting and writing procedures of sub-section "2" of Section B of the job description, the actual duties performed in that regard vary from what is written. The job description states "Be familiar with the Department's records and reporting system in detail and instruct officers in the proper method of reporting." It is true that the Chief has established, in detail, the system and requirements for report writing, and those standards are also established by the Clerk of the Courts and the General Laws of Massachusetts, as well as training that all officers receive at the Academy. I have nothing to do with reviewing patrol officer reports and have never performed it. It is distinct from my duties as the Administrative Officer.

9. <u>No work having to do with management:</u>

As a Sergeant and Administrative Officer I have not participated in interviewing and selecting Department employees except to the limited extent described above; I have not set or adjusted rates of pay and hours of work; I have not directed any employee's work; I have not maintained production records for use in supervision or control except for payroll documents; I have not appraised employee productivity and efficiency for the purpose of recommending promotions or other changes in status; I have not handled employees' complaints and grievances other than answering payroll, detail or overtime questions for which all answers are based on the applicable contracts and other rules and regulations, not my own independent opinion or discretion; I have not planned any employee's work other than my own; I have not participated in apportioning the work among the workers; and I have not participated in determining the type of materials, supplies, or tools to be used in the course of an employee's duties.

Sworn to under the pains and penalties of perjury this 16th day of November, 2006:

<u>/s/ Leo Fitzpatrick</u>
Leo Fitzpatrick, Sergeant