THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Robert F. Murphy, III, Lead Plaintiff for
Patrol Officer Plaintiffs, et al. and,

Brian C. Grassey, Lead Plaintiff for
Superior Officer Plaintiffs, et al.,

      Plaintiffs,

      v.

Town of Natick, et al.

      Defendants

USDC Case No.:  04-11996 RGS

**Affidavit of Thomas G. Lamont**

I, Thomas G. Lamont, attest to the following based upon my own personal knowledge:

1. My name is Thomas Lamont and I reside in Holliston, Massachusetts.

2. I have been employed by the Town of Natick within its police department since 1974, first as a reserve officer and then as a regular police officer beginning in 1975.  I have been a Sergeant for 22 years.

3. <u>Academy training.</u>  I attended the Massachusetts State Police Academy in Framingham, Massachusetts in 1975.  While at the Academy I was trained in all the specific techniques of law enforcement for police officers in Massachusetts as well as the General Laws affecting police work and how it guides such techniques.  Some examples of this include the following:

    (a) <u>Vehicle Crash Investigation</u>.  Training in this regard included learning the specific procedures relating to laying the foundation of motor vehicle crash investigation including the specific information that should be included in a "report", what should be done with respect to "investigation", the purposes of reporting and investigating including enforcement of traffic law to facilitate public safety on the roads and deter unsafe practices, educate drivers and the community, and prevent accidents.  With regard to this I was also taught about the elements of investigation including witness observations, interviewing all available witnesses, the importance of gathering information relating to the accident's time, place and type of accident, and the final resting place of the vehicle.

1

(b) <u>Causes for vehicle crash.</u>  Training in this regard included examining the reasons why the driver did not or was not able to evade the accident.  This includes considering the driver's decision as to the speed of the vehicle prior to the accident and whether excess speed was factor in the accident; driver distraction due to any number of factors (i.e., children fighting car, conversation); impairment of senses due to vision, glare, auditory capacity, knowledge of traffic laws, driver skill and years of driving experience, driver motivation such as anger, fear, timidity, and exhibitionism, and ailments caused by medicines, drugs, poisons (like carbon monoxide), fatigue, or heart or other health conditions.  Training also instructed officers to consider the condition of the vehicle and its potential cause (headlights, wheels, brakes, windows, windshield wipers, and the condition of the road and weather.  There is also specific training on what observations to make of the driver and determining whether the driver is Operating Under the Influence ("OUI") within the meaning of G.L. c. 90.  With regard to these, as well, training involved information on what is probable cause and what steps can and cannot be taken with or without probable cause, as well as the circumstances that allow the officer to require the driver to take a Field Sobriety Test ("FST") and the implications of driver refusal, as well as the appropriate use of a breathalyzer.

(c) <u>Other details relating to vehicle crash response.</u>  Training also included other longstanding police techniques relating to what to do when responding to a vehicle crash such as where to place the police cruiser, which vehicle to attend to first in a multi-vehicle crash, using lights and siren when traveling to a crash scene after radio dispatch, crowd control, special traffic control techniques depending on the location of the vehicles, what information to collect from drivers and passengers, and what information if any to collect from the interior of the vehicle.

(d) <u>Domestic disturbances and other response situations.</u>  Training also included information on the criteria for report writing, investigation, and other longstanding police techniques relating to other response situations, with detail similar to that noted above for vehicle crash situations.

(e) <u>Criminal procedure.</u>  At the academy I was given detailed information on the constitutional and statutory standards governing criminal procedure and how those standards affect police work.  This includes, e.g., standards relating to probable cause, affording citizens' their constitutional rights, how to not endanger the investigation by improper conduct under those standards, and review of case law applying such constitutional and statutory standards.

(f) <u>Criminal law.</u>  I was also given detailed information on the statutes of the Commonwealth of Massachusetts that a police officer must enforce.  I learned which offenses are ones for which an individual may be arrested; which

2

require a warrant; and key exceptions to these general rules including those set forth in statutes. I also learned the importance of each element of the crime and why an investigation must identify each element.

      (g)    <u>Motor Vehicle law.</u> In addition to learning how to investigate a vehicle crash scene as noted above, I also learned each of the statutes that a police officer must enforce relating to motor vehicles, the elements pertaining to each offense, and the importance of identifying the existence of those elements. There was also specific focus on which motor vehicle laws are arrestable offenses.

      (h)    <u>Elements of self defense.</u> At the Academy, as well, I was given detail information on techniques of self defense and the laws applicable to that. I was taught about handcuffing technique for passive situations and force situations. There was also role playing in situations such as bar room brawls and how to handle those situations.

      (i)    <u>Driving.</u> I was taught about driving a police cruiser and the laws that relate to that. I was also taught on an emergency driving course techniques of driving and about the tolerance (limitations) of a vehicle (e.g., turns, skidding).

      (j)    <u>Firearms.</u> At the academy there was extensive information on the laws governing the use of firearms by law enforcement officials, as well as the safe and effective use of a firearms (e.g., proper stances, target shooting, no shoot situations). In addition, there was education on a concept called the "use of force continuum", where you learn about how to escalate force and deescalate force, from police presence alone, to verbal commands, to hand tactics, to use of pepper spray, to use of a baton, to handgun use. I was taught how to recognize and control a situation and move up and down this continuum, using the least force necessary to obtain control.

      (k)    <u>Interview techniques.</u> I was also taught about interview techniques and the key elements of information that should be obtained from witnesses and how that varied based upon the elements of the crime that I may be investigating. I learned about judging a person's credibility and veracity based upon eye contact (or lack of eye contact), covering mouth when speaking, and/or non-responsive answers to questions posed, as well as separating witnesses.

      (l)    <u>Report writing.</u> At the academy I was also taught about report writing. That in part included an application of other information I learned relating to elements of the crime, criminal procedure and criminal law, as well as issues relating to witness credibility and veracity. I was taught about the key elements that must be included in a report and otherwise how to complete a satisfactory police report so that is will be objective and support the crime for which it was written.

(m)  <u>Inservice Training.</u>  I am required to attend yearly inservice training to keep abreast of any changes in the law.

4.  <u>Natick Police Department Rules, Regulations, Policies, Procedures, General Orders.</u>  In addition to knowledge relating to the General Laws of the Commonwealth and information reviewed above pertaining to longstanding special techniques of police work that I learned at the Police Academy that provide the criteria for how I must perform my job, the Natick Police Department's Police Chief has issued a vast number of Rules, Regulations, Polices, Procedures and General Orders that also dictate how I am must perform my job, from patrol officer, my current position as a Sergeant.  They relate to matters such as how to proceed to an accident scene (lights, sirens, speed, marked cruiser), and what to do at an accident scene to collect information, what information to incorporate in a report, how to investigate domestic crimes, and what investigation to do at an accident scene and other matters.  Most of these same principles were taught to me on the job, from the time I was a patrol officer onward, with more senior patrol officers or sergeants and lieutenants offering guidance to me as a junior patrol officer etc.  This guidance related to reinforcing the principles of police technique and reinforcing the expectations required under the General Laws and the Police Chief's rules, regulations, policies, procedures and general orders applicable to the Natick Police Department.

5.  <u>Education.</u>  I have a Bachelors degree from Northeastern University in Law Enforcement (1980) and a Masters degree from Westfield State College in criminal justice (1995). That education reinforces much of the knowledge and standards of police work noted above.

6.  <u>Virtually all duties governed by longstanding techniques and other external standards.</u>  Based upon the training and education that I received as reviewed above, and the documentation of the Department that otherwise describes standards of performance, virtually every aspect of what I did as a patrol officer and now do as a Sergeant was governed by the aforementioned material, rather than by me deriving my own brand of police work unique to me. Currently, as a Patrol Sergeant I simply apply those same external guidelines to others.  To the best of my knowledge I have established no guidelines for performance of police work myself.  I apply no discretion in my decision making that is independent of these external mandates to the best of my knowledge.

7.  <u>Mannix Affidavit – disagreement on facts.</u>  I am aware of the following topics covered in the Affidavit of Chief Mannix in this matter and, respectfully, submit that the allegations identified below are inaccurate:

**(a)   [Sergeant – "independent decisions"]**  At ¶15(b), Chief Mannix states that "Sergeants are independent and expected to use their skills, knowledge, and experience, in making decisions about how to guide and direct the Patrol Officers."  It is not true that I am "independent" when I work as a Patrol Sergeant.  Also, regardless of whether I am a Station Supervisor or Field

4

Supervisor (also known as "Street Supervisor") I do not exercise discretion independent of the mentioned above, including Police Academy training, longstanding techniques of police work that I was taught at the Academy and as a patrol officer by more senior officers, the General Laws of the Commonwealth, and the detailed rules, regulations, policies, procedures and general orders issued by the Police Chief.  Moreover, I rarely give instruction or direction to Patrol Officers.  The patrol officers are equipped with the same or similar training as I, and are governed by the same external standards that dictate how we must perform our jobs.  If they have a question about how to proceed, I can explain to them what those sources require, not what I am requiring them to do from my own independent discretion.  Likewise, if I happened to observe performance that is in violation of such standards, I could re-direct the Patrol Officer to the course of conduct that conforms with those standards, all of which are determined by sources external to me rather than my own personal independent discretion.  Furthermore, with regard to this, to my knowledge, I have always been forbidden from issuing guidance or direction to Patrol Officers that would be inconsistent with that established by the sources set forth above.  I will provide one example of this to illustrate the point.  If I were to go to an accident scene and learn that the officer failed to get statements from all witnesses, I may speak to the officer and suggest that he/she get statements from the remaining witnesses.  When I do this it is not because it is the week that I have decided that it important to interview all witnesses and the following week I can change that some other concept.  Rather, it is because of the special techniques long known to the field of police work, Academy training, and rules, regulations, policies, procedures and general orders mentioned above that I know and reinforce in others that we must interview all witnesses.  I am not in control of any portion of the budget or discretionary funds.

     **(b)**    **[Sergeants – job description]**  At ¶¶16, 18 and 19 the Chief states that the job description attached to the Town's motion is a fully accurate description of how sergeants have performed that assignment.  I respectfully disagree with the chief.  I am familiar with and have reviewed the job description for the Sergeant position in question and find that it is not fully accurate in describing the actual duties of that position.  Below in general, and in a separate paragraph of this affidavit relating to the job description, I will more specifically explain the degree to which each element of the job description is inaccurate.

     **(c)**    [**Area Commander description**] At ¶¶23-24, the Chief describes my duty as Area Commander.  That description is incorrect to the extent it implies that my duties are anything more than what is described in this sub-paragraph of my affidavit.  In that regard, as Area Commander I only do the following: I receive information from police officers and community members regarding issues or problems in my area and then try to solve the problem with established community policing techniques.  For example, if the Traffic Safety Officer informs me of a road in my area with speeding problems, I might assign a directed patrol to that neighborhood with speed guns and/or promote other traffic control

5

measures. Traffic issues are a significant part of an Area Commander's duties. I occasionally do liquor inspections as trained by the ABCC. I also occasionally attend a neighborhood and/or "merchant" meeting in my area to better understand area concerns. Ultimately, my responsibility as an Area Commander is to address problems that come up in my geographic area. The duties that come with being an Area Commander specifically account for very little of my work time and all acts are pursuant to external mandates and longstanding practices as described above.

      (d)    **[Sergeants – "primary duty to direct"]** At ¶17 the Chief states that the "primary duty" of the sergeant "is to direct the activities of the Patrol Officers, or to monitor their activities. This applies whether the Sergeants are in the station or out on patrol". The facts as I know them do not support the Chief's statement in this regard. As a Sergeant I typically work two shifts as a Field Supervisor and two shifts as a Station Supervisor. As a Field Supervisor I perform the same duties as patrol officers. This includes checking on the security of homes and businesses, responding to all sorts of calls, and generally patrolling an assigned area in a police cruiser. I do not partake in any more interaction with patrol officers than as described next. As a Sergeant I sometimes perform roll call. This is simply repeating messages that I am required to read to the patrol officers at roll call. There is nothing that I present to the patrol officers at roll call that is more than repeating what was handed down to me through the ranks to read. It is a clerical function that requires no discretion. At roll call I would learn if there was a hole in the staffing. For example the Town is divided into three Areas. The officers are already assigned to each area and shift by authority higher than the sergeant. If one Area is not covered due to absence (e.g., sick call, vacation) then I would observe that on the roster and assign someone from an Area that had two offices to work that Area. That decision requires nothing more than a rote application of existing standards which require that there be at least one officer assigned to patrol each designated area. That decision in any event would be based upon longstanding principles of police work that I learned over the years relating to volume of activity and the need for an officer to patrol such area. Roll call typically lasts about fifteen or so minutes. The balance of my eight hours shift as Station Supervisor rarely involves direction because I am involved in duties such as booking prisoners (which in many police departments is done by patrol officers), administering breathalyzer tests, checking station security, and responding to calls from the public. It is true that I might monitor that what dispatchers are saying in routing call responses to officers in the field, but it would be an anomaly for me to do so. For example, I would rarely have to intervene and advise a dispatcher to send another patrol cruiser to the scene of a call. Another interaction with dispatchers would be when they would come to me and say that they just received a phone call and are confused on how to proceed. As Station Supervisor I respond by explaining what they should do. Furthermore, where I would find that a second car should be sent or explain in response to a dispatcher question how they should proceed in a confusing situation, my instructions would not based upon

6

my own personal opinions or special brand of police work, but instead based upon long known standards and techniques of police work as well as knowledge that I obtained from the Police Academy and the Chief's printed guidelines reviewed above.  In addition to the above, a couple of times per week, as Station Supervisor, I might have a conversation with an officer about writing a report about an incident.  Under the report writing system that has been used since approximately 2003, report writing is even more automatic since that system prompts officers for information under each category necessary.  Some reports are even more rote since they are governed by guidelines of the federal or state government.  For example, state guidelines and the Chief's established procedures dictate the type and content of the report for particular crimes such as for domestic violence and situations of "use of force".  The Chief also mentions "monitoring" at ¶17.  As Station Supervisor the only monitoring that takes place is by report review, which I have described above, listening to what the dispatchers say, and listening to the radio for what patrol officers state on the radio.  What is said over the radio gives little indication of whether a patrol officer is performing up to standard.  Therefore, by monitoring the radio I am not effectively monitoring for performance that violated any rules.  In fact, January 2006, to the best of my knowledge, there has not been a single instance where I discerned any sub-standard performance by a radio.  In summary, the department is so well formatted by virtue of the Chief's guidelines and the other sources mentioned above, that responses are automatic and not subject to independent discretion.  The benefit of that system is the comfort that someone has already devised a response to each situation and the sergeant involved with that system is simply applying those external standards in responding to each given situation.  To the best of my knowledge, there are no other instances of interactions which require instruction in the role of Sergeant, other than as set forth above.

     (e)    **[Superior Officers - Hiring]**  At ¶39 the Chief states among other things that "[a]s Chief [he] oversees the selection process and gather[s] input and information about candidates developed in the process and with that information and input, [the Chief] ultimately [is] responsible for making the final recommendation to the Selectmen about who should be hired. . . ."  The Chief states as well that he does "not recall an instance where [he] did not give substantial and significant weight to others in the Department involved in the process, or where [the Chief] did not rely materially on their input."  As a Sergeant I give no input on hiring.  To my knowledge there is no communication from the Chief or the Town, or documentation issued which indicates that I should give input on hiring.

     (f)    **[Input on employee of the month and officer of the year – input on poor performance]**  At ¶ 34 the Chief states that he seeks input from the Command Staff and all supervisors in making Employee of the Month and Officer of the Year awards.  Based on my own knowledge, all employees in the department, not just superior officers, may give input to the Chief on employee of the month and officer of the year**.**  Over the past 5 years I have made a handful

7

of comments or recommendations regarding these awards. I do not do so regularly. To my knowledge to do so is not part of my duty as a Sergeant and I have never been told otherwise. Also to my knowledge there is no communication from the Chief or the Town, or documentation issued which defines how much weight, if any, should be accorded to any input I might give.

(g) **[Command Staff and Sergeants – general – input and weight]** At ¶48 the Chief states that he gives "serious weight to the thoughts and opinions of [the] Command Staff and Sergeants, and [that he takes] their recommendations seriously. He also states: "At times, however, I may choose to not follow their recommendations, based on my own knowledge and experience." As a Sergeant the Chief has not solicited my input on any topic outside of a situation involving Officer Thorpe. My recommendation on how to handle Officer Thorpe's disciplinary issues was not followed. Nor did he or the Town in general ever express to me or in documentation to my knowledge that whatever opinion I expressed would be given "serious weight". This litigation is the first time I heard that sentiment expressed.

(h) **[Hiring process – memorandum to the Selectmen]** At ¶49 the Chief states that he communicates his recommendation (I assume relating to hiring a candidate) he presents it in a memorandum and that "typically [he mentions] whether the recommended candidate is a unanimous choice or a consensus choice." The Chief has never before indicated, nor is there any Town documentation to my knowledge, that indicates any criteria relating to whether the Chief must present input to the Selectmen that references the opinions of others, or criteria for how much weight the Chief or the Selectmen should place on such opinions. The Chief has never discussed this with me and this litigation is the first that I have heard of any communication to the Selectmen of views of individuals other than the Chief.

(i) **[Sergeant – promotions – input]** At ¶52 the Chief states that he expects that, "as part of a Sergeant's duty, [the Sergeant] would report to me directly, or through chain of command, any information they possess which could impact a decision about promotion." Until this litigation, there has been no communication by the Chief or the Town in any form relating to this expectation and I never gave input on any promotion decision while a Sergeant. Nor, to my knowledge, is there any documentation in the Town which establishes how much weight should placed on the opinion, if any was given, by a Sergeant relating to a promotion decision.

(j) **[Patrol Services Division Commander – seek information – promotions – this is for sergeants and lieutenants too]** At ¶53 the Chief states that he expects the Patrol Services Division Commander to "seek information from other Superior Officers, with respect to the promotability of a particular Officer seeking advancement." The Patrol Services Division Commander sought my input on a promotion on only one occasion. I do not know how much weight

8

if any was given to my opinion. Nor at any time has the Chief or the Town communicated an expectation that he expects the Patrol Services Division Commander to seek information from me until this lawsuit.

(k) **[Reports of supervisors – promotions]** At ¶54 the Chief states that "the work records of persons seeking promotions, including reports by their supervisors over the years (if any) are taken into consideration." To the best of my memory, from at least September 2001 to present, there have been no occasions when I have filed any reports on patrol officers in the regular course of duties. The Chief has established a procedure which requires that a sergeant file a document known as the Supervisor's First Report of Complaint when a citizen complaint is filed. The report simply summarizes the citizen complaint allegations and no findings are made by the superior officer completing such report. This is a rote activity of simply listing allegations and passing those allegations via this paperwork up the chain of command for review by someone else. With respect to the supposed reports that supervisors file regarding employee performance, the Chief nor the Town has communicated that it would use any such reports in making promotion decisions or, if so, how much weight would be placed on such reports. This lawsuit is the first I have heard of this issue. There is no performance appraisal system in place.

(l) **[Superior Officers - Input – discipline and firing – weight]** At ¶56 the Chief states that the process for imposing discipline or termination is similar to the process for obtaining input as in the case of promotions or hiring. He further states that, when the Selectmen are involved in discipline, "they have indicated to [the Chief] that they rely on my recommendations, and the fact that I seek input in developing that recommendation from other officers." As a Sergeant I gave no input on any such decisions outside of the Officer Thorpe incident discussed above. To my knowledge there is no requirement that I give input or that the Board of Selectmen require my input in making any decision that they make on discipline or firing. Nor has the Chief or the Town ever expressed to me or in documentation that the Board will "rely" on my input. This litigation is the first time I have ever heard this claim.

(m) **[Superior Officers – verbal counseling]** At ¶59 the Chief states: "Verbal counseling happens very frequently, and is part of the job duties of the Sergeants and the Lieutenants." To the extent that the Chief is referring to input on performance where the superior officer comments on employee performance, this has happened, but to say it happens frequently is not true. When this happens, it is simply based upon observation of performance that is not in accord with the external guidelines established by the laws, the Chief, and by longstanding well-known techniques of police work, rather than any special rule that I independently fashion.

(n) **[Superior Officers – relieve someone from duty]** At ¶60 the Chief states that all superior officers have the power to relieve "someone of duty,

9

when the situations requires such action." I have never done this. Moreover, to the extent that the Chief is referring to a serious issue such as a patrol officer, sergeant, lieutenant or the Chief himself, proceeding to engage in police duties while inebriated or otherwise incapacitated, all officers from patrol officer up the ranks to my knowledge have the power to relieve another of duty in such situation for public safety reasons.  There are no other situations, other than situations where the officer or superior officer's performance will endanger the public, that allows for such relief from duty.  There are no rules, regulations, policies, procedures, general orders, or any other Town document which affords superior officers the right to suspend someone from duty.  This power is vested solely in the Chief and the Board of Selectmen for suspensions from one to five days, and solely with the Board of Selectmen for suspensions of greater than five days up to termination, per Civil Service Law.

    (o)    **[Sergeants – disciplinary process – "major role"]**  At ¶61 the Chief states that "[s]ergeants play a significant and material role in the disciplinary process of Patrol Officers.  They are responsible for dealing with the day to day conduct issues that are not serious (serious meaning things such as flagrant refusal to obey orders or commission or crime).  They are responsible for acting on any misconduct or performance, and bringing forth the appropriate facts and reports about conduct that rises to the level of warranting more formal discipline or action."  Respectfully, the Chief's statement in this regard is inaccurate.  Regarding my role as a sergeant, first I note that if a superior officer engaged in criminal misconduct or other misconduct a patrol officer or any superior officer is obliged to report that up the chain of command.  As a sergeant I play no role, let alone a "significant and material role" in disciplining of any patrol officer and issue no discipline.  If I had to handle non-serious issues that arise during the shift of violations of minor rules (e.g., uniforms appearance, minor rudeness) I would simply identify the conduct and explain how it violated said minor rule.  From September 2001 to present this occurs occasionally.  For more substantial violations as a Sergeant I am required to complete a document entitled "Supervisors Report of First Complaint".  This is required by the policy relating to professional standards.  I simply report the allegations up the chain of command.  I am not involved with making findings or recommendation on the allegations as a Sergeant.  This has happened on less than 6 occasion times from September 2001 to present.  I never offered an opinion on the substance of the complaint, nor have I ever recommended or not recommended discipline outside of the one occasion discussed above.  To my knowledge there has been no communication by the Chief or the Town or documentation issued relating to the supposed "significant and material" role that the sergeant would have in the process or how much weight would be accorded to the input of a sergeant, until this litigation.

    (p)    **[Sergeants – disciplinary process – "major role"]**  At ¶61 the Chief also states that, with regard to the discipline process, that sergeants are "required and expected as supervisors [to monitor] conduct and performance, and

10

address[] problems as they arise in different ways depending upon the seriousness of the incident."  Respectfully this is inaccurate to the extent that it implies that I engaged in any significant first hand observation of the performance of patrol officers while a Sergeant.  On a typical shift I do not observe their performance.  See the discussion above for detail.

(q)    **[Sergeants – authority to resolve grievances**]  At ¶62 the Chief states that "Sergeants have the authority to resolve grievances" under the patrol officers collective bargaining agreement.  This is false.  The grievance procedure requires that the patrol officer speak to the immediate supervisor.  As a Sergeant no one officer has given me a written grievance.  It has always been an informal discussion.  The most typical example of this relates to when an officer complained about not being awarded a paid details or concern about the number of officers required to be on a shift as a condition to granting a vacation day.  As a sergeant I am unable to resolve these and bind the Town.  With respect to details, there is a procedure which is contractual and I am not authorized to modify it.  With respect to granting vacation days, this as well is contractual and the Chief has requirements as to how many officers must be on each shift.  I do not have the authority to override the contracts negotiated by the Town and rules established by the Chief.  Therefore, while it is true that the contract language in the patrol officers' contract states that a grievance initially should be discussed with the sergeant, this is at best an informal discussion.  The actual process begins with submission of the written grievance to the Chief.  The Town does not vest the Sergeant's with the ability to sustain a grievance and thereby create a binding precedent (as would be the case in the case of a truly sustained grievance).  The grievances, if discussed with the Sergeant, are routinely routed up the chain of command for decision by the Chief.

**(r)    [Sergeants – Lt. Mason – other superiors - referral to investigate complaints]**  At ¶64 the Chief states that "[i]nvestigative duties are usually assigned to the immediate supervisor, either a Sergeant or a Lieutenant."  Other than as relates to completing the Supervisor's First Report of Complaint, this has not happened.

**(s)    [Sergeants – Lt. Mason – other superior officers – referral to investigate complaints]**  At ¶65 the Chief states that, "Superior Officers who investigate complaints are allowed to include recommendations for discipline in their reports, but do not always do so.  The facts provided by the Sergeant or Lieutenant are always relied upon in making a determination about if, or what, action should be taken."  With respect to the claim that the "facts provided" are always relied upon, this is a distortion in the case of the Supervisor's First Report of Complaint; that document merely passes along "allegations" not any findings or established facts.

8.    <u>Job description - Sergeant.</u>  I have reviewed the job description for Sergeant and find that it is not accurate in describing what my job was as Sergeant in

multiple respects, as follows (citation refers to paragraph and section of the job description):[1]

    (a)    B(1)(a): Although the job description stated that I am "responsible" for the "effectiveness" in which patrol officers working on my shift work, in reality this is not true. I have never been held accountable for the poor performance of a patrol officer on my shift and my role in monitoring the shift is only to the extent noted above.

    (b)    B(1)(b): It is generally true that I should be familiar with the rules, regulations, policies, procedures and general orders of the Police Chief as relates to my job and those on my shift is correct, but the reference to patrol officers on my shift as "my personnel" is inaccurate to the extent it implies that I have authority over such personnel beyond that which I have described in this affidavit.

    (c)    B(1)(c): The job description states that it is my duty to "monitor the duty performance of departmental members" and "ensure that it is satisfactory through encouragement, explanation, discipline, referral to his superior officer or other methods consistent with departmental policy." My role in interacting with patrol officers as may impact how they perform their job is limited to what I described above.

    (d)    B(1)(d): With regard to the job description's claim that I am to submit a "written report to the superior officer of any member of the Department when he commits a serious breach of the regulations of the Department and informal corrective measures prove inadequate," this was also not an accurate reflection of my job duties. The true extent of my duties in this regard are set forth above.

    (e)    B(1)(h): The job description repeats the concept that I am "accountable for the actions or omissions of officers under [the sergeant's] supervision which are contrary to the departmental regulations and which would have been avoided if [the sergeant] had been properly executing his supervisory responsibilities." I have never been held accountable for any conduct of a patrol officer on my shift. With regard to execution of "supervisory responsibilities", I have little if any communication with officers during the shift to remind them how to perform their job in accordance with rules, regulations, policies, procedures and general orders.

    (f)    B(1)(i): With regard to the job duty that I was to respond to "emergency or incident of a serious nature" and "[t]ake command of the situation until relieved by an officer of superior rank", the actual practice did not comport with this. Under the Department's policies, the individuals with greatest

---

[1] I do not comment on the initial section referred to as "Summary" since I understand that it correlates with the items otherwise listed in the job description.

12

knowledge, not necessarily the sergeant, is the one who takes command of the situation. This is set forth in the Incident Command System (ICS).

     (g)    B(1)(j): The job description states that the sergeant is to ensure that "all Patrolmen receive warrants, summonses, subpoenas, or other official papers, and serve or deliver or perform their duties regarding such papers promptly and accurately." This task is clerical in nature and requires no judgment. I learn of such material to provide to officers and they serve or deliver them. I do not monitor how they serve or deliver. I simply note whether the documents are served and if not, according to the Chief's rules, I refer the matter back to the patrol officer or perhaps the Sergeant on the next shift to complete service.

     (h)    B(1)(k): With regard to the duty to review the log, it is true that I review the log and occasionally perform the ministerial task of noting material on the log at roll call is one of the clerical functions that a sergeant performs. This function requires no judgment or discretion. The content of the log is dictated by Departmental practice in compliance with the Public Records Law and HIPAA regulations.

     (i)    B(2)(a)(b) and (c): Regarding reporting and writing procedures of sub-section "2" of Section B of the job description, the actual duties performed in that regard vary from what is written. The job description states "Be familiar with the Department's records and reporting system in detail and instruct officers in the proper method of reporting." It is true that the Chief has established, in detail, the system and requirements for report writing, and those standards are also established by the Clerk of the Courts and the General Laws of Massachusetts, as well as training that all officers receive at the Academy. Like patrol officers, as a sergeant I am also required to be familiar with the standards of report writing and to adhere to them. The sergeant does review reports at the end of the shift, but this task requires no judgment or discretion. It is a clerical task of ensuring that the certain established protocols are satisfied. If they are not, as a sergeant I note the discrepancy and return the report to the officer with guidance on revising the report so as to conform with those standards. The job description also states that the sergeant is to report to the "Commanding Officer and to the Chief all serious or unusual occurrences immediately". This is another ministerial task since serious and unusual occurrences are obvious to all officers that have undergone the same training as me, and it is a matter of reporting the information. There is no judgment or discretion involved in this task.

     (j)    Sergeants are authorized to fill overtime if staffing falls below the minimum established by the Chief. This minimum, although not set in stone is reflective of staffing needs as established by calls for service in times past. There is always a sentiment that calls for service will be higher on Friday and Saturday and often the minimum is greater on those days (in a department the size of Natick's an increase in manpower may be one officer). The minimum

has fluctuated over the years but has generally been 4-5 officers on each shift. Openings can be caused by illness or scheduled time off. Officers (up to five) are allowed to take a day off if staffing levels are met without invoking mandatory overtime.

9. As a Sergeant I do not participate in interviewing and selecting Department employees; I do not set or adjust rates of pay and hours of work; I do not direct any employee's work, except in accordance with external standards and only to the limited extent set forth above; I do not maintain production records for use in supervision or control; I do not appraise employee productivity and efficiency for the purpose of recommending promotions or other changes in status; I do not handle employees' complaints and grievances except when addressing informal "grievances" about matters like detail assignments to the extent set forth above; I do not plan any employee's work except to the limited extent set forth above; I do not determine or set the work techniques to be used; I do not participate in apportioning the work among the workers, except in rare occasions noted above; and I do not participate in determining the type of materials, supplies, or tools to be used in the course of an employee's duties.

Sworn to under the pains and penalties of perjury this 16th day of November, 2006:

*/s/ Thomas Lamont*
Thomas Lamont, Sergeant
   9.