Page 26

1  A. There may be one or two people. Generally
2     there is a background investigator they may be
3     assisted by another, depending on the time
4     frame in which I have to make a recommendation.
5     They will then complete the background
6     investigation and submit a -- a report to me.
7         And we will then -- some of the
8     sergeants, what I refer to as my command staff,
9     and the background investigator will sit down,
10    all the lieutenants and Sergeant Fitzpatrick,
11    perhaps Sergeant Lauzon and the background
12    investigator himself or herself will sit with
13    me and discuss the candidates.
14        Then we express our opinions with
15    regard to each candidate. And sometimes we
16    rate them on a numerical scale. Sometimes we
17    just do it by voice vote. And -- and I make a
18    recommendation generally based on the consensus
19    of whether it be unanimous or just a consensus
20    opinion.
21 Q. And that's the recommendation that goes to the
22    Board of Selectmen?
23 A. Correct.
24 Q. And then does the Board of Selectmen have a

Page 27

1     formal hearing where you present your
2     recommendation or is it done by writing?
3  A. I send them a memo. I send the Board a memo
4     and give them a brief background on each one of
5     the candidates that I'm recommending. And --
6     and that memo would contain not only a little
7     bit of background on them but the -- I might
8     tell them that it's the unanimous opinion of
9     the command staff that this candidate be
10    recommended or I may not, depending on how
11    strongly I want to word it.
12 Q. And that's a document that's --
13 A. It's a memorandum.
14 Q. -- that is sent in your name to them?
15 A. Correct.
16 Q. Whether you sign it or not or initial it, it's
17    authored by you to them?
18 A. Correct.
19 Q. So you communicate that in written form to the
20    Board of Selectmen. What's the next step after
21    that?
22 A. The next step is I would be scheduled to attend
23    a Board of Selectmen's meeting and I would make
24    those recommendations formally at the meeting,

Page 28

1     very often reading the memorandum that I wrote
2     to them for the record. And the Board would
3     then vote to either -- either vote for the
4     candidates or not.
5  Q. Have there been any instances where the Board
6     of Selectmen has not proceeded in accordance
7     with the recommendations that you've set forth
8     in your memorandum and presented to them?
9  A. Not that I recall. No, there have not been.
10 Q. So assuming that they vote to hire one or two
11    individuals, whatever the number is, what's the
12    next step?
13 A. The next step would be to schedule the
14    candidate for the medical evaluation and a
15    psychological evaluation and schedule them for
16    a physical abilities test, that is a
17    prerequisite to entry into a municipal police
18    academy. And from there if they satisfy all of
19    those requirements, they will be scheduled to
20    attend the next available academy.
21 Q. What is the schedule of the academy?
22 A. It varies. It fluctuates depending on the
23    number of applicants. It's run by the -- the
24    Commonwealth, the Criminal Justice Training

Page 29

1     Counsel. And the academies vary depending on
2     how many candidates they have available or how
3     many they have funding to run.
4  Q. How long is the academy in the past five years?
5  A. It's -- it's gone from 19 to probably 22 weeks.
6  Q. And you don't know whether that happened in the
7     past five years or do you?
8  A. I think it's generally been about the same.
9  Q. So it's somewhere between --
10 A. Somewhere between 19 and 22 weeks.
11 Q. And the specific time of year varies depending
12    on how much demand there is and whether the
13    academy is filled; is that correct?
14 A. Yes, correct.
15 Q. So the person then passes their conditional
16    testing and they are scheduled for the academy
17    and then they proceed to the academy?
18 A. Correct.
19 Q. If things go according to plan?
20 A. Yes. They are classified as student officers
21    and they are assigned to the academy.
22 Q. And while they are in the academy, they are
23    paid by the Town of Natick?
24 A. Yes.

8 (Pages 26 to 29)

Page 90

1  Q. But if you feel that you want to clarify it
2     either now or later, just let us know.
3  A. I'm done.
4  Q. That's why I let some time go by.
5  A. Thank you.
6  Q. Is it fair to say that it's your understanding
7     of the requirements of civil service law, at
8     least in the past five years, that you're
9     required to hire and not bypass unless you can
10    articulate a compelling, objective reason for
11    not selecting that person?
12       MS. MURPHY: Objection.
13 A. Just an explanation of the process. If I
14    bypass someone on the list, I have to submit a
15    reason to bypass to civil service, which will
16    be reviewed by the human resources, what it's
17    called now Department of Human Resources, to
18    determine whether that's an appropriate reason
19    to bypass. And from there they will either
20    approve or disapprove the Selectmen's
21    appointment.
22 Q. And you understand that the reason you provide
23    must be something that's objectively based?
24 A. I do.

Page 91

1  Q. And do you understand that the reason you
2     provide that's an objective one, must be
3     compelling as compared to insignificant?
4  A. Yes.
5  Q. Same definition of the word "rule" --
6       MS. MURPHY: Do you need that read back
7     you to?
8       THE WITNESS: I understand.
9  Q. Are you aware of any rule establishing how much
10    emphasis the Board of Selectmen should place on
11    the recommendation that you make relating to
12    the hiring of individuals?
13 A. I'm not aware of any rule, no.
14 Q. Are you aware of any rule, same definition,
15    establishing how much weight the Board of
16    Selectmen should place on input that you
17    receive from command staff?
18 A. No.
19 Q. You're not aware of any such --
20 A. I'm not aware of any rule, by your definition.
21 Q. Do you understand, within my definition of
22    rule, among other things, that would include
23    any written material of the Board of Selectmen
24    that would establish such criteria?

Page 92

1     Do you understand that as encompassed
2     within the rule?
3  A. I understand that, but I'm not familiar with
4     any rules that they may have. I'm not familiar
5     with them in any event.
6  Q. But you understood what I meant by it
7     encompassed any rule from the Town, whether
8     it's printed from your office or the Board of
9     Selectmen's office, for example?
10 A. Again, I don't know what they have written in
11    the Board of Selectmen's office. I only know
12    what I have written.
13 Q. I just wanted to make sure you understood that
14    aspect of it, which I think you. So at least
15    answer that part of my question.
16       Did you understand when I explained
17    what a rule is to you that it included any
18    printed material of the Town, whether it be
19    from your office or from the office of the
20    Board of Selectmen?
21 A. And I said that I'm a not aware of any rule by
22    the Board of Selectmen.
23 Q. Did you understand?
24 A. I don't know that one doesn't exist. I'm just

Page 93

1     not aware of it.
2  Q. I understand that. When I said the word
3     "rule," though, you knew that I meant a rule
4     that would be generated, for example, by the
5     Board of Selectmen, correct?
6  A. Yes.
7  Q. And I understand you're further stating, you're
8     not aware of such rule, that doesn't mean that
9     it doesn't exist?
10 A. That would be true.
11 Q. And none has been communicated to you by the
12    Board of Selectmen?
13 A. No.
14 Q. Are command staff required, as part of their
15    job, to attend command staff meetings where you
16    discuss these applicants?
17 A. Yes.
18 Q. So if a command staff member routinely did not
19    go to that, they would be failing to perform
20    one of the expectations that you have of their
21    job, is that fair or not?
22 A. Well, if they had a reason not to be there. If
23    they could not be there for some reason, they
24    would give me that reason. But they can't

24 (Pages 90 to 93)

Page 94

1  unilaterally decide not to attend when I call
2  them to a meeting.
3  Q. So you consider it part of their job duties to
4  attend that meeting?
5  A. I do.
6  Q. And you're saying you have some reasonableness,
7  where if they have a conflict and they talk
8  about it with you, then they are excused from
9  the meeting?
10 A. They may be. But I generally try to schedule
11 the meetings. Unless they are on an extended
12 vacation, I'll move the meeting so that they
13 would accommodate their schedules.
14 Q. Are there any other employees of the police
15 department, other than the lieutenants, from
16 whom you solicit input on the hiring decision
17 in the past five years?
18 A. Original appointments?
19 Q. Yes.
20 A. Excluding promotions?
21 Q. Excluding promotions.
22 A. I could say if someone had information about a
23 particular candidate, they would certainly be
24 welcome to share that information with me. But

Page 95

1  I don't -- again, as a matter of practice, I
2  use my command staff as a -- to review the
3  candidates.
4  Q. Let me break it down a little bit more.
5       I understand that at this meeting you,
6  for example, solicit information from or
7  reaction from the lieutenants on the command
8  staff as to their view of the candidates. That
9  much is true, correct?
10 A. Correct.
11 Q. And do I understand that sometimes you invite
12 the traffic safety officer, at one point in
13 time that was --
14 A. Sergeant Davis.
15 Q. And now it's Lauzon?
16 A. Correct.
17 Q. And sometimes you've invited the traffic safety
18 officer, whoever it was, to attend that
19 meeting?
20 A. Yes.
21 Q. And sometimes you don't?
22 A. Sometimes I don't.
23 Q. Do you know how many such meetings there have
24 been in the past five years?

Page 96

1  A. Whenever we've had occasion to hire patrol
2  officers.
3  Q. And you have one meeting per one or more
4  vacancy batch? I don't know if that's clear.
5  A. At least one. And I've also had conversations
6  with them individually from time to time about
7  the candidates. It's not a complicated world
8  that I live in. It's a few candidates. And a
9  lot of stuff we know intuitively and a lot of
10 stuff we -- we communicate formally at those
11 meetings so that I have something on which to
12 base my recommendation to the Board of
13 Selectmen.
14 Q. Are there any instances that you can recall
15 where you solicited the opinion of Sergeant
16 Lauzon in the past five years as to whether or
17 not you should hire somebody?
18 A. I don't know. I can't recall when he's been at
19 these meetings with me. He's kind of a -- but
20 I do consider him part of my command staff.
21 Q. So in the moment you're not recalling any
22 instance where you solicited an opinion from
23 him; is that correct?
24 A. I don't recall, no.

Page 97

1  Q. Is there something that you could look at that
2  would refresh your recollection on that or not?
3  A. Unless I had some handwritten note of that
4  meeting somewhere in my office, I could not.
5  There is no formal document, no.
6  Q. Do you take notes of your meetings with the
7  command staff when you're reviewing the
8  candidates?
9  A. I may.
10 Q. Is there a secretary there that takes notes?
11 A. No.
12 Q. So when you say you may, do I understand that
13 to mean that you're not sure whether you do,
14 but it's something you may do sometimes and you
15 may not?
16       MS. MURPHY: Objection.
17 A. I take...
18 Q. What do you mean by "may"? I don't know what
19 it means.
20 A. Well, I don't always. If there is something
21 that I want to remember about the meeting, I'll
22 put it down and generally save it until I make
23 my recommendation to the Board.
24 Q. So, to your knowledge, those types of notes

25 (Pages 94 to 97)

Page 110

1  Q. Do you agree that it is not the job duties of
2     the patrol sergeant, setting aside those that
3     have the further function of being a background
4     investigator, to provide you with input on
5     hiring decisions?
6  A. I'd degree it's not in the job description.
7  Q. And the same holds true, I take it, for patrol
8     officers, that it's not part of their job
9     responsibilities to provide you with input on
10    hiring decisions?
11 A. That's correct.
12 Q. With respect to patrol officers, that's the
13    last group I didn't mention in my prior line of
14    questions.
15       In the last five years, have there been
16    any instances when patrol officers have given
17    you input on whether you should hire a
18    candidate or not for a patrol officer?
19 A. Informally. I don't remember the specifics.
20    But people from time to time will say, I know
21    that -- he's a nice family or a nice kid or a
22    nice person.
23 Q. But there is no rule relating to how much
24    emphasis you should place on that input or not?

Page 111

1  A. No. Other than that which I impose upon
2     myself.
3  Q. "No" means there is no such rule other than
4     what you impose on yourself?
5  A. Correct.
6  Q. How frequently in the past five years have
7     patrol officers provided with you that input?
8     How many times? Quantify it, if you can.
9  A. Infrequently. I don't know how many times.
10 Q. Now we're going to turn to the topic of
11    promotions. It's going to be a similar set of
12    questions and perhaps to the extent that it's
13    repetitious, maybe our time will be shorter on
14    that category.
15       With respect to promotions for patrol
16    officer to sergeant, that happens, correct?
17 A. It does.
18 Q. And that's only a lateral promotion; that is,
19    patrol officers already employed by the Natick
20    Police Department are the only ones that become
21    sergeants?
22 A. Legally we could take lateral transfers, but we
23    never have.
24 Q. And, likewise, for individuals who have been

Page 112

1     promoted from sergeant to lieutenant, that's
2     only happened from internally?
3  A. Correct.
4  Q. Has there ever been a deputy chief or not?
5  A. There has not.
6  Q. So the highest rank is --
7  A. Is lieutenant.
8  Q. With regard to the scenario after patrol
9     officer being promoted to sergeant in the past
10    five years, one of the individuals that that
11    would pertain to is Sergeant Hoffman; is that
12    correct?
13 A. Right.
14 Q. And that also pertains to Sergeant
15    Rossi-Cafarelli?
16 A. Correct.
17 Q. And to Sergeant Vieira?
18 A. Correct.
19 Q. And are there any others that you can recall?
20    And if it's necessary, you're welcome to look
21    at the Exhibit No. 1 document.
22 A. Within that five-year period?
23 Q. Yes, that are promoted from patrol officer to
24    sergeant?

Page 113

1  A. It might be Sergeant Mark St. Hilaire. And I
2     don't know whether Sergeant Bob Dunlop falls
3     into that category or not, how long he's been a
4     sergeant.
5  Q. Any others? You're welcome to look at Exhibit
6     No. 1.
7  A. (Peruses photograph.) From patrolman to
8     sergeant you're talking about, right?
9  Q. Yes.
10 A. Leo Fitzpatrick. And I'm not positive about
11    him either, the date of his appointment.
12 Q. But he's on the cusp at least, right?
13 A. Right. And I don't recall when Brian Lauzon
14    was promoted. You know, the years blur
15    together now. But that would be the extent of
16    it on the outside.
17 Q. On the outside?
18 A. On the outside those are the names that would
19    be possibly within that five-year period, but
20    certainly a couple of them might be just
21    outside of that.
22 Q. And the four that you're positive about are
23    Hoffman, Rossi-Cafarelli, Vieira and St.
24    Hilaire?

29 (Pages 110 to 113)

Page 134

1  A. I do.
2  Q. And among other things you're asking them
3     whether there is anything that they want to
4     bring to your attention that they think should
5     be a reason for not promoting?
6  A. Correct.
7  Q. Is there any other inquiry that you make of
8     them in those meetings?
9  A. Again, we're -- I live in a small -- in a small
10    department, relatively small. And I know
11    intuitively who's a good officer and who
12    doesn't do as much work. But people are
13    promoted or not promoted based on their
14    production, or whatever you want to call it.
15        They are -- they are usually -- it's
16    rather rare that I'll bypass someone. I think
17    I've only bypassed someone in 15 years, based
18    on the system that's -- the system that I have
19    to work within.
20 Q. And that person is St. Hilaire the first time
21    around?
22 A. Correct.
23 Q. When you choose to bypass someone, as you did
24    in the case of St. Hilaire, do you then have to

Page 135

1     submit something to HRD, the Human Resources
2     Department, of the Civil Service Commission,
3     stating the reasons for your bypass?
4  A. Yes.
5  Q. And do I understand correctly that the reasons
6     must be objective?
7  A. Yes.
8  Q. Do I understand correctly that the objective
9     reasons must be compelling rather than towards
10    the insignificant end of the spectrum?
11 A. Yes.
12 Q. Over the past five years when you've had these
13    certified lists, had there been incidents where
14    you believe that one of the candidates on the
15    list, setting aside their test score, was a
16    superior leader and would make a better
17    sergeant, but you did not pick them because
18    they had a lower score?
19 A. Yes.
20 Q. And that's because the person who was in first
21    place had no negative material in their
22    background, which disqualified them under the
23    standards that you applied; is that correct?
24 A. Under the standards that are -- to the best of

Page 136

1     my knowledge says human resources would sustain
2     if I were to bypass that person.
3  Q. So you do your best to approximate the Civil
4     Service Commission HRD standard in making that
5     decision?
6  A. Well, based on my experience with HRD in the
7     literature and caselaw that I've reviewed over
8     the years, I know that the criteria for bypass
9     is stringent and if appealed, you need to be
10    able to sustain that burden.
11 Q. We're going through the process. You had the
12    list and then you brought it to the command
13    staff and then you have your discussion with
14    the command staff determining whether you're
15    going to pick number one or not?
16 A. Right.
17 Q. And after the conclusion of that meeting,
18    what's the next step generally?
19 A. The next step would be to write a memo to the
20    Board of Selectmen with my recommendation
21    articulating my reasons.
22 Q. Articulating what kind of reasons?
23 A. Well, the reasons why I recommend that person
24    for a promotion.

Page 137

1  Q. And in the one case where you had a bypass, you
2     also set forth the reasons for the bypass?
3  A. I don't know whether I set forth those reasons
4     in the memorandum making the recommendation,
5     but at some point I did give them the reasons
6     that they needed to submit to the human
7     resources.
8  Q. Have you received input from Sergeant
9     Fitzpatrick in the past five years relating to
10    the promotion of Hoffman?
11 A. Is that the end of your question?
12 Q. Did you receive input from Sergeant Fitzpatrick
13    relating to whether or not you should promote
14    Sergeant Hoffman?
15 A. I don't recall.
16 Q. Same question with respect to Rossi-Cafarelli?
17 A. Same answer. I don't recall.
18 Q. Same question with respect to Vieira?
19 A. I don't recall.
20 Q. Same question with respect to Sergeant St.
21    Hilaire?
22 A. I don't recall.
23 Q. Same question with respect to Dunlop?
24 A. I -- I don't know whether Fitzpatrick was

Page 138

1  promoted before Dunlop or not, so, you know...
2  Q. You don't recall?
3  A. I don't recall.
4  Q. I have him on my list of people here that could
5     have been promoted in the past five years.
6  A. Fitzpatrick?
7  Q. Yes.
8  A. He could have been promoted, but Dunlop could
9     have been six years. It gets blurry after.
10    MR. CANZONERI: Off the record for a
11    second.
12    (Discussion off the record.)
13 Q. And what about with respect to Sergeant Brian
14    Lauzon?
15 A. The question is did Sergeant Fitzpatrick have
16    any feedback?
17 Q. Did he give you any input on whether or not
18    Brian Lauzon should be promoted from a patrol
19    officer to sergeant?
20 A. I don't recall.
21 Q. And Sergeant Joe Haze, same question?
22 A. I don't recall. And all of those not recalling
23    are because I don't recall if he was at that
24    meeting. Had he been at the meeting, he would

Page 139

1  have given some comment.
2  Q. Is there any document that would refresh your
3     recollection as to whether or not he was
4     present at those meetings or not?
5  A. Not that I'm aware of.
6  Q. With respect to the traffic safety officer,
7     whether it be Davis or Lauzon, I'd like to know
8     whether they provided you with any input with
9     respect to whether or not any of the
10    individuals that I'll identify all over again,
11    should be promoted or not from patrol officer?
12    MS. MURPHY: Objection.
13 Q. Do you understand the question?
14 A. I understand the question.
15 Q. Hoffman?
16 A. I don't recall.
17 Q. Rossi-Cafarelli?
18 A. I don't recall.
19 Q. Vieira?
20 A. I don't recall.
21 Q. St. Hilaire?
22 A. I don't recall.
23 Q. Dunlop?
24 A. I don't recall.

Page 140

1  Q. Fitzpatrick?
2  A. I don't recall. With the same qualification
3     that I put on the last one, that if they were
4     in the room during those interviews, they would
5     have expressed an opinion.
6  Q. And Joe Haze?
7  A. I don't recall.
8  Q. And Brian Lauzon? And in that case it would
9     have been Davis.
10 A. I don't recall.
11 Q. And in each case, you don't have a document
12    that could refresh your recollection as to
13    whether they were present in the room or not,
14    or he was present, Davis or Lauzon, correct?
15 A. Unless I had some meeting notes that had been
16    put in a folder. But generally speaking, I
17    would say no.
18 Q. That leaves us now to the patrol sergeants.
19    I've defined that expression earlier in your
20    deposition.
21 A. Correct.
22 Q. And setting aside for the moment the background
23    investigators who I've identified, have you had
24    any input from any of the patrol sergeants

Page 141

1  relating to whether any of the following
2  individuals should be promoted from patrol
3  officer to sergeant, and setting aside the
4  background investigators for a moment.
5  Sergeant Hoffman?
6  A. Through the operations lieutenant I've had
7     input. In other words, the operations
8     lieutenant would probably -- it would be more
9     appropriate to ask him that, whether he
10    interviewed other people that work with that
11    person that's up for promotion or -- and I
12    would get that information from him. But other
13    than in passing, in my conversations with
14    people, not -- they generally don't make
15    recommendations directly to me.
16 Q. Well, when you've made your decision to promote
17    Sergeant Hoffman from patrol officer to
18    sergeant, do you know whether or not you had
19    any information before you that reflected the
20    opinion of a patrol sergeant?
21 A. I think -- I didn't have any written
22    information in front of me, but he was
23    recommended informally by everyone. He was
24    well known in the department and there was

36 (Pages 138 to 141)