Page 74

1   perhaps it's more than just sometimes -- but
2   sometimes the background investigator does not
3   provide a recommendation as to whether or not
4   the person should be hired, they just provide
5   facts, is that correct, sometimes?
6   A. I think most of the time they will either
7   indicate whether or not there is an objection,
8   a reason not to offer employment to that
9   person. But they don't always do it. I
10  couldn't say that they always do that.
11  Q. When you say "identify an objection," you mean
12  that they state that this particular credential
13  did not check out, in fact, they have a felony
14  background, therefore, under the statutes they
15  should not be hired?
16  A. Right. They would point out the obvious. If
17  there was a statutory exclusion for not hiring
18  them, they would point that out to me. And,
19  again, the facts would speak for themselves.
20  Q. When you're making your recommendation to the
21  Board of Selectmen, I asked you what factors
22  you rely upon. Do you remember that question?
23  Maybe you don't, that's fine.
24  A. No. You've asked a lot of them.

Page 75

1   Q. I'm going to take a moment to define a word for
2   you.
3   A. Okay.
4   Q. I'm going to use the word "rule." And by rule
5   I mean any printed material; whether it be a
6   policy and procedure of the police department,
7   whether you call it a rule and regulation of
8   the police department, a general order, a
9   special order, a personnel order; whether it be
10  a standard that's only verbally communicated,
11  that would count, too, as a rule, too, or
12  verbally communicated by someone above you in
13  authority, like the Board of Selectmen of the
14  Town of Natick, okay, or written.
15  A. Using your definition of "rule"?
16  Q. Using my definition of "rule," correct.
17  A. Which differs from mine.
18  Q. Any of those written materials and any of those
19  kinds of verbal communications are a rule.
20      Are you aware of any rule that dictates
21  how much emphasis, if any, you should place on
22  the input that you receive from the background
23  investigator?
24  A. Only those rules I impose upon myself and they

Page 76

1   are not communicated to others. But my -- you
2   know, just to clarify that.
3   Q. I will give you an opportunity to expound about
4   what you mean by only the rules that you have
5   for yourself that you haven't communicated.
6   A. Right.
7   Q. So I'm talking about communicated rules. Are
8   there any such? Only the ones that you have in
9   your own mind that you haven't communicated; is
10  that correct?
11      MS. MURPHY: Objection.
12  A. I'm thinking whether or not there is some
13  policy, procedure, regulation or some way I've
14  communicated to them. What I've told them
15  during the interview process with the candidate
16  prior to it, is I've told them...
17  Q. And by "them" you mean who?
18  A. The command staff that I've identified
19  previously, whoever happens to be there among
20  them. I've told them that the process would be
21  thus and such and we'd interview them. And
22  following that we'd rate them, either
23  numerically on a one to five or identify
24  strengths and areas that they could have done

Page 77

1   better on in the interview process. And I
2   would take them into consideration in making my
3   recommendations.
4   Q. And have you told them words to the effect that
5   in the end, though, it will be your decision as
6   to who you will recommend? Have you stated
7   words to that effect to them?
8   A. I don't know that I've stated that
9   specifically. I think it's pretty much
10  understood that, you know, I have the authority
11  to make a recommendation in the same way that
12  the Selectmen have the same authority to make
13  their own recommendation irrespective of what I
14  recommend.
15  Q. With regard to the ranking, you said you
16  mentioned to the command officers, among other
17  things, that we will rank the candidates.
18      With regard to that, you mean who was
19  the first person who will be presented for
20  recommendation, who was the second person who
21  will be presented for recommendation and such?
22  A. Well, that's dictated by civil service
23  depending on where they are on the list.
24  Q. Who do you mean by "ranking" then? Or is that

20 (Pages 74 to 77)

Page 86

1  consummation of that conversation, in the end
2  your communication to the Board of Selectmen
3  for recommendation is based upon your
4  application of the civil service law and
5  disqualification principals?
6  A. Correct.
7       MS. MURPHY: John, just for timekeeping
8  purposes, it's noon. What time do you want to
9  break? We can take a short break.
10       MR. CANZONERI: Off the record.
11       (Discussion off the record.)
12  Q. I'm sorry, I'm going to ask that question
13  again.
14       Is there any rule -- "rule" being
15  defined as any communication -- that exists, to
16  your knowledge, that has defined how much
17  emphasis you will place on input you receive
18  from the command staff when making hiring
19  recommendations to the Board of Selectmen?
20  A. No. And to clarify the "no," no with the
21  understanding that I have my own thought
22  process that I go through that's not
23  communicated to my command staff.
24  Q. Thanks for reminding me of that.

Page 87

1       So you have a thought process that you
2  engage relating to how much emphasis you're
3  going to place on input from the command staff?
4  A. Right.
5  Q. And what is that thought process?
6  A. It varies. It's based on my, you know, 35
7  years of police experience. I -- I always keep
8  in mind that some of my supervisors have, you
9  know, less experience -- or most of them -- all
10  of them have less experience than I do.
11       And even though I generally go along
12  with their recommendations, again, my
13  experience may lead me to recommend someone for
14  appointment that they may not be so inclined to
15  do.
16       And it usually goes that way. It's
17  usually that I would appoint somebody that --
18  appoint or promote someone over an objection as
19  opposed to not appoint. I think to not appoint
20  someone, we all generally agree to that. If
21  that makes any sense.
22  Q. I think it does. Actually, I did understand.
23       And you said it relates to hiring and
24  promotion?

Page 88

1  A. I think I confused myself. I want to make sure
2  I understand what I said there, so I'm clear on
3  that.
4  Q. Do you want to have it read back to you?
5  A. Can you read that back?
6       (Previous answer was read.)
7  Q. Having your answer read back to you, do you
8  need to add anything to that?
9  A. I do. As far as the last part of it, I think I
10  confused myself there. The recommendation --
11  what most often happens is that if I'm going to
12  override their recommendation, it would be
13  because they may not recommend someone for
14  appointment or promotion and I would recommend
15  over certain objections of some of the members
16  there.
17       Not always. It's not always unanimous.
18  There are some people that recommend for, some
19  people that recommend against. So I take all
20  of their recommendations seriously, but I
21  reserve the right to make recommendations based
22  on my thoughts and experience.
23  Q. Which forms your judgment and then you provide
24  that to the Board of Selectmen, fair?

Page 89

1  A. Fair. Can I offer a clarification on that last
2  answer?
3  Q. You sure can.
4  A. What I was trying to draw the distinction
5  between was if all the people on the --
6  whenever the command staff recommend
7  appointment of someone, I don't ever recall not
8  taking their recommendation and overriding it
9  go and not appointing them.
10  Q. But you do have recollection of what by
11  contrast?
12  A. By contrast they may not have -- they may
13  have...
14  Q. Recommended bypass?
15  A. Yes. They may have recommended someone else
16  and I over their -- and, again, it wasn't
17  unanimous. I think it's happened that way.
18  But there may have been one or two people that
19  don't recommend someone and I'll appoint them
20  or I'll recommend appointment. I'm confused
21  enough now.
22  Q. I think I'm clear on what you're saying,
23  though.
24  A. Okay.

Page 110

1  Q. Do you agree that it is not the job duties of
2     the patrol sergeant, setting aside those that
3     have the further function of being a background
4     investigator, to provide you with input on
5     hiring decisions?
6  A. I'd degree it's not in the job description.
7  Q. And the same holds true, I take it, for patrol
8     officers, that it's not part of their job
9     responsibilities to provide you with input on
10    hiring decisions?
11 A. That's correct.
12 Q. With respect to patrol officers, that's the
13    last group I didn't mention in my prior line of
14    questions.
15        In the last five years, have there been
16    any instances when patrol officers have given
17    you input on whether you should hire a
18    candidate or not for a patrol officer?
19 A. Informally. I don't remember the specifics.
20    But people from time to time will say, I know
21    that -- he's a nice family or a nice kid or a
22    nice person.
23 Q. But there is no rule relating to how much
24    emphasis you should place on that input or not?

Page 111

1  A. No. Other than that which I impose upon
2     myself.
3  Q. "No" means there is no such rule other than
4     what you impose on yourself?
5  A. Correct.
6  Q. How frequently in the past five years have
7     patrol officers provided with you that input?
8     How many times? Quantify it, if you can.
9  A. Infrequently. I don't know how many times.
10 Q. Now we're going to turn to the topic of
11    promotions. It's going to be a similar set of
12    questions and perhaps to the extent that it's
13    repetitious, maybe our time will be shorter on
14    that category.
15        With respect to promotions for patrol
16    officer to sergeant, that happens, correct?
17 A. It does.
18 Q. And that's only a lateral promotion; that is,
19    patrol officers already employed by the Natick
20    Police Department are the only ones that become
21    sergeants?
22 A. Legally we could take lateral transfers, but we
23    never have.
24 Q. And, likewise, for individuals who have been

Page 112

1     promoted from sergeant to lieutenant, that's
2     only happened from internally?
3  A. Correct.
4  Q. Has there ever been a deputy chief or not?
5  A. There has not.
6  Q. So the highest rank is --
7  A. Is lieutenant.
8  Q. With regard to the scenario after patrol
9     officer being promoted to sergeant in the past
10    five years, one of the individuals that that
11    would pertain to is Sergeant Hoffman; is that
12    correct?
13 A. Right.
14 Q. And that also pertains to Sergeant
15    Rossi-Cafarelli?
16 A. Correct.
17 Q. And to Sergeant Vieira?
18 A. Correct.
19 Q. And are there any others that you can recall?
20    And if it's necessary, you're welcome to look
21    at the Exhibit No. 1 document.
22 A. Within that five-year period?
23 Q. Yes, that are promoted from patrol officer to
24    sergeant?

Page 113

1  A. It might be Sergeant Mark St. Hilaire. And I
2     don't know whether Sergeant Bob Dunlop falls
3     into that category or not, how long he's been a
4     sergeant.
5  Q. Any others? You're welcome to look at Exhibit
6     No. 1.
7  A. (Peruses photograph.) From patrolman to
8     sergeant you're talking about, right?
9  Q. Yes.
10 A. Leo Fitzpatrick. And I'm not positive about
11    him either, the date of his appointment.
12 Q. But he's on the cusp at least, right?
13 A. Right. And I don't recall when Brian Lauzon
14    was promoted. You know, the years blur
15    together now. But that would be the extent of
16    it on the outside.
17 Q. On the outside?
18 A. On the outside those are the names that would
19    be possibly within that five-year period, but
20    certainly a couple of them might be just
21    outside of that.
22 Q. And the four that you're positive about are
23    Hoffman, Rossi-Cafarelli, Vieira and St.
24    Hilaire?

29 (Pages 110 to 113)

Page 122

1. discussing promotional opportunities for people
2. who put in --
3. A. Again, I don't know. I can't cite the time and
4. place.
5. Q. Well, in the case of this Dunlop/St. Hilaire
6. situation, you're opining that there was a
7. command staff meeting on that one?
8. A. There was.
9. Q. And who decided to hold that meeting?
10. A. I did.
11. Q. Why did you make that decision?
12. A. Because I -- I wanted their support in -- if we
13. needed to bypass, I wanted to make sure that I
14. was making the right decision on that.
15. Q. With respect to the later promotion of St.
16. Hilaire, was there a command staff meeting
17. relating to that promotional situation?
18. A. Yes.
19. Q. And in this case you decided not to bypass
20. Sergeant Mark St. Hilaire, correct?
21. A. Correct.
22. Q. And is that a situation where the command staff
23. wanted to bypass St. Hilaire and you used your
24. own judgment, you described it in your own

Page 123

1. words earlier in your testimony today, and
2. decided nevertheless, I'm going to recommend
3. St. Hilaire for the promotion?
4.     MS. MURPHY: Objection.
5. Q. Is that correct?
6. A. What happened, I believe, to the best of my
7. recollection, is that it was a split vote among
8. the...
9. Q. Why don't you tell me what happened.
10. A. I think Lieutenant Mason and perhaps Lieutenant
11. Grassy, I'm not sure -- but at least Lieutenant
12. Mason and one other of the lieutenants was
13. opposed to promoting Officer St. Hilaire to
14. sergeant. And Lieutenants Mabardy -- and I
15. don't know who the lieutenant was.
16.     I think it was a split vote or it may
17. have been just one descending voice and three
18. in favor of it or two to two. I don't recall.
19. But there was some -- it was uncharacteristic
20. that there was some descent among the people
21. discussing the candidates for promotion, where
22. generally there is not a lot of descent.
23. Q. And then you decided to recommend Sergeant St.
24. Hilaire for promotion?

Page 124

1. A. After I reinterviewed Sergeant St. Hilaire and
2. clarified a few things to him, I decided to
3. recommend him.
4. Q. Was this interview one that you did on your own
5. or with the command staff?
6. A. It was one that I did on my own.
7. Q. After you interviewed Sergeant St. Hilaire, did
8. you then bring that information that you had
9. back to the command staff and have a further
10. discussion with them?
11. A. I did.
12. Q. So then you have this follow-up interview with
13. Sergeant St. Hilaire after the first command
14. staff meeting and then you had a second command
15. staff meeting?
16.     MS. MURPHY: Objection.
17. A. Correct.
18. Q. And at that command staff meeting were all the
19. lieutenants present again?
20. A. To the best of my knowledge, they would have
21. been, yes.
22. Q. Who spoke and what was said?
23. A. I don't think much was said. At that point I
24. had just indicated to them that I had -- you

Page 125

1. know, I respected what they had to say,
2. particularly the ones that descended, but had
3. decided that I was going to recommend Sergeant
4. St. Hilaire to the Board for promotion.
5. Q. Is there any rule that relates to the amount of
6. emphasis that you should place on input for
7. promotional situations, either from sergeant to
8. lieutenant or patrol officer to sergeant?
9. A. Again, only that which I impose upon myself.
10. Q. Just to be clear, with regard to the rule that
11. you impose on yourself, earlier in your
12. testimony you were discussing how it varies and
13. you have 35 years of experience and you went on
14. to explain it. Is that the same?
15.     MS. MURPHY: Objection.
16. Q. I didn't complete my question. But I'll start
17. it again and then if she has an objection,
18. she'll state it.
19.     Earlier in your testimony when you
20. talked about hiring situations, I asked you
21. what your thought process was when you decided
22. how much emphasis to place on input you receive
23. from the command staff. Do you remember that
24. question and answer?