Page 174

1  A. Yes.
2  Q. Please describe that conversation.
3  A. The conversation I had with the Sergeant about
4     who should replace him and he indicated to me
5     that Sergeant Lauzon was the best person to
6     replace him.
7  Q. And I take it that there is no rule that
8     defines how much weight should go to Sergeant
9     Davis' opinion on assignments, a traffic safety
10    officer's opinion on assignments; is that
11    correct?
12 A. Other than that which I impose upon myself, the
13    weight that I give to Sergeant Davis'
14    recommendation.
15 Q. So you make that decision for yourself and
16    there is no external communicated rules that
17    define that?
18 A. No.
19 Q. With respect to your communication with
20    Lieutenant Mason on making assignments for
21    lieutenant positions or sergeant positions, do
22    I understand correctly that similarly there is
23    no rule that defines how much weight you should
24    accord his opinion in your decision-making,

Page 175

1     it's just whatever you choose to provide based
2     upon your judgment?
3  A. Yes.
4  Q. With regard to the assignment to patrol
5     sergeants, who, if at all, did you discuss that
6     issue with in the past five years?
7  A. I would discuss -- you're saying the assignment
8     of supervisors within?
9  Q. I'll restate the question.
10    MR. CANZONERI: Off the record.
11    (Discussion off the record.)
12 Q. With respect to the process relating to the
13    assignment of sergeant in the past five years,
14    we've already defined the various assignments.
15    Can you explain to me, please, what that
16    process is, how you make your decision?
17 A. Sergeants for specialists positions I will
18    discuss with my command staff, the lieutenants,
19    and give whatever weight I assign to their
20    recommendation in making that assignment.
21    Patrol assignments are dictated by contract for
22    the shift that they...
23 Q. Do you mean patrol sergeant?
24 A. Meaning both station supervisors, shift

Page 176

1     assignments are dictated by contract and area
2     assignments are -- one of the three areas are
3     done by the command staff. And the assignment
4     of the area commander is done after consulting
5     with the lieutenant.
6     In other words, the -- each area, A, B
7     and C, has the commander. And determining who
8     would be the appropriate person to be the area
9     commander, I discuss that with the command
10    staff lieutenants.
11 Q. Similar to the way you discuss with them
12    specialty sergeant assignments, you discuss
13    that with them, too?
14 A. I do.
15 Q. And I didn't catch the earlier portion when you
16    said if somebody is I assigned to the position
17    of patrol sergeant, I understand that they may
18    or may not rotate between patrol supervisor and
19    station supervisor.
20    Please explain to me in the past five
21    years what the process is leading to your
22    decision to assign somebody as patrol sergeant.
23 A. In the absence of an assignment to a specialist
24    position, they would be assigned to one of the

Page 177

1     three patrol shifts and those patrol shift
2     assignments are governed by the bids in
3     accordance with the contract.
4  Q. So the superior officers contract has language
5     relating to they can bid upon the particular
6     set of duties that they will do as a patrol
7     sergeant?
8  A. They have language in the contract that says
9     that when a vacancy exists, it will be subject
10    to the bid process. And that bid is the most
11    senior person will get that bid. And there is
12    a provision within the contract, I think, that
13    says something unless for -- I forget the
14    language exactly, but it gives me the authority
15    to change someone for cause.
16 Q. I'm going to show you Exhibit No. 3. And I'll
17    let you share this with your attorney. It's
18    the only copy that I have here right now.
19    Do you recognize that as the superior
20    officer's contract?
21 A. (Peruses document.) Yes.
22 Q. Can you just direct my attention to the section
23    that you're referring to in that regard?
24 A. It says, "The following seniority provision

45 (Pages 174 to 177)

Page 267

1  employee of the month, they have not been spoken
2  to or disciplined for that; is that correct?
3  A. I don't believe I said they haven't been spoken
4  to. They haven't been disciplined or they have
5  spoken to officers in staff meetings about
6  making recommendations.
7  Q. Okay. With respect to a particular officer who
8  has failed to make a communication to you on
9  employee of the month, have you spoken to any
10  such officer directly in a group or one on one
11  setting to order them to make such input?
12  A. I've spoken to them in a group setting in staff
13  meetings and indicated to them that I believe
14  that they should be able to find someone that
15  has performed in an exemplary manner over the
16  period of a month.
17  Q. Okay. And I take it you've requested them to
18  issue that but you have not ordered them to do
19  that; is that correct?
20  A. I think any directive I give is given first as a
21  request and at some point, if they habitually
22  don't or refuse to comply with a request, it
23  becomes an order.
24  Q. Has there been any point, though, where you've

Page 268

1  ordered them to do that?
2  A. No.
3  Q. Okay. Is there any superior officer who
4  habitually neglects to submit employee of the
5  month input or officer of the year input?
6  A. There are a number that have no number of
7  superior officers who have not submitted any
8  nominations, but I can't tell you who they were
9  or how often they do or don't.
10  Q. Okay. And with respect to them, you have not
11  ordered them to do so; is that correct?
12  A. I have not.
13  Q. Okay. Is the employee of the month system also
14  established by policy of the police department?
15  A. I think that's part of the awards policy.
16  Q. Okay. And for all forms of accommodation, let's
17  just ask the question generally, whether it be
18  officer of the year, employee of the month, and
19  some of the other examples that you've given us,
20  do I understand correctly that there is no rule
21  establishing how much emphasis that you should
22  place on input from others in making those
23  decisions; is that correct?
24  A. There is no --

Page 269

1       MS. MURPHY: Objection.
2  A. -- written rule that would require qualification
3  of their contribution. Just that I impose upon
4  myself.
5  Q. Okay. Have you verbally communicated to one or
6  more employees of the police department in the
7  past five years how much emphasis you would
8  place on input received from them with respect
9  to these accommodations?
10       MS. MURPHY: Objection.
11  A. I don't recall whether we've had a specific
12  conversation with regard to that, no. I mean, I
13  don't recall. I'm not saying I have not had
14  conversations to that effect.
15  Q. Is there any document that could refresh you on
16  that that you're aware of?
17  A. No.
18  Q. Are there any other ways that employees are
19  rewarded or advanced than we've discussed so
20  setting aside promotions, setting aside
21  accommodations and setting aside pay increases
22  in the past five years?
23  A. Civilian employees are sometimes granted
24  upgrades in their position based on my

Page 270

1  recommendation to the town administrator and my
2  recommendation would be based very often on the
3  information given by that person's immediate
4  supervisor since they don't work directly for
5  me.
6  Q. And for those civilian employees, is there a
7  direct supervisor, any of the patrol officers or
8  superior officers?
9  A. Superior officers.
10  Q. Okay. The category of civilian employees that
11  work in the police department are -- I'm just
12  going to go through it one at a time.
13  Dispatchers?
14  A. Yes.
15  Q. You have an executive assistant?
16  A. Yes.
17  Q. You mentioned some other employees in the
18  communications division that have to do with
19  doing clerical work and transcriptions?
20  A. Yes.
21  Q. Are there any civilian employees in addition to
22  those that work under the patrol division?
23  A. No.
24  Q. Any others that work under the information and

12 (Pages 267 to 270)

Page 279

1  any other individuals who are employees of the
2  department that have been disciplined in the
3  past five years; that is, by means of a
4  suspension?
5  A. I would have to look at a document.
6  Q. And is there a form of discipline that's
7  possible to be imposed, shy of a suspension, for
8  employees of the police department, like a
9  written warning or a verbal warning?
10 A. There are.
11 Q. And what are the lower levels of discipline,
12 lower than suspension?
13 A. There can be a verbal counseling, a letter of
14 counseling, a reprimand. Then suspension.
15 Q. Is the reprimand a written --
16 A. Yes.
17 Q. And for each of these actions, verbal
18 counseling, letter of counseling or reprimand,
19 are those always memorialized in a written
20 document, to the best of your knowledge?
21 A. Except for the verbal counseling. There may be
22 a record of that, but it doesn't become part of
23 their personnel file. Anything beyond that
24 would.

Page 280

1  Q. Anything beyond the verbal counseling would be
2  reduced to writing and included in the personnel
3  file; is that correct?
4  A. That's correct.
5  Q. What employees in the past five years, if you
6  can recall, have been disciplined, shy of a
7  suspension by one of these ways you've
8  mentioned?
9  A. I don't recall without referring to some
10 records.
11 Q. Just to push you a little bit more and if you
12 don't recall, you don't, can you recall anybody
13 in the past five years that's received a written
14 reprimand that's an employee of the police
15 department?
16 A. Yes.
17 Q. Who would that be?
18 A. At least one of my dispatchers, Dispatcher
19 Deborah Barnes.
20 Q. Okay. Any others that you can recall for
21 written reprimands?
22 A. I know there have been others, but I can't
23 recall them specifically.
24 Q. So the only way to refresh yourself would be to

Page 281

1  look through records?
2  A. Yes.
3  Q. Okay. And with respect to letters of
4  counseling, are you aware of any -- do you
5  recall any letters of counseling issued in the
6  past five years?
7  A. Again, the same person, Deborah Barnes, has
8  received letters of counseling.
9  Q. And anybody else?
10 A. And, again, I know that there have been others
11 that have been reduced to writing, but I can't
12 recall to whom they were written.
13 Q. Have there been any verbal counselings in the
14 past five years that you're aware of?
15 A. Yes.
16 Q. Who has that been for?
17 A. It happens very frequently by supervisors, both
18 at the sergeant's and lieutenant's level. I
19 don't know specifically who they have been.
20 Q. When you say, "verbal counseling," do you mean
21 at least that the sergeant or superior officer
22 is stating to the employee words that define
23 what the employee did and words that explain to
24 the employee that what they did was not okay,

Page 282

1  not acceptable?
2  A. That's what I'm saying, yes.
3  Q. Is a verbal counseling anything more than
4  identifying performance that's deficient?
5  A. It could be a performance issue and it could be
6  a violation of the rules and regulations. It
7  could be counseled for either.
8  Q. I didn't mean to limit it in that way. Is the
9  verbal counseling anything more than defining
10 the behavior performance, for example, that is
11 deficient and letting the employee know that
12 it's deficient? Is it anything more than that?
13 A. No.
14 Q. So do I understand that the patrol sergeant that
15 has the assignment of station supervisor from
16 time to time will review a report submitted by a
17 patrol officer that is deficient, for example,
18 because it doesn't include all of the elements
19 of the crime and that the patrol station
20 supervisor who has noted this deficiency in the
21 report will advise the patrol officer of that
22 deficiency and ask the patrol officer to correct
23 that deficiency? Does that happen from time to
24 time?

15 (Pages 279 to 282)

Page 311

1  the severity of the violation.
2  Q. With respect to these disciplinary actions that
3     you've taken, do I understand that there is no
4     rule that defines how much weight, other than
5     that which you place upon yourself, to the input
6     given to you by superiors for disciplinary
7     issues?
8  A. There is no written rule that gives a numerical
9     quantification to the weight that I would give
10    to their recommendations, no.
11 Q. Well, my question is somewhat broader than that
12    so let me make sure we're understanding each
13    other. By rule, as in the first day of
14    deposition here as well, I mean any verbal or
15    written communication that speaks to whatever
16    the issue is I'm mentioning in my question.
17       MS. MURPHY: Objection.
18 Q. That's how I'm defining the word "rule." With
19    that definition in mind, my question is, is
20    there any rule in the department that defines in
21    any way whatsoever how much emphasis, if any,
22    you should place on the input given to you by
23    superior officers on issues relating to
24    discipline or termination?

Page 312

1        MS. MURPHY: Objection.
2  A. I've always indicated to the superior officers
3     that I give serious consideration to their
4     recommendations.
5  Q. And how do you determine in a particular case
6     whether you're going to follow a recommendation
7     or not?
8  A. The nature of the information that they are
9     giving to me, their experience as a supervisor,
10    on the testimony, other witnesses' statements,
11    compare and contrasted.
12 Q. So do I understand if you believe that the
13    superior officer's opinion was incongruent with
14    what the facts indicated should have been, you
15    would not follow the superior officer's
16    recommendation, like in the case with Brian
17    Grassey and Dispatcher Barnes?
18       MS. MURPHY: Objection.
19 Q. Is that correct?
20       MS. MURPHY: Objection.
21 A. I don't know that that's an analogous situation.
22    Are we talking about following it? Oh, I see
23    what you mean. You mean his recommendation to
24    dismiss?

Page 313

1  Q. Yes.
2  A. Right. I don't think he -- I think his
3     experience at that level was limited and the way
4     to assign in my own deliberations was less than
5     it would be for someone -- I don't think his
6     recommendation would have been the same had he
7     had more experience.
8  Q. Okay. And after you received the input from a
9     superior officer on what action, if any, you
10    should take as far as discipline or termination
11    goes, do you independently consider their input
12    and then make your own decision?
13 A. I do.
14 Q. And the same holds true for terminations? If
15    you have any input, you do that same process?
16 A. Yes.
17 Q. And the one termination situation that has come
18    up is this individual named Andrew Thorp, he
19    was, in fact, terminated, doesn't work for the
20    department anymore, correct?
21 A. That's correct.
22 Q. Can you explain to me from the beginning how did
23    the first information regarding the issue with
24    Andrew Thorp come to your attention?

Page 314

1  A. It was communicated to me by Sergeant Brian
2     Lauzon.
3  Q. And at the time, he was a patrol sergeant?
4  A. Yes.
5  Q. And he worked the night shift; is that correct?
6  A. Midnight to 8:00 shift, yes.
7  Q. And Thorp was a police officer trainee at the
8     time?
9  A. He was a probationary employee.
10 Q. Okay. And prior to his probation coming up,
11    that's when this information surfaced that
12    related to the decision to terminate him?
13 A. Yes.
14 Q. And that information was first presented to you
15    by Brian Lauzon?
16 A. To the best of my knowledge, it was Brian, yes.
17 Q. And when it was first presented to you, was it
18    presented in writing or verbally?
19 A. I think it was probably verbally and then in
20    writing.
21 Q. Okay. And just in a nutshell, I'm not looking
22    for excruciating detail, what was the issue with
23    Thorp? His performance?
24 A. Again, to the best of my knowledge, it had to do

23 (Pages 311 to 314)